**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION**

| | | |
|---|---|---|
| **Ronald A. Hollon, Sr.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No. 2:06-CV-1099-WKW-CSC** |
| | ) | |
| **CSX Transportation, Inc.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Pursuant to Federal Rule of Civil Procedure 56(c), Defendant CSX Transportation, Inc. ("Defendant" or "CSXT") respectfully moves this Court for summary judgment as to all claims asserted by Plaintiff Ronald A. Hollon, Sr. ("Plaintiff" or "Hollon").

As set forth more fully in the accompanying brief, Plaintiff's claims of age discrimination and retaliation under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 et seq., fail in their entirety because Plaintiff fails to demonstrate that he was denied a promotion because of his age and fails to demonstrate that he was demoted from his management position at CSXT for anything other than his admitted violation of Company policies.

As factual bases for this motion, Defendant relies upon Plaintiff's admissions in his deposition, the pleadings and papers filed in this action, the facts obtained through discovery, and the materials accompanying the attached memorandum of law in support of this motion.

Defendant respectfully requests that this motion be granted, that Plaintiff's claims be dismissed with prejudice in their entirety, and that Defendant be awarded its attorneys' fees and costs in defense of this matter.

This 30th day of November, 2007.

Respectfully submitted,


___/s/   William C. Barker___
Weyman T. Johnson, Jr.
Ga. Bar. No. 395775
William C. Barker
Ala. Bar. No. 3411-R-71W

Attorneys for Defendant
CSX Transportation, Inc.

PAUL, HASTINGS, JANOFSKY
   & WALKER, LLP
600 Peachtree Street, N.E.
Suite 2400
Atlanta, Georgia 30308
Telephone:  (404) 815-2400
Facsimile:  (404) 815-2424

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA**
**NORTHERN DIVISION**

| | | |
|---|---|---|
| **Ronald A. Hollon, Sr.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No. 2:06-CV-1099-WKW- CSC** |
| | ) | |
| **CSX Transportation, Inc.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## CERTIFICATE OF SERVICE

I hereby certify that on November 30, 2007 I electronically filed the foregoing **MOTION FOR SUMMARY JUDGMENT** with the Clerk of Court using the EM/ECF system, which will automatically send e-mail notification of such filing to the following attorney of record.  I also certify that I served a copy via U.S. mail:

Gary E. Atchison, Esq.
P.O. Box 2002
492 S. Court St.
Montgomery, AL 36102
Telephone: (334) 262-7232

   */s/ William C. Barker*
Attorney for Defendant
CSX Transportation, Inc.

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| Ronald A. Hollon, Sr., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 2:06-CV-1099-WKW-CSC |
| | ) | |
| CSX Transportation, Inc., | ) | |
| | ) | |
| Defendant. | ) | |

## BRIEF  IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

### I.    INTRODUCTION

Plaintiff Ronald A. Hollon, Sr. was demoted from his management position with Defendant CSX Transportation, Inc. ("CSXT") after he admittedly signed another employee's name on a document required by the federal government, and, in so doing, falsely certified the occurrence of an event that indisputably had not yet happened.  Hollon filed this lawsuit after his demotion, alleging that he was denied promotions because of his age and demoted because of his age and his alleged protected activity in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 et seq.

The undisputed evidence demonstrates that Hollon's claims are wholly without merit.  As discussed in further detail in this brief, Hollon cannot demonstrate that he was denied a promotion because of his age, nor can he demonstrate that he was demoted for anything other than his admitted violation of Company policies.  Because there are no genuine issues of material fact that warrant a trial in this action, CSXT is entitled to summary judgment on all of Hollon's claims.

## II.  FACTUAL BACKGROUND

### A.  Hollon's Employment with CSXT.

CSXT is a railroad transportation company operating in the Eastern United States and Canada. (Pendergrass Decl. at ¶ 2.)[1]  Hollon was hired by one of CSXT's predecessor companies in 1981 and held various non-management positions in Montgomery, Alabama until 2001, when he was promoted to his first management position – assistant trainmaster. (PD at 33:13–35:9, 64:1-65:14.)  In 2002, Hollon was promoted from assistant trainmaster to terminal trainmaster.  (PD at 76:14-20.)  As an assistant trainmaster and later as a terminal trainmaster, Hollon reported to the Montgomery terminal manager and was responsible for managing railroad crews in the Montgomery terminal, for administering various tests and safety audits, and for generally overseeing the safety operations of the terminal.  (PD at 65:15-22, 68:20-69:21, 76:21-77:6.)  Except for a handful of short-term assignments to other locations in the early 1990s, Hollon has worked in the Montgomery terminal during the entirety of his employment with CSXT.  (PD at 41:6-43:11, 49:22-50:8, 203:18-205:5.)

### B.  Hollon Applies for Promotion in the Spring of 2006

In the spring of 2006 – four years after his promotion to terminal trainmaster – Hollon applied, but was not selected, for four different positions: (1) Assistant Manager of Customer Operations in Jacksonville, Florida; (2) Terminal Manager in Montgomery, Alabama; (3) Assistant Terminal

---

[1] The following abbreviations are used in this Memorandum of Law in Support of Defendant's Motion for Summary Judgment: PD for the deposition of Plaintiff, TPD for the deposition of Travis Mikel ("Mike") Pendergrass, Pendergrass Decl. for the declaration of Mike Pendergrass, WD for the deposition of Rodney Steven Workman, Leyhew Decl. for the declaration of Frank Leyhew, and Callahan Decl. for the declaration of Rebecca Callahan.  Copies of the declarations and deposition transcripts referenced herein are attached to Defendant's Notice of Filing Transcripts, Exhibits, and Declarations in Support of Defendant's Motion for Summary Judgment, which is being filed contemporaneously with this brief.

Superintendent in Atlanta, Georgia; and (4) Trainmaster in Pensacola, Florida.  (PD at 183:21-184:18, 197:22-198:9.)

1.      **The Assistant Manager of Customer Operations position.**

Hollon applied for the Assistant Manager of Customer Operations position on March 10, 2006. (Callahan Decl. at ¶ 10).  That position is part of CSXT's customer operations group, which is centralized in Jacksonville.  (PD at 205:6-17; TPD at 23:24-25:3.)

Unbeknownst to Hollon, at the time that he applied for the Assistant Manager of Customer Operations position, that position had already been filled.  (Callahan Decl. at ¶ 10.)  CSXT uses a software program called "E-Recruit" to manage the process of filling management job openings.  (Id. at ¶ 3.)  When a management job opening is posted at CSXT, the Company assigns a requisition number for the job opening.  (Id.)  For positions with multiple openings, the Company "clones" a requisition, as only one person can be hired per requisition.  (Id.)  When the requisition is cloned, it takes on all the properties of the original requisition.  (Id.)  Since requisitions are usually programmed to be posted for 7 days, a human resources employee must manually adjust the cloned requisition in the "E-Recruit" program so that the requisition does not continue to be posted.  (Id.)  Until the cloned requisition is adjusted, it is posted on the company's intranet and available to be viewed by employees.  (Id.)

The Assistant Manager of Customer Operations position was assigned a requisition number of 015462.  (Id. at ¶ 4.)  Because two openings were available in that position, CSXT hired two applicants for the position – Aldred Odom and Timothy Grayson.  (Id.)  After the hiring decisions had already been made, requisition no. 015462 was cloned and was assigned a requisition number of 015882.  (Id.)  Hollon applied for the position on March 10, 2006 during the short period of time that the cloned requisition was being adjusted in the "E-Recruit" program.  (Id.)   The position was never intended to be "open" on March 10, 2006, as it had already been filled.  (Id.)

##### 2.      The Montgomery Terminal Manager position.

The Montgomery terminal is part of the Atlanta Division of CSXT's Southern Region.[2] (Pendergrass Decl. at ¶ 4.)  The terminal manager is the company officer responsible for all aspects of terminal operation.  (Id.)  This position became open in March 2006.  (Id.)  In 2006, candidates for open management positions within the Atlanta Division were screened and selected for interview by Assistant Division Manager David Hamby.  (Id.)  Two of the candidates selected for interviews were Hollon and Jason Tipton.  (PD at 212:16-213:18.)  After interviewing the candidates, Hamby made a recommendation that was then reviewed by Rod Workman (age 53 at the time), who was at the time the Division Manager of the Atlanta Division.  (Pendergrass Decl. at ¶ 4.; WD at 39:1-3.)  Workman, in turn, made recommendations to Mike Pendergrass (age 53 at the time), Vice President of the Southern Region.  (TPD at 5:7-14, 21:2-3, 25:4-10; Workman Decl. at ¶ 3; Pendergrass Decl. at ¶ 4)

In considering internal applicants for management positions, CSXT considers, among other factors, the applicant's management job performance, his or her educational background, the diversity of his or her experience in other positions at CSXT and at other geographic locations, his or her knowledge of CSXT's railroad network, and the particular skills that he or she may bring to the position in question.  (TPD at 18:22-19:10).  For management employees seeking promotion, past performance in management positions is considered, not past performance in non-management positions.  (Pendergrass Decl. at ¶ 7.)

Hollon, who had only five years of management experience, had never previously held a Terminal Manager position and had never worked in any management-level position outside of

---

[2] CSXT's Southern Region includes five Divisions: the Huntington Division, the Nashville Division, the Atlanta Division, the Florence Division, and the Jacksonville Division.  (TPD at 8:5-11:24.)  Each division is headed by a division manager who reports to the Vice President of the Southern Region. (TPD at 11:16-24.)

Montgomery.  (PD at 49:22-50:8, 64:15-21, 216:7-17.)  In contrast, Tipton (the applicant selected for the position) had nine years of prior management experience, having previously been a Terminal Manager in Mobile, Alabama, a Trainmaster in Flomaton, Alabama and Columbus, Ohio, and an Assistant Trainmaster in Richmond, Virginia.  (Pendergrass Decl. at ¶ 5 Ex. A.)  In addition, at the time that he was selected for the Montgomery Terminal Manager position, Tipton was an Assistant Terminal Superintendent in Atlanta.  (PD at 214:15-216:17; Pendergrass Decl. at ¶ 5 Ex. A.)  Although the Montgomery Terminal Manager position would have been a promotion for Hollon, the position was a lateral move for Tipton.  (Pendergrass Decl. at ¶ 5.)

An "[u]ndergraduate degree in business or [a] related field" is also a preferred qualification for the Terminal Manager position.  (PD at 234:2-13, Ex. 14.)  Hollon does not have a college degree.  (PD at 29:7-30:7.)  In contrast, Tipton has a bachelor's degree in business and management, as well as an MBA.  (TPD Decl. at ¶ 5, Ex. A).

Tipton was considered the best candidate by Hamby.  (Pendergrass Decl. at ¶ 5; Workman Decl. at ¶ 3.)  Workman concurred in this recommendation and Pendergrass approved the selection of Tipton for the Montgomery terminal manager position.  (Pendergrass Decl. at ¶ 5; Workman Decl. at ¶ 3.)

### 3.    The Atlanta Assistant Terminal Superintendent Position

In April 2006, CSXT also posted a vacancy for an Assistant Terminal Superintendent position in Atlanta, Georgia.  (Pendergrass Decl. at ¶ 6.)  The process of filling this position was similar to that followed for the Montgomery Terminal Manager position.  (Id.)  Hamby interviewed various candidates and made a recommendation to Workman.  (Id.)  Workman in turn made a recommendation to Pendergrass.  (Id.)  As with the Montgomery Terminal Manager position, the ultimate hiring decision for the Atlanta Assistant Terminal Superintendent position was made by Pendergrass.  (TPD at 25:11-26:2.)

The applicant selected for the position – Terrance Walton – had ten years of prior management experience, having previously held management positions for CSXT as the Managing Director of Mechanical Operations and Director of Process Improvements in Jacksonville, Florida and as Plant Manager and Manager of Production in Waycross, Georgia.  (Pendergrass Decl. at ¶ 6, Ex. B.)  An "[u]ndergraduate degree in business or [a] related field" is also a preferred qualification for the position.  (PD at 241:10-23, Ex. 14.)  In contrast to Hollon, Walton has a bachelor's degree in engineering from the U.S. Naval Academy and an MBA.[3]  (Pendergrass Decl. at ¶ 6, Ex. B; PD at 218:16-19.)  In addition, Walton was formerly an officer in the United States Marine Corps and is a veteran of Operation Desert Storm.  (Id.)  Accordingly, Walton was selected for the Atlanta Assistant Terminal Superintendent position because of his superior qualifications.  (Pendergrass Decl. at ¶ 6.)

### 4.    The Pensacola Trainmaster position

The Pensacola Trainmaster position is a position within CSXT's Jacksonville Division.  (TPD at 11:4-15.)  Bob Frulla is the Jacksonville Division Manager.  (PD at 181:19-21.)

As part of the application process in 2006, Frank Leyhew (who was at the time the Manager of Professional Recruiting for CSXT) screened applications to determine which applicants should be interviewed for various management positions.  (Leyhew Decl. at ¶¶ 2-3.)  When Leyhew and his colleagues determined that an applicant would be invited to interview for a position, a clerical employee would be assigned the task of contacting the applicant to schedule an interview.  (Id.)  The clerical employee would then notify Leyhew of the applicant's availability.  (Id.)

---

[3] According to CSXT's records, Walton's date of birth is August 5, 1961. (Pendergrass Decl. at ¶ 6.)  Thus, Walton is less than two years younger than Hollon, who was born on November 14, 1959.  (PD at 21:2-3.)

Although Hollon was selected to interview for the Pensacola Trainmaster position, Leyhew was notified that Hollon did not respond to the interview request before the deadline.[4] (Id. at ¶ 4.) Because Hollon did not respond to the interview request, he was not interviewed and, therefore, was not considered for the position. (Id.)

### C.    Hollon Inquires About His Non-Selection for Three Positions

On May 27, 2006, Hollon sent two e-mails to, respectively, Workman and Frulla, inquiring about his non-selection for the Montgomery Terminal Manager, Atlanta Assistant Terminal Superintendent, and Pensacola Trainmaster positions. (PD at 248:21-249:9.) Specifically, Hollon sent the following e-mail to Workman:

> Mr. Workman:
>
> I just need some understanding why I was not considered for the Montgomery or the Atlanta positions? How can I improve my chances of growing with this company?
>
> Thanks

(PD at 298:11-299:9, Ex. 25.) Hollon also sent an e-mail to Frulla, writing:

> Mr. Frulla:
>
> While checking on my status for the position in Pensacola, in the computer. [*sic*] It showed that I was in the interview stage but I was never interviewed. I just need a little help in understanding this if you can help me.
>
> Thanks

(PD at 298:2-10, Ex. 24.)

Until Hollon filed the present lawsuit, Pendergrass was not aware of these e-mails to Workman and Frulla. (Pendergrass Decl. at ¶ 8; TPD at 70:14-20.)

---

[4] Hollon does not recall receiving this invitation. (PD at 228:5-229:22.) Although Hollon "was expecting to be called any day" about interviewing for this position, he did not e-mail anyone about the position until after he learned that he was not selected for the position. (PD at 229:23-230:14.)

**D.      Applicable FRA Regulations and Company Policies**

CSXT, like other commercial railroads in the United States, is subject to regulations

promulgated by the Federal Railroad Administration ("FRA").  (Pendergrass Decl. at ¶ 2).

A remote control operator ("RCO") is a railroad employee who has been trained to operate a

remote control box that sends signals to an on-board computer that moves the locomotive in response

to those signals.  (PD at 90:12-20; WD at 16:9-17:12.)  RCO's must be certified by CSXT pursuant to

a training program developed and administered by CSXT to comply with FRA regulations and which

CSXT submits to the FRA.  (PD at 107:18-108:12.)  Pursuant to FRA regulations, RCO's must be

given at least one "operational monitoring event" by a qualified supervisor of locomotive engineers in

each calendar year.  (49 C.F.R. §§ 240.129, 240.303.)  That is, a qualified manager must watch the

employee operate a remote control locomotive to ensure that he or she "possesses and routinely

employs the skills to safely operate locomotives."  (PD at 108:13-19; 49 C.F.R. § 240.129).  At

CSXT, the individuals authorized to conduct such operational observations are usually management

employees called road foremen of engines who are also certified locomotive engineers and remote

control operators.  (PD at 108:13-110:5).  Hollon has never been an engineer, remote control operator,

or a road foreman of engines.  (PD at 110:10-13, 133:22-133:6).

FRA regulations also require CSXT to issue a certification card to each certified RCO that is

signed by a qualified supervisor of locomotive engines and that lists, among other information, the

employee's name and the date of the employee's last operational monitoring event.  (49 C.F.R.

§ 240.223(a).)  Certified RCOs are required to keep this certification card in their possession while on

duty; failure to do so is punishable by a fine of up to $2,000.  (49 C.F.R. § 240.305(b); 49 C.F.R. Pt.

240, App. to § 240.305.)  FRA regulations prohibit any railroad or individual from making, causing to

be made, or participating in the making of a false entry on a certification card or otherwise falsifying a

certification card through material misstatement, omission, or mutilation.  (49 C.F.R. § 241.223(d).)

8

Violation of this provision is punishable by a fine of up to $10,000.  (49 C.F.R. Pt. 240, App. to § 240.223; PD 137:9-12.)

In addition to these requirements of federal law, CSXT's parent company, CSX Corporation, maintains a Code of Ethics applicable to its subsidiaries that provides, among other provisions, that "[e]very CSX director, officer and employee must help ensure that reporting of business and financial information – computerized, paper, or otherwise – is accurate, complete and timely."  (PD at 82:10-83:14, 86:1-20, Ex. 3).  The Code of Ethics also provides that employees "are personally responsible for [their] own conduct in complying with all provisions of the Code of Ethics and for promptly reporting all known or suspected violations of this Code of Ethics to [their] supervisor, manager, or the CSX Ethics Information Hotline."  (PD at 82:10-83:14, 85:12-20, Ex. 3).  During the time that Hollon was employed by CSXT, Hollon was familiar with the Code of Ethics and received training on it.  (PD at 82:10-83:14).

### E.    Hollon Falsifies an FRA Certification Card

On May 27, 2006 – the same day that Hollon e-mailed Workman and Frulla about his non-selection for the Montgomery Terminal Manager, Atlanta Assistant Terminal Superintendent, and Pensacola Trainmaster positions – CSXT needed a remote control operator ("RCO") to report for work at its Montgomery terminal.  (PD at 103:8-16, 136:20-22.)  Because no RCO's were available to report to work on this occasion, Hollon instructed the crew caller[5] to contact an employee named J. R. Weeks who had previously worked as an RCO.  (PD at 103:8-104:15).  When the crew caller contacted Weeks, Weeks informed the crew caller that, while his FRA certification card was still

---

[5] "Crew callers" are clerical employees who contact railroad "crews" to report to work when a train has been assembled and is scheduled to depart for its destination.  (PD at 54-55).

valid, it had not been signed by a road foreman of engines within the past two years.  (PD at 107:6-12, 110:23-8, 131:22-132:13, Ex. 5).

Believing that a road foreman of engines would be on duty, Hollon instructed Weeks to report to work and informed him that someone would sign his card.  (PD at 110:23-111:8.)  Hollon asked Weeks to contact T.J. Dean, one of the two road foremen of engines at the Montgomery terminal, to inform him that he would need to sign Weeks' FRA certification card that morning.  (PD at 111:20-112:14.)  According to Hollon, Dean, who had not yet arrived at the terminal, instructed Weeks that Hollon should sign the card and that he (Dean) would arrive later in the morning.  (PD at 111:20-112:16, 114:19-19, 131:22-132:13, Ex. 5.)  Although Wayne Powell, another road foreman of engines, was also assigned to the Montgomery terminal, Hollon did not make any attempt to contact Powell.  (PD at 109:21-110:5, 112:17-21.)

Because he was concerned that it was not appropriate for him to sign Weeks' FRA certification card, Hollon personally called Dean back and questioned whether he was permitted to sign the certification card.  (PD at 112:1-5, 114:19-19, 120:20-121:1.)  Dean allegedly told him to "just go ahead and sign the damn card" and explained that he would be in later that morning to take care of the necessary computer work and to observe Weeks operate the remote control locomotive.  (PD at 115:11-19, 135:23-136:12.)  Although Hollon did not report to Dean, Hollon complied with Dean's instruction and signed Dean's name to the certification card.  (PD at 121:2-6.)[6]  Weeks then proceeded to work as an RCO.  (PD at 121:11-15.)  Dean did not arrive at the terminal until an hour and a half to two hours later.  (PD at 121:11-21.)  Although Hollon believes that Dean conducted an

---

[6] Hollon and Dean were in different reporting structures.  (PD at 112:23-113:14).  Hollon reported to the terminal manager, while Dean reported to the senior road foreman of engines.  (PD at 113:1-8.)

observation of Weeks upon his arrival at the terminal, Hollon was not physically present during the observation. (PD at 123:5-124:3.)

Later that same day, Hollon was confronted about this incident by Dale Barnett, a local union official who told Hollon that it was inappropriate for him to sign the certification card. (PD at 126:6-128:18.) Hollon believes that another union employee reported the incident to Barnett and that Barnett then reported the incident to the FRA. (PD at 124:12-128:18). In response to Barnett's complaint, the FRA initiated an investigation. (Id.)

Hollon is not aware of any FRA-required documents on which employees are permitted to sign other employees' names, nor is he specifically aware of anyone else who was not an engineer or road foreman of engines who signed a remote control operator's FRA certification card. (PD at 118:14-18, 120:17-18.)[7]

### F.    Because of His Admitted Violation of Company Policy, Hollon is Demoted

In early June, 2006, Workman was made aware of the FRA certification incident by Rodney Saunders, the senior road foreman of engines for the Atlanta Division, who informed Workman that the FRA was investigating the issue. (WD at 18:6-20:25). Workman, in turn, informed Pendergrass of the situation. (WD at 22:15-23:4.) CSXT thereafter pulled Hollon and Dean out of service, with pay, while the Company launched its own internal investigation. (PD at 129:9-131:21, 145:4-9; WD at 92:20-93:16.) At the request of Jason Tipton, the terminal manager in Montgomery, Hollon submitted a written statement regarding the incident. (PD at 130:10-131:21.) In that statement, he

---

[7] Although Hollon alleges that a trainmaster named Ken Williams signed an FRA certification card for a locomotive engineer, he does not know whether Williams is remote control certified, does not know the name of the engineer whose certification card Williams allegedly signed, and does not know if this alleged incident was ever reported to management. (PD at 115:20-118:18, 293:17-294:13). Moreover, Hollon admits that he bases this allegation solely on hearsay. (PD at 116:8-12.)

admitted to having signed Weeks' FRA certification card at Dean's request.  (PD at 131:14-132:10, Ex. 5.)

Ultimately, the FRA determined that CSXT was not in violation of federal law because the FRA provides a 60-day grace period for RCO's to operate locomotive engines prior to the completion of an observation of the RCO.  (WD at 22:23-25:20, Ex. 1.)  Notwithstanding the FRA's determination that CSXT was not in violation of federal law, the Company's internal investigation demonstrated that Hollon and Dean had violated Company policies by falsely certifying that an operational monitoring event had occurred when no such observation had occurred at the time that the certification card was signed.  (Pendergrass Decl. at ¶ 3.)  Accordingly, Pendergrass decided to demote Hollon and Dean from their management positions because of their violation of Company policy.  (TPD at 55:15-18, 66:3-20; Pendergrass Decl. at ¶ 3.)

On June 19, 2006, Workman and Jack Frost, human resources manager for the Atlanta Division, met in Montgomery with Hollon and Dean to advise them of Pendergrass' decision.  (PD at 150:7-13, 137:12-15; WD at 14:18-15:7; TPD at 64:14-65:4.)  During the meeting, Workman informed Hollon and Dean that they were being demoted from their positions as CSXT managers and that, if they chose to exercise their union seniority under applicable collective bargaining agreements, they could continue their employment with CSXT in non-management positions.  (PD at 153:9-154:20).  Hollon chose to exercise his union seniority and has remained employed with CSXT in a yardmaster position since his demotion from the trainmaster position.  (PD at 154:17-20).

During the meeting, Hollon handed Workman and Frost a copy of a draft EEOC charge that he had prepared with the assistance of counsel but had not yet filed.  (PD at 156:11-158:13, 263:4-267:17, Ex. 17).  Hollon filed the charge with the EEOC the next day.  (PD at 158:3-6).

Approximately two months later, Hollon filed an amended EEOC charge. (PD at 267:18-268:6, Ex. 18.)[8]

At the time of the demotion decision, both Pendergrass and Workman were 53 years old. (TPD at 28:5-8; WD at 39:1-3.) Hollon was 46 years old. (PD at 21:2-3.)

## III.    ARGUMENT AND CITATION OF AUTHORITY

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is appropriate if the pleadings, depositions, affidavits, and other evidence adduced "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." See also Young v. General Foods Corp., 840 F.2d 825, 828 (11th Cir. 1988). "Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986) (holding that "mere existence of a scintilla of evidence" in support of the plaintiff's position is insufficient to withstand summary judgment).

"Summary judgments for defendants are not rare in employment discrimination cases." Earley v. Champion Int'l Corp., 907 F.2d 1077, 1081 (11th Cir. 1990). Indeed, the Eleventh Circuit has recognized that "in employment discrimination cases, more than ninety percent…are resolved before trial,… many of them on the basis of summary judgment for the defendant." Chapman v. AI Transp., 229 F.3d 1012, 1025 (11th Cir. 2000) (quoting Wallace v. SMC Pneumatics, Inc., 103 F.3d

---

[8] On or about October 30, 2006, the EEOC dismissed Hollon's EEOC charge and issued Hollon a notice of right to sue. (PD at 268:7-18, Ex. 19.) Hollon filed this lawsuit on December 11, 2006. (See Compl.)

1394, 1396 (7th Cir. 1997).  As Hollon's own admissions demonstrate the absence of any evidence

supporting his claims, CSXT respectfully requests that its motion be granted.

   A.     **Hollon's Age Discrimination Claim is Subject to Summary Judgment.**

   Hollon's age discrimination claim is governed by the burden-shifting framework set forth in

McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), Texas Dep't of Cmty. Affairs v. Burdine,

450 U.S. 248 (1981), and St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502 (1993).[9]  Under this

framework, Hollon first bears the burden of proving a prima facie case of age discrimination by

demonstrating (1) that he is a member of the protected group of persons between the ages of forty and

seventy, (2) that he applied and was qualified for a vacant position for which CSXT was seeking

applications, (3) that despite his qualifications, he was rejected, and (4) that a substantially younger

person filled the positions that he sought or that, after his rejection, the position remained open and the

employer continued to seek applicants of similar qualifications.  Early v. Champion Int'l Corp., 907

F.2d 1077, 1082 (11th Cir. 1990); Damon v. Fleming Supermarkets, Inc., 196 F.3d 1354, 1359 (11th

Cir. 1999).  A prima facie case creates only an inference of discrimination, which CSXT can rebut by

presenting legitimate, non-discriminatory reasons for the alleged adverse employment.  Elrod v. Sears,

Roebuck & Co., 939 F.2d 1466, 1470 (11th Cir. 1991).  Hollon must then present concrete evidence in

the form of specific facts which show that CSXT's proffered reason is mere pretext.  Id.  Mere

conclusory allegations and assertions will not suffice.  Id.

   1.     **Hollon Fails To Establish A Prima Facie Case of Discriminatory Failure to
          Promote.**

   Hollon fails to establish a prima facie case of age discrimination with respect to the Assistant

Manager of Customer Operations and Atlanta Assistant Terminal Superintendent positions that he

---

[9] The McDonnell Douglas framework applicable to Title VII claims also applies to claims brought
under the ADEA.  Elrod v. Sears, Roebuck & Co., 939 F.2d 1466, 1469 (11th Cir. 1991).

sought because (a) he cannot show that the Assistant Manager of Customer Operations position was available or that he was qualified for it and (b) he cannot show that a "substantially younger" person was selected for the Atlanta Assistant Terminal Superintendent position.

      **a.**      **Hollon Cannot Show That the Assistant Manager of Customer Operations Position was Available or that He was Qualified for it.**

Hollon cannot present a prima facie case of age discrimination with respect to the Assistant Manager of Customer Operations position because (1) the position was not available at the time that Hollon applied for it and (2) Hollon was not qualified for the position.

First, at the time that Hollon applied for the Assistant Manager of Customer Operations position, the position had already been filled and was not available. (Callahan Decl. at ¶ 4.)  Thus, Hollon cannot show that he applied for a position for which CSXT was seeking applications.  See King v. ADT Sec. Sys., No. 06-0519-WS-C, 2007 WL 2713212, at *16 (S.D. Ala. Sept. 17, 2007) (plaintiff could not present prima facie case of discriminatory failure to promote where plaintiff did not apply for position until it had already been filled).

Second, even if the position had been available at the time that Hollon applied for it, Hollon's own testimony conclusively demonstrates that he was not qualified for the position.  The position requires "proficiency in various legacy [information and computer] systems," including systems called "IIDS" and "Interline Received."  (PD at 233:13-234:1, Ex. 13.)  The position also requires "working knowledge of STEPS, AEI Studio, OBWO and COPS."  (PD at 233:13-234:1, Ex. 13.)  Hollon, admits, however, that he is not familiar with the "IIDS," "Interline Received," STEPS, AEI Studio, or COPS systems, and that, while he has some familiarity with the OBWO (or "On Board Work Order") system, he has not previously used the OBWO system in his daily responsibilities.  (PD at 206:13-208:22, 210:20-211:4.)

15

       b.      **Hollon Cannot Show That a "Substantially Younger" Person was Selected for the Atlanta Assistant Terminal Superintendent Position.**

Likewise, Hollon cannot present a prima facie case of age discrimination with respect to the Atlanta assistant terminal superintendent position because he cannot show that CSXT selected a "substantially younger" person for that job.  At the time that he applied for that position, Hollon, who was born on November 14, 1959, was 46 years old.  (PD at 21:2-3).  Terrance Walton, who was selected for the position, was born on August 5, 1961 and was 44 years old at the time that he was selected for the position.  (Pendergrass Decl. at ¶ 6.)  This less- than two-year difference in age between Hollon and Walton simply does not create an inference of age bias sufficient to create a prima facie case of discrimination under the ADEA.  See Pace v. Southern Ry. Sys., 530 F. Supp. 381, 385 (N.D. Ga. 1981) (plaintiff could not present prima face case of age discrimination where plaintiff was replaced by someone two years his junior; difference in age of "a mere two years" is insufficient to raise inference of age discrimination), aff'd, 701 F.3d 1383 (11th Cir. 1983).[10]

---

[10] Although the Eleventh Circuit has held that a three-year age difference may be legally sufficient to create a prima facie case of age discrimination, Carter v. Decisionone Corp., 122 F.3d 997, 1003 (11th Cir. 1997), CSXT is not aware of any decision from any court in the Eleventh Circuit that has held that an age difference of less than two years is sufficiently "substantial" to create an inference of age discrimination.  Indeed, courts in other circuits have held that greater differences in age do not create a prima facie case of age discrimination.  See, e.g., Hoffmann v. Primedia Special Interest Publ'ns, 217 F.3d 522, 524-25 (7th Cir. 2000) (three year age difference between plaintiff and replacement was insufficient to create prima facie case under ADEA; age difference of less than ten years is presumptively insubstantial); Williams v. Raytheon Co., 220 F.3d 16, 20 (1st Cir. 2000) (age difference of less than five years is insufficient to support prima face case of age discrimination); Gutknecht v. Smithkline Beecham Clinical Labs., 950 F. Supp. 667, 672 (E.D. Pa. 1996) (difference in age of fewer than five or six years generally does not create prima facie case of age discrimination), aff'd mem., 135 F.3d 764 (3d Cir. 1997).

**2.     Hollon Cannot Demonstrate That CSXT's Legitimate, Non-Discriminatory Reasons For Its Promotion Decisions Were A Pretext For Age Discrimination.**

Even if Hollon were able to set forth a prima facie case of age discrimination with respect to the Assistant Manager of Customer Operations and Atlanta Assistant Terminal Manager positions, Hollon has failed to raise any inference of intentional age discrimination with respect to any of the promotion decisions that he challenges in this lawsuit.[11]  As the record reflects, Pendergrass selected Tipton and Walton for, respectively, the Montgomery Terminal Manager and Atlanta Assistant Terminal Superintendent positions because he believed that Tipton and Walton possessed superior qualifications for those positions.  (Pendergrass Decl. at ¶¶ 5-6.)  Moreover, the record demonstrates that Hollon was not considered for the Pensacola Trainmaster position because he failed to respond to an invitation to interview for the position (Leyhew Decl. at ¶ 4.)  Finally, as set forth above, the Customer Operations position had already been filled at the time Hollon applied.  As discussed below, Hollon fails to present any evidence that these legitimate, nondiscriminatory reasons for CSXT's promotion decisions are a pretext for age discrimination.

---

[11] In addition to the four positions for which he applied in the spring of 2006, Hollon also alleges that he applied for "15 or 20" positions after his demotion.  (PD at 197:22-198:9.)  However, in his deposition he identified only four specific positions for which he applied after his demotion: a management trainee position in Atlanta; a trainmaster position in Birmingham; a terminal manager position in Waycross, Georgia; and an unidentified position in Greenwood, South Carolina.  (PD at 242:1-17).  These promotion decisions are not at issue in the case, as Hollon did not raise these decisions in his EEOC charge (PD at 263:4-13, Ex. 17) and he admitted in his deposition that he bases his discrimination claims on Workman's alleged comments and the four positions that he did not receive in the spring of 2006 (PD at 197:13-21.)  See Newman v. Career Consultants, Inc., 470 F. Supp. 2d 1333, 1343 (M.D. Ala. 2007) (plaintiff's ADEA failure to promote claims were untimely where plaintiff failed to assert claims in prior EEOC charge).  Moreover, even if these promotion decisions were at issue in this case, Hollon has failed to adduce sufficient evidence to demonstrate a prima facie case of discrimination with respect to these positions, as Hollon has no idea who was selected for any of these positions and, therefore, cannot demonstrate that a "substantially younger" person was selected for these positions.  (PD at 242:18-243:2.)

### a.    Hollon Cannot Show That He was Better Qualified Than the Individuals Selected for the Positions at Issue.

Hollon cannot establish pretext merely by asserting that he was better qualified than the individuals selected for the positions at issue.  Rather, Hollon must show that the disparities in qualifications were "of such weight and significance that no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff for the job in question."  Cooper v. Southern Co., 390 F.3d 695, 732 (11th Cir. 2004) (cited with approval in Ash v. Tyson Foods, Inc., 546 U.S. 454, 457 (2006)).

Hollon cannot meet this standard, as a comparison of Hollon's qualifications with those of the individuals selected for the positions at issue does not demonstrate that Hollon was better qualified than the individuals selected.  In contrast to Hollon, whose only management experience was as a trainmaster at the Montgomery terminal, Tipton had nine years of prior management experience, having previously served as an Assistant Terminal Superintendent in Atlanta, a Terminal Manager in Mobile, Alabama, a Trainmaster in Flomaton, Alabama and Columbus, Ohio, and an Assistant Trainmaster in Richmond, Virginia.  (Pendergrass Decl. at ¶ 5, Ex. A.)[12]  Likewise, Walton had ten years of prior management experience, having previously served as the Director of Process Improvement and Managing Director of Mechanical Operations in Jacksonville, Florida and a Plant Manager and Manager of Production in Waycross, Georgia. (Pendergrass Decl. at ¶ 6, Ex. B.)  Moreover, in contrast to Hollon, who has no college degree (PD at 29:7-30:7), both Tipton and Walton have a bachelor's degree and an MBA.  (Pendergrass Decl. at ¶¶ 5-6.)

---

[12] Indeed, far from contending that Tipton was unqualified for the Montgomery terminal manager position, Hollon contends that Tipton was "overly qualified" for the position.  (PD at 226:1-11.)

**b.** **Workman's Alleged Comments Do Not Demonstrate Pretext.**

Hollon also cannot demonstrate pretext by pointing to alleged "age-related" comments. Hollon alleges that, during a meeting in Montgomery in early April, 2006, Workman looked at a two younger employees[13] and said, "You all have a bright future with this company," and that several minutes later he asked Hollon how old he was. (PD at 187:12-17; 195:7-13.)[14] After Hollon allegedly answered that he was "a little older than the terminal manager," Workman allegedly told Hollon that he "looked good for [his] age." (PD at 187:12-188:3).[15] These alleged comments do not create any inference of age discrimination.

First, Pendergrass, not Workman, was the decision-maker regarding the Montgomery Terminal Manager, Atlanta Assistant Terminal Superintendent, and Pensacola Trainmaster positions (Pendergrass Decl. at ¶¶ 4-6; TPD at 25:4-26:5), and Hollon fails to allege any facts suggesting that Workman's comments were in any way related to any of the promotion decisions that he challenges in this case.[16] Thus, Workman's comments are too attenuated to the employment decisions at issue in this case to constitute evidence of pretext. See Barnes v. Southwest Forest Indus., Inc., 814 F.2d 607, 610-11 (11th Cir. 1987) (supervisor's comment to plaintiff that "at your age, I don't believe you could pass [a physical exam] were "too attenuated" to employer's hiring practices to be of legal

---

[13] Hollon alleges that one of the employees in question (Chandler Plots) was in his mid-thirties, while the other employee (Jeremiah Grant) was in his mid to late twenties. (PD at 188:4-8.)

[14] Workman does not recall asking Hollon his age during this meeting or telling younger employees that they had a "bright future" with the Company. (WD at 52:3-53:7). According to Workman, he believed that the entire organization in Montgomery had a bright future. (WD at 52:9-17.)

[15] Hollon cannot recall what was said in-between these two comments. (PD at 195:15-21.) He does admit, however, that two of his co-workers were discussing their upcoming retirement during this meeting. (PD at 190:18-191:7, 195:22-197:4, 295:9-19.)

[16] Neither Pendergrass nor Workman has responsibility over the customer operations group and neither Pendergrass nor Workman had any role in the promotion decisions regarding the Assistant Manager of Customer Operations position. (TPD at 23:24-25:3; Workman Decl. at ¶ 7.)

significance); <u>Henry v. Jefferson County Pers. Bd.</u>, --F. Supp. 2d --, 2007 WL 3227679 (N.D. Ala. Feb. 23, 2007) (plaintiff couldn't show circumstantial evidence of age discrimination by supervisor's comment that employer needed "new blood;" remark was "stray comment" unrelated to decisionmaking process).

Second, the alleged comments simply do not suggest age bias. As one court has observed, "statements about age, unlike statements about race or gender, do not rest on a we/they dichotomy and therefore do not create the same inference of animus" because, barring unfortunate circumstances, everyone will enter the protected age group at some point in their lives. <u>Dockins v. Benchmark Commc'ns</u>, 176 F.3d 745, 749 (4th Cir. 1999). Particularly given the fact that Workman (like Pendergrass) is older than Hollon,[17] no reasonable interpretation of Workman's comments at the April, 2006 management meeting could construe them as evidence of age bias. At most, Workman's alleged questioning of Hollon about his age and his comment that Hollon "looks good for [his] age" evidence nothing more than an innocuous compliment of one middle-aged employee by another. <u>See Sumrell v. Americold Logistics</u>, No. 8:00CV154, 2002 WL 63082, at *2, *6 (D. Neb. Jan. 3, 2002) (plaintiff couldn't show pretext on basis of management employee allegedly asking him how old he was; question was unrelated to employment decision at issue and management employee who made comment was himself over age 40).

### 3. Hollon Cannot Show Discriminatory Demotion.

In addition to his promotion discrimination claims, Hollon alleges that he was demoted because of his age. (Compl. at ¶ 8.) Specifically, Hollon alleges that, after his demotion, he was replaced by a younger employee named Jeremiah Grant. (PD at 287:2-289:23.) Even assuming that

---

[17] As the Eleventh Circuit has observed, a plaintiff faces "a difficult burden" in proving age discrimination where the decision-makers regarding the challenged employment action were "well over age forty and within the class of persons protected by the ADEA." <u>Elrod</u>, 939 F.2d at 1471.

Hollon can state a prima facie case of age discrimination on the basis of this contention, Hollon cannot demonstrate that CSXT's legitimate, non-discriminatory reason for his demotion - his admitted violation of company ethics policies - is a pretext for discrimination.

First, as noted above, Workman's alleged comments at the April 2006 meeting do not create an inference of age discrimination, particularly since Pendergrass, not Workman, was the decision-maker with respect to Hollon's demotion.  (Pendergrass Decl. at ¶ 3.)  Second, there can be no serious question that Pendergrass honestly believed that Hollon had violated CSXT's policies, as Hollon himself *admits* that he signed Dean's name on Weeks' FRA certification card, that he was not authorized to sign FRA certification cards, and that, at the time that he signed Weeks' certification card, *Weeks had not yet been observed by Dean*.  (PD at 108:13-110:13, 121:2-123:19.)  Finally, there is no evidence that other employees who similarly violated the company's ethics policy were not demoted.

Although Hollon may believe that CSXT's decision to demote him was too harsh, such a subjective belief does not constitute proof of pretext.  See Abel v. Dubberly, 210 F.3d 1334, 1339 n.5 (11th Cir. 2000) (affirming judgment as a matter of law for employer who fired employee for borrowing ten dollars from a cash register (leaving a signed IOU) and replacing it four days later when she next returned to work because "[a]lthough termination may, to some, seem a draconian response given the level of the Plaintiff's offense, the reasonableness of [the employer's] disciplinary policies are not a consideration").  See also Nix v. WLCY Radio/Rahall Commc'ns., 738 F.2d 1181, 1187 (11th Cir. 1984) (employee who was fired for violating employer's moonlighting policy failed to demonstrate pretext, notwithstanding his contention that he didn't violate rules; "[t]he employer may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason").

B.     **Hollon's Retaliation Claim is Subject to Summary Judgment.**

      1.     **Hollon Fails To Establish A Prima Facie Case of Retaliation.**

Like Hollon's discrimination claim, Hollon's retaliation claim is also governed by the

McDonnell Douglas framework.  Bonham v. Regions Mortgage, Inc., 129 F. Supp. 2d 1315, 1326

(M.D. Ala. 2001).  That is, Hollon has the initial burden of establishing a prima facie case of

retaliation by demonstrating that (1) he engaged in statutorily protected expression, (2) he suffered an

adverse employment action, and (3) the adverse action was causally related to the protected

expression.  Weeks v. Harden Mfg Corp., 291 F.3d 1307, 1311 (11th Cir. 2002).  Hollon fails to meet

this standard because he cannot show that he engaged in any protected activity prior to his demotion,

nor can he show that any protected activity was causally related to his demotion.[18]

---

[18] Although Hollon alleges in his Complaint that CSXT has retaliated against him by denying him
promotions since his demotion (Compl. at ¶ 16), Hollon did not allege such post-demotion retaliation
in his initial EEOC charge or in his amended EEOC charge.  (PD at 263:4-268:6, Ex. 17, 18.)  Thus,
because Hollon has failed to exhaust his administrative remedies with respect to these claims, these
promotion decisions are not properly before the Court.  See Robinson v. Regions Fin. Corp., 242 F.
Supp. 2d 1070, 1079 (M.D. Ala. 2003) (plaintiff's claims for promotions that she was allegedly
denied following her filing of EEOC charge were not properly before court because, although plaintiff
had alleged in EEOC charge that she was denied other promotions, her post-EEOC charge allegations
could not reasonably be expected to grow out of her initial EEOC charge and, therefore, were not ripe
for court's consideration).  Even if these promotion decisions were properly before the court, Hollon
cannot demonstrate that he was denied these positions because of his EEOC charge or any other
alleged protected activity.  First, Hollon fails to show that he was qualified for these promotions, as
clearly his demotion would be considered a substantial negative factor with respect to any promotion
that he sought following his demotion.  (Pendergrass Decl. at ¶ 7.)  Second, Hollon cannot
demonstrate a causal connection between those promotion decisions and his alleged protected activity,
as the promotion decisions are too remote in time to suggest causation.  See Higdon v. Jackson, 393
F.3d 1211, 1220-21 (11th Cir. 2004) (three-month period between alleged protected activity and
adverse employment action does not allow reasonable inference of causation).  Moreover, Hollon has
not identified the relevant decision-makers regarding those promotions, and, therefore, cannot
demonstrate that the relevant decision-makers were even aware of his EEOC charge or his other
alleged protected activity at the time the relevant decisions were made.

a.     **Holon did not engage in any protected activity prior to his demotion.**

The ADEA prohibits retaliatory conduct by an employer when an employee "has opposed any practice made unlawful by [the ADEA]" or "has made a charge, testified, assisted, or participated in any manner in any investigation, proceeding, or litigation under this chapter."  29 U.S.C. § 623(d). Hollon has failed to show that he engaged in either type of these protected activities for purposes of his retaliation claim.  Although Hollon filed a charge of discrimination with the EEOC, Hollon admits that he did not file his charge until the day <u>after</u> he was informed of his demotion.  (PD at 158:3-6.) Therefore, Hollon cannot rely on his EEOC charge as the basis for his retaliation claim in this case. Rather, Hollon alleges that the two e-mails that he sent to Workman and Frulla before his demotion are the basis for his retaliation claim.  (PD at 248:21-249:9, 268:20-270:12, 298:2-299:9, Ex. 24, 25.)

Hollon's reliance on these e-mails is misplaced, as nowhere in the e-mails did he even mention his "age," let alone complain that he believed he was passed over for promotional opportunities because of his age or that he was otherwise subjected to age discrimination.  (<u>Id.</u>)  As a matter of law, such communications cannot constitute "opposition" to an unlawful practice sufficient to state a prima facie case of retaliation under the ADEA.  <u>See</u> <u>Smith v. Wynfield Dev. Co.</u>, 451 F. Supp. 2d 1327, 1349 (N.D. Ga. 2006) (employee did not engage in protected activity under ADEA where, although she complained to employer, she did not actually complain about age discrimination).  <u>See</u> <u>also</u> <u>Jamal v. Wilshire Mgmt. Leasing Corp.</u>, 320 F. Supp. 2d 1060, 1078-79 (D. Or. 2004) (plaintiff failed to engage in protected activity under ADEA where, although plaintiff complained about manager, she did not allege in her complaint that age discrimination had occurred and court would not infer that complaint was intended to allege age discrimination).

Hollon also bases his retaliation claim on a handful of conversations that he allegedly had with his co-workers regarding CSXT's promotion practices.  (PD at 250:3-261:20.)  Specifically, Hollon

alleges that he spoke with Melvin Murray, a line of road trainmaster, and Jerry Hozeworth, a road foreman of engines, about "the age discrimination issue" and advised Hozeworth that he should file an EEOC charge against CSXT because he was denied a promotion.  (PD at 257:9-258:21.)  Like Hollon's e-mails, these alleged conversations also do not constitute protected activity under the ADEA because neither Murray nor Hozeworth are or were Hollon's supervisors,[19] nor does Hollon know whether Murray or Hozeworth told anyone about the conversations with Hollon.  (PD at 258:22-259:7.)  Such private conversations with one's co-workers cannot constitute "opposition" to an unlawful practice within the meaning of the ADEA.  See, e.g., Crosby v. City of Walterboro, 444 F. Supp. 2d 559, 563-64 (D.S.C. 2006) (employee did not engage in protected activity under Title VII where employee suggested to co-worker that she may have been subjected to sexual harassment and privately encouraged co-worker to consult attorney); Fox v. Eagle Distrib. Co., No. 3:05-cv-476, 2006 WL 2927441, at *8 (E.D. Tenn. Oct. 11, 2006) (while complaints about age discrimination to management are protected activity, "complaints about the company to co-workers and customers are not").

> **b.    Hollon cannot establish a causal connection between his demotion and any alleged protected activity.**

Even if Hollon could demonstrate that he engaged in statutorily protected activity, Hollon cannot demonstrate that there is a causal connection between his demotion and any such protected activity.  In order to show causation, "[a]t a minimum, a plaintiff must generally establish that the employer was actually aware of the protected expression at the time it took [the] adverse employment action."  Clover v. Total Sys. Servs., Inc., 176 F.3d 1346, 1354 (11th Cir. 1999).  Hollon presents no evidence that Pendergrass was aware of his e-mails to Workman and Frulla or that he was aware of

---

[19] According to Hollon, Hozeworth is a road foreman of engines, while Murray is a line-of-road trainmaster.  (PD at 257:18-258:8.)

Hollon's alleged conversations with his co-workers.  On the contrary, the undisputed evidence demonstrates that Pendergrass was not aware of any complaints made by Hollon until Hollon gave Workman a copy of the EEOC charge during the demotion meeting.  (Pendergrass Decl. at ¶ 8) and that, other than Hollon's e-mail to Workman, Workman was not aware of any communications by Hollon regarding CSXT's promotion practices (Workman Decl. at ¶ 8).  Accordingly, Hollon cannot present a prima facie case of retaliation.  See Eldridge v. Morrison, 970 F. Supp. 928, 939 (M.D. Ala. 1996) (plaintiff failed to establish prima facie case of retaliation where he failed to show that relevant decision-makers were aware of his protected activity), aff'd, 120 F.3d 275 (11th Cir. 1997).

<blockquote>

**2.    Hollon Cannot Demonstrate That CSXT's Legitimate, Non-Retaliatory Reason For His Demotion Was A Pretext For Retaliation**

</blockquote>

Finally, for the same reasons that Hollon cannot establish that CSXT's legitimate, non-discriminatory reason for his demotion was a pretext for demotion, he cannot demonstrate that it was a pretext for retaliation – especially since Hollon admits to having engaged in the unethical conduct for which he was demoted.  (See Section III.A.3, infra.)  In the face of this utter lack of evidence of pretext, Hollon's claim for retaliatory demotion fails.

## IV.    CONCLUSION

For the reasons stated above, the City is entitled to summary judgment on all of Hollon's claims.

This 30th day of November, 2007.

Respectfully submitted,

    */s/   William C. Barker*

PAUL, HASTINGS, JANOFSKY         Weyman T. Johnson, Jr.
  & WALKER, LLP                 Ga. Bar. No. 395775
600 Peachtree Street, N.E.         William C. Barker
Suite 2400                       Ala. Bar. No. 3411-R-71W
Atlanta, Georgia 30308
Telephone:  (404) 815-2400       Attorneys for Defendant
Facsimile:  (404) 815-2424        CSX Transportation, Inc.

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION**

| | | |
|---|---|---|
| **Ronald A. Hollon, Sr.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No. 2:06-CV-1099-WKW-CSC** |
| | ) | |
| **CSX Transportation, Inc.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 30, 2007 I electronically filed the foregoing **BRIEF IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** with the Clerk of Court using the EM/ECF system, which will automatically send e-mail notification of such filing to the following attorney of record.  I also certify that I served a copy via U.S. mail:

Gary E. Atchison, Esq.
P.O. Box 2002
492 S. Court St.
Montgomery, AL 36102
Telephone: (334) 262-7232


  */s/ William C. Barker*
Attorney for Defendant
CSX Transportation, Inc.