**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION**

| | | |
|---|---|---|
| **Ronald A. Hollon, Sr.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No. 2:06-CV-1099-WKW-CSC** |
| | ) | |
| **CSX Transportation, Inc.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**DEFENDANT'S NOTICE OF FILING IN SUPPORT OF
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Defendant CSX Transportation, Inc. ("Defendant" or "CSXT") hereby gives notice of

filing of the following declarations, deposition transcripts and exhibits:

1) Deposition transcript and exhibits from the deposition of Ron Hollon;

2) Deposition transcript and exhibits from the deposition of Travis Mikel ("Mike") Pendergrass;

3) Deposition transcript and exhibits from the deposition of Rod Workman;

4) Declaration of Mike Pendergrass;

5) Declaration of Rod Workman;

6) Declaration of Frank Leyhew; and

7) Declaration of Rebecca Callahan.

This 30th day of November, 2007.

*[signature on next page]*

Respectfully submitted,


PAUL, HASTINGS, JANOFSKY          _/s/   William C. Barker_
   & WALKER, LLP                  Weyman T. Johnson, Jr.
600 Peachtree Street, N.E.        Ga. Bar. No. 395775
Suite 2400                        William C. Barker
Atlanta, Georgia 30308            Ala. Bar. No. 3411-R-71W
Telephone:  (404) 815-2400
Facsimile:  (404) 815-2424        Attorneys for Defendant
                                  CSX Transportation, Inc.

- 2 -

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION**

| | | |
|---|---|---|
| **Ronald A. Hollon, Sr.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No. 2:06-CV-1099-WKW-CSC** |
| | ) | |
| **CSX Transportation, Inc.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**<u>CERTIFICATE OF SERVICE</u>**

   I hereby certify that on November 30, 2007 I electronically filed the foregoing **NOTICE OF FILING IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** the Clerk of Court using the EM/ECF system, which will automatically send e-mail notification of such filing to the following attorney of record.  I also certify that I served a copy via U.S. mail:

Gary E. Atchison, Esq.
P.O. Box 2002
492 S. Court St.
Montgomery, AL 36102
Telephone: (334) 262-7232

     <u>  /s/ William C. Barker</u>
     Attorney for Defendant
     CSX Transportation, Inc.

1          IN THE UNITED STATES DISTRICT COURT

2          FOR THE MIDDLE DISTRICT OF ALABAMA

3               NORTHERN DIVISION

4

5

6   RONALD A. HOLLON, SR.,

7          Plaintiff,              CIVIL ACTION

8      VS.                  FILE NO. 2:06-CV-1099-WKW

9

10  CSX TRANSPORTATION, INC.,

11         Defendant.

12                              **COPY**

13

14          *      *      *      *      *

15

16          VIDEOTAPED DEPOSITION OF RONALD A. HOLLON,

17  SR., taken on behalf of the Defendant, pursuant to

18  the stipulations set forth herein, before Jeana S.

19  Boggs, Certified Court Reporter and Notary Public,

20  at the offices of  Boggs Reporting & Video, 492

21  South Court Street, Montgomery, Alabama, commencing

22  at approximately 9:00, Wednesday, September 19,

23  2007.

```
1                    APPEARANCES OF COUNSEL

2    FOR THE PLAINTIFF:

3              HONORABLE GARY ATCHISON

4              Attorney At Law

5              492 South Court Street

6              Montgomery, Alabama   36104

7              334.262.7232

8    FOR THE DEFENDANT:

9              HONORABLE WILLIAM C. BARKER

10             Attorney At Law

11             PAUL, HASTINGS, JANOFSKY & WALKER, LLP

12             600 Peachtree Street, NE

13             Suite 2400

14             Atlanta, Georgia   30308-2222

15             404.815.2379

16                        *  *  *

17   Examination By Mr. Barker - 7, 315

18   Examination By Mr. Atchison - 306

19

20

21

22

23
```

```
1                      EXHIBIT INDEX

2    Defendant's Exhibit No. 1......................10
     Defendant's Exhibit No. 2......................51
3    Defendant's Exhibit No. 3......................82
     Defendant's Exhibit No. 4......................88
4    Defendant's Exhibit No. 5.....................132
     Defendant's Exhibit No. 6.....................142
5    Defendant's Exhibit No. 7.....................163
     Defendant's Exhibit No. 8.....................170
6    Defendant's Exhibit No. 9.....................175
     Defendant's Exhibit No. 10....................177
7    Defendant's Exhibit No. 11....................177
     Defendant's Exhibit No. 12....................203
8    Defendant's Exhibit No. 13....................233
     Defendant's Exhibit No. 14....................234
9    Defendant's Exhibit No. 15....................234
     Defendant's Exhibit No. 16....................241
10   Defendant's Exhibit No. 17....................263
     Defendant's Exhibit No. 18....................267
11   Defendant's Exhibit No. 19....................268
     Defendant's Exhibit No. 20....................281
12   Defendant's Exhibit No. 21....................282
     Defendant's Exhibit No. 22....................283
13   Defendant's Exhibit No. 23....................293
     Defendant's Exhibit No. 24....................298
14   Defendant's Exhibit No. 25....................298

15

16

17

18

19

20

21

22

23
```

```
 1                         *  *  *

 2                      STIPULATION

 3            It is hereby stipulated and agreed by and

 4     between counsel for the respective parties and the

 5     witness that the videotaped deposition of RONALD A.

 6     HOLLON, SR., is taken pursuant to notice and

 7     stipulation on behalf of the Defendant; that all

 8     formalities with respect to procedural requirements

 9     are waived; that said deposition may be taken before

10     Jeana S. Boggs, Certified Professional Reporter and

11     Notary Public in and for the State of Alabama At

12     Large, without the formality of a commission; that

13     objections to questions, other than objections as to

14     the form of the questions, need not be made at this

15     time, but may be reserved for a ruling at such time

16     as the deposition may be offered in evidence or used

17     for any other purpose as provided for by the Federal

18     Rules of Civil Procedure.

19            It is further stipulated and agreed by and

20     between counsel representing the parties in this

21     case that the filing of the videotaped deposition of

22     RONALD A. HOLLON, SR., is hereby waived and that

23     said deposition may be introduced at the trial of
```

1    this case or used in any other manner by either

2    party hereto provided for by the Statute, regardless

3    of the waiving of the filing of same.

4              It is further stipulated and agreed by and

5    between the parties hereto and the witness that the

6    signature of the witness to this deposition is

7    hereby not waived.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23



Boggs Reporting & Video
334.264.6227/800.397.5590    www.boggsreporters.com

1    THE REPORTER:  This is in the United

2        States District Court, Northern

3        Division, in the case of Ronald A.

4        Hollon, Sr., Plaintiff, versus CSX

5        Transportation, Inc., Defendant,

6        Civil Case No. 2:06-CV-1099-WKW.

7        My name Jeana Boggs, Court

8        Reporter with Boggs Reporting &

9        Video.  Today is Wednesday,

10        September, 19th, 2007.  The time

11        is approximately 9:16.  Also

12        present is Leighton Boggs,

13        Videographer, with Boggs Reporting

14        & Videographer.

15    MR. BARKER:  Cory Barker for CSX

16        Transportation.

17    MR. ATCHISON:  And Gary Atchison for

18        the Plaintiff Ronald Hollon.

19    THE REPORTER:  Would you raise your

20        right hand, please.

21            (At which time, the witness

22            was sworn.)

23                *      *      *

1                    RONALD A. HOLLON, SR.,

2     of lawful age, having been first duly sworn, was

3     examined and testified as follows:

4

5                        DIRECT EXAMINATION

6     BY MR. BARKER:

7     Q     Mr. Hollon, my name is Cory Barker.  I'm the

8           attorney for CSX in the lawsuit that you

9           have brought against the company.  Could you

10          state your full name for the record, please.

11    A     Ronald Alexander Hollon, Senior.

12    Q     And -- and have you ever been known by any

13          other names?

14    A     Ron.

15    Q     Okay.  Never -- Never had any other last

16          names or anything like that?

17    A     No, I have not.

18    Q     That may seem like a strange question, but

19          you'd be surprised.

20                Your deposition today is being

21          taken as part of your participation in this

22          lawsuit.  Do you understand that?

23    A     Yes.

```
1    Q    And you understand that your testimony today

2         is under Oath just like you were giving it

3         in a court of law?

4    A    Yes, I do.

5    Q    All right.  And that this deposition will be

6         used for a variety of purposes throughout

7         your lawsuit; do you understand that?

8    A    Yes.

9    Q    And the Court Reporter here today will

10        create a written transcript of your

11        deposition.  Essentially, it will be like a

12        book where my questions and your answers and

13        any objections or questions your attorney

14        asks later in the deposition will be

15        recorded.  Do you understand that?

16   A    Yes.

17   Q    All right.  One of the most important things

18        that we need to do in this deposition today

19        is to make sure that everything is as clear

20        as possible, what you say is clear, what I

21        say is clear, so that this -- this

22        transcript that she creates is as accurate a

23        recording of what has transpired.  Okay?
```

```
 1   A   Okay.

 2   Q   There are some things that we need to do to

 3       make sure that happens.  First, if I ask you

 4       a question and you don't -- you're not sure

 5       what I'm asking or if you're not clear about

 6       the question, you can ask me to explain it

 7       or to clarify it.  I'll be happy to do that.

 8       All right?

 9   A   Okay.

10   Q   Otherwise, I'm going to assume that your

11       answers are to the questions that I have

12       asked.

13              It's very important that your

14       testimony be verbal.  So, if I ask you,

15       like, a yes-or-no question, for example,

16       it's important you say yes or no, or

17       whatever the appropriate answer is, as

18       opposed to uh-huh (positive response) or

19       uh-uh (negative response) or anything like

20       that, or shrugging or shaking your head or

21       anything like that.  It may seem like just

22       you and I are talking here in this

23       conference room here today, but, you know,
```

```
 1          the Court Reporter has to interpret what

 2          you're saying when you're not giving a

 3          verbal answer.  And so, for the purpose of

 4          the clarity, it's easiest if you do give a

 5          verbal answer.  Okay?

 6   A      Okay.

 7   Q      Last but not least, sometimes you may

 8          anticipate what my question is going to be

 9          before I finish it.  It's important that we

10          try not to interrupt each other.  I'll try

11          not to interrupt you, and I'd appreciate it

12          if you'd try not to interrupt me.  Okay?

13   A      Okay.

14   Q      Otherwise, it's hard for her to record when

15          we're both talking at the same time.

16                    I'm going to show you this

17          document what I've marked as Exhibit Number

18          One.

19                         (At which time, the referred-

20                         to document was marked as

21                         Defendant's Exhibit No. 1 by

22                         the Reporter.)

23   Q      Have you ever seen that document before?
```

```
 1              MR. ATCHISON:  Cory, I don't think I've

 2                  provided him a copy of this, but

 3                  we'll acknowledge that we received

 4                  deposition notice --

 5              MR. BARKER:  Okay.

 6              MR. ATCHISON:  -- for today's

 7                  deposition.  We so stipulate.

 8              MR. BARKER:  Okay.

 9    BY MR. BARKER:

10    Q    Have you ever given a deposition like this

11         before, Mr. Hollon?

12    A    I've been in -- in on a deposition for the

13         company.

14    Q    Okay.  When you say you've "been in on a

15         deposition," did you answer questions, or

16         did you just watched a deposition?

17    A    I answered questions.

18    Q    Okay.  What circumstances was that in?

19    A    It was a crossing lawsuit against the

20         company.

21    Q    All right.  So, somebody was in an accident

22         at a train crossing; is that right?

23    A    That's correct.
```

```
 1    Q    All right.  Was it a vehicular accident?

 2    A    Yes, it was.

 3    Q    All right.  And were you a part -- Were you

 4         named in the lawsuit, or were you just a

 5         witness somehow?

 6    A    I was a witness for the company.  I was the

 7         trainmaster on duty when the incident

 8         happened.

 9    Q    Okay.  And do you recall how many years ago

10         that was?

11    A    It was probably the fall of '06.

12    Q    Okay.  Have you given depositions in any

13         other circumstances?

14    A    No, I have not.

15    Q    Have you ever been a party to a lawsuit

16         before?

17    A    A class action, yes.

18    Q    Okay.  Is that a -- was that a Fen-Phen

19         lawsuit?

20    A    That's correct.

21    Q    Do you remember when that was?

22    A    No, I cannot recall the exact date.

23    Q    Did you have to give any kind of testimony
```

1      as part of that lawsuit?

2  A   No, I did not.

3  Q   All right.  Did you just complete the

4      paperwork, essentially?

5  A   That's correct.

6  Q   All right.  Were you named in the lawsuit,

7      or did you just receive some papers in the

8      mail about how to participate?

9  A   Papers in the mail how to participate.

10  Q   Okay.  Did you ever meet with the -- any

11      attorneys in that lawsuit?

12  A   No, I did not.

13  Q   Okay.  Everything that you did was via mail?

14  A   That's correct.

15  Q   And did you receive any payments as part of

16      that lawsuit?

17  A   Yes, I did.

18  Q   How much did you receive?

19  A   As I can recall, it was around eight

20      thousand ($8,000) dollars.

21  Q   All right.  And do you remember what year

22      that was?

23  A   No, I do not.

1    Q    More than five or less than five years ago?

2    A    More than five.

3    Q    All right.  So, you've never sued anyone

4         before or been sued by anyone before?

5    A    No, I have not.

6    Q    Have you ever testified in any kind of other

7         legal proceeding?

8    A    No, I have not.

9    Q    Okay.  Have you ever declared bankruptcy

10        before?

11   A    No, I have not.

12   Q    Have you ever been arrested before?

13   A    No.

14   Q    What did you do to get ready for your

15        deposition today?

16   A    What did I do?

17   Q    Uh-huh (positive response).

18   A    Just re-collected the incidence that took

19        place during the time period.

20             MR. BARKER:  I'm going to instruct him

21                  not to testify about any

22                  communications that he had with

23                  his attorney.

1    Q    Yeah, I'm not asking you -- Did you meet

2         with your attorney?

3              MR. BARKER:  You can testify that you

4                   met with me, but you cannot

5                   testify as to anything that you

6                   and I said in that -- in that

7                   meeting.

8    A    Yes, I did.

9    Q    All I'm asking is whether you had a meeting.

10   A    Yes, I did.

11   Q    I don't want to know what was said.

12   A    Yes, I did.

13   Q    All right.  When was that meeting?

14   A    Yesterday.

15   Q    How long did you-all meet for?

16   A    Probably 30 or 45 minutes.

17   Q    Okay.  Did you talk -- Other than your

18        attorney, was there anybody else present at

19        that meeting?

20   A    Doug was.

21             MR. ATCHISON:  My legal assistant.

22   Q    Okay.  Have you talked with anybody else

23        about your deposition?

```
 1    A    No, I have not.

 2    Q    Did you talk with any of your family members

 3         about your deposition?

 4    A    I discussed with my wife that it was going

 5         to take place today; but other than that,

 6         that was all that was said.

 7    Q    Okay.  Did you talk with any of your

 8         co-workers about your deposition?

 9    A    Other than marking off for today for the

10         deposition, that was the only thing that was

11         said.

12    Q    All right.  Who did you -- Did you have to

13         communicate with somebody, or did you just

14         write down the schedule that you would not

15         be there today?

16    A    Well, I had to notify the -- there's the

17         steno clerk that wrote it in the book that I

18         would be off today.

19    Q    Okay.  And who was that steno clerk?

20    A    Beverly Doorman.

21    Q    Okay.  Did you have to tell her why you

22         wouldn't be there or just that you would not

23         be there?
```



Boggs Reporting & Video
334.264.6227/800.397.5590    www.boggsreporters.com

```
 1   A    Well, I told her that -- I told her that I

 2        would be off for a company deposition.

 3   Q    Okay.  And the steno clerk keeps track of,

 4        you know, absences and attendance and things

 5        like that for your current position; is that

 6        correct?

 7   A    Well, any clerk keeps the journal of who

 8        marks off on vacation, personal leave, sick,

 9        whatever, yes.

10   Q    Okay.  So, there are -- there are multiple

11        clerks, and the particular one that you

12        spoke to was the steno clerk; is that right?

13   A    That's correct.

14   Q    Did you look at any documents to get ready

15        for your deposition today?

16        MR. ATCHISON:  Again, I -- I would

17             object if it involves attorney/

18             client communications.

19   Q    You can answer whether you --

20        MR. BARKER:  He can answer whether he

21             did or did not look at documents.

22        MR. ATCHISON:  Go ahead and answer,

23             please.
```

```
 1    A    Yes, I did.

 2    Q    All right.  Now, and your attorney

 3         apparently is going to instruct you not to

 4         testify about the documents that you've

 5         reviewed; is that correct?

 6              MR. ATCHISON:  Go ahead and testify.  I

 7                   mean, the -- the documents are

 8                   part of the Court proceeding.

 9                   That's fine.

10    Q    Do you remember what documents you looked

11         at?

12    A    I looked at some -- at notes that I had

13         written on various positions that I had

14         applied for, people who were awarded these

15         positions.  Basically, that was about it.

16    Q    Right.  Were these documents that you had

17         had that you brought to your attorney when

18         you filed your lawsuit or at some point

19         afterwards?

20    A    Probably both, yes.

21    Q    Okay.  Were they -- When you say "notes," do

22         you -- did you keep any kind of diary or log

23         about your experiences at CSX?
```

```
 1   A    What period are you referring to, my entire

 2        railroad career?

 3   Q    At any -- at any point.

 4   A    Notes, positions that I applied for, yes.

 5   Q    All right.  So, when did you start keeping

 6        these notes?

 7   A    Well, I usually -- any position that I

 8        applied for, I usually print out the

 9        application so you have record or proof that

10        you did apply for it.

11   Q    Okay.  And did you keep those applications

12        that you submitted?

13   A    There are some I did.  There are some I did

14        not.

15   Q    Okay.  Did you make handwritten notes on

16        some of them too?

17   A    Yes, I have.

18   Q    All right.  And have you provided copies of

19        any of those applications or notes to your

20        attorney that you personally have in your

21        possession?

22   A    Yes, I have.

23   Q    All right.  Do you have any other notes or
```

```
 1          documents that you think relate to your

 2          lawsuit that you have not provided to your

 3          attorney?

 4     A    At this time, no.

 5     Q    Okay.  Are there any reasons that can think

 6          of why you cannot answer my questions today

 7          completely, accurately, and truthfully?

 8     A    Repeat that.

 9     Q    Are there any reasons why you cannot answer

10          my questions today completely, accurately,

11          and truthfully?

12     A    I don't see there's -- if there's any reason

13          I cannot.

14     Q    Okay.  I speak quickly sometimes.  So, if I

15          talk -- if you need me to repeat something,

16          I'll be -- I'll be happy to do that.

17     A    Thank you.

18     Q    Are you taking any medication, or do you

19          have any health conditions that affect your

20          ability to remember things or to understand

21          things?

22     A    No.

23     Q    Have you ever been convicted of a crime?
```

| | | |
|---|---|---|
| 1 | A | No. |
| 2 | Q | All right.  What is your date of birth? |
| 3 | A | November the 14th, 1959. |
| 4 | Q | All right.  And where were you born? |
| 5 | A | Prattville. |
| 6 | Q | All right.  And Prattville is near |
| 7 | | Montgomery here; is that right? |
| 8 | A | Autauga County, yes. |
| 9 | Q | Thirty minutes or so away? |
| 10 | A | Yes. |
| 11 | Q | What is your current address? |
| 12 | A | 2341 County Road 61, Deatsville, Alabama. |
| 13 | Q | All right.  And how long have you lived |
| 14 | | there? |
| 15 | A | Since 1988. |
| 16 | Q | And who lives there with you? |
| 17 | A | My wife and two children. |
| 18 | Q | All right.  What is your wife's name? |
| 19 | A | Ramona. |
| 20 | Q | Okay.  Does she work? |
| 21 | A | Yes, she does. |
| 22 | Q | Where does she work at? |
| 23 | A | The Board of Education for Autauga County. |

1  Q    All right.  Is she a teacher?

2  A    No.  She works with the special education.

3  Q    Okay.  Does she teach special education, or

4       does she work for -- actually for the

5       Department of Education like in an

6       administrative capacity?

7  A    Actually, she's a job coach for kids that

8       cannot actually get a diploma, high school

9       diploma.

10  Q   Okay.  And that's in Autauga County; is that

11      right?

12  A   That's correct.

13  Q   Are there -- Does she work out of a

14      particular school or is there a set of

15      schools that she works out of or an

16      administrative office?

17  A   She works out of an administrative office.

18  Q   Okay.  Do you have any other adult

19      relative -- well, let me back up a second.

20      How old are your children?

21  A   15 and 17.

22  Q   Okay.  Do you have any adult relatives that

23      live in the Montgomery area other than your

```
 1        wife?

 2   A    Are you talking about the tri-county area?

 3        Are you talking about -- What area are you

 4        referring to?

 5   Q    I'm -- I'm talking about -- let's say, you

 6        know, south of Birmingham, north of Mobile.

 7   A    I would say, yes.

 8   Q    Okay.

 9            MR. ATCHISON:  Are you referencing the

10                 Middle District?

11            MR. BARKER:  Yes, I'm trying to get the

12                 geographic designation that makes

13                 sense to any other human beings,

14                 except for lawyers.

15   Q    And I guess east of Selma.

16   A    Yes.

17   Q    All right.  Can you name -- name those for

18        me?

19   A    There's too many to list.

20   Q    Okay.  Do you have -- Are your parents

21        living?

22   A    No, they're both deceased.

23   Q    All right.  Do you have any brothers or
```

|   |   |   |
|---|---|---|
| 1 |   | sisters that live in that geographic |
| 2 |   | description I gave you. |
| 3 | A | Yes, I do.  I have six brothers and sisters. |
| 4 | Q | Okay.  What are your brothers' and sisters' |
| 5 |   | names? |
| 6 | A | Do you want their full name? |
| 7 | Q | Yeah. |
| 8 | A | Their married name? |
| 9 | Q | Their married name, their current names. |
| 10 | A | Okay.  Annette Raines. |
| 11 | Q | Okay.  Is that your -- one of your sisters? |
| 12 | A | That's my oldest sister. |
| 13 | Q | All right.  Where does she live? |
| 14 | A | She probably lives within a mile from me. |
| 15 | Q | Okay. |
| 16 | A | Robert Hollon, that's my older brother, |
| 17 |   | probably within a mile. |
| 18 | Q | Okay. |
| 19 | A | Carolyn McGowan, she lives in the City of |
| 20 |   | Prattville.  Kay Morgan, probably a half a |
| 21 |   | mile from me. |
| 22 | Q | Okay. |
| 23 | A | Steve Hollon, he lives in Prattville, |

```
 1          probably 10, 15 miles from me.  Rodney

 2          Hollon, he lives within a mile from me.

 3    Q     Okay.  The reason I ask that if there's a --

 4          were to be a -- if there were to be a jury

 5          trial in this case, you know, one of the

 6          things we would ask the people who might be

 7          potential jurors is if they knew you or were

 8          related to you.  We wouldn't want one of

 9          your brothers or sisters or relatives to be

10          on the jury.  So, it's important that we

11          understand who your relatively close adult

12          relatives are.

13                Do you have any aunts or uncles

14          that are still living that live in that

15          area?

16    A     I have one aunt -- well, I have two aunts

17          that are living.  One lives within that

18          area.

19    Q     Okay.  What is her name?

20    A     Polly Ross.

21    Q     All right.  And where does she live?

22    A     She lives probably within five miles of me.

23    Q     Okay.  Do you have any nieces or nephews
```

```
 1        that are over the age of 18 that live in

 2        that area?

 3   A    Yes, I do.

 4   Q    Any -- Can you name them?

 5   A    Yes.

 6   Q    Okay.

 7   A    Alex Hollon, Vicki Johnson, Karen Meznick --

 8        Kara Meznick, Joshua Hollon, Jeremy Hollon,

 9        and those are the only ones that live within

10        this area.

11   Q    Okay.  Have you ever been married before?

12   A    No, I have not.

13   Q    Okay.

14        MR. ATCHISON:  You're talking about

15             before his present marriage?

16   Q    Before your present marriage.

17   A    This is the one and only.  No, I have not.

18   Q    Very impressive.

19             Are you a member of any social or

20        civic organizations in the Montgomery area?

21   A    No, I'm not.

22   Q    Are you a member of any religious

23        organizations?  Do you go to a church on a
```

```
1          regular basis?

2    A     Recently, no, I have not.

3    Q     Right.  When you say "recently," how far

4          back are you referring to?

5    A     Probably been about five years.

6    Q     Okay.  Are you a -- currently member of a

7          union?

8    A     Yes, I am.

9    Q     What union are you a member of?

10   A     Actually two, the UTU.

11   Q     And the UTU is the -- Could you state what

12         the full name of the UTU is for the record,

13         please?

14   A     I'm trying to recall because it's

15         basically -- I'm a TCU union member, which

16         has to do with the telecommunications clerk

17         union.

18   Q     Okay.

19   A     Because at the beginning, I was a clerk;

20         then I became a yardmaster, which belongs to

21         the United Transportation Union, UTU.

22   Q     Okay.  Is the TCU part of the UTU, or is it

23         a separate union?
```

```
 1    A    It's a separate union.

 2    Q    All right.  Do you still pay dues to the

 3         TCU?

 4    A    I pay associate dues, yes.

 5    Q    Okay.  And you pay primary dues to the UTU;

 6         is that right?

 7    A    That's correct.

 8    Q    Your current job is covered -- is covered as

 9         a UTU job; is that right?

10    A    That is correct.

11    Q    Have you ever been a member of any other

12         unions?

13    A    Those are the only two.

14    Q    Okay.  Do you have any relatives who work

15         for CSX?

16    A    I have a distant cousin.

17    Q    When you say "distant," you -- like, more

18         than second cousin?

19    A    Yeah.  Probably about fifth or sixth.

20    Q    All right.  Where did you go to high school

21         at?

22    A    Marbury.

23    Q    Is that in Marbury, Alabama?
```

| | | |
|---|---|---|
| 1 | A | Yes. |
| 2 | Q | Okay.  And what year did you graduate? |
| 3 | A | 1978. |
| 4 | Q | All right.  Since graduating from high |
| 5 | | school, did you obtain any formal education? |
| 6 | A | Yes.  Some. |
| 7 | Q | All right.  Can you list for me the -- the |
| 8 | | post high school formal education you |
| 9 | | received? |
| 10 | A | Massey Draughon Junior College -- |
| 11 | Q | Okay. |
| 12 | A | -- accounting; Trenholm Technical College, |
| 13 | | that was an EMS. |
| 14 | Q | Okay. |
| 15 | A | Troy State and Auburn University in |
| 16 | | Montgomery. |
| 17 | Q | Okay.  So, the Troy State in Montgomery? |
| 18 | A | That's correct. |
| 19 | Q | All right.  And Auburn University in |
| 20 | | Montgomery? |
| 21 | A | That's correct. |
| 22 | Q | Did you pursue a degree program in either |
| 23 | | one of those schools? |

| | | |
|---|---|---|
| 1 | A | Yes, but I never did receive the degree. |
| 2 | | That's correct. |
| 3 | Q | Do you remember approximately how much |
| 4 | | credit total you received between the two of |
| 5 | | them? |
| 6 | A | It's probably, like, sophomore or early |
| 7 | | junior. |
| 8 | Q | Okay.  Now, you received a -- an EMS, you |
| 9 | | said, certification; is that right? |
| 10 | A | That's correct. |
| 11 | Q | And then you took accounting courses at |
| 12 | | Massey -- is it Massey Draughons? |
| 13 | A | Massey Draughon Junior College, yes, sir. |
| 14 | Q | Did you receive a degree from there or just |
| 15 | | take classes? |
| 16 | A | Well, I completed, actually, at the top of |
| 17 | | the class at Massey Draughon. |
| 18 | Q | I'm sorry? |
| 19 | A | I got a certificate in accounting.  That's |
| 20 | | correct. |
| 21 | Q | Okay.  You got a certificate? |
| 22 | A | Yes. |
| 23 | Q | Have you ever been in the military? |

```
1   A    No, I have not.

2   Q    Have you had any other formal education

3        other than the schools we've just listed?

4   A    No, I have not.

5   Q    Okay.  Since high school I mean.

6             MR. ATCHISON:  When you say "formal

7                education," would that include

8                training courses on his job?

9             MR. BARKER:  No, I'm not talking about

10               on-the-job training.

11  Q    I'm talking about anything that -- Well, any

12       training you had -- job-related training

13       that required you to go to an educational

14       institute.  Did you ever have any jobs

15       that -- where you sent for a course, for

16       example, to a junior college or to a

17       four-year college for -- for training?

18  A    It was -- It was, like, we would go to

19       trainmaster classes for a week or so in

20       Jacksonville.

21  Q    Okay.  But other than that kind of training,

22       did you have any classroom training --

23  A    No.  No.
```

```
 1   Q     -- associated with your job?  Okay.

 2             MR. ATCHISON:  Basically, you're asking

 3                  whether or not he had any higher

 4                  education?

 5             MR. BARKER:  Any kind of higher, you

 6                  know, non-company-related

 7                  education or company sponsored

 8                  education.

 9             MR. ATCHISON:  Okay.

10   Q     And you -- Did you -- I think your prior

11         question answered this, but you graduated

12         high school; is that right?

13   A     That's correct.

14   Q     When you -- When you graduated high school,

15         what -- did you go to work at that time?

16   A     I worked the summer after graduation.

17   Q     Okay.

18   A     And I started school that fall.

19   Q     Was that Massey Draughons?

20   A     That's true -- correct.

21   Q     Did you have any full-time employment after

22         high school?

23   A     Well, when I attended Massey Draughon, I
```

```
 1           worked for the president of the Lion's Club

 2           at the Central YMCA.

 3    Q      Okay.  And what did you do for him?

 4    A      I was his secretary's assistant.

 5    Q      Okay.  And then after that, what did you do?

 6    A      After completing Massey Draughon, I worked

 7           for a Maddox Transportation.  It was a

 8           trucking company.

 9    Q      What sort of work did you do for them?

10    A      Accounting.

11    Q      Okay.  And then how long did you work there?

12    A      Probably a year.

13    Q      Okay.  After Maddox Transportation, where

14           did you work?

15    A      Actually, that -- that -- seemed like that

16           January after that period, I applied for

17           CSX.

18    Q      Okay.

19    A      Or the Family Lines as it was called back

20           then.

21    Q      Could you repeat that?  I'm sorry.

22    A      The Family Lines Railroad.

23    Q      Okay.  The Family Lines Railroad is a
```

```
 1          railroad that was ultimately -- became part

 2          of CSX; is that right?

 3    A     That's correct.

 4    Q     CSX wasn't in existence at that time?

 5    A     At that time, it was not.

 6    Q     Okay.  Where was the Family Lines Railroad

 7          based at?

 8    A     Jacksonville, Florida.

 9    Q     Okay.  Was it part of another railroad, or

10          is it an independent railroad?

11    A     It was a conglomeration of several

12          railroads.

13    Q     Okay.  Was there a particular railroad that

14          you worked for in that conglomeration?

15    A     The Western of Alabama.

16    Q     Okay.  How long did you work for the Western

17          of Alabama?

18    A     It seems like it was a six-month period,

19          then they merged with the L and N Railroad.

20    Q     Okay.  And then, when they merged with the L

21          and N, did your job remain the same?

22    A     Well, they dove-tailed their seniority in

23          with the clerical forces of the L and N.
```

```
 1   Q    Okay.  And how long did you work for the L

 2        and N?

 3   A    Which -- it -- it later become CSX,

 4        Seaboard/Family Lines, currently now --

 5   Q    Okay.

 6   A    -- until today.

 7   Q    Okay.  When you started with the Western of

 8        Alabama, was that 1981; is that right?

 9   A    That's correct.

10   Q    What -- What was your position that you were

11        in?

12   A    Extra board clerk.

13   Q    Okay.  And could you explain what an extra

14        board clerk is?

15   A    Extra board clerk covers any positions that

16        individuals might be on vacation, off sick,

17        or personal leave.

18   Q    All right.  And that's what an extra board

19        is; is that right?

20   A    That's correct.

21   Q    All right.  Now, what is that -- what's sort

22        of clerk duties did you have?

23   A    The clerical duties on a railroad are
```

1    different from the clerical jobs out in the

2    field.  You had to -- operators where you

3    typed up train orders for trains operating

4    from point, let's say, Montgomery to

5    Atlanta.

6  Q   Uh-huh (positive response).

7  A   So, you give them their orders, and they'd

8    have meet orders where they would meet

9    another train at a sighting.  A crew calling

10    where you called the crews, give them a

11    two-hour -- two, 15-hour call, that you had

12    a train call going towards Atlanta.  We had

13    1050 keypunch operating machine.  You

14    actually keypunched the cards so you get a

15    documentation or what the actual train was

16    in its consist.  So, any Hazmat, they could

17    locate it.

18  Q   Okay.

19  A   Loads and empties, length, footage, tonnage,

20    actual waybill clerk, which kept the

21    inventory of each tracks that was in the

22    yard.  So, you could actually have a proper

23    train consist of the train because the FRA

```
 1        is very tight about documentation on Hazmat.

 2        And from porter to driving, hauling crews.

 3    Q   So, you may have to -- might have to drive,

 4        like, a truck around that would transport

 5        the crews; is that right?

 6    A   Yes.  They'd call it a carry-all, yes.

 7    Q   Okay.  Was that -- Was that a vehicle that

 8        operated on the roads or on a rail?

 9    A   Roads.

10    Q   Okay.  Did you ever work in a position that

11        involved actually driving on the rails or

12        operating of the rails?

13    A   No, I have not.

14    Q   Okay.  Did you stay in the same clerk

15        position for a period of time?

16    A   The extra board position?

17    Q   Yes.

18    A   Yes.

19    Q   How long were you an extra board clerk?

20    A   Clerk?  Well, there was periods during my

21        clerical career that I did all -- a position

22        for a short period of time, but I would say

23        ten years.
```

```
 1    Q    Okay.  So --

 2    A    Roughly.

 3    Q    You were in various clerical positions for

 4         roughly ten years; is that right?

 5    A    Yes.

 6    Q    Did -- did you -- Those were all TCU covered

 7         positions too; is that right?

 8    A    That's correct.

 9              MR. ATCHISON:  The TCU?

10              MR. BARKER:  The TCU covered positions.

11              MR. ATCHISON:  What's TCU?

12              MR. BARKER:  It's a union.

13              MR. ATCHISON:  Okay.  All right.

14    Q    The -- Were you in different job titles

15         during that time frame?  Did you have

16         different clerical jobs, or was there one

17         particular clerical job that you were in?

18    A    There were several.  I would probably say in

19         that period before everything relocated to

20         Jacksonville, you probably had between fifty

21         and a hundred different jobs.  It was

22         just -- I mean, we -- we actually worked

23         three shifts, 365 days a year.  So, there
```

```
1        were several different positions from Lionel

2        Railroad from Newnan, Georgia, to Selma,

3        Alabama.

4    Q   Okay.  The -- Did you ever bid for a -- Were

5        these clerk jobs that you had, were they all

6        under one job title, or did you ever move

7        into a different job title?

8    A   Different -- different job titles.

9    Q   Okay.  When you change from one job title to

10       another, did you have to bid on a position

11       to do that or --

12   A   If it come open, yes.

13   Q   Okay.  All right.  Do you recall how many

14       times you actually bid on different clerical

15       positions in that ten-year period?

16   A   It's been 15 years or more.  So -- So, I

17       would say, no.

18   Q   Okay.  Were there periods of time during

19       your clerical career in which you were

20       furloughed?

21   A   Early -- Probably 1984 or early 1985.

22   Q   Okay.  How long were you furloughed --

23       furloughed for?
```

```
 1   A    Probably, roughly, about -- There was

 2        different periods.  Sometimes you would

 3        furloughed a month, and then they'd call you

 4        back.  Then there was a long period after

 5        the merger with the Western of Alabama and L

 6        and N.  There was probably a year's period

 7        of furlough.

 8   Q    Okay.  And what did you do during that

 9        furlough?

10   A    I worked for the City of Prattville.

11   Q    Uh-huh (positive response).  What did you do

12        for the City of Prattville?

13   A    Fire medic.

14   Q    Paramedic, is that what you said?

15   A    Well, actually, it wasn't a paramedic.  I

16        was a -- I had just completed the class, and

17        I had taken the state exam to become a

18        paramedic when the railroad called me back.

19   Q    Okay.  So, were you a fire medic?  Is that

20        what you said?

21   A    Yeah, I was a fire medic, EMS, yes.

22   Q    Okay.  So, you were doing, what, fireman

23        duties and some emergency medical service
```

```
 1        duties --

 2   A    That's correct.

 3   Q    -- but you weren't -- you weren't a licensed

 4        paramedic; is that right?

 5   A    That's correct.

 6   Q    Once you returned from that furlough, were

 7        you furloughed again for any length of time?

 8   A    No -- let me see here.  The summer of 1991,

 9        I believe, I was furloughed for a period of

10        three months.  That's when they moved all

11        the clerical duties from the Montgomery yard

12        office to Jacksonville.

13   Q    Okay.  So, clerical duties were centralized

14        around 1991 in Jacksonville; is that right?

15   A    1991 -- '90 or '91.

16   Q    Okay.  When you returned from that furlough,

17        did you resume clerical duties, or did you

18        move into a different area?

19   A    Moved into a different area, yardmaster.

20   Q    All right.  Did you have the option of

21        moving to Jacksonville at that time or

22        staying in Montgomery and changing crafts?

23   A    Well, at the time, I was -- Mark Avery asked
```

```
 1        me to train as a yardmaster in Montgomery.
 2   Q    Okay.  And who is Mark Avery?
 3   A    He was my -- He used to be the terminal
 4        trainmaster in Montgomery.
 5   Q    Okay.  And he asked you to -- if you wanted
 6        to or just to transit?
 7   A    Well, he asked me several times.  Then
 8        finally I decided to give it a shot.
 9   Q    Okay.  Now, the clerical duties that you had
10        performed, those have basically been inside
11        an administrative office during the prior
12        ten years or when you had to handle porter
13        duties or something like that; is that
14        right?
15   A    Well, it -- it was inside a -- a CSX yard
16        office.  You might call it an L and N yard
17        office, or different yard offices along the
18        whole railroad.
19   Q    Okay.  Were there any yard office -- So, you
20        were in the Montgomery yard office?
21   A    That's correct.
22   Q    What other yard offices were -- did you work
23        out of during that time frame?
```

1  A    Selma, Alabama; Opelika; LaGrange, Georgia;

2       and once or twice Newnan, Georgia.

3  Q    Okay.  When you worked out of those offices,

4       did you work out of them on a short-term

5       basis or a long-term basis?

6  A    It was probably to cover a vacation vacancy.

7  Q    All right.  Were you ever -- Did you ever

8       have a long-term assignment at a yard office

9       outside of Montgomery for more than six

10      months?

11 A    No.

12 Q    Did you have any interest in going to

13      Jacksonville when the clerical positions

14      moved there, or did you want to stay in

15      Montgomery at that time?

16 A    I did; but at the time, my wife was

17      pregnant, and so, we decided to stay in

18      Montgomery --

19 Q    Okay.

20 A    -- so my children, at least, know their

21      grandparents.

22 Q    Uh-huh (positive response).  And your -- And

23      so, that -- you had an opportunity to train

```
 1        for a yardmaster position; is that right?
 2   A    That's correct.
 3   Q    Now, when you -- And you were ultimately
 4        hired into a yardmaster position; is that
 5        right?
 6   A    Yardmaster's extra board.  That's correct.
 7   Q    Okay.  When you went from a clerical
 8        position to the yardmaster position, did you
 9        have a change in seniority dates?
10   A    Correct.
11   Q    Did you lose all your prior seniority as a
12        clerical employee when you --
13   A    No, I did not.
14   Q    All right.  How -- Were you given some
15        partial credit for your clerical service?
16   A    It's totally different crafts.  Since I was
17        furloughed as a clerical personnel, my
18        seniority date as a clerk is still March the
19        30th, 1981.
20   Q    Uh-huh (positive response).
21   A    So, to this day, I have an option to roll
22        any junior employee under me.
23   Q    Okay.
```

| 1 | A | So, if I decided to today, I could do that. |
|---|---|---|
| 2 | Q | All right.  So, you could become a clerical |
| 3 | | employee tomorrow. |
| 4 | A | That's correct. |
| 5 | Q | And you could bump anybody who was -- |
| 6 | A | Junior. |
| 7 | Q | -- junior to you from that 1981 date? |
| 8 | A | That's correct. |
| 9 | Q | Okay.  So, you retained that seniority, and |
| 10 | | then you obtained a new seniority date in |
| 11 | | the yardmaster crafts; is that correct? |
| 12 | A | That's correct. |
| 13 | Q | What was your yardmaster craft seniority |
| 14 | | date? |
| 15 | A | I would say November of '92. |
| 16 | Q | Okay.  And you were a yardmaster in |
| 17 | | Montgomery; is that right? |
| 18 | A | That's correct. |
| 19 | Q | And who were you working for when you became |
| 20 | | a yardmaster? |
| 21 | A | Terminal trainmaster was Mark Avery.  The |
| 22 | | terminal manager was a Reese Hardman. |
| 23 | Q | Okay.  And can you explain for us for the |

46

```
 1         record what a yardmaster does exactly?

 2   A     Actually, he's the manager of the yard.

 3   Q     Okay.

 4   A     From the yard crews working to any inbound

 5         trains coming into his terminal.

 6   Q     Okay.  So, once a train crosses into the --

 7         what is defined as the perimeter of the

 8         yard, then it comes under the authority of

 9         the yardmaster; is that right?

10   A     That's correct.

11   Q     Once it's outside the yard, then the train

12         crew is responsible for the train's

13         operations; is that right?

14   A     That's correct.

15   Q     Did you ever work in the conductor craft at

16         all?

17   A     No, I have not.

18   Q     Did you ever work in -- then -- then you

19         never worked an engineer craft either?

20   A     No, I have not.

21   Q     Have you ever worked in any -- is the term

22         "line of road" -- is that the right term --

23         crafts?
```

```
 1   A    No, I have not.

 2   Q    Okay.  But is that the -- you understand

 3        when I say "line of road" --

 4   A    Yes.

 5   Q    -- that's any of the crafts that are

 6        actually out on the trail line -- trails --

 7        on the -- Let me rephrase that.  I was sort

 8        of getting tongue twisted.

 9             Those are any crafts that are out

10        on the rails outside a terminal yard; is

11        that right?

12   A    Line of road, you're referring to different

13        locations, or are you referring to the line

14        of road trainmaster, or what are you

15        referring to?

16   Q    I'm referring to any -- to the -- to the

17        line of road crafts.  Those are different

18        from the crafts in the yard; is that right?

19   A    Well, basically, you've got the BLE and U

20        are the same crafts.

21   Q    Okay.

22   A    So, they cover yard and in-line road.

23   Q    Okay.  So, as a yardmaster, do you have --
```

```
 1        if you were to apply for a conductor

 2        position, would you have -- would your

 3        yardmaster seniority count towards that

 4        conductor job?

 5   A    No, it would not.

 6   Q    All right.  You would start fresh with

 7        conductor seniority?

 8   A    That's correct.  Yes.

 9   Q    But conductors are part of the UTU as well;

10        is that right?

11   A    That's correct.

12   Q    But then the -- the engineers are not part

13        of the UTU; is that right?

14   A    They're a different union.

15   Q    Okay.  Are there any other --

16                       (At which time, there was an

17                       off-the-record discussion.)

18   Q    Now, the yardmaster, you said, is the

19        manager of the yard.  The -- the yardmaster

20        is -- is a union position; is that right?

21   A    That's correct.

22   Q    It's not a management position in a formal

23        sense, is it?
```

49

```
 1    A    He -- he's still a manager of the yard.

 2    Q    You were managing things, but you're not

 3         considered a manager by the company; is that

 4         correct?  As a yardmaster, you're a

 5         bargaining unit employee?

 6    A    Yes, but he's still a manager of the yard.

 7    Q    I understand.  But I'm just trying to

 8         draw -- Do you understand the distinction

 9         I'm trying to draw there?  I understand you

10         have management duties as a yardmaster, but

11         the company does not consider yardmasters to

12         be management employees, like, for the

13         purposes of, you know, pay or benefits or

14         bonuses or things like that; is that right?

15    A    Bonus wise, that's correct.

16    Q    Okay.

17    A    There is a differential in pay because he's

18         in charge of his terminal.

19    Q    Uh-huh (positive response).  How long did

20         you remain in the yardmaster position?

21    A    It's right at ten years.

22    Q    All right.  And were you always a yardmaster

23         in Montgomery?
```

```
 1    A    That's correct.

 2    Q    All right.  And that was in the -- the

 3         terminal in Montgomery; is that right?

 4    A    That's correct.

 5    Q    Did you ever do any extensive time on a

 6         temporary basis, even, as a -- as a

 7         yardmaster in any other locations?

 8    A    No, I have not.

 9    Q    Okay.  Have your duties as a yardmaster --

10         Did the duties of the yardmaster change over

11         the 10 years you were working as a

12         yardmaster in any significant way?

13    A    When there were the -- more access to the

14         computer and different computer programs, I

15         would say, yes, it was a faster pace.

16    Q    Okay.

17              MR. BARKER:  Let's take a quick break

18                  here.

19              MR. ATCHISON:  Thank you.

20                      (At which time, a recess was

21                      held.)

22    BY MR. BARKER:

23    Q    Mr. Hollon, we were talking about your --
```

```
1        your work experience at -- at CSX and the

2        predecessor railroads that you worked at.

3        I'm going to show you this document that

4        I've marked as Exhibit Number Two.

5                        (At which time, the referred-

6                        to document was marked as

7                        Defendant's Exhibit No. 2 by

8                        the Reporter.)

9   Q    Do you recognize this document?

10  A    Yes.

11  Q    What is it exactly?

12  A    It's just a -- a record employee master,

13       which shows my birth date, hire date, and my

14       last payroll period.

15  Q    All right.  And can you tell when this

16       particular employee master was printed?

17  A    You can tell the date, but you can't tell

18       the year.

19  Q    Okay.  Looks like 6/24 --

20  A    That's correct.

21  Q    -- is the date.  Is this your handwriting on

22       the document?

23  A    That is correct.
```

1  Q   All right.  And is this a document that you

2      printed?

3  A   I'm not sure I have access to this, so I --

4      I did not print this document.  But it is my

5      handwriting.

6  Q   All right.  So, this is -- Do you remember

7      how you obtained this document?

8  A   No, I do not.

9  Q   At some point, this document came into your

10     possession and you -- and you wrote the

11     handwritten parts on it, though; is that

12     right?

13 A   That is correct.

14 Q   Is that -- Did you also circle your birth

15     date and hire date on this document as well?

16 A   That is correct.

17 Q   All right.  And you write on -- The

18     handwriting states that, "I have worked with

19     the company and its affiliates since 1981.

20     I was furloughed for about a year to a

21     year-and-a-half.  I have trained and worked

22     in the following positions."  And it lists

23     various jobs --

1    A    Yes.

2    Q    -- off?  At the bottom, they put -- it's cut

3         off.  Can you tell me what -- Can you tell

4         what that one is?

5    A    Let's see.  Crew callers, operators -- Well,

6         there's one that's not on here.  That was

7         janitor driver.  It looks like driver at the

8         bottom.

9    Q    Okay.  Now, at the top it says -- There's

10        AWP crew caller, LW -- LN crew caller, and

11        SCL crew caller; is that right?

12   A    That's correct.

13   Q    All right.  And then the AWP, LN and SCL,

14        are those different railroads?

15   A    It's all of the affiliate companies of CSX.

16        These are different -- We had one office who

17        called -- called crews for these different

18        railroads because they're under different

19        agreements.

20   Q    Okay.

21   A    Contractual agreements.

22   Q    So, even though now CSX is the company that

23        all these railroads are a part of, they

```
 1        still exist as separate -- sort of sub-units

 2        within CSX to some extent or another; is

 3        that right?

 4   A    That's correct.

 5   Q    All right.  And at one point in time, were

 6        you any -- were you just in a crew caller

 7        clerk clerical position and you were

 8        responsible for calling crews on each of

 9        these subsidiary railroads at various

10        points?

11   A    That's correct.

12   Q    All right.  But the general duties of a crew

13        caller were the same throughout that time;

14        is that right?

15   A    You just had different contracts --

16        different ways you could call these

17        different types of crews.

18   Q    All right.  And when you say "call the

19        crews," you mean, like, if a crew was

20        needed, call somebody and tell them they

21        needed to appear to work a particular --

22   A    If you had a train built, then you would

23        call -- then the crew caller would call a
```

55

| | | |
|---|---|---|
| 1 | | crew to protect the train. |
| 2 | Q | Okay.  I didn't hear all of it during the |
| 3 | | coughing there.  If you had a train and you |
| 4 | | needed to call a crew for what purpose? |
| 5 | A | Well, if the yardmaster or the trainmaster |
| 6 | | had a train built or was building a train -- |
| 7 | Q | Okay. |
| 8 | A | -- and he was ready for it to be called to |
| 9 | | destination -- |
| 10 | Q | Okay. |
| 11 | A | -- then the crew caller would call the |
| 12 | | crews. |
| 13 | Q | All right.  And when you say "building a |
| 14 | | train," you mean when they're assembling a |
| 15 | | train to go out and -- you know, take |
| 16 | | certain -- an engine that takes certain cars |
| 17 | | to a certain destination where they have to |
| 18 | | be at -- |
| 19 | A | That's correct. |
| 20 | Q | I'm just trying to get all that clear for |
| 21 | | the record too. |
| 22 | A | Okay. |
| 23 | Q | Now, there's a designation here -- Was there |

```
 1        a period of time where you were a -- where a

 2        crew caller was a position that you were in?

 3   A    Well, most of your extra boards were

 4        qualified on different positions.  So, those

 5        were the positions that I was qualified on.

 6   Q    Okay.  So, you were qual -- I cannot say

 7        that word today -- qualified as a crew

 8        caller, an operator?

 9   A    That's correct.

10   Q    And you were a crew caller for these three

11        subsidiary railroads.  You were an operator

12        for those same railroads; is that right?

13   A    And actually for the Southern.  That's

14        correct.

15   Q    Okay.  And then you said here, "Inbound 1050

16        operator?"

17   A    That's correct.

18   Q    "Outbound, interchange, connection."  Are

19        those just different types of operator

20        positions?

21   A    No, sir.  Those are the actual different

22        types of clerical positions.

23   Q    Okay.  So, operator is one type of clerical
```

| | | |
|---|---|---|
| 1 | | position, and then these other type of |
| 2 | | positions are different types of clerical |
| 3 | | positions? |
| 4 | A | That is correct, yes. |
| 5 | Q | And crew caller is a third kind of clerical |
| 6 | | position? |
| 7 | A | That's correct. |
| 8 | Q | All right.  Now, what does an operator do? |
| 9 | A | In -- in the beginning, you had a -- a |
| 10 | | dispatcher, which operated, let's say, from |
| 11 | | Mobile to Montgomery. |
| 12 | Q | Uh-huh (positive response). |
| 13 | A | So, the operator would actually type up any |
| 14 | | train orders or train meets that this |
| 15 | | dispatcher had lined up on his part of the |
| 16 | | railroad.  And you give the train orders to |
| 17 | | the crews.  Before they could leave the |
| 18 | | terminal, they had to have these train |
| 19 | | orders. |
| 20 | Q | Uh-huh (positive response).  So, you would |
| 21 | | essentially type up the train orders to -- |
| 22 | | to give to the different people on the crews |
| 23 | | so they would know where to go? |

```
 1   A    That's correct, yes.

 2   Q    Over time, did that position change?  There

 3        was a change in the technology, I take it?

 4   A    That's correct.  It -- it all shifted to

 5        Jacksonville about the same time the other

 6        clerical positions moved there.

 7   Q    All right.  At this point in time, are there

 8        any clerical positions in Montgomery, the

 9        type that you used to perform?

10   A    The steno clerk is still there.  The chief

11        clerk at the shop is still there.  The

12        janitor, porter drivers are still there.

13   Q    Okay.  And is this a list of all the

14        clerical positions that you held with the

15        company prior to becoming a yardmaster?

16   A    There's some that's not on here.

17   Q    All right.  What were the other ones that

18        are not listed on there.

19   A    Let's see.  I actually worked the steno

20        position for the terminal manager.

21   Q    Any other ones?

22   A    I worked Selma.  I worked the agent

23        position, the 1050 operator position, and
```

```
 1        I'm thinking I had an assistant agent's

 2        position in Selma.

 3   Q    Okay.  Now, what is an agent?

 4   A    That's old terminology, again, of the -- let

 5        me see here.  It was a clerical position.

 6        Actually, it was a -- sort of a management

 7        position of that specific location.  He was

 8        in charge -- let's say Opelika.  He was in

 9        charge of Opelika.  He was the agent for

10        Opelika.  And if customers come in with

11        waybills, whatever, you would usually sign

12        the agent's name.  He was just a

13        representative of the company, but still he

14        was union.

15   Q    Uh-huh (positive response).  So, the

16        responsibility of the agent was to sort of

17        meet with -- deal with customers who would

18        come in and bring in bills for transport; is

19        that right?

20   A    That's correct.  And he was actually over

21        any other clerical personnel in his office.

22   Q    Office.  And that would be a small office

23        normally?
```

```
1    A    On the line of road, yes.

2    Q    So, like, it's basically a station, a weigh

3         station --

4    A    That's correct.

5    Q    -- that anybody could come into but not a

6         full-size terminal?

7    A    Yes.

8    Q    It wouldn't be a place that would have,

9         like, a yard or anything like that.

10   A    Some of them, yes, they did have yards.

11   Q    Okay.  Did you work at any station as an

12        agent that had yards?

13   A    Yes.  Selma had a yard, LaGrange.  Opelika

14        had a small yard.

15   Q    Okay.  Were there non-union employees who

16        were present at any of those yards too who

17        were over them?

18   A    No.

19   Q    Okay.  The -- Now, are -- You had a steno

20        position, too, where you were the steno

21        clerk for the terminal manager in

22        Montgomery; is that right?

23   A    That's correct.
```

```
1    Q    What were your responsibilities in that

2         position?

3    A    Well, like I said, most of these positions I

4         worked extra, so I was qualified on all of

5         them.

6    Q    Okay.  So, in -- in -- in order -- an extra

7         board is like a fill-in kind of position; is

8         that right?

9    A    Yes.

10   Q    So, when somebody is gone, you're filling in

11        for them?

12   A    That's correct.

13   Q    And when you're an extra board person, you

14        have to be trained to do a variety of

15        clerical duties for anybody at any time?

16   A    You have to actually be qualified -- or work

17        in that position as well as the person you

18        were replacing, so, yes.

19   Q    Okay.  Which clerical positions did you have

20        on a long-term basis that weren't extra

21        boards?

22   A    Well, I was going to either AUM or Troy

23        State.  I was trying -- I was working -- I
```

```
 1        would say there was a connections position
 2        on third shift.
 3   Q    Okay.  And what is a connections position?
 4   A    Well, in the old days where we used to have
 5        a lot of railroads in Montgomery where you
 6        did interchange work, they would actually do
 7        the interchanging from the foreign line
 8        railroads.
 9   Q    Okay.  So, where another company's railroad
10        would intersect with a CSX railroad --
11   A    Interchange cars, that's correct.
12   Q    Okay.  And did you physically interchange
13        the cars or just transmit communications
14        back and forth with the other railroad?
15   A    You mean, by paper or --
16   Q    By paper or other -- or by --
17   A    It was physically interchanged through the
18        computer so you would have proper
19        documentation because you still could
20        collect per diem on foreign line cars --
21   Q    Okay.
22   A    -- which is the cost.  They're on our rails.
23        So, you try to get them unloaded and empty
```

```
 1          and turn -- return back to the foreign line
 2          railroad as soon as you possibly can.
 3     Q    Okay.  Were you doing the emptying of the
 4          cars yourself?
 5     A    Oh, no.
 6     Q    Okay.  That's what I was trying to
 7          understand.  You weren't physically out at
 8          the intersection working with the cars.  You
 9          were transmitting the information back and
10          forth between the other two railroads?
11     A    Yes.  Actually, it's just like a record that
12          we received this car from this certain
13          railroad at this certain date and time.
14     Q    Okay.
15     A    That's when it became on your property.
16     Q    All right.  So, you were -- When you were an
17          extra board, was that your position, so to
18          speak, where you didn't have -- where you
19          would just work in different -- any
20          different clerical position that was
21          necessary?
22     A    That's correct.
23     Q    Okay.  How long were you in an extra board
```

```
 1        position during the ten years that you were

 2        clerical?

 3   A    Probably most of it.

 4   Q    Okay.  So, other than the extra board

 5        position, the only long-term clerical

 6        assignment you had was the connections

 7        position?

 8   A    That's correct.

 9   Q    All right.  And there were -- Were there --

10        And were there any other long-term

11        assignments you had other than connections

12        and the extra boards?

13   A    Not that I can recall.

14   Q    All right.  Now, you moved into a yardmaster

15        position next; is that right?

16   A    That's correct.

17   Q    All right.  Were you always in -- and you

18        were always a yardmaster in Montgomery; is

19        that right?

20   A    That's correct.

21   Q    At some point in time you moved to a

22        trainmaster position; is that right?

23   A    Assistant trainmaster, yes.
```

```
 1   Q    Okay.  Assistant trainmaster.  Do you recall
 2        when that occurred?
 3   A    Actually, it was probably May of '01.
 4   Q    And as an assistant trainmaster, were you
 5        still a union employee at that point?
 6   A    No, I was not.
 7   Q    Okay.  That was the first position you had
 8        where you were considered an officer of the
 9        company; is that how that --
10   A    That's -- that's correct.
11   Q    That's how they referred to it, as an
12        officer position --
13   A    Yes.
14   Q    -- is that right?  What were you -- your
15        duties as an assistant trainmaster?
16   A    The safety operations of the yard, managing
17        your crews in line of road to the yard
18        personnel, efficiency testing, safety
19        audits, safety observations, anything that
20        had to operate with the safety operation of
21        the terminal itself.
22   Q    Okay.  Can you explain what an efficiency
23        test is for the record, please.
```

```
 1   A    Where the railroad operates by operating
 2        rules.  An efficiency test is what the
 3        Federal Railroad Administration mandates.
 4        You have to have so many efficiency tests
 5        per month.  So, your officers out there are
 6        monitoring, watching their crews, make sure
 7        that they're working within the scope of the
 8        operating rules of the company.
 9   Q    Okay.  So, essentially, you were in the
10        yard, then you were watching the crews that
11        are working in the yard, and you're
12        documenting to make sure that they are
13        operating within the operating rules and the
14        safety rules of the company and the FRA; is
15        that right?
16   A    That's correct.
17   Q    And you -- you make notations if they're
18        not -- if they're not in compliance with
19        those rules?
20   A    That's correct.
21   Q    And they may or may not know that you're
22        conducting an efficiency test when you're
23        doing it?
```

| | | |
|---|---|---|
| 1 | A | Well, you're supposed to either tell them |
| 2 | | they've passed or failed. |
| 3 | Q | Okay. |
| 4 | A | How can you correct something unless you |
| 5 | | address it? |
| 6 | Q | Okay.  But when you're -- You don't tell |
| 7 | | them that until you're done making -- doing |
| 8 | | the test; is that right? |
| 9 | A | That's correct. |
| 10 | Q | They don't necessarily know when you're |
| 11 | | making the observations? |
| 12 | A | That's correct. |
| 13 | Q | And then -- what was the -- There's another |
| 14 | | kind of test? |
| 15 | A | Safety audits or observations.  Now, they |
| 16 | | knew you were there when you were doing your |
| 17 | | safety audits. |
| 18 | Q | And an observation is tests sometimes |
| 19 | | referred to as an "O test"? |
| 20 | A | Observations, safety audits, no. |
| 21 | Q | Okay. |
| 22 | A | An "O test" is an operating test, which is |
| 23 | | operating rules. |

| | | |
|---|---|---|
| 1 | Q | Okay.  And is that, like, a written test or |
| 2 | | a -- |
| 3 | A | No, it's like you're watching somebody where |
| 4 | | they don't know you're watching them do a |
| 5 | | procedure. |
| 6 | Q | Okay. |
| 7 | A | Or make sure they're going by the rules, the |
| 8 | | operating rules. |
| 9 | Q | So, it's like an efficiency test? |
| 10 | A | The same thing. |
| 11 | Q | Okay.  It is the same thing.  All right. |
| 12 | | And how long were you in the assistant |
| 13 | | trainmaster position? |
| 14 | A | For right about a year. |
| 15 | Q | And who did you report to at that point? |
| 16 | A | At that time, it was -- Matt Meadows was the |
| 17 | | terminal manager, and Charlie Brown was the |
| 18 | | superintendent for the Montgomery area. |
| 19 | Q | All right.  Why don't you explain for the |
| 20 | | record what the management structure is in a |
| 21 | | terminal or in the Montgomery terminal, at |
| 22 | | least. |
| 23 | A | Then or now? |

```
 1   Q   How about then, and then we'll talk about

 2       now.

 3   A   We had a district sup, and he covered

 4       probably Montgomery, and I'm pretty sure he

 5       covered the S and A South, which was, I

 6       think, Calera towards Montgomery.  Then you

 7       had the -- under him was the terminal

 8       manager who covered the terminal operations

 9       and the yard.  And even back then, you had

10       an assistant terminal manager who usually

11       worked third shift.

12   Q   That's the overnight shift?

13   A   Yes.  Then you had four terminal

14       trainmasters who actually covered the yard,

15       and what we had back then was a tower.  So,

16       they worked directly with the yardmaster and

17       the yard.

18   Q   Okay.  And then -- and those were all

19       officer positions; is that correct?

20   A   That's correct.

21   Q   And then there are the bargaining unit

22       employees who are -- the union employees who

23       were -- operated underneath those people; is
```

```
 1        that right?
 2    A   That's correct.
 3    Q   Now, there have been some -- there was a
 4        reorganization of the company in about 2005;
 5        is that right?
 6    A   That's correct.
 7    Q   And the structure was changed at that time;
 8        is that right?
 9    A   That's correct.
10    Q   What was the restructure after the
11        reorganization?
12    A   I think we were considered a little top
13        heavy, so they worked their way down.
14        Seemed like we did away with the assistant
15        terminal manager, and we did away with the
16        superintendent.
17    Q   Okay.  So, there was -- After the
18        reorganization, there was no longer a
19        district superintendent.  There was a
20        terminal manager, but there was an -- there
21        was no longer an assistant terminal manager.
22        And then there was still terminal
23        trainmasters.
```

```
1    A    That's correct.

2    Q    Okay.  And that reorganization was referred

3         to as OEI; is that right?

4    A    That's the best I understand it, yes.

5    Q    Okay.  And so, as a part of that process, a

6         number of positions were eliminated; is that

7         right?  That would be some of the ones we

8         talked about there like the district

9         superintendent position was eliminated.  So,

10        that -- whoever was in that position had to

11        go to a different position; is that right?

12   A    That's correct.

13            MR. ATCHISON:  Excuse me.  For the

14               record, what does OEI stand for.

15            MR. BARKER:  I don't know what it

16               stands for exactly.

17            MR. ATCHISON:  Okay.

18   Q    The -- So, the district superintendent

19        position was eliminated, and the person in

20        that position had to go somewhere at that

21        point; is that right?

22   A    That's correct.

23   Q    And some of the people who were -- Like, if
```

```
 1        the district superintendent's position was

 2        eliminated, that person often bumped down a

 3        lower level manager and took their job; is

 4        that right?

 5   A    That's correct.

 6   Q    Who was the district superintendent in

 7        Montgomery in 2005?

 8   A    2005?

 9   Q    Or before the OEI, who was the --

10   A    That's Charlie Brown.

11   Q    Okay.  And what happened to Charlie Brown in

12        the OEI?

13   A    He was -- He went from -- Let me see.  It

14        was a different level.  It's a bump down.

15        He went from a superintendent -- He went to

16        the MOPS position.

17   Q    Okay.

18   A    Then from the MOPS, during OEI he was --

19        actually forced back to a trainmaster's

20        position in, I want to say, Wildwood,

21        Florida.

22   Q    All right.  So, before the OEI, Charlie

23        Brown was the district superintendent; is
```

1      that right?

2  A   That's correct.

3  Q   And who was the terminal manager in

4      Montgomery?

5  A   Matt Meadows.

6  Q   All right.  And who was the assistant

7      terminal manager before the --

8  A   Warren Carr.

9  Q   Okay.  After the OEI, Charlie Brown went to

10     a MOPS position; is that right?

11 A   That's correct.

12 Q   And that was in Atlanta; is that correct?

13 A   That's correct.

14 Q   That's where the MOPS position is located

15     at?

16 A   Yeah, for the Atlanta division, yes.

17 Q   Okay.  And --

18 A   Actually, he was working out of Montgomery,

19     but, yes, he was on the MOPS position.

20 Q   So, he was physically located in Montgomery,

21     but the positional was really in Atlanta?

22 A   That's correct.

23 Q   And who was the terminal manager after --

```
 1        after OEI?

 2   A    A.B. Montgomery.

 3   Q    Okay.  And what happened to the former

 4        assistant terminal manager?  Where did he

 5        go?

 6   A    I'm trying to think if it was done away with

 7        during the OEI or prior to OEI.  He went

 8        back to a terminal trainmaster's position.

 9   Q    Okay.  And Matt -- What was his last name?

10   A    Meadows.

11   Q    Meadows.  Where did Matt Meadows go?

12   A    He went to a line of road trainmaster on the

13        M and M.

14   Q    Okay.  Can you explain the difference

15        between a line of road trainmaster and a

16        terminal trainmaster?

17   A    Well, terminal trainmaster operates directly

18        with the terminal like Montgomery.  A line

19        of road trainmaster would cover from, let's

20        say, Montgomery to maybe Flomaton or, let's

21        say, Mobile.  It would cover those crews

22        operating within that length of railroad;

23        plus, he would deal with any and all
```

```
 1        customers on that length of railroad.
 2   Q    Okay.  So, the terminal trainmasters
 3        operated within a terminal area; whereas,
 4        the line-of-road trainmaster would have sort
 5        of the line between two terminals?
 6   A    That's correct.
 7   Q    Okay.  And he would have various
 8        responsibilities in between those two
 9        terminals; is that right?
10   A    That's correct.
11   Q    And you were never a line of road
12        trainmaster; is that right?
13   A    No, I was not.
14   Q    You were always a terminal trainmaster?
15   A    That's correct.
16   Q    Are most line-of-road trainmasters -- are
17        they people who came up from conductor or
18        engineer positions, or do they come -- is
19        that not the case in your experience?
20             MR. ATCHISON:  Do you understand the
21                 question?
22             THE WITNESS:  Yes, I understand the
23                 question.
```

```
 1    A    I'm trying to recall.  Probably both because

 2         Steven Dow come out of a management

 3         trainee's position, and he had never seen a

 4         line of roads.  So...

 5    Q    So, there are some terminal trainmaster --

 6         or line-of-road trainmasters who come

 7         directly out of management training?

 8    A    That's correct.

 9    Q    All right.  It's not a prerequisite to be a

10         line-of-road trainmaster that you work in a

11         line-of-road craft position?

12    A    That's correct.

13    Q    Okay.  So, in approximately 2002, you were

14         promoted to the terminal trainmaster

15         position from the assistant terminal

16         trainmaster position --

17    A    That's correct.

18    Q    -- is that right?

19    A    Yes.

20    Q    What were the differences in the terminal

21         trainmaster position versus the assistant

22         terminal trainmaster position?

23    A    Basically, it's the same.  It's just a pay
```

```
 1        increase, basically.

 2    Q   Okay.  So, the assistant one -- one is

 3        almost like a trainee position to be a

 4        terminal trainmaster?

 5    A   That's correct.

 6    Q   Okay.  Are there normally assistant terminal

 7        trainmasters in the yard, or is that only

 8        when there's a -- less than a full capacity

 9        terminal trainmaster?

10    A   Well, actually, I think they've done away

11        with assistant trainmaster's position.

12    Q   Okay.

13    A   It's strictly trainmaster now.

14    Q   So, now you're -- trainmaster is sort of the

15        first-line management position?

16    A   That's correct.

17    Q   Prior to 2006, were you ever disciplined

18        while you were -- by CSX?

19            MR. ATCHISON:  Prior to what?

20            MR. BARKER:  2006.

21    A   Disciplined -- what do you mean by

22        "disciplined"?

23    Q   Did you ever receive -- receive any written
```

```
 1        discipline?
 2   A    The only one that I can recall, I received a
 3        letter from Matt Meadows probably chastising
 4        me for adding some power to a train going to
 5        Birmingham.
 6   Q    Okay.
 7   A    But other than that, none other.
 8   Q    Okay.  That's the only one you can recall?
 9   A    That's the only one.
10   Q    Have you ever been self-employed?
11   A    Self-employed?
12   Q    Uh-huh (positive response).  Have you ever
13        had a business outside of work?
14             MR. ATCHISON:  Full time, part time?
15   Q    Full time or part time.
16   A    From what dates?
17   Q    Any point in the past ten years.
18   A    I'm -- I'm trying to start a business now.
19   Q    Uh-huh (positive response).
20   A    But other than that, no.
21   Q    All right.  What is the business you're
22        trying to start now?
23   A    I'm just -- flea market, antiques,
```

```
 1        collectibles, stuff like that.

 2    Q   When did you start doing that?

 3    A   Probably last August.

 4    Q   I'm sorry?

 5    A   Last August.

 6    Q   Okay.  Before that, had you ever had any

 7        kind of business on your own?

 8    A   No, I had not.

 9    Q   Okay.  Is there a particular flea market

10        that you're working out of?

11    A   Eastbrook here in Montgomery.

12    Q   And is that sort of the arrangement where

13        you have, like, a stall or something --

14    A   Yes.

15    Q   -- that you can put up whatever you want to

16        sell at?

17    A   Yes.

18    Q   As a terminal trainmaster, did you receive

19        training on company policies?

20    A   As always, in the computer through the

21        Gateway.  From now and then, you'd have to

22        complete -- and usually it's a Code of

23        Ethics on the POD system.
```

80

| | | |
|---|---|---|
| 1 | Q | Uh-huh (positive response).  And what is |
| 2 | | that exactly?  Is that, like, an internal |
| 3 | | computer system? |
| 4 | A | That's correct.  Where you can take your |
| 5 | | operating rules and different other |
| 6 | | information you can obtain from it. |
| 7 | Q | All right.  So, you received training on |
| 8 | | operating rules from time to time; is that |
| 9 | | right? |
| 10 | A | That's yearly, yes. |
| 11 | Q | Yeah.  Did you have -- Was that locally, or |
| 12 | | did you have to go somewhere for that? |
| 13 | A | Locally as a union personnel and as a |
| 14 | | trainmaster locally, and usually you would |
| 15 | | go to Atlanta for, like, a classroom rules |
| 16 | | test. |
| 17 | Q | Okay.  So, there was a classroom rules test |
| 18 | | at least once a year when you were a |
| 19 | | trainmaster position on operating rules? |
| 20 | A | Usually, yes. |
| 21 | Q | Okay.  Did you also receive training at that |
| 22 | | time on any changes in the rules? |
| 23 | A | Oh, yes. |

```
1    Q    Was that more than once a year, or would you

2         receive any kind of periodic training on

3         operating rules and changes?

4    A    Well, any changes that -- usually would come

5         over a system bulletin, whatever.  So, you

6         had access to it in the computer.

7    Q    Okay.  So, you would receive sort of --

8         Would it be e-mails or just sort of -- some

9         sort of -- How would you learn if there was

10        a change?

11   A    Well, everybody -- I mean, from union to

12        management would know through the system and

13        headquarter bulletins where they were

14        located and where you could review them at.

15   Q    Okay.  You would also receive training in

16        the Code of Ethics; is that right?

17   A    Well, periodically, you can get an e-mail to

18        them complete this course on the POD

19        system --

20   Q    Okay.

21   A    -- or on your computer.

22   Q    Okay.  Were there any other courses that you

23        took in the POD system besides a Code of
```

```
 1        Ethics?

 2   A    Well, you did your -- the yardmaster has a

 3        skills -- computer skills -- periodically,

 4        he has to take a test on his -- his skills.

 5   Q    Okay.

 6   A    That's yearly, basically.  So, you can get a

 7        difference -- differential in pay for your

 8        computer skills.

 9   Q    Okay.  I show you this document that I'm

10        going to mark as Exhibit Number Three.

11                        (At which time, the referred-

12                         to document was marked as

13                         Defendant's Exhibit No. 3 by

14                         the Reporter.)

15   Q    I'm not going to ask you to read that entire

16        document, but as it -- I would ask you just

17        to flip through it and see if it looks

18        familiar to you.

19   A    Yes, it does.

20   Q    All right.  Does that appear to be the --

21        the CSX Code of Ethics policy?

22   A    Yes.

23   Q    Did you receive a paper copy of this policy
```

```
 1         at any time point, or did you just have

 2         access to it electronically?

 3    A    Access electronically.

 4    Q    Okay.  Were you required as part of the PODS

 5         program to review the whole policy?

 6    A    Actually, I'm pretty sure we just went

 7         through any updates or changes in the Code

 8         of Ethics or -- or different segments of it.

 9    Q    All right.  Was there, like, a little

10         question and answers about the Code of

11         Ethics too as part of the training?

12    A    That is correct.  So they'd make sure you

13         understand it.

14    Q    Okay.

15              THE WITNESS:  Can I be excused for just

16                 one second?

17         MR. BARKER:  Sure.

18              THE WITNESS:  I need to go to the

19                 restroom.

20         MR. BARKER:  That's no problem.  We can

21                 take a real quick break.

22         MR. ATCHISON:  Yes, a few minutes.  Now

23                 is a good time.
```

```
 1                    (At which time, a recess was

 2                    taken.)

 3   Q    Mr. Hollon, did you have any classroom

 4        training on the Code of Ethics?

 5   A    I cannot recall any.

 6   Q    Okay.  Do you recall how many classroom

 7        training -- You don't recall any?

 8   A    No, I don't recall any.

 9   Q    Okay.  Would you turn to -- do you see those

10        little numbers in the bottom left-hand

11        corner there?  The first page is -- I think

12        it says "three" at the bottom.  Do you see

13        that?  If you look in the first -- If you

14        look on the first page, it says "three."  Do

15        you see that?

16   A    It's got "three," yeah.

17   Q    On the bottom, on the next page, it's got

18        "four" at the bottom.

19   A    Yeah.

20   Q    The third paragraph it says:  CSX expects --

21        expects its directors, officers, and

22        employees to abide -- to understand and

23        abide by all legal requirements governing
```

```
 1          the Company's business and operations.

 2                     Were you familiar with that

 3          statement in the Code of Ethics?

 4   A     Yes.

 5   Q     All right.  And -- and also said, "The

 6          Company provides ongoing education and

 7          guidance concerning applicable laws and

 8          regulations."

 9                     Were you aware of that as well?

10   A     That's correct, yes.

11   Q     And then it says -- there's some bullet

12          points lower down the page, and the first

13          one says, "You are personally responsible

14          for your own conduct in complying with all

15          provisions of this Code of Ethics and for

16          promptly reporting known or suspected

17          violations of this Code of Ethics to your

18          supervisor, manager or the CSX Ethics

19          Information Hotline."

20   A     That's correct.

21   Q     You are familiar with that as well?

22   A     Yes.

23   Q     Okay.  If you will, turn to the page that's
```

```
 1        numbered eight at the bottom.  There's a

 2        section that says an "Accurate and Complete

 3        Books, Records and Accounting."  Do you see

 4        that?

 5   A    Yes.

 6   Q    That first sentence says, "A company's

 7        credibility is judged in many ways -- one

 8        fundamental way is the integrity of its

 9        books, records and accounting."  Were you

10        familiar with that?

11   A    Yes.

12   Q    And the next paragraph says, "Every CSX

13        director, officer and employee must help

14        ensure that reporting of business and

15        financial information -- computerized, paper

16        or otherwise -- is accurate, complete and

17        timely."  Were you familiar with that as

18        well?

19   A    That's correct.

20   Q    Okay.  Did you ever have any training on

21        what I will call HR policies, like,

22        discrimination or things like that?

23   A    Any training?
```

87

```
1    Q    Yeah.

2    A    Just through, like, what we would receive on

3         the PODS.

4    Q    Okay.  But there was never -- You don't

5         recall any classroom training on the

6         subjects?

7    A    No.

8    Q    But you did receive information about the

9         subjects on the PODS; is that right?

10   A    That's correct, yes.

11   Q    Okay.

12            MR. ATCHISON:  What does that acronym

13                 stand for?

14            MR. BARKER:  I don't know what that one

15                 stands for either.  There are a

16                 lot of acronyms.

17   Q    So, do you know what the acronym PODS stands

18        for?

19   A    No, I do not.

20   Q    Okay.  Being on the railroad is like being

21        in the military as far as acronyms go, isn't

22        it?

23   A    Yes.  It's different terminology.
```

```
 1   Q   Let me show you what's marked as Exhibit

 2       Number Four there.

 3                        (At which time, the referred-

 4                        to document was marked as

 5                        Defendant's Exhibit No. 4 by

 6                        the Reporter.)

 7   Q   You don't have to read the whole thing, but

 8       do you recall seeing a policy -- or

 9       receiving a copy of something that looked

10       like this?

11   A   Well, it's posted.  I mean, you don't

12       physically obtain one, but it is posted.

13   Q   Where is it posted at?

14   A   This is posted in -- I believe in the copy

15       room.

16   Q   Okay.  So, that's something you see any time

17       you go in the copy room; is that right?

18   A   Yes.

19   Q   All right.  But they don't distribute

20       personal copies of them; is that right?

21   A   No, they do not.

22   Q   Was that something that you received on PODS

23       as well?
```

```
 1   A   No, this is -- this policy is posted, but

 2       you had access to it if you went through the

 3       Gateway.

 4   Q   Okay.  And the Gateway is the internal

 5       computer system; is that right?

 6   A   That's correct.

 7   Q   Like a company internal Internet?

 8   A   Yeah.

 9   Q   Okay.  Have you heard the term "intranet"

10       used before?

11   A   I can't recall.

12   Q   Okay.  Now, you said that prior to 2006 the

13       only written discipline you can recall

14       receiving was a letter from Matt Meadows

15       regarding a -- a train assignment; is that

16       right?

17   A   Well, he -- he claimed I delayed a train

18       because I was trying to add power to this

19       train to progress it to Birmingham.

20   Q   Okay.  And that's the only written

21       discipline you can recall receiving?

22   A   That's correct.

23   Q   Okay.  Now, in 2006, there was a situation
```

```
1          in which you received some discipline; is

2          that correct?

3    A     Explain what you mean by "discipline."

4    Q     All right.  Well, you were taken out of

5          service in May of 2006; is that right?

6    A     No.

7    Q     That's not correct?

8    A     That's not correct.

9    Q     When were you taken out of service?

10   A     June of 2006.

11   Q     All right.  What is a remote control

12         operator?

13   A     In the yard, we have switching operations

14         and we've gone to remote control

15         locomotives.

16   Q     Uh-huh (positive response).

17   A     Remote control operator operates the

18         engine -- it's a regular remote control box,

19         just like you would a remote control car.

20   Q     Uh-huh (positive response).  And a remote

21         control operator is a conductor who's been

22         trained how to operate that remote control

23         box; is that correct?
```

```
 1   A    It would be a switchman that is trained to

 2        operate that remote control box.

 3   Q    Okay.  Are there also conductors who are

 4        trained to operate the remote control boxes

 5        as well?

 6   A    Well, it's like in the -- in the yard and

 7        the line of road you have different

 8        terminology.

 9   Q    Okay.

10   A    In the yard, you have switchmen or foremen.

11        On the line of road, you have conductors or

12        brakemen.

13   Q    Okay.  So, is the switchman a person who is

14        assigned to the terminal all the time?

15   A    Well, his -- his terminology tells -- I

16        mean, he is a switchman.  He switches box

17        cars --

18   Q    Okay.

19   A    -- in the terminal.

20   Q    Okay.  And that's what his job is?

21   A    It is.

22   Q    All right.  And so, the people who are in

23        the switchman position are trained how to
```

```
 1        use the remote control device; is that

 2        right?

 3   A    The majority of them are, correct.

 4   Q    Okay.  There are certain -- at least there

 5        are certain ones who are trained?

 6   A    There are some that are not.  That's

 7        correct.

 8   Q    All right.  Just like on a line of road,

 9        there's some conductors who are trained on

10        how to use them and some who are not?

11   A    I have not -- remote control is strictly in

12        the yards right at this minute.

13   Q    Okay.

14   A    It's not been approved by the FRA for the

15        line of road that I -- I know of.

16   Q    Okay.  Now, if a conductor operates a remote

17        control in the yard, is that person -- is he

18        referred to as a switchman when he's doing

19        that?

20   A    Or a remote control foreman or a remote

21        control operator.  He's still a switchman.

22   Q    Okay.  But if -- if I'm a conductor and the

23        train passes into the yard and I'm operating
```

1    the train inside the yard, am I considered a

2    switchman while I'm doing that inside the

3    yard or am I still just considered a

4    conductor?

5  A    You're still considered a conductor.

6  Q    Okay.  So, when the train is inside the

7    yard, the switchmen are the ones -- ones who

8    are responsible for moving them around the

9    yard?

10  A    He's responsible for reclassifying cars that

11    are brought into the terminal to be

12    reclassified.

13  Q    Okay.  And when you say "reclassified," what

14    does that mean?

15  A    Say you have a train coming up from Mobile,

16    in his consist, he has trains -- cars going

17    to Atlanta or Birmingham or Selma.

18  Q    Uh-huh (positive response).

19  A    Then the -- the switching crew switches

20    these cars to these different classification

21    tracks.

22  Q    Uh-huh (positive response).

23  A    So, that can be built on other trains going

1       in those directions.

2  Q   Were -- And you had never been a switchman

3       before; is that right?

4  A   No, I have not.

5  Q   Had any of the other terminal trainmasters

6       been switchmen before in Montgomery, to your

7       knowledge?

8  A   A few of them had, but I would say a

9       majority of them had not.

10  Q   In 2006, who were the other terminal

11       trainmasters?

12  A   2006?

13  Q   Uh-huh (positive response).

14  A   You had Warren Carr.

15  Q   Okay.

16  A   You're talking about at the time of my

17       demotion?

18  Q   Yes.

19  A   Warren Carr, Roger Jackson, Josh Connell and

20       myself.

21  Q   All right.  And how long had each of those

22       individuals been in Montgomery as a terminal

23       trainmaster?

```
 1   A    Roger Jackson had been -- had been a line of

 2        road trainmaster several times, and he had

 3        even been to New Orleans, during OEIs, where

 4        he got bumped to.

 5   Q    Okay.

 6   A    So, he had probably been back in Montgomery

 7        probably about a year or a little less than

 8        a year.

 9   Q    But he had been in various trainmaster

10        positions for some period of time before

11        that?

12   A    Yes.  That's correct.

13   Q    Okay.  What about Josh Connell?

14   A    He was actually a -- He was actually from

15        Alabama, but he had transferred back from, I

16        think, Albany in New York.

17   Q    Okay.  And had he been a terminal

18        trainmaster there?

19   A    In Albany?

20   Q    Yeah.

21   A    I'm not sure if it was terminal or line of

22        road.

23   Q    Okay.
```

```
 1   A    But, yes, he was a trainmaster in New York.

 2   Q    Okay.  So, it's Josh Connell and Warren

 3        Carr?

 4   A    Yes.

 5   Q    And who is -- yourself, and who was the

 6        other person?

 7   A    Roger Jackson.

 8   Q    Jackson.  How long had Warren Carr been a

 9        trainmaster?

10   A    Just a rough guess, probably -- Well, he --

11        he was the -- the assistant terminal manager

12        in Montgomery at a period.

13   Q    Okay.  So, before O -- OEI, he had been the

14        assistant terminal manager?

15   A    Well, right before -- I'm not sure if he got

16        bumped down before OEI or during OEI.

17   Q    Okay.

18   A    But he was, like, a trainmaster in Mobile.

19        I think he was a -- a trainmaster in

20        Flomaton.  But Montgomery was his home

21        terminal.  That's where he first hired out

22        at --

23   Q    Okay.
```

```
 1   A    -- on the Western of Alabama with myself.

 2   Q    Okay.  Had you-all been working on the

 3        Western of Alabama together for a long time?

 4   A    Well, I worked with him a few years as -- as

 5        a clerk, yes.

 6   Q    Okay.  And all those guys -- Josh Connell,

 7        Roger Jackson, Warren Carr, and yourself,

 8        you had all been in Montgomery at least a

 9        year at that point; is that right?

10   A    Or longer, yes.

11   Q    Or longer.  At least a year?

12   A    Yes.

13   Q    Okay.  Were -- was Josh Connell, Roger

14        Jackson, or Warren Carr -- Do you know if

15        they were -- any of them were trained on how

16        to operate remote control devices?

17   A    I would say Roger Jackson and Warren Carr

18        both were.

19   Q    All right.  And do you know how it was they

20        came to be trained on how to operate remote

21        control devices?

22   A    Well, like I stated in my paperwork,

23        Montgomery was one of the first terminals
```

```
 1        that went remote.

 2   Q    Uh-huh (positive response).

 3   A    So, basically, Roger Jackson went to be

 4        trained in remote control -- I think in the

 5        same area as Georgia -- along with Warren

 6        Carr, I think, Matt Meadows and Charlie

 7        Brown.

 8   Q    Uh-huh (positive response).  They all went

 9        through training in remote controls?

10   A    That's correct.  But the three terminal

11        trainmasters -- three or four terminal

12        trainmasters that actually ran the terminal

13        were never afforded the training to go to

14        these locations.

15   Q    Okay.  So, at that point, Charlie Brown,

16        Matt Meadows, Warren Carr were all above the

17        level -- level of terminal trainmaster when

18        they received that kind of training in

19        remote controls?

20   A    Yes.

21   Q    Okay.  And Roger Jackson was also above the

22        level of terminal trainmaster?

23   A    He was a line of road trainmaster.
```

1   Q    Oh, he was a line of road trainmaster.

2   A    I'm not sure why he even needed it.

3   Q    Were there any other terminal trainmasters,

4        to your knowledge, in Montgomery who

5        received that remote control training while

6        they were in the terminal trainmaster

7        position?

8   A    Mike Langford finally did towards the end of

9        the -- before he left for Dothan.

10  Q    Okay.  Was terminal -- or was remote control

11       training something you could sign up to

12       take?  How did one --

13  A    Well, usually, your terminal manager would

14       sign you up for certain classes to go to.

15  Q    Okay.  And did you have to request those

16       classes, or did they just pick things for

17       you to take?

18  A    Usually, they would look at the schedule and

19       try to work you in, which they never worked

20       any -- any of us in, basically.

21  Q    Okay.  Did you ever ask to take remote

22       control training?

23  A    With Ms. Angie Averitte, yes, I did on

```
 1        two -- several occasions.

 2   Q    All right.  And what did she tell you in

 3        response to that?

 4   A    Well, it seems like she -- she lined me up

 5        for a class.  Something would always take

 6        place.  You'd have a change of a supervisor

 7        where, you know, you'd have to stay in a

 8        terminal to work while they were gone or

 9        whatever.

10   Q    Uh-huh (positive response).  So, you may

11        have been signed up for a class, but you --

12        because of various circumstances, you were

13        never actually able to take the classes?

14   A    That's correct.

15   Q    All right.  Other than Angie Averitte, were

16        there any other people you talked to about

17        the remote control training?

18   A    Well, Matt Meadows had us -- I'm pretty sure

19        he had a line -- us lined up to go to -- I

20        think they changed it from Saint Mary's to

21        Huntington, West Virginia, or Maryland.  And

22        that was probably about the time of OEI when

23        all the roll-downs took place.
```

```
1    Q    Okay.  So, you think that Matt Meadows had

2         you signed up for the training as well --

3    A    Yes.

4    Q    -- but then there was OEI --

5    A    Yes.

6    Q    -- and the training never happened at that

7         point.

8    A    That's correct.

9    Q    Okay.  Now, what is a road foreman of

10        engineers?

11   A    Usually, he is an engineer who is a -- as a

12        supervisor/manager, which is called road

13        foreman of engines, which --

14   Q    Engines.  I'm sorry.

15   A    -- he deals with strictly engineers.

16   Q    Okay.  So, he's like the person who

17        supervises engineers, basically.

18   A    Yes.

19   Q    And then there's a senior road foreman of

20        engines as well; is that right?

21   A    Yes.  He would be over your line of -- other

22        road foremen of engines.

23   Q    Okay.  And where are road -- road foreman of
```

```
 1          engineers and senior road foreman of --

 2          excuse me, road foreman of engines and

 3          senior road foreman of engines, where are

 4          they based out of?

 5    A     Your senior road foreman of engines is

 6          Atlanta, Georgia, for this division.

 7    Q     Okay.  What about the -- just the road

 8          foremans of -- foreman of engines?

 9    A     Well, in Montgomery, you have two, which is

10          the road foreman of engines for the M and M

11          part of the Montgomery or Atlanta division.

12          Then you have another one which covers from,

13          like, Montgomery to Atlanta or short of

14          Atlanta.

15    Q     Okay.  And do they have, like, a geographic

16          assignment based on a particular -- sort of

17          a sub-component of a local railroad

18          division?

19    A     Yes, or maybe one covers the other one when

20          he's off or on vacation, whatever.

21    Q     Okay.  In 2006, the two -- who were the two

22          road foremen of engines in Montgomery?

23    A     Wayne Powe and T.J. Dean.
```

```
1   Q    Okay.  How do you spell Powe for her?

2   A    P-O-W-E.

3   Q    Okay.

4            MR. ATCHISON:  Off the record.

5                     (At which time, a recess was

6                     taken.)

7   Q    In May of 2007, do you -- or '06, do you

8        recall there was an occasion where you

9        needed a remote control operator where there

10       wasn't one that was available?

11  A    That's correct.

12  Q    All right.  And that -- So, you needed to

13       call in somebody who was certified; is that

14       right?

15  A    That's correct.

16  Q    All right.  And the person who you

17       identified to call was J.R. Weeks; is that

18       right?

19  A    That's correct.

20  Q    Jeremy Weeks; is that --

21  A    Yes.  That's correct.

22  Q    How did -- How did you know who was

23       available to be called?
```

1    A    Well, actually, it was a little tight on the

2         S and A South, Atlanta, M and M, and Dothan

3         side.  So, you did not want to use an

4         engineer to convert a position.  So, the

5         switchman of the board was exhausted.  We

6         needed remote control people or personnel.

7    Q    Right.

8    A    So, we -- So, I went to the brakeman's board

9         on the M and M side, which they fluctuate

10        from the yard to the road.  And Jeremy Weeks

11        had worked for me before as a remote control

12        operator.  So, I told the crew caller to

13        give him a call for a remote control

14        operator.

15   Q    Okay.  Can you explain what a board is, what

16        you're referring to?  When you go the

17        brakeman's board, is that like a listing of

18        who the brakemen were who were available?

19   A    Well, it -- it goes back to crew calling.

20        You have an engineer's board, which is a

21        list of the engineers that are qualified for

22        that particular part of the railroad.

23   Q    Okay.

```
 1    A    Then you have a conductors.  You have a

 2         brakeman, which you usually go first in to

 3         first out.  I mean, if you come in on a

 4         train and if you're extra, you go to the

 5         bottom of the board.

 6    Q    And so, if you were short a switchman, you

 7         could have converted -- you could have asked

 8         an engineer to come in and perform that duty

 9         but you were --

10    A    Not an engineer, no.

11    Q    Okay.  When you say "converting

12         an engineer," what do you mean by that?

13    A    Converting a yard job where you don't have

14         remote control operated people qualified,

15         you can call in an engineer to operate the

16         engine.

17    Q    Okay.  So, you could have called an --

18         theoretically, you could have called in an

19         engineer to operate an engine within the

20         yard there where you didn't have any remote

21         control operators available.

22    A    That's correct.

23    Q    But you were short on engineer's on several
```

```
 1         of the -- the areas that Montgomery was

 2         responsible for?

 3    A    That's correct.

 4    Q    And so, instead of converting an engineer,

 5         asking an engineer to come in off of the --

 6         off the line or stop being on call for being

 7         on the line, you looked at the brakeman's

 8         board and found a brakeman who was remote

 9         control qualified; is that right?

10    A    That's correct.

11    Q    All right.  And was there more than one

12         brakeman who was a remote control

13         operator -- remote control certified who was

14         available?

15    A    I -- I could not recall to be honest.  I --

16         I remember Jeremy Weeks had worked in the

17         yard before.

18    Q    Okay.  So, he had -- and yet he worked for

19         you as a remote control operator before; is

20         that correct?

21    A    That's correct, yes.

22    Q    So, you called Jeremy -- did you call him

23         personally, or did the -- the clerk call
```

```
1        him?

2    A   The crew caller did.

3    Q   Okay.  So, the crew --

4    A   The yard crew caller.

5    Q   The yard crew caller called Weeks.  And did

6        he just show up, or what happened then?

7    A   Well, he -- he -- he called -- he told the

8        crew caller that his remote control card had

9        not been signed.  So, I asked the crew

10       caller was it still in date, and he said it

11       was.  It was, like, good until March of

12       2007.

13   Q   Okay.  Now, what is a remote control card?

14   A   It's just a FRA document saying you're

15       authorized to, like, operate that engine in

16       a remote control.

17   Q   All right.  To be a remote control operator,

18       you have to be certified by the Federal

19       Railway Administration; is that right?

20   A   Yes.

21   Q   And if you're not certified, then you're not

22       legally allowed to operate --

23   A   That's correct.
```

1    Q    -- an engine; is that right?

2    A    That's correct.

3    Q    And the company has its own policy that

4         parallels that legal requirement; is that

5         right?

6    A    Well, it usually goes hand in hand with what

7         the FRA dictates.

8    Q    Uh-huh (positive response).  But, I mean,

9         the FRA has a rule -- the company has a rule

10        just like the FRA rule?

11   A    Basically, yes.

12   Q    Okay.  Now, when you say that the person's

13        FRA card or their remote control operator

14        card needs to be signed, what does that

15        mean?

16   A    That means that a qualified manager has to

17        watch him perform or operate the remote

18        control locomotive.

19   Q    Okay.  And how does one become a qualified

20        manager who's authorized to do that?

21   A    Usually the way I understand it, he has to

22        be an engineer and has to be trained because

23        we -- we have a trainer in Montgomery who

```
 1        trains the remote control operators, but he
 2        cannot sign the card.
 3   Q    Okay.  So, to become a remote control
 4        operator you have to go to the class and
 5        then you actually have to have an engineer
 6        sign -- sign off on the certification; is
 7        that right?
 8   A    Well, you go through the class, and you have
 9        hands-on operating.
10   Q    Uh-huh (positive response).  And then that
11        engineer has to sign off on the -- the card
12        itself --
13   A    That's correct.
14   Q    -- that they've observed you?
15   A    Yes.
16   Q    All right.  And -- and it's a management-
17        level engineer, so a road foreman
18        of engines, basically; is that right?
19   A    That's correct.  Yes.
20   Q    And at that time in Montgomery, there were
21        two road foremen of engines:  T.J. Dean
22        and -- is it Warren Powell or Wayne Powell?
23   A    Wayne Powe.
```

1    Q    Powe.  Okay.  So, those are the two

2         potential road foreman of engines who could

3         sign a card?

4    A    That's correct.

5    Q    Do you know how -- how long a card signature

6         is valid for?

7    A    Roughly, I will say two years, but I cannot

8         swear to that.

9    Q    Okay.  And you had never had -- you had

10        never been an engineer or a road foreman

11        of engines; is that right?

12   A    No, I had not.

13   Q    All right.  So, that was an area that you

14        weren't as familiar with; is that right?

15   A    That's correct.

16   Q    But you did have some knowledge of what the

17        rules were that governed those remote

18        control certifications and the -- who could

19        and could not operate a remote control

20        engine; is that right?

21   A    Basically, yes.

22   Q    So, you spoke with Weeks -- Did you

23        personally speak with Weeks about whether

1       his card was signed or not?

2   A   Well, the crew caller gave him the call.

3       And usually, there's a road foreman of

4       engines out there on Saturday morning

5       anyway.  So, I told him to come on out,

6       that, you know, somebody would sign his

7       card.

8   Q   Okay.  Did you -- Did you check to see

9       whether there was a road foreman of engines

10      there already, or did -- is that just the

11      usual practice, that there was somebody who

12      was there?

13  A   Usually, there's somebody there on Saturday.

14      I usually got there an hour or two

15      earlier --

16  Q   Okay.

17  A   -- before one them showed up.

18  Q   Okay.

19  A   But I did call T.J. Dean to give him a

20      little heads up that I would probably need

21      his signature -- or to sign a remote control

22      card.

23  Q   Okay.  And -- and what did he say?

```
 1   A    He -- he instructed me to sign it.  Then
 2        I -- I questioned him to have the authority
 3        to.  Then he told me to get Mr. Weeks to
 4        call him when he come in.
 5   Q    Okay.  Did Mr. Weeks talk to Mr. Dean first
 6        or did you --
 7   A    I called Dean first.
 8   Q    So, you called Dean first?
 9   A    Yes.
10   Q    And then Weeks called Dean.  Then Dean told
11        you to tell Weeks to call him when he
12        arrived?
13   A    That's correct.  Yes.
14   Q    Did Dean say where he was at that point?
15   A    No, he did not.
16   Q    What about Warren Powe, did you -- did you
17        try him too?
18   A    No, I didn't try Warren because I had
19        communicated with T.J.
20   Q    Okay.
21   A    So, T.J. was supposed to take care of it.
22   Q    Okay.  And in terms of corporate hierarchy,
23        I realize the terminal -- the terminal
```

```
 1          trainmaster is sort of in one hierarchy who

 2          reports to the terminal manager, correct?

 3     A    Yes.

 4     Q    The road foreman of engines is in a separate

 5          hierarchy, is that right, who reports to a

 6          senior road foreman of engines?

 7     A    Yes.

 8     Q    So, there's, like, a parallel reporting

 9          structure there; is that right?

10     A    I would say yes.

11     Q    And -- and you didn't report to T.J. Dean,

12          and he didn't report to you; is that right?

13     A    That's correct.  Yes.

14     Q    In terms of managers, does the company have,

15          like, grades or levels that are assigned to

16          those of any kind of numeric or alphabetical

17          nature?

18     A    Numerical grades, yes.

19     Q    Okay.  And what is the lowest end of the

20          numerical grades?

21     A    I've seen a two.  I'm not sure if it goes

22          below a two.

23     Q    Okay.  So, two is, like, a low -- low-level
```

114

```
 1        manager?
 2    A   Yes.
 3    Q   And do you know how high the higher end of
 4        that scale goes?
 5    A   Probably -- I'm not for sure -- probably a
 6        seven or higher.
 7    Q   Okay.  So, they get bigger --
 8    A   Yes.
 9    Q   -- as they go up?
10    A   Yes.
11    Q   Okay.  And what -- what is the numerical
12        rating for a terminal trainmaster?
13    A   Well, assistant was three; terminal
14        trainmaster was a four.
15    Q   Okay.  Do you know what the numerical rating
16        is for a road foreman of engines?
17    A   No, I do not.
18    Q   Okay.  So, you talked -- Weeks -- or the
19        next thing that happened that Weeks arrived
20        at the yard; is that right?
21    A   That's correct.
22    Q   And what happened then?
23    A   He -- he come in, and I told him to call
```

```
 1        T.J.  So, him and T.J. communicated.
 2   Q    Were you in the room when they were
 3        communicating?
 4   A    Yes.
 5   Q    Okay.
 6   A    It was in my office -- or the yard-
 7        master's -- trainmaster's office.
 8   Q    Was it on the phone?
 9   A    Yes.
10   Q    Okay.  And what happened then?
11   A    T.J. told him to tell me to sign it.  Then I
12        said I'm not sure I'm -- I'm supposed to
13        sign that card.  So, then I called T.J.
14        back, and he instructed me to go ahead and
15        sign -- sign the card, and that he would be
16        in to take care of the computer work and to
17        watch Mr. Weeks operate the remote control
18        locomotive.
19   Q    Okay.  Had you ever signed a card like that
20        for anybody before?
21   A    No, I had not.
22   Q    Was there anybody that you had ever seen
23        sign a card for somebody before who wasn't
```

```
 1        an engineer or a road foreman of engines?
 2   A    There was a trainmaster on S and A South --
 3        this happened afterwards -- that signed a
 4        card for a locomotive engineer.
 5   Q    Who was that?
 6   A    It's ken Williams.
 7   Q    Okay.  So, after this happened, Ken
 8        Williams -- Did you see Ken Williams sign
 9        this card for this person or did you hear
10        that he signed it?
11   A    I just -- I just heard.
12   Q    So, you heard Ken Williams signed the card.
13        And he is in Montgomery, or is he somewhere
14        else?
15   A    He's actually a line of road trainmaster for
16        Calera, or the S and A South.
17   Q    And you heard that -- that he signed -- do
18        you know who the person's card was?
19   A    No, sir, I do not recall.
20   Q    Do you know if he is remote control
21        certified?
22   A    An engineer I would say, no, but there's a
23        possibility maybe we have conductors
```

```
 1        stepping up to the engineer rank.

 2   Q    All right.  You refer -- So, you're not sure

 3        if Ken Williams is remote control certified

 4        or not?

 5   A    I'm not sure of that, no.

 6   Q    He could be?

 7   A    Well, that wasn't an issue.  This is a

 8        locomotive engineer's certification.  That's

 9        not --

10   Q    So, you have to be a locomotive engineer to

11        certify that?

12   A    I would say yes.

13   Q    All right.  That's your understanding, at

14        least?

15   A    Yes.

16   Q    Okay.  And --

17   A    Or a road foreman of engines.

18   Q    Or a road foreman of engines.

19   A    Yes.

20   Q    And as a line of road trainmaster, he would

21        not be an engineer or a road foreman of

22        engines; is that right?

23   A    I wouldn't -- I wouldn't think he would be
```

```
1        authorized to sign it being a line of road
2        trainmaster even if he was an engineer.
3   Q    Okay.
4   A    He's not a road foreman of engines.
5   Q    Okay.  And do you know who the person's card
6        was he -- you heard he signed?
7   A    No, sir, I do not.
8   Q    But you heard him sign somebody's card?
9   A    That's correct.
10  Q    And that was after this occurred with --
11       with you?
12  A    That's correct.
13  Q    Before this occurred, had you ever heard of
14       anybody signing who was not a road foreman
15       of engines or an engineer signing a remote
16       control operator's FRA certification?
17  A    No.
18  Q    All right.  Where did T. J. Dean say he was
19       at this point?
20  A    He did not say.
21  Q    All right.  And did you ask him if you could
22       wait until he got there for -- to put Weeks
23       out in the yard?
```

```
 1   A    No, I didn't.  He told me he was in route,

 2        go ahead and sign it, and he'd take care of

 3        watching them operate the remote and putting

 4        the information into the -- the computer.

 5   Q    Okay.  Did he tell you how long it would be

 6        before he would be there?

 7   A    No, he didn't.

 8   Q    And this was on Saturday; is that right?

 9   A    That's correct.

10   Q    Do you remember what time of the day it was,

11        roughly, morning, afternoon?

12   A    It was morning because of the -- the two

13        remotes on the South and one goes on duty at

14        7:30 eastern or 8:00 eastern.  So, it was

15        fairly early.

16   Q    Okay.  And so, Dean told you to sign the

17        card and that he would handle the paper --

18        he would enter the information into the

19        computer and do the observation when he

20        arrived; is that right?

21   A    That's correct.

22   Q    And then at that point, you signed the card;

23        is that right?
```

1    A    With his instruction and authority, yes, I

2         signed it.

3    Q    Do you know if he had the ability to

4         delegate to you the authority to sign that

5         card for him?

6    A    Well, we signed -- I mean, all through CSX

7         people sign from the agent -- As a clerk, I

8         signed the agent's name when I received any

9         waybills from a customer.  Then you would

10        initial it.

11   Q    A waybill from a customer is not an FRA

12        document, though, is it?

13   A    It's still a company document.

14   Q    But are you aware --

15   A    It's a legal and binding contract.

16   Q    Are you aware of any FRA documents that

17        people sign other people's names to?

18   A    No.

19   Q    All right.  And you were concerned that this

20        wasn't -- this wasn't appropriate, weren't

21        you?  That's why you called T.J. Dean back

22        several times?

23   A    That's correct.

```
 1    Q    Okay.  So, you signed the document.  Did you
 2         sign your name to it or T.J. Dean's name to
 3         it?
 4    A    I was instructed to sign his name, and I
 5         signed his name.
 6    Q    Okay.  Did you just sign T.J. Dean or T.J.
 7         Dean by Ron Hollon or --
 8    A    I can't recall if I signed it, initialed it,
 9         or just signed it.
10    Q    Okay.  And then what happened?  You send
11         Weeks out in the yard?
12    A    Yes.
13    Q    Okay.
14    A    That's correct.
15    Q    And do you recall how long it was before
16         T.J. Dean arrived?
17    A    It was probably about mid-morning.
18    Q    So, two or three hours later?
19    A    Maybe, yeah, an hour and a half to two hours
20         later.
21    Q    At any point, did you contact Warren Powe --
22         or is it Powe?  Is that how you say it?
23    A    Powe.  No, I did not.
```

```
 1   Q   Okay.  Why didn't you contact Warren Powe

 2       and see if he was available to sign it?

 3   A   I had contacted the road foreman of engines,

 4       and he was supposed to take care of it --

 5       taken care of it.

 6   Q   Okay.  And are the road foremen of

 7       engines -- do they have a set schedule like

 8       what -- do they take turns on Saturdays, or

 9       how does that work as far as which one is

10       going to be there what days?

11   A   I'm not for sure how the senior road foreman

12       of engines covers that.  I know they're

13       basically on call a lot.  And I imagine

14       somebody covers their off days.

15   Q   Okay.  Do you know if that date was T.J.

16       Dean's off date?

17   A   No.  I could not tell you.

18   Q   Okay.

19   A   He did not tell me that it was his off day.

20   Q   Okay.  He did not tell you it was his off

21       day.  And once you had contacted him, you

22       didn't think it was necessary to contact

23       anybody else?
```

| | | |
|---|---|---|
| 1 | A | No, sir. |
| 2 | Q | Because you had contacted him? |
| 3 | A | Yes. |
| 4 | Q | All right.  So, he arrives later on that |
| 5 | | morning, and he entered into the computer. |
| 6 | | So, he did -- he did the remote observation |
| 7 | | himself; is that right? |
| 8 | A | The way I understand it, yes, he did. |
| 9 | Q | Were you present when he did that |
| 10 | | observation? |
| 11 | A | I was -- I was present in the yard office. |
| 12 | Q | You were not present, like, physically |
| 13 | | present? |
| 14 | A | In the yard -- |
| 15 | Q | In the yard. |
| 16 | A | -- watching him? |
| 17 | Q | Yes. |
| 18 | A | No, I was not. |
| 19 | Q | Okay.  And then he indicated in the |
| 20 | | computers that he did done the observation |
| 21 | | and signed the card for Mr. Weeks; is that |
| 22 | | right? |
| 23 | A | The best of my knowledge, yes. |

```
 1   Q    All right.  You didn't witness that either?

 2   A    I did not actually witness it.

 3   Q    All right.  And then when is the next time

 4        that you heard anything about this issue?

 5   A    This issue?  The FRA lady, Marlo Owens,

 6        called me from Atlanta and said she just

 7        needed to interview me, and that she knew I

 8        was going on vacation the next week.  That

 9        she would just interview me when I first got

10        back.

11   Q    Okay.  And do you know how the -- the issue

12        came to the attention of the FRA?

13   A    I'm not sure if a -- some switchman

14        questioned it or Mr. Dale Barnett questioned

15        it.  I think it went from switchman to Mr.

16        Barnett, from Mr. Barnett to the FRA.

17   Q    Okay.  So, one of the switchman in the yard

18        questioned -- Your understanding, at least,

19        is one of the switchman in the yard --

20   A    Yes.

21   Q    -- questioned the appropriateness of your

22        signing that certification?

23   A    That's correct.
```

1   Q   Do you know which switchman that was?

2   A   It could have been Mr. Weeks, or it could

3       have been -- There's several people there it

4       could have been.

5   Q   All right.  But you don't know which one it

6       was?

7   A   Directly, no, I do not.

8   Q   Have you heard which one it was?

9   A   I've heard several things.

10  Q   Okay.  What have you heard?

11  A   Well, I've heard it could have been Tim

12      Hicks, the remote control trainer.  I've

13      heard it could have been Mark Strickland,

14      who is the conductor trainer.  It could have

15      been Jeremy Weeks or David Brown, who worked

16      on the other remote control locomotive.

17  Q   All right.  Did you ever ask any of those

18      individuals whether they were the ones who

19      contacted --

20  A   No, I did not.

21  Q   Okay.  Well, let me repeat this because I

22      didn't quite finish.  I want to be clear.

23              You never asked any of those

```
 1          individuals if they were the person who

 2          contacted the FRA, is that right, or

 3          initiated contact with the FRA?

 4     A    That's correct.

 5     Q    Okay.  Ultimately, your understanding is

 6          that Dale Barnett contacted the FRA; is that

 7          right?

 8     A    That's correct.

 9     Q    Dale Barnett is a local union official; is

10          that right?

11     A    He's the -- You might call him the safety

12          coordinator for the Atlanta division.

13     Q    Okay.  But is -- He's also a union

14          representative as well; is that right?

15     A    Yes.

16     Q    Is his position safety coordinator -- is

17          that a company position, or is that a union

18          position?

19     A    I would say company.

20     Q    Okay.  So, his job with the company is to be

21          the safety coordinator, but he also happens

22          to have some sort of management role in the

23          union as well or doesn't he?
```

1    A    Well, he's a union rep, I guess.

2    Q    Okay.  He's an elected union rep?

3    A    Yes.

4    Q    So, one of the -- the members in his unit

5         has a concern about something, they come to

6         him and he presents it to the company; is

7         that right?

8    A    That's correct.

9    Q    Okay.  And in this case, he presented that

10        concern directly to the FRA; is that

11        correct?

12             MR. ATCHISON:   If you know.

13   A    That's correct.

14   Q    That's what you've been told?

15   A    That's what I've been told.

16   Q    Did you ever speak with Mr. Barnett about

17        it?

18   A    Seemed like he come in later that day and

19        made the statement that what we did was

20        wrong.

21   Q    Okay.  So, the very day this happened, Mr.

22        Barnett came in and said something to you

23        about it?

```
1    A    Later that evening, yes.

2    Q    Yeah, later that evening, he came and said

3         something to you about it?

4    A    That's correct.

5    Q    And what was your response?

6    A    To be honest, I can't recall what I

7         responded to him.

8    Q    Okay.  Was anybody else present when you had

9         this conversation?

10   A    There was a yardmaster directly behind me.

11   Q    Do you remember who the yardmaster was?

12   A    I would say it was Lonnie Neese.

13   Q    Okay.  And was that the first time anybody

14        had told you they thought it was

15        inappropriate for you to sign the

16        certification?

17   A    Yes.

18   Q    All right.  Who was the next person you

19        heard from about the certification?  Was

20        that the lady from the FRA in Atlanta?

21   A    Well, she just wanted to interview me about

22        the circumstances that took place.

23   Q    All right.  But between the time that you
```

```
 1        spoke with Mr. Barnett and the time you

 2        heard from the lady with the FRA in Atlanta,

 3        did you hear from anyone else at the company

 4        or the union or the FRA about the

 5        certification issue?

 6   A    I can't recall, to be honest.  I just

 7        remember those -- those two.

 8   Q    At some point, Rodney Saunders contacted you

 9        about the issue; is that right?

10   A    He did not contact me.

11   Q    Did you ever -- Did you ever speak to Rodney

12        Saunders about the issue?

13   A    No, I did not.

14   Q    Did Jason Tipton contact you about the

15        issue?

16   A    He contacted me in the middle of my

17        vacation, June the 7th, which was roughly a

18        week and a half, maybe two weeks later after

19        the incidence.

20   Q    Was this before or after you had spoken with

21        the woman from the FRA?

22   A    This was after she had told me she would

23        interview me when I come back from my
```

```
 1        vacation.

 2   Q    Okay.  Who -- At that time, what was Rodney

 3        Saunders' position?

 4   A    He was a senior road foreman of engines.

 5   Q    Okay.  So, he was the chief engine -- person

 6        over engineers in the Atlanta division; is

 7        that right?

 8   A    That's correct.

 9   Q    And Jason Tipton was the terminal manager in

10        Montgomery at that time; is that right?

11   A    That's correct.

12   Q    So, he was who you reported to?

13   A    That's correct.

14   Q    Okay.  Did -- And Jason contacted you over

15        the telephone, I guess, while you were on

16        vacation?

17   A    Over my cell phone.  That's correct.

18   Q    And what do you recall of that conversation?

19   A    Well, actually, he left me a voice mail to

20        call him back as soon as possible once I got

21        that voice mail.

22   Q    And where were you at that point?

23   A    I was at the Water Park in Panama City,
```

```
1        Florida.

2   Q    Okay.  And did you contact him?

3   A    As soon as I received my voice messages,

4        yes, I did.

5   Q    Was -- That was that day or the next day?

6   A    Yes, it was that very same day.

7   Q    Okay.  And what do you recall about the

8        conversation you had with him?

9   A    He told me that I was pulled out of service

10       until further advised; that he needed a

11       written statement faxed to him as soon as

12       possible.

13  Q    Uh-huh (positive response).  Did he tell you

14       what needed to -- what --

15  A    He just told me to write down what I

16       remembered about the incidence that day.

17  Q    All right.  And he didn't give you any

18       further instructions about what to include

19       in the statement or what not to include?

20  A    Just the -- what happened that day.

21  Q    Okay.  I'm going to show you this document

22       I'm going to -- I'm going to mark Exhibit

23       Number Five.
```

```
 1                      (At which time, the referred-

 2                      to document was marked as

 3                      Defendant's Exhibit No. 5 by

 4                      the Reporter.)

 5   Q    Is this the -- the statement you prepared?

 6   A    Yes, it is.

 7   Q    All right.  And this is your handwriting; is

 8        that right?

 9   A    That's correct.

10   Q    And is -- The date on here at the top, is

11        that the date you prepared it?

12   A    That's correct.

13   Q    Now, if you had received remote control

14        operator training, you still would not have

15        been authorized to sign for remote control

16        operator certification.  That's your

17        understanding, correct?

18   A    Yes.

19            MR. ATCHISON:  I'm going to object to

20                the form.  It may call for a legal

21                conclusion.

22            MR. BARKER:  I will leave my question

23                as it stands.
```

```
 1    Q    Do you -- Okay.  You said, yes, that you

 2         would have needed to be a road foreman of

 3         engines to be authorized to sign that card,

 4         is that right, regardless of whatever

 5         training you had received?

 6              MR. ATCHISON:   Same objection.

 7    Q    Is that your understanding, that even if you

 8         had received remote control operator

 9         training, you would not have been authorized

10         to sign that card?

11    A    Can you repeat that?

12    Q    All right.  Is it your understanding that,

13         even if you had received a remote control

14         operator training, you would not have been

15         authorized to sign that card -- that remote

16         control operator card?

17    A    As a trainmaster or a road foreman of

18         engines?

19    Q    As a trainmaster.

20    A    That's correct.

21    Q    All right.  You would have needed to have

22         been a road foreman of engines to have

23         signed that card; is that right?
```

| 1 | A | That's correct. |
| 2 | Q | And you at no point in your career were an |
| 3 | | engineer or a road foreman of engines; is |
| 4 | | that correct? |
| 5 | A | That's correct. |
| 6 | Q | Now, at this point, you had been in -- in a |
| 7 | | management position as either an assistant |
| 8 | | trainmaster or a trainmaster since 2001; is |
| 9 | | that right? |
| 10 | A | That's correct. |
| 11 | Q | So, a little over five years? |
| 12 | A | It was right at five years. Yeah, a little |
| 13 | | over five years. |
| 14 | Q | And how many years before that had you been |
| 15 | | a yardmaster? |
| 16 | A | Roughly, ten -- nine to ten. |
| 17 | Q | Okay. And then you had approximately ten |
| 18 | | years as a clerk before that? |
| 19 | A | That's correct. |
| 20 | Q | And your total service time was about 25 |
| 21 | | years? |
| 22 | A | 25, 26. Yeah, 25 years. |
| 23 | Q | Okay. Now, the statement you wrote here is |

```
 1        directed to a Rodney Saunders; is that
 2        right?
 3   A    I'm pretty sure that's who Jason told me to
 4        address it to.
 5   Q    All right.  Did -- Did Jason tell you
 6        that -- that Mr. Saunders was conducting an
 7        investigation of the issue?
 8   A    No.  He just told me to write out a
 9        statement what happened that day.
10   Q    Did he tell you why that you needed to write
11        out a statement?
12   A    That I was pulled out of service, and they
13        needed a statement that -- other than that,
14        no.
15   Q    All right.  Is that the first time you had
16        ever been pulled out of service before?
17   A    Yes.
18   Q    All right.  Either as a management or a
19        union employee?
20   A    Any time during my 25 years of railroad
21        career.
22   Q    Okay.  And this statement you wrote up,
23        that's an -- an accurate reflection of your
```

```
 1        recollection of what happened on that date?

 2   A    Other than the -- the last request when I

 3        asked T.J. Dean if I should sign that and he

 4        instructed me to sign the damn card, but

 5        other than that, yes.

 6   Q    So, that was what he said:  Just go ahead

 7        and sign the damn card?

 8   A    That's correct.

 9   Q    But, otherwise, this is an accurate

10        reflection?

11   A    That is correct.

12   Q    And so, you sent this to -- to -- to Mr.

13        Tipton on the morning of the 7th -- or

14        sometime during the day of the 7th; is that

15        right?

16   A    It was at lunch or a little -- probably

17        about 1:00 o'clock that day.  That's

18        correct.

19   Q    And the day you actually signed the card was

20        the 27th of May; is that right?

21   A    That's correct.

22   Q    Which was a week and a half or so earlier?

23   A    That's correct.
```

1   Q   Do you know if the company can be fined or,

2       otherwise, punished for having an -- an

3       inaccurate signature on a FRA certification?

4   A   Well, I know that the FRA reviewed it and

5       did not fine CSX or find any wrongdoing --

6   Q   Did you understand --

7   A   -- under the circumstances.

8   Q   Did you understand that, if the FRA had

9       found wrongdoing, they could have fined CSX?

10  A   And myself, yes.

11  Q   And you personally?

12  A   That's correct.

13  Q   Okay.  But they did not -- they determined

14      that Mr. Weeks' prior observation was still

15      valid.  So, it wasn't necessary for you to

16      sign the card; is that right?

17  A   That is correct.

18  Q   So, the -- his card was still valid and

19      didn't need -- need to be signed at that

20      time; is that right?

21  A   Well, I think he had a 60-day period from

22      the time he first began operating a remote

23      control engine again --

1    Q    Okay.

2    A    -- for it to be signed and for him to be

3         observed.

4    Q    All right.  And you were not aware of that

5         grace period at the time you signed his

6         card, were you?

7    A    I was.  But like I said before, I was

8         instructed by the road foreman of engines to

9         sign it.

10   Q    Okay.  Did you understand that there was a

11        grace period in which he had to operate the

12        engine without having --

13   A    No, I did not.

14   Q    -- his card signed?  Okay.  We're starting

15        to talk over each other just a little bit.

16        Now I want to just slow down just so we're

17        clear because I don't want to interrupt you.

18   A    Okay.

19   Q    After the fact -- After the investigation

20        was done, you learned that it wasn't

21        necessary for you to sign the card because

22        there was a grace period; is that right?

23   A    Repeat that.

```
 1   Q   After the investigation was done by the FRA,
 2       you learned that it wasn't necessary for you
 3       to sign the card because he had a 60-day
 4       grace period in which to get that card
 5       signed; is that right?
 6   A   Actually, I think it was before the
 7       investigation of the FRA because I think,
 8       during the process, T.J. had contacted
 9       either Mr. Saunders or somebody in
10       Jacksonville about the incident.
11   Q   Okay.  The -- but -- On the day that you
12       signed it, you didn't realize there was this
13       grace period?
14   A   No, I did not.
15   Q   Okay.  After you spoke with Jason Tipton at
16       some point during this process, Mr. Dean
17       contacted either Mr. Saunders or someone in
18       Jacksonville; is that right?
19   A   That's correct.
20   Q   Do you know if the FRA contacted
21       Mr. Saunders or anyone in Jacksonville?
22   A   Me personally, no, I do not.
23   Q   All right.  Have you heard that any -- that
```

```
 1        FRA contacted Mr. Saunders or anyone in

 2        Jacksonville?

 3   A    No.

 4   Q    Okay.  Do you know if the FRA contacted

 5        Mr. Tipton?

 6   A    Personally, no, not at all.

 7   Q    All right.  Do you have any idea how

 8        Mr. Tipton or Mr. Saunders learned about the

 9        certification issue?

10   A    No, I do not.

11   Q    Okay.  But they did learn about it, and

12        Mr. Tipton asked you to submit a description

13        of what happened; is that right?

14   A    A statement.

15   Q    A statement?

16   A    That's correct.

17            MR. ATCHISON:  Can we take a short

18               break?

19            MR. BARKER:  Okay.

20                    (At which time, a recess was

21                    taken.)

22   Q    Mr. Hollon, is it your understanding that

23        Marlo Owens, the woman from the FRA, came to
```

1          Montgomery while you were on vacation?

2     A    No, I wasn't.

3     Q    Did you hear -- do -- do -- Let me rephrase

4          that.

5               Do you know if she ever came to

6          Montgomery as part of her investigation?

7     A    To this one or...

8     Q    To this issue, yes.

9     A    Not that I can recall.

10    Q    All right.  Did anyone ever tell you that

11         she came to Montgomery while she -- while

12         you were on vacation?

13    A    No, they did not.  She said I was just --

14         she were -- that she would get with me when

15         I come back from vacation to give a

16         statement.

17    Q    Okay.  But she didn't tell you she was

18         coming to Montgomery whether you -- when you

19         were gone or anything like that?

20    A    Not that I can recall, no, sir.

21    Q    All right.  I'm going to show you this

22         document that I'm going to mark as Exhibit

23         Number Six.

```
 1                    (At which time, the referred-

 2                    to document was marked as

 3                    Defendant's Exhibit No. 6 by

 4                    the Reporter.)

 5    Q    Have you had a chance to review that

 6         document, Mr. Hollon?

 7    A    Yes.

 8    Q    Have you ever seen that document before?

 9    A    Yes, I have.

10    Q    When did you see it?

11    A    I -- I believe I saw it yesterday.

12    Q    All right.  Before yesterday or before this

13         month, have you ever seen this document

14         before?

15    A    Other than my -- my statement, no, I had

16         not.

17    Q    Okay.  And on the second page there, there's

18         a typed version of the handwritten statement

19         that's Exhibit Number Three -- or excuse

20         me -- Number Five; is that right?

21    A    That's correct.

22    Q    Is there anything in this -- this document

23         that you think is inaccurate?
```

```
1    A    Other than him telling me to sign the damn

2         card, no.

3    Q    Okay.  So -- And that was something that you

4         left out of your original statement; is that

5         right?

6    A    Yes.

7    Q    Okay.  Did you ever have any conversations

8         with Rodney Saunders about this

9         investigation at all?

10   A    No.

11   Q    Have you ever met Rodney Saunders before?

12   A    Yes, I've e-tested with him.

13   Q    Okay.  So, you knew him, at least?

14   A    Yes.

15   Q    All right.  Did you ever have any problems

16        with Rodney Saunders?

17   A    Oh, no, never.

18   Q    And you don't recall having any

19        conversations with him about the

20        investigation; is that right?

21   A    No.

22   Q    All right.  So, you were taken out of

23        service while you were on vacation.  What
```

```
 1        was the next thing you heard about the

 2        investigation?

 3   A    The next thing was that David Hamby was

 4        supposed to come down to Montgomery to see

 5        T.J. Dean and myself.  It seemed like it was

 6        supposed to have been the -- the Thursday

 7        prior to the Monday we was actually pulled

 8        out of -- demoted.

 9   Q    Okay.  So, sometime in the latter part of

10        June.  Do you remember how many weeks later

11        that was?

12   A    Probably -- Probably about the fifteenth,

13        roughly.

14   Q    Okay.  And how did you understand that

15        Mr. Hamby was going to be coming to town?

16   A    It was just to -- to see T.J. Dean and

17        myself.

18   Q    How did you learn that?  Did he call you, or

19        did someone else tell you that, or...

20   A    I can't recall, but it was probably

21        Mr. Tipton that informed us of this.

22   Q    Okay.  Was Mr. Dean present when you were --

23        were you at home at this point when you were
```

```
 1        out of service?

 2  A     Yes.

 3  Q     All right.  You worked -- You didn't work

 4        again after you were taken out of service?

 5  A     That's correct.

 6  Q     All right.  And were you being paid while

 7        you were out of service?

 8  A     That's correct.

 9  Q     Okay.  Did you talk to Mr. Dean at all while

10        you were out of service about the

11        investigation?

12  A     To be honest, I can't recall talking to him

13        about it.

14  Q     Okay.  So, you think Mr. Tipton, but you're

15        not sure that Mr. Tipton called you and told

16        you that David Hamby was going to come and

17        meet with you?

18  A     That's correct.

19  Q     All right.  Who is David Hamby at that point

20        in time?

21  A     He's the -- I -- I'm trying -- I think he's

22        a superintendent of the Atlanta division.

23  Q     At that point in time, was he the
```

```
 1        superintendent of the Atlanta division, or

 2        was he the assistant superintendent of the

 3        Atlanta division?

 4    A   You know, I can't recall.  It was one or the

 5        other.

 6    Q   Okay.  Did you know Mr. Hamby?

 7    A   Oh, yeah, personally.

 8    Q   All right.  Had you -- Did you work with him

 9        before as well?

10    A   Actually, he began in Montgomery.  That's

11        where he first hired out.

12    Q   Did you have any problems with Mr. Hamby?

13    A   Oh, never.

14    Q   Okay.  And -- when -- When did Mr. Hamby

15        work in Montgomery?  More than five years

16        ago?  Less than five years ago?  I mean, are

17        we talking about more recently?

18    A   The date of my demotion?

19    Q   Yes.

20    A   From -- Okay.

21    Q   '80s, '90s?

22    A   Well, I know he was working as an engineer

23        when I first became a yardmaster up there.
```

```
 1         So, it was the early '90s.
 2    Q    Okay.  So, when you were a yardmaster, you
 3         dealt with him as an engineer; is that
 4         right?
 5    A    That's correct.
 6    Q    All right.  And then in his position as a
 7         assistant superintendent of the division,
 8         did you have any dealings with him?
 9    A    Other than maybe talking to him on a
10         conference call, no.
11    Q    Okay.  At that point in time, Rod Workman
12         was a superintendent of the division; is
13         that right?
14    A    He was the division manager.
15    Q    Division manager.  Okay.  And Mr. Hamby
16         reported to him; is that right?
17    A    That's correct.
18    Q    Did you know Mr. Workman personally?
19    A    Define personally.
20    Q    Had you ever worked with him directly?
21    A    Yes.  He was the -- He had been on the
22         Atlanta division once before, then the OEI
23         bumped him back towards Jacksonville.
```

1   Q   Okay.  When he had been in the Atlanta

2       division before, what was his position to

3       your recollection?

4   A   I can't recall his title at that time.

5   Q   Okay.  Did you-all work directly together,

6       or did you just kind of know who he was?

7   A   Well, he was on the conference call a lot.

8       So, basically, you -- you heard his voice

9       daily.

10   Q   Okay.  Did you have any in-person

11       interaction with him?

12   A   Are you talking about friendly or company?

13   Q   Either way.

14   A   Business, other than what was expected of

15       the work terminal and our numbers and all.

16       Basically, that was about it.

17   Q   Did you have any personal interaction with

18       him?

19   A   No.

20   Q   Okay.  Did you have personal interaction

21       with David Hamby?

22   A   Other than "hi" and "it's good to see you,

23       how are you doing," no.

```
 1    Q    You don't ever, like, go to lunch together

 2         when you were in --

 3    A    No.

 4    Q    -- or anything like that?

 5    A    No.

 6    Q    Before this -- this incident, you had met

 7         Mr. Workman in person; is that right?

 8    A    Several occasions.

 9    Q    More than five?  Less than five?

10    A    Or anytime, basically, when you went to

11         Atlanta for training, you would run into

12         him.  So, five or more.

13    Q    Okay.  Did he know you on a first name --

14         Would he know you if he saw you in the

15         hallway, for example?

16    A    Yes, he would.

17    Q    Okay.  He would know your name and who you

18         were and where you worked?

19    A    Basically, that's correct.

20    Q    Okay.  Now, did Mr. Hamby come and meet with

21         you, or did someone else come and meet with

22         you?

23    A    It seemed like there was an incident that
```

```
 1        arose that Mr. Hamby had to take care of.
 2   Q    Okay.
 3   A    So, that was postponed until the -- I
 4        believe the nineteenth was the following
 5        Monday.
 6   Q    Okay.  And who did you meet with at that
 7        time?
 8   A    Mr. Rod Workman and Jack Frost.
 9   Q    Okay.  And had you ever -- Who is Jack
10        Frost?
11   A    He's the human resource or laborer relations
12        for the Atlanta division.
13   Q    All right.  Had you had any dealings with
14        Mr. Frost before?
15   A    I had been to a class with him, but other --
16        a couple of classes with him, but other than
17        that, no.
18   Q    All right.  Would he even know your name, do
19        you think, necessarily?
20   A    I would hope so, yes.
21   Q    All right.  If you ran into him on the
22        street, would he recognize you?  Had you had
23        that much interaction with him?
```

```
1    A    It's like I said, I only met him a couple of
2         times in classes.
3    Q    Okay.
4    A    So, I'm not sure he would recognize me or
5         not.
6    Q    Okay.  Did you have any problems with
7         Mr. Frost?
8    A    No.
9    Q    Had you -- Other than a -- Had you ever had
10        any one-on-one interaction with Mr. Frost
11        before?
12   A    We had a leadership training in Atlanta for
13        a week, and there's a little bit.
14   Q    Okay.  Had you had any one-on-one
15        interaction with Mr. Workman before this?
16   A    Other than work-related?
17   Q    Well, even work-related, did you have, like,
18        an occasion to have to call him directly on
19        the phone or speak to him directly?
20   A    Oh, yes.
21   Q    Okay.
22   A    And he even -- we was at out-of-the-park
23        meeting in Atlanta, and he pulled me and
```

1      Jason into his office to discuss crew

2      overtime.

3   Q  Okay.  So, you had had direct business-

4      related interaction with him?

5   A  Yes.

6   Q  Okay.  Did you have any problems with

7      Mr. Workman before this time?

8   A  What do you mean by "problem"?

9   Q  Did you have any reason to think he didn't

10     like you?

11         MR. ATCHISON:  What was the time frame

12             you're talking about?  June the

13             19th?

14         MR. BARKER:  June of 2006, yeah.

15  A  Well, he -- he was a hard one to -- I mean,

16     it was strictly business.  It wasn't -- it

17     wasn't nothing personal there.

18  Q  Okay.  So, you met with Mr. Workman and

19     Mr. Frost.  Was Mr. Dean present at the time

20     too or anyone else?

21  A  Mr. Dean was.

22  Q  Was it just the two of you-all and the two

23     of them?

```
 1   A    In the conference room, yes, but Rodney

 2        Saunders and Mr. Tipton was standing by

 3        probably in Mr. Tipton's office.

 4   Q    Okay.  So, they were present on that day

 5        too, but they weren't in this meeting with

 6        you?

 7   A    That's correct.

 8   Q    And -- and what do you recall about the

 9        meeting?

10   A    That Mr. Workman and Mr. Frost told us to

11        come back in the conference room.  And that,

12        basically, before we sit down in our seats,

13        he said our services was no longer needed to

14        be managers -- CSX no longer needed our

15        services as managers.

16   Q    Mr. Workman said that?

17   A    That's correct.

18   Q    And what else was said?

19   A    He -- he claimed due to us falsifying -- or

20        forging is what he said -- an FRA document.

21   Q    Okay.  And do you remember anything else he

22        said at that point?

23   A    That we could -- Mr. Frost handed us letters
```

1       with our -- who would contact in

2       Jacksonville to roll back to positions that

3       we could protect.

4    Q  Okay.  So, did Mr. Frost tell you how you

5       would go about doing that, or he just handed

6       you a piece of paper?

7    A  Verbally, he handed us a letter.  And then,

8       basically, he just -- I believe he read over

9       the letter.

10   Q  He said that you had the right to go back to

11      a contract position?

12   A  That's correct.

13   Q  In your case, that would be a yardmaster

14      position or a clerical position?

15   A  That's correct.

16   Q  And you chose to exercise your seniority to

17      go back to a yardmaster position; is that

18      right?

19   A  That's correct.

20   Q  And to your knowledge, Mr. Dean exercised

21      his seniority and went back to an engineer's

22      position; is that right?

23   A  That's correct.

1    Q    Where was the engineering position that he

2         went to?

3    A    I think it was on the M and M.  He -- he'd

4         been on several -- I mean, Coast Line, AWP.

5         I'm pretty sure he was on the M and M at

6         that time.

7    Q    Did you consider exercising your clerical

8         seniority in trying to find a clerical

9         position in Jacksonville or elsewhere or was

10        it --

11   A    Well, I could not roll to Jacksonville.  All

12        I could protect was in the Montgomery

13        terminal.

14   Q    Okay.  Because of the contract provisions?

15   A    Well, you're moving from different railroad

16        properties.

17   Q    Okay.  And so, the seniority rights you had

18        were specific to the Montgomery terminal; is

19        that right?

20   A    On the L and N, yes.

21   Q    And on the L and N Railroad?

22   A    That's correct.

23   Q    And so the only position, really, there was

```
 1        the yardmaster positions.  There were no

 2        longer clerical positions?

 3   A    Well, I could have rolled back to a clerical

 4        position.  It paid less.  So, I rolled back

 5        to the yardmaster's position.

 6   Q    So, you rolled back to a yardmaster's

 7        position.  Do you recall anything else about

 8        what was said in the meeting with

 9        Mr. Workman and Mr. Frost?

10   A    Well, no.  During halfway between the

11        conversation, I handed him the EEOC charge.

12   Q    When you say "him," who did you hand it to?

13   A    I handed it to Mr. Workman.

14   Q    All right.  And what did he say?

15   A    I think he was a little shocked for a bit.

16        Then he -- I said I believe you need to read

17        this.  So, he read it, him and Jack Frost

18        both read it.

19   Q    And then what did they say?

20   A    He was a little hesitant.  He made -- I

21        think he made the remark about

22        discrimination.

23   Q    What was the remark that he made?
```

1    A    He -- I don't think he believed that I filed

2         an EEOC charge against discrimination.

3    Q    That he didn't -- He was surprised that you

4         had filed an EEOC charge alleging

5         discrimination?

6    A    That's correct.

7    Q    All right.  Did he say anything else?

8    A    After that he said, if I needed any help,

9         that CSX had a psychologist that I could

10        talk to.

11   Q    All right.  Was that all?

12   A    And that, if we had any CSX properties in

13        our possession, we needed to turn them in.

14   Q    Was there anything else that was said in

15        this meeting?  Did he say anything else

16        about your EEOC charge other than that he

17        was surprised?

18   A    Could he keep it.

19   Q    Okay.  And did you -- What did you say to

20        him?

21   A    I said, yes.

22   Q    Okay.  So, you gave it to him, and he kept

23        it.

```
 1    A    That's correct.

 2    Q    All right.  At that point, do you know if

 3         you had filed your EEOC charge with EEOC?

 4    A    I think it had been written up, and it was

 5         filed the next day.

 6    Q    Okay.  So, at that point when you gave it to

 7         him, it hadn't actually been filed yet, but

 8         it was filed the next day?

 9    A    That's correct.

10    Q    All right.  Did Mr. Frost say anything about

11         your EEOC charge?

12    A    No, he did not.

13    Q    Okay.  And do you recall anything else about

14         the conversation that you had with the two

15         of them that day?

16    A    I remember we -- we -- we stood up to leave,

17         then T.J. left the room, and he told me to

18         come back and have a seat.

19    Q    Who?

20    A    Mr. Workman.

21    Q    Okay.

22    A    So, I sat down.  And that's when he asked me

23         if I needed any assistance, that CSX had the
```

```
 1        assistance through a psychologist you could
 2        talk to.  And I told him I did not need any
 3        assistance from CSX.  I would seek help
 4        outside.
 5   Q    Okay.  And that was the -- And did you have
 6        any other thing that was said between the
 7        two of you at that point?
 8   A    Other than that -- that I think I told him
 9        I'd always been punctual, on time, and even
10        early to work.
11   Q    Uh-huh (positive response).  And did he have
12        any response to that?
13   A    No, he didn't.
14   Q    All right.  And was that the extent of the
15        meeting right there?
16   A    Basically, yes.
17   Q    You don't remember anything else that was
18        said in the meeting by either he or Mr.
19        Workman at any point?
20   A    No, I do not.
21   Q    And then the discussion about the
22        psychologist was just you and Mr. Workman,
23        the only people present at that point?
```

```
 1   A    Well, Jack Frost was there.

 2   Q    Okay.  Mr. Frost.  Mr. Dean was no longer

 3        present at that time?

 4   A    I'm not sure if he was there or not.  I

 5        mean, I wasn't really focused on T.J. Dean

 6        at that minute.

 7   Q    Did Mr. Dean say anything during the

 8        meeting?

 9   A    I think he asked Mr. Workman and Jack Frost

10        if we would be eligible to apply for future

11        positions.

12   Q    And what did they say?

13   A    They said, yes, if your work ethics was as

14        good as it was before.

15   Q    Okay.  And did you ask anything about that

16        issue?

17   A    No, I did not.

18   Q    All right.  And do you recall Mr. Dean

19        saying anything else in the meeting?

20   A    No, I do not.

21             MR. BARKER:  All right.  Let's change

22                  the tapes real quick.  I've got,

23                  maybe, about five more minutes,
```

```
 1                  and then we can have lunch.

 2                       (At which time, a recess was

 3                       taken.)

 4   BY MR. BARKER:

 5   Q    Mr. Hollon, did Mr. Workman say anything to

 6        you about how the decision was made to

 7        demote you or who was involved?

 8   A    Other than him saying that we had forged an

 9        FRA document, no.

10   Q    Okay.  Do you have any idea how old

11        Mr. Workman is?

12   A    From -- from --

13   Q    Just from looking at him.

14   A    I would assume mid-fifties.

15   Q    All right.  So, he's older than you are; is

16        that right?

17   A    I would say so.

18   Q    Okay.  How about Mr. Frost?

19   A    I'll probably say late fifties.

20   Q    Okay.  How about Mr. Hamby?

21   A    He's closer to my age.  Probably late

22        forties to early fifties.

23   Q    All right.  And what about Mr. Saunders?
```

```
1    A    Mid-fifties, roughly.

2    Q    Okay.  So, except for, perhaps, Mr. Hamby,

3         all the rest of those gentlemen are older

4         than you are; is that right?

5    A    Yes.

6    Q    Okay.  And Mr. Tipton is younger than you

7         are; is that right?

8    A    That's correct.

9    Q    Do you know how old Mr. Tipton is

10        approximately?

11   A    Approximately about 35.

12   Q    Okay.

13             MR. BARKER:  Why don't we go ahead and

14                  break for lunch now.

15                      (At which time, a recess was

16                      taken.)

17   BY MR. BARKER:

18   Q    Mr. Hollon, we just returned from lunch

19        here.  I'm going to show you this document

20        I've marked as Exhibit Number Seven.

21                      (At which time, the referred-

22                      to document was marked as

23                      Defendant's Exhibit No. 7 by
```

```
 1              the Reporter.)

 2    Q    Do you recognize this document, Mr. Hollon?

 3    A    Yes.

 4    Q    Who is -- And we talked about earlier that

 5         Dale Barnett is the safety coordinator and

 6         the union rep for your UTU; is that right?

 7    A    Yes.  That's correct.

 8    Q    Who is Jimmy Weekley?

 9    A    He's the -- He's on the safety committee.

10         He's a switchman in the Montgomery terminal.

11    Q    All right.  And this is a series of e-mails

12         that your attorney provided during this

13         litigation.  How did you come into

14         possession of these e-mails?

15    A    I obtained mine from Mr. Weekley.  He gave

16         it to me.

17    Q    How did that come about?  Did you -- where

18         you talked to Mr. Weekley, or did he just

19         volunteer and give -- voluntarily give this

20         to you out of the blue?

21    A    I'm trying to recall.  I think he told me he

22         had a document, and I asked him if I could

23         get a copy of it.
```

```
 1   Q   And this is from his personal e-mail it

 2       looks like; is that right?

 3   A   That's correct, yeah.

 4   Q   Now, in this e-mail, Mr. Barnett tells

 5       Mr. Weekley and John -- first, I guess it's

 6       a series of e-mails, it looks like.  The

 7       first is from Dale Barnett to Mike

 8       Pendergrass and Rod Workman.  Who is Mike

 9       Pendergrass?

10   A   I think he's the vice-president of the

11       Atlanta division.

12   Q   Do -- do you know if his -- his

13       responsibility extends beyond the Atlanta

14       division or if it's just the Atlanta

15       division?

16   A   I think it's the southern region.

17   Q   Okay.  So, he's like the southern region

18       vice-president?

19   A   That's right.

20   Q   Have you ever met Mr. Pendergrass before?

21   A   Probably a couple of times.

22   Q   All right.  Do you have any -- beyond the --

23       Let's see.  When was the last time you met
```

```
 1        Mr. Pendergrass, to your recollection?

 2   A    We was at an officers' meeting at the

 3        Capital Hill Country -- golf course.

 4   Q    Okay.  And where was this?

 5   A    It's in Prattville.

 6   Q    Okay.  So, the one in Prattville here in

 7        Alabama?

 8   A    Yes.

 9   Q    Did you have any one-on-one interaction with

10        Mr. Pendergrass on that occasion?

11   A    Basically, I -- I mean, I sit by him when we

12        eat supper.  He asked the managers at the

13        table how we had turned Montgomery around.

14   Q    Uh-huh (positive response).  So, it was him

15        and, like, the Montgomery managing --

16        management team?

17   A    That's correct.

18   Q    Okay.  So, there was, like, ten of -- less

19        than ten of you-all there, I guess?

20   A    Less than ten.

21   Q    Okay.  Was that the only time you sort of

22        had one-on-one interaction with

23        Mr. Pendergrass?
```

```
 1   A    Well, he asked a question, and I just felt

 2        like I totally answered it.  So, I e-mailed

 3        him.

 4   Q    Uh-huh (positive response).  What question

 5        was that?

 6   A    He asked how we turned the numbers and

 7        turned Montgomery terminal around.

 8   Q    Uh-huh (positive response).  And who all was

 9        present at this meeting?

10   A    Terminal manager, Angie Averitte.

11   Q    Uh-huh (positive response).

12   A    Rod Dunlap -- it's been awhile back.  I'm

13        not sure if I can remember everybody that

14        was there.

15   Q    Okay.

16   A    Let's see.  Warren Carr was there.  Maybe

17        Wayne Powe and Roger Jackson.

18   Q    Who is Mr. Dunlap?

19   A    He was a terminal trainmaster who was

20        working in Montgomery at that time.

21   Q    Okay.  Did -- Did you ever have any problems

22        with Mr. Pendergrass?

23   A    No, sir.
```

1   Q   Do you have any idea how old Mr. Pendergrass

2       is?

3   A   Without looking?

4   Q   Just from guessing, I guess.

5   A   Guessing.  Okay.  I don't know, early

6       fifties.

7   Q   Old -- looks like to be older than you are

8       you think?

9   A   Oh, yes.

10  Q   Okay.  So, Mr. Barnett sent this e-mail to

11      Mr. Pendergrass, and it looks like it

12      purports to have been copied to Mr. Workman;

13      is that right?

14  A   Yes.

15  Q   And then he forwarded this e-mail to John

16      Strength and Jimmy Weekley.  Who is John

17      Strength?

18  A   He's a switchman.  I'm not sure exactly what

19      committee he was on.  At one time, he was a

20      remote control trainer; but at that time, I

21      don't think he was a remote control trainer.

22  Q   Okay.  Did -- And you never had any

23      conversations with Mr. Barnett about this

```
1        issue at all?

2    A   What, this?

3    Q   The -- Your demotion and the issues that

4        surrounded that.

5    A   No, basically, I mean, from that date, no,

6        uh-uh (negative response).

7    Q   At any point in time, did you have

8        conversations with Mr. Barnett about it?

9    A   No, I have not.

10   Q   Okay.

11   A   Other than that day.

12   Q   Other than the day he came in?

13   A   That's correct.

14   Q   Okay.  Now, he says in here that Mr. Dean

15       contacted someone in Jacksonville regarding

16       this issue.  Do you know anything about

17       that?

18   A   Just -- just from hearsay is all.

19   Q   All right.  What have you heard?

20   A   That he contacted -- Basically, what it says

21       here that, basically, he was probably going

22       to be held on a local division coaching

23       level.  But then Mr. Dean contacted
```

```
 1          Jacksonville.  Jacksonville got involved.

 2    Q     Do you have any idea who Mr. Dean contacted?

 3    A     No, I do not.

 4    Q     Have you ever asked Mr. Dean about that?

 5    A     No, I have not.

 6    Q     Has anyone -- Other than what you've seen in

 7          this e-mail, has anybody else ever told you

 8          anything about how that process took place,

 9          or have you ever heard anything about how --

10          what happened when Mr. Dean contacted

11          Jacksonville or who heard -- at Jacksonville

12          or who he contacted?

13    A     No, sir.

14    Q     Okay.  I mean, when -- when it refers to a

15          divisional level, what is that referring to?

16    A     Well, the railroad is broke down in certain

17          divisions like the Huntington, the Atlanta,

18          the Florence, the Jacksonville; different

19          regions, the Southern the Northern.

20    Q     And if someone was going to be handling the

21          divisional level, would that mean Mr.

22          Workman would handle it or Mr. Hamby or --

23    A     Or Mr. Workman, Hamby or Mr. Saunders.
```

```
1    Q    Okay.  That's your understanding of who the

2         divisional level would refer to?

3    A    Yes.

4    Q    Okay.  And you don't know who would have

5         been involved beyond the divisional level?

6    A    Probably Mr. Pendergrass.

7    Q    Okay.  I show you this document that I'm

8         going to mark as Exhibit Number Eight.

9                        (At which time, the referred-

10                        to document was marked as

11                        Defendant's Exhibit No. 8 by

12                        the Reporter.)

13   Q    Do you recognize this document?

14   A    Yes.

15   Q    All right.  And what is that?

16   A    It's just a e-mail reply from the FRA,

17        Mr. Patrick Plumb.

18   Q    All right.  Did you ever speak with

19        Mr. Plumb?

20   A    No, I did not.

21   Q    Did you ever actually have an interview with

22        the FRA investigator?

23   A    To be honest, I cannot recollect meeting
```

```
 1        with her after that.

 2    Q   Okay.  Did you recall ever meeting with her

 3        about this issue that led to your demotion?

 4    A   This issue, no, sir.

 5    Q   Had you met with her about other issues

 6        before?

 7    A   Yes.

 8    Q   Okay.  How did you obtain a copy of this

 9        e-mail?

10    A   Let -- let's back up to this -- this other

11        question you asked --

12    Q   Okay.

13    A   -- have I ever met with her.  And I would

14        say, yes, because she come to my house --

15    Q   Okay.

16    A   -- with a statement.

17    Q   She came to your house and took a statement

18        from you?

19    A   That's correct.

20    Q   All right.  Do you remember when that was?

21        Was it after you were -- It was after you

22        were removed from service?

23    A   It was after I come back from vacation, yes,
```

172

```
1        and before I was actually demoted.

2    Q   Okay.

3    A   But as to the exact date, I couldn't tell

4        you.

5    Q   All right.  But she came to your house and

6        talked to you.  Did you give her any written

7        statement, or did she just take an oral

8        statement from you?

9    A   Well, I -- I can't recall, but I'm pretty

10       sure she had a copy of the written

11       statement.  It seems like she did -- it was

12       oral, and she took notes.

13   Q   Okay.  So, she talked to you, and she took

14       notes.  Do you think -- do you think that

15       she had a copy of your -- your written

16       statement that you had provided to

17       Mr. Tipton?

18   A   I didn't actually see it, but I would say

19       she did.

20   Q   All right.  Your -- It was your belief that

21       she did?

22   A   It's my belief.

23   Q   Okay.  But you never saw anything?
```

```
1   A    No.

2   Q    Was she the only person you spoke to at the

3        FRA about this issue?

4   A    With the FRA, yes, she's the only one I ever

5        spoke to.

6   Q    You never spoke to Mr. Plumb, did you?

7   A    No, I did not.

8   Q    All right.  Did Mr. Plumb ever send -- Did

9        you receive a -- a direct copy of any

10       correspondence from Mr. Plumb about the

11       complaint or the issue?

12  A    Well, I talked to Ms. Owens about getting a

13       copy of it, and she told me she would either

14       talk to Mr. A.B. Montgomery or see if there

15       was an issue with me getting a copy of it.

16  Q    Okay.  And who is A.B. Montgomery?

17  A    Actually, he used to be the terminal manager

18       of Montgomery.  He works for the FRA up in

19       Atlanta now.

20  Q    Okay.  And Mr. Montgomery was a -- When you

21       were working as a trainmaster in Montgomery,

22       he had been the terminal manager; is that

23       right?
```

```
1    A    That's correct, yes.

2    Q    And he left CSX and went to work for the FRA

3         now?

4    A    That's correct.

5    Q    And did -- Did Ms. Owens report to him?

6    A    I'm not sure she reported to him or Mr.

7         Plumb.  I'm not sure who she reported to

8         exactly.

9    Q    But she was going to contact Mr. Montgomery

10        and determine whether she could give you a

11        copy --

12   A    That's correct.

13   Q    -- of the investigation?

14   A    That's correct.

15   Q    Okay.  Did you ever get anything from her?

16   A    No, I did not.

17   Q    Did you ever contact her again to find out

18        what was going on with that?

19   A    I did, but she had stated she would -- had

20        been out of town, and she would talk to

21        Mr. Montgomery.

22   Q    Okay.  And did you ever get anything?

23   A    No, I did not.
```

```
 1   Q    Did you call her again?

 2   A    I can't recall.

 3   Q    And do you recall how you got this e-mail

 4        from Mr. Weekley?

 5   A    He said he had a copy of it, and I just

 6        wanted -- he said he had an e-mail, and I

 7        requested a copy from him.

 8   Q    Okay.  Let me show you this document I'm

 9        going to mark as Exhibit Number Nine.

10                      (At which time, the referred-

11                       to document was marked as

12                       Defendant's Exhibit No. 9 by

13                       the Reporter.)

14   Q    Do you recognize this document?

15   A    Yes, I do.

16   Q    Who is Michael Ward?

17   A    He's the CEO.

18   Q    Right.  And is this an e-mail that you sent

19        to Mr. Ward?

20   A    That is correct.

21   Q    Did you receive a response to this e-mail?

22   A    No, I did not directly.

23   Q    Okay.  When you say you don't directly, did
```

```
 1          you receive an indirect response to this

 2          e-mail or other form of response?

 3     A    Other -- from the information that I looked

 4          over yesterday, no, I had not.

 5     Q    Had you ever met Mr. Ward before?

 6     A    No, I have not.

 7     Q    And is this e-mail the only communication

 8          you've ever had with Mr. Ward?

 9     A    Yes.

10     Q    Okay.

11     A    Well, I -- I probably re-sent this e-mail

12          probably a couple of times to him.

13     Q    Okay.  But -- and you never received a

14          response from him to any of those e-mails?

15     A    Not response from him.  I received a

16          response from the EEOC from CSX stating they

17          would not further investigate it since I had

18          filed -- filed with the State of Alabama

19          EEOC.

20     Q    Is that -- let me show you this document I'm

21          marking as Exhibit Number 10.  Is that what

22          you're referring to as a response from CSX?

23                    (At which time, the referred-
```

```
 1                        to document was marked

 2                        Plaintiff's Exhibit No. 10 by

 3                        the Reporter.)

 4   A   Yes, that's correct.

 5   Q   I show you this document I'm going to mark

 6       as Exhibit Number 11.

 7                        (At which time, the referred-

 8                        to document was marked as

 9                        Plaintiff's Exhibit No. 11 by

10                        the Reporter.)

11   Q   Do you recognize this document -- series of

12       documents?

13   A   Yes, I do.

14   Q   And this is copies of e-mail you sent to

15       Mr. Ward that were sent to other people; is

16       that right?

17   A   That's correct.

18   Q   Who is Ken Dziwulski?

19   A   He's the director of train operations in

20       Jacksonville, Florida.

21   Q   All right.  What is a director of train

22       operations?

23   A   For the Atlanta division.
```

1    Q    Okay.

2    A    Basically, he coordinates everything between

3         all the other terminals.

4    Q    Mr. Tipton was the terminal manager in

5         Montgomery at this point in time; is that

6         right?

7    A    That's correct.

8    Q    Who would he report to?

9    A    Probably David Hamby.

10   Q    Okay.  And then through Mr. Hamby to

11        Mr. Workman?

12   A    That's correct.

13   Q    Did Mr. Saunders report to Mr. Workman as

14        well, or did he have a different chain of

15        command?

16   A    He also reported to Hamby also.

17   Q    Okay.  Did you receive a response from Mr.

18        Dziwulski to this e-mail?

19   A    I didn't receive it, no, I did not.

20   Q    And then you -- you forwarded it to David

21        Hamby as well; is that right?

22   A    That's correct.

23   Q    Did you receive a response from Mr. Hamby?

```
 1   A   No, I did not.

 2   Q   All right.  You forwarded this e-mail as

 3       well to Tony Ingram; is that right?

 4   A   That's correct.

 5   Q   Who is Mr. Ingram?

 6   A   I would say he's the president of CSX.

 7   Q   Had you ever interacted with Mr. Ingram

 8       before?

 9   A   He's come through Montgomery on some -- what

10       they call president tours.

11   Q   Uh-huh (positive response).

12   A   I probably met him a couple of times.

13   Q   All right.  Do you know if he is older than

14       you are or younger than you are?

15   A   Now, that's a hard one to -- maybe a little

16       older.

17   Q   Okay.  But you're not sure how old he is?

18   A   I'm not for sure about him.

19   Q   Okay.  He's certainly not younger than you

20       are, though; is that right?

21   A   I don't think so.

22   Q   Okay.  He doesn't appear to be younger to

23       you?
```

```
1    A    No, sir.

2    Q    Okay.  But you don't know his exact age?

3    A    No, sir, I do not.

4    Q    Did you ever have any direct interactions

5         with Mr. Ingram?

6    A    Other than shaking his hand and saying --

7         asking how he was, no, I did not.

8    Q    Okay.  And then the last thing is what is

9         another copy you sent to Mr. Ward; is that

10        right?

11   A    That's correct.

12   Q    Did you receive a response from Mr. Ingram

13        to your e-mail?

14   A    No, I did not.

15   Q    How about from -- from Mr. Ward the second

16        time was when you received the response from

17        Mrs. Wittington?

18   A    That's correct.  Just this.

19   Q    Do you recall sending any other e-mails or

20        forwarding this e-mail to any other people

21        at CSX?

22   A    This e-mail or any other e-mails?

23   Q    This e-mail or any other e-mail on this
```

```
 1        subject.

 2   A    Wrongful termination?  I -- I did send a

 3        couple of e-mails to Mr. Workman and Bob

 4        Frulla, but it wasn't on this subject.

 5   Q    What was that about?

 6   A    It was about -- Actually, it was on the same

 7        day that the remote card issue was signed.

 8   Q    Uh-huh (positive response).

 9   A    I had sent one to Mr. Workman asking what I

10        needed to do, what I could do to be promoted

11        on this division.

12   Q    Uh-huh (positive response).

13   A    What steps or what did I need to do to be

14        promoted on this division.

15   Q    And did you have a response from that

16        e-mail?

17   A    Never did get one.

18   Q    Okay.  Who is Mr. Frulla?

19   A    He's the division manager for the

20        Jacksonville division.

21   Q    Had you ever interacted with him at all

22        before?

23   A    Oh, yes.
```

```
1    Q    Did you know him?

2    A    Yes.

3    Q    Okay.  And did you have a response from him?

4    A    The e-mail to him was -- I had applied for

5         the line of road trainmaster on the

6         Pensacola -- at Pensacola, Florida.  And in

7         the computer, it showed me staged for the

8         interview stage.

9    Q    Uh-huh (positive response).

10   A    But I was never contacted via cell phone,

11        company e-mail, or even at work or by my

12        home phone to set up an interview.

13   Q    Uh-huh (positive response).

14   A    So, just talking to Mr. Hoseworth

15        (phonetic), who already applied for the

16        position, that he had already been

17        interviewed.  And I was trying to find out

18        why I was not interviewed for this position,

19        but yet the computer showed me staged to be

20        interviewed.

21   Q    Uh-huh (positive response).

22   A    So, I sent him an e-mail asking why I was

23        not interviewed for this position and why
```

1      the computer was showing me in the interview

2      staged, but I never received an interview.

3  Q   Okay.  And did you get a response from Mr.

4      Frulla?

5  A   No, I did not.

6  Q   Okay.  Who is -- the -- Is Mr. Frulla older

7      or younger than you are, in your opinion?

8  A   Probably younger.

9  Q   Okay.  Not by much, I take it, from your

10     reaction, there?

11 A   I would say he's in his thirties.

12 Q   Oh, you think he's in his thirties?

13 A   Yes.

14 Q   Now, you understand that in your lawsuit

15     here you were claiming that you were

16     discriminated against on the basis of your

17     age; is that right?

18 A   Yes, sir, age and retaliation.  That's

19     correct.

20 Q   All right.  How do you believe that you were

21     discriminated against on the basis of your

22     age?

23 A   Okay.  Between the period of late January to

1      April, May, I -- I applied for four

2      positions.

3  Q   Of 2006, that's the year you're referring

4      to?

5  A   That's correct.  2006.

6  Q   All right.

7  A   The first one being assistant manager/

8      customer service, Jacksonville, Florida,

9      which I never obtained an interview for, but

10     I felt like that I was qualified to -- to

11     hold this position.

12 Q   Uh-huh (positive response).

13 A   The second one being the terminal manager,

14     Montgomery, Alabama.  I have a railroad

15     history of 25 years transportation, working

16     transportation knowledge, plus I do have

17     some college background.

18 Q   Uh-huh (positive response).

19 A   And during the first part of April, we were

20     in a meeting, an out-of-the-park meeting.

21 Q   Uh-huh (positive response).

22 A   We was in competition with Large Flat Yards,

23     Switching Yards, and we had won this

```
 1            competition for the first quarter 2006.
 2     Q      Oh, this is a -- When you say "competition,"
 3            what do you mean by that?
 4     A      Where you had different terminals competing
 5            ride car ride train, on-time originations,
 6            cars processed in your terminal.
 7     Q      So, it was a competition comparing various
 8            statistical measurements of performance of
 9            the yard?
10     A      Different yards, that's correct.
11     Q      Okay.
12     A      And you had different classes:  Small,
13            medium, large.  And you had your hump --
14            hump terminals.  And we had won this
15            competition, so we were -- each manager was
16            supposed to obtain a five thousand ($5,000)
17            dollar bonus because we won this
18            competition.
19     Q      Uh-huh (positive response).
20     A      So, it -- it kept coming down we never did
21            receive our bonus.  So, Mr. Workman came to
22            Montgomery to explain why we didn't receive
23            our bonus, that they had did away with this
```

1    practice because somewhere up north where

2    they had won the competition, it seemed like

3    everybody come out of the woodwork getting

4    the bonus --

5  Q  Uh-huh (positive response).

6  A  -- that wasn't entitled to it.

7          So, during this meeting, we had

8    a -- we had a management trainee, Jeremiah

9    Grant, in the meeting.  You had Chandler

10   Plots, who is also a manager trainee.  You

11   had Josh Connell.

12 Q  Who -- Who was the first person, Jermond --

13 A  Jeremiah Grant.

14 Q  Jeremiah --

15 A  Grant.

16 Q  -- Grant.  Who was the other management

17   trainee?

18 A  Chandler Plots -- or Plot.

19 Q  Okay.  And who else was present?

20 A  I know Warren Carr was present.  T.J. Dean

21   was present.  Rod Workman was present.

22   Angie Averitte was present.  I'm not sure if

23   Roger Jackson and Josh Connell was in that

```
 1          meeting or not, to be honest.

 2     Q    Roger Jackson and -- and Josh Connell?

 3     A    That's correct.

 4     Q    Okay.

 5     A    So, he explained why we did not receive our

 6          bonus, and that we'd probably getting -- we

 7          had a choice of either leather baseball

 8          jacket or going to Capital Hill or somewhere

 9          playing a round of golf.

10     Q    Uh-huh (positive response).

11     A    So, during the meeting, he directly looks at

12          the management trainees and said, "You-all

13          have a bright future with this company."  I

14          say within five -- after addressing them, he

15          turned to me and asked how old I was.  I was

16          the only person in the room he asked my age.

17     Q    Uh-huh (positive response).

18     A    So, my reply was that I was a little older

19          than the terminal manager.  And I think he

20          made the statement that I looked good for my

21          age or something to that effect.  I mean,

22          I'm a little sensitive to my age because

23          I -- I mean, I still use that For Men Only
```

1    in my beard and my hair.  So, I do have gray

2    hair.

3  Q   Do you have any idea how old Mr. Grant or

4    Mr. Plots are?

5  A   Mr. Plots was probably in his mid-thirties.

6  Q   Uh-huh (positive response).

7  A   Mr. Grant was in his mid to late twenties.

8  Q   Were they working in Montgomery at that

9    time?

10 A   Actually, Jeremiah was training in

11   Montgomery.

12 Q   Uh-huh (positive response).

13 A   And also, Mr. Plots was training also.

14 Q   Okay.  But they were -- They were training

15   in Montgomery?

16 A   That's correct.

17 Q   They didn't just come with Mr. Workman for

18   the day or something like that?

19 A   Uh-uh (negative response), no.

20 Q   What -- what -- What sort of jobs do the

21   management trainees do when they were

22   training?

23 A   Well, they would go to different terminals

| | | |
|---|---|---|
| 1 | | like Atlanta, Birmingham, Mobile, New |
| 2 | | Orleans.  And line of road outlets like |
| 3 | | Calera. |
| 4 | Q | Uh-huh (positive response). |
| 5 | A | And just work with those managers for a |
| 6 | | period of time. |
| 7 | Q | How long were those individuals -- these two |
| 8 | | individuals in Montgomery? |
| 9 | A | We were actually -- before or after I was |
| 10 | | demoted or what? |
| 11 | Q | Period.  But did they come and go?  I mean, |
| 12 | | I guess, were they there more than once? |
| 13 | A | Well, Jeremiah had been there once before. |
| 14 | | Then he -- It seemed like he trained at |
| 15 | | Calera for a period then came back to |
| 16 | | Montgomery. |
| 17 | Q | Uh-huh (positive response).  And what about |
| 18 | | Mr. Plots? |
| 19 | A | I want to say the same situation with him. |
| 20 | Q | Okay.  And so, you said Mr. Workman, during |
| 21 | | this meeting, was discussing the bonus plan. |
| 22 | | What else was it discussing besides the |
| 23 | | bonus plan? |

```
 1   A    Just what our options were for not receiving
 2        the bonus.
 3   Q    Okay.  There weren't any other topics that
 4        came up in the meeting besides the bonus
 5        issue and how that was going to be handled?
 6   A    Other than addressing the younger managers
 7        and addressing how old I was, no.
 8   Q    All right.  So, you said he turned to these
 9        two and said something, and he was looking
10        in their direction at the time.  So, you
11        understood it to be directed at them?
12   A    That's correct.
13   Q    That -- Where he said you have a bright
14        future with the company?
15   A    That's correct.
16   Q    All right.  And --
17   A    Warren Carr was there.  He also asked how
18        much longer Warren had because Warren was
19        planning on retiring in -- I think he was
20        shooting for October.
21   Q    And so, he asked -- and that was two or
22        three months down the road, I take it, at
23        that point or six months?  When was this
```

```
1         meeting exactly?
2    A    It was in April.
3    Q    Okay.  So -- So, this was in April, and you
4         understood that Mr. Carr was expected to
5         retire in October of that year?
6    A    Yeah.  Within six months, yeah.
7    Q    All right.  Do you have any idea how old
8         Mr. Carr is or was at that time?
9    A    I would probably say 58 because he -- he had
10        to obtain a certain age.  His wife was older
11        than him, so probably about 58.
12   Q    Okay.  Late fifties at least?
13   A    Yeah.
14   Q    And did he retire in October of that year?
15   A    Actually, when I was demoted, he went ahead
16        and retired early in August.
17   Q    Okay.
18   A    I think the first -- first day of August.
19   Q    Okay.
20   A    So did Roger Jackson.
21   Q    Was Roger Jackson scheduled to retire that
22        year as well?
23   A    I think so, yes.
```

| | | |
|---|---|---|
| 1 | Q | Are you suggesting that Mr. Carr's |
| 2 | | retirement date was tied to your demotion? |
| 3 | A | He'll tell you that. |
| 4 | Q | All right.  So, he decided to go ahead and |
| 5 | | leave because you were demoted? |
| 6 | A | That's correct. |
| 7 | Q | Was it because of he didn't agree with your |
| 8 | | demotion, or because he didn't want to train |
| 9 | | another trainmaster or deal with the |
| 10 | | situation with less than this -- prior to |
| 11 | | the number of trainmasters? |
| 12 | A | He didn't agree with my demotion, and he |
| 13 | | also was a little nervous about retaliation |
| 14 | | against him. |
| 15 | Q | Why would there be retaliation against |
| 16 | | Mr. Carr? |
| 17 | A | Because he was an older manager at the time. |
| 18 | Q | And he was already scheduled to retire a |
| 19 | | month later? |
| 20 | A | Well, October.  His plan was October. |
| 21 | Q | But what would the point be of retaliating |
| 22 | | against Mr. Carr a month before he was going |
| 23 | | to retire? |

| | | |
|---|---|---|
| 1 | A | It was just -- That's just the way he felt. |
| 2 | | You'd have to ask him. |
| 3 | Q | Okay.  He never told you what that was |
| 4 | | about? |
| 5 | A | Well, it had something to do with my |
| 6 | | demotion and the whole atmosphere around |
| 7 | | everything that was going on. |
| 8 | Q | And when you said the whole atmosphere, what |
| 9 | | are you referring to? |
| 10 | A | We had a -- the guy that did the MOPS in |
| 11 | | Atlanta before Angie took it over -- Ed |
| 12 | | McClellan (phonetic) -- was terminated, as |
| 13 | | you might say. |
| 14 | Q | And why was he -- |
| 15 | A | Allen Snap was demoted.  He went back to |
| 16 | | yardmaster in Tampa, Florida. |
| 17 | Q | All right.  The person who had the MOPS |
| 18 | | position before Angie -- Ed McClellan, is |
| 19 | | that who that was? |
| 20 | A | Yes. |
| 21 | Q | Do you know why he was -- Do you know if he |
| 22 | | was terminated or not or if he -- |
| 23 | A | I know he took an early retirement. |

```
 1   Q    Okay.  And do you know why he took an early
 2        retirement?
 3   A    I wouldn't say because he was forced to take
 4        early retirement, or he was terminated to go
 5        back to his craft.
 6   Q    And --
 7   A    He was fired as a manager, in other words.
 8   Q    All right.  And do you know if he was fired
 9        as a manager because he failed to report a
10        derailment?
11   A    From hearsay or try -- from hearsay.
12   Q    So, you've heard through hearsay that
13        Mr. McClellan was responsible for a
14        derailment, and he didn't report that; is
15        that correct?
16   A    That's correct.
17   Q    And under company policy and under FRA
18        rules, one is required to report derailment;
19        isn't that correct?
20   A    If it's FRA reportable, yes.
21   Q    Is it reaches a certain level of damage.
22   A    That's correct.  I'm not sure what the
23        damage was, so...
```

| | | |
|---|---|---|
| 1 | Q | Okay. Are you aware of any other managers |
| 2 | | who were responsible for derailments that |
| 3 | | were FA -- FRA reportable and who did not |
| 4 | | report them and who were not disciplined? |
| 5 | A | FRA reportable, no. |
| 6 | Q | Okay. So, you said that Mr. Workman made |
| 7 | | this comment about people having a bright |
| 8 | | future, and he was looking at Mr. Grant and |
| 9 | | Mr. Plots when he said that? |
| 10 | A | That's correct. |
| 11 | Q | And then shortly thereafter, several minutes |
| 12 | | later, he asked you how old you were? |
| 13 | A | That's correct. |
| 14 | Q | Was there -- What was said between the time |
| 15 | | that he made the comment about people having |
| 16 | | a bright future and -- Do you remember what |
| 17 | | the subject -- what -- what was being said |
| 18 | | between the time that that was said and the |
| 19 | | time that he asked about your age? |
| 20 | A | No, I do not. |
| 21 | Q | All right. At that point in time, was |
| 22 | | Mr. Jackson already scheduled to retire? |
| 23 | A | I can't recall because this is supposed to |

```
 1        have been a good year for a bonus.  So, I'm

 2        not sure if they were scheduled or

 3        anticipating it, or if they were planning on

 4        hanging around to get the bonus which comes

 5        out in February.

 6    Q   Okay.  February, like, the following year?

 7    A   Yes.

 8    Q   Okay.  But it was already known that Mr.

 9        Carr was going to retire?

10    A   He had mentioned it.  He was wishy-washy.  I

11        mean, he -- he basically loved the railroad.

12        So, it was hard to say he was going to

13        retire on a set date.

14    Q   Okay.  Do you know if Mr. Carr or

15        Mr. Jackson had conversations with

16        Mr. Tipton or Mr. Workman regarding

17        retirement already?

18    A   No, I do not.  Well, let -- let's back up.

19        During that meeting they had out of the

20        park, I think Mr. Workman asked how much

21        longer they had.  Then I think Warren and

22        those addressing that he was planning on

23        leaving in October.
```

```
 1   Q    Okay.  So, Warren mentioned at that time

 2        that he was planning to do that?

 3   A    Yeah.

 4   Q    Was Mr. Tipton in this meeting as well?

 5   A    No.  I would say no.

 6   Q    Was this before Mr. Tipton became the

 7        terminal manager in Montgomery?

 8   A    It was before he personally took controller

 9        of it, but I think he had already been

10        awarded it.  I think he was awarded terminal

11        manager, like, March the 27th.

12   Q    All right.  So, you believe that you were

13        discriminated against on the basis of your

14        age because of -- of positions you applied

15        for in the spring of 2006 that you did not

16        receive?

17   A    That's correct.

18   Q    And because this comment made by Mr.

19        Workman?

20   A    That's correct.

21   Q    All right.  Now, you specifically mentioned

22        the assistant manager/customer service

23        position and the terminal manager in
```

```
 1          Montgomery position.  Are those the only

 2          positions you think that --

 3    A     I applied for the assistant superintendent

 4          position that Jason left in Atlanta,

 5          Georgia; the Atlanta road trainmaster

 6          Pensacola, Florida; then after demotion,

 7          there was probably about 15 to 20 that I

 8          applied for.

 9    Q     All right.  And do you think that was

10          discriminatory as well?

11    A     Yes, I do.

12    Q     All right.  Let's back up for a second.  Do

13          you have any idea who received the assistant

14          manager/customer service position?

15    A     Yes, I do.

16    Q     Who is that?

17    A     Timothy Gray -- Grayson.

18    Q     Okay.  How do you know Mr. Grayson received

19          that position?

20    A     Other than the paperwork I read over

21          yesterday, I did not know.

22    Q     Okay.  Do you know when Mr. Grayson was

23          hired for that position?
```

| 1 | A | It's probably mid-February, roughly.  I |
| 2 |  | can't pinpoint the exact date. |
| 3 | Q | And that's based on the paperwork that |
| 4 |  | you've reviewed? |
| 5 | A | Yes, sir. |
| 6 | Q | All right.  Before reviewing this paperwork |
| 7 |  | yesterday, you had no idea who -- |
| 8 | A | No idea. |
| 9 | Q | -- had received that position? |
| 10 | A | No idea. |
| 11 | Q | Do you have any idea what Mr. Grayson's age |
| 12 |  | is? |
| 13 | A | Probably mid-twenties. |
| 14 | Q | Was that reflected in the paperwork you |
| 15 |  | reviewed? |
| 16 | A | That's correct. |
| 17 | Q | Do you have any idea who made the decision |
| 18 |  | about -- picked Mr. Grayson for that |
| 19 |  | position? |
| 20 | A | Other than the paperwork I looked at, no, |
| 21 |  | sir. |
| 22 | Q | All right.  Did -- From the paperwork you |
| 23 |  | looked at, did that identify who made the |

```
 1        decision?

 2   A    I think it was Mr. Neal Sharpton, I believe.

 3   Q    Who is Neal Sharpton?

 4   A    I'm not for sure, but I've heard the name

 5        before.

 6   Q    No one you've ever met before?

 7   A    No.

 8   Q    All right.  Do you know if Mr. Sharpton

 9        knows what your age is?

10   A    You mean, considering all my information is

11        in the computer, yes, he would.

12   Q    Well, do you have any idea if Mr. Sharpton

13        looked at that information your -- that had

14        your age on it?

15   A    Hopefully if I interview somebody, I would

16        not necessarily look at their age, but I

17        would look at their work history and

18        background.

19   Q    So, he would at least know that you had 20

20        plus years with the railroad?

21   A    There you go.

22   Q    Even if he didn't know your age?

23   A    That's correct.
```

```
 1   Q   Okay.  Do you have any idea what the salary

 2       was for the assistant manager/customer

 3       operations position?

 4   A   Other than the paperwork you gave us

 5       yesterday, no, I would not know.

 6   Q   Do you have -- Do you know from the

 7       paperwork you looked at yesterday what the

 8       salary was?

 9   A   Yes.

10   Q   All right.  And what was that?

11   A   Probably the low to mid-fifties.

12   Q   All right.  And that was less than you were

13       making in your position in Montgomery, isn't

14       it?

15   A   But like I stated, I was in the position --

16       I wanted to grow with this company.  So, if

17       it means moving to Jacksonville to grow, I

18       would do it.

19   Q   So, you would have taken a twenty thousand

20       ($20,000) dollar pay cut for -- if you felt

21       the job was -- had provided better

22       opportunities down the road?

23   A   That's correct.
```

```
 1   Q   Why did you think the assistant manager/

 2       customer operations position provided better

 3       opportunities?

 4   A   Actually, I didn't know the -- the salary

 5       base when I applied for it because it wasn't

 6       listed.

 7   Q   Okay.  Is there -- Is the salary normally

 8       listed on job postings?

 9   A   The -- the grade is; the salary is not.

10   Q   All right.  So, from the grade, you may or

11       may not be able to tell what the salary is

12       going to be?

13   A   Yeah.  I'm not even for sure if the grade

14       was listed on the assistant manager's

15       position.

16   Q   Okay.

17   A   And, plus, I had hoped they would base the

18       salary on my railroad experience and

19       longevity with the company.

20   Q   So, you would hope that they would pay you a

21       higher salary based on your prior

22       experience?

23   A   That's correct.
```

```
 1   Q    Do you have any reason to believe that that
 2        is how they would handle the -- handle the
 3        situations then?
 4   A    Not necessarily.
 5   Q    Let me show you this document I'm going to
 6        mark as Exhibit Number 12.
 7             THE VIDEOGRAPHER:  I need to change
 8                  tapes.
 9             MR. BARKER:  Why don't we do that.
10                       (At which time, the referred-
11                       to document was marked as
12                       Defendant's Exhibit No. 12 by
13                       the Reporter.)
14                       (At which time, a recess was
15                       taken.)
16   BY MR. BARKER:
17   Q    Mr. Hollon, I just showed you this document
18        that I marked as Exhibit Number 12, I
19        believe.
20   A    That's correct.
21   Q    Do you recognize that document?
22   A    Yes.
23   Q    And what is that?
```

```
 1    A     It's a resume.

 2    Q     Is that your resume; is that right?

 3    A     That's correct.

 4    Q     Do you -- Do you recall when this resume is

 5          from exactly?

 6    A     When?

 7    Q     Uh-huh (positive response).

 8    A     This had to have been after I was demoted

 9          because of the time period.

10    Q     Okay.  Would your resume from -- be

11          substantially the same from before you were

12          demoted except the dates would be different?

13    A     Some of these dates are off, I think.

14    Q     Okay.  But this is the resume you prepared?

15    A     Well, actually, my mother-in-law typed it

16          up, but, yes.

17    Q     Okay.  But this is the resume you submitted

18          to the company?

19    A     That's correct.

20    Q     Do you know if you submitted a resume like

21          this -- like this -- Do you know if you

22          submitted this resume or one substantially

23          similar to this to the -- for the positions
```

```
 1            in the spring of 2006?

 2    A       Yes.

 3    Q       Okay.

 4    A       Well, it's comparable to this.

 5    Q       Okay.  What's your understanding of what the

 6            customer operations group does?

 7    A       They -- They deal with customers' issues

 8            from waybilling to on-board work systems to

 9            work orders to demurrage, per diem, issuing

10            work orders, Hazmat, information about

11            trains.

12    Q       And this is done -- this group, is it just

13            in Jacksonville; is that right?

14    A       That's correct.

15    Q       And it's a centralized group; is that right?

16    A       That's correct.

17    Q       Do they supervise, like, employees who work

18            in, like, a call center or something like

19            that?  Do you have any idea what the -- what

20            the layout of the job is in that sense?

21    A       Well, you have some that supervise the

22            clerical forces that are in the customer

23            service center.  Then you have some that
```

```
 1        supervise the clerical forces that are in

 2        the crew management center.

 3   Q    Where is the crew management center?

 4   A    It used to be -- I'm not sure if it's all

 5        centrally located at South Point or if

 6        it's -- it used to be at Moncrief Yard.

 7   Q    Is that in Jacksonville, though?

 8   A    Yes.

 9   Q    Okay.  But both -- all these are in

10        Jacksonville --

11   A    Yes.

12   Q    -- is that right?  What is -- What is IIDS?

13   A    I could not tell you.

14   Q    Okay.  What is STEPS?

15   A    I could not tell you.

16   Q    How about AEI studio?

17   A    AEI?

18   Q    Uh-huh (positive response).

19   A    It has to do with -- I'm assuming -- or just

20        from past experience, it has to do with the

21        reading of the car and initial number off

22        AEI readers when the car goes by.  It reads

23        a tag that identifies the car by number.
```

```
 1   Q    All right.  But you're not specifically
 2        familiar with the a AEI studio -- what --
 3        exactly what that particular thing is?
 4   A    No, sir.
 5   Q    Okay.  What about C-O-P-S, or COPS?
 6   A    I've heard a little bit about it, but other
 7        than that --
 8   Q    All right.  What about O-W -- O-B-W-O?
 9   A    On Board Work Order?
10   Q    Right.  What is that?
11   A    That's -- Our yard crews have handheld
12        computers, you might say, that when you
13        issue a paperwork order, you can pull that
14        work order into this on-board.  When you're
15        actually working the customer, you can show
16        the cars spotted, pulled or placed.  And
17        through a radio signal or a phone signal,
18        it's sent -- it's sent back to Jacksonville
19        so the customer can have the information
20        pretty instantly.
21   Q    Did you work with that system yourself?
22   A    With the crews and actually completing work
23        orders, yes, I have worked with that a
```

```
1         little bit.

2    Q    Okay.  When you say "a little bit," what do

3         you mean by that?

4    A    Well, when a yard crew comes in there and

5         needs hours of service and he needs you to

6         complete his work order, you usually

7         complete it for him, or you make sure

8         it's -- it's on its docking station.  You

9         make sure it's transmitting the information

10        back to Jacksonville.

11   Q    Okay.  But that wasn't something you would

12        ordinary -- your ordinary daily

13        responsibilities did not include personally

14        using that On Board Work Order system?

15   A    Personally, no.

16   Q    Okay.  You might take a look at something

17        that somebody had entered on there from time

18        to time, or signed off on something --

19   A    That's correct.

20   Q    -- that had been entered; is that right?

21   A    Yeah, yeah.

22   Q    All right.  Are you familiar with the work

23        order system other -- Is there a work order
```

```
 1        system other than the On Board Work Order

 2        system?

 3   A    Well, yes.  We, as yardmasters, issue work

 4        orders for our yard jobs to do industrial

 5        work.

 6   Q    Uh-huh (positive response).

 7   A    Or we input close-outs, which sends the

 8        information to Jacksonville where a clerk

 9        actually issues the work orders for your

10        outbound trains.

11   Q    What is the yard system?

12   A    It's, like, a computerized inventory of the

13        yard.  Let's say you have tracks one through

14        seventeen.

15   Q    Uh-huh (positive response).

16   A    And it says system -- you have a receiving

17        track where a train comes in.  You issue a

18        switch list on this track through, let's

19        say, the north yard.

20   Q    Uh-huh (positive response).

21   A    And they come out with a part of a cut.

22        They switch it.  They complete it like it's

23        tabbed to each track.  And once you complete
```

```
 1          it, you have a running inventory of what

 2          cars or at what track and in what yard.

 3    Q     Was that a system that you personally used?

 4    A     Oh, yes.

 5    Q     Okay.  What about the -- Have you ever heard

 6          of the car and train system?

 7    A     Yeah, it's TRCR.  Yes.

 8    Q     And what is that exactly?

 9    A     It's where you can run various records on

10          cars to see where they're at.  Let's say you

11          were as a customer and you were looking for

12          a car.  Give me the card initial number and

13          I would bring it up.  It's still in Mobile.

14          It has not reached Montgomery yet.

15    Q     Uh-huh (positive response).

16    A     Or if it's in a bad order state, it's in the

17          shop.  So, it would have a move saying that

18          it was placed in the shops.

19    Q     What is -- And you do not know what IIDS is;

20          is that right?

21    A     I've heard of it, but, personally, I do not

22          know what it is.

23    Q     What about inner line received?
```

| | | |
|---|---|---|
| 1 | A | Interchange or inner line? |
| 2 | Q | Inner line. |
| 3 | A | I'm not familiar with that terminology. |
| 4 | Q | Okay.  Have you ever heard TYMS inventory |
| 5 | | management? |
| 6 | A | Yes. |
| 7 | Q | What is that? |
| 8 | A | It goes back to yard system again -- |
| 9 | | Training Yard Management System? |
| 10 | Q | Uh-huh (positive response). |
| 11 | A | Yeah, they run inventory of the yard. |
| 12 | Q | Did you receive an interview for the |
| 13 | | assistant manager/customer operations |
| 14 | | position? |
| 15 | A | No, I did not. |
| 16 | Q | All right.  Do you know anything about the |
| 17 | | interviewing process for that position? |
| 18 | A | No, I do not. |
| 19 | Q | Do you know anything about how the job |
| 20 | | posting system works, like, when jobs -- |
| 21 | | how -- like when the company post jobs and |
| 22 | | how they mechanically are posted? |
| 23 | A | They're -- they're -- Usually, you can -- I |

```
1        mean, anybody can go.  Anybody outside the

2        railroad can go in and apply.  If it's

3        internal or external, the way I understand

4        it, you go through the Gateway.

5   Q    But do you understand how the job actually

6        gets on the Gateway?

7   A    No, I do not.

8   Q    Okay.  Do you know what functions within the

9        company is responsible for that job posting?

10  A    I would say human resources.

11  Q    But specifically within human resources,

12       you're not sure exactly how that works?

13  A    No.  I've never been in Jacksonville in the

14       human resource department.

15  Q    Okay.  Now, the terminal manager position in

16       Montgomery is another one that you applied

17       for; is that right?

18  A    That is correct.

19  Q    Did you receive an interview for that

20       position?

21  A    Yes, I did.

22  Q    And who did you interview with?

23  A    I remember David Hamby.  And I'm not sure
```

```
 1        the name of the other individual who was --
 2        that did the interview.
 3    Q   Okay.  Was it in person or over the phone?
 4    A   It was over the phone.
 5    Q   All right.  Does the name Frank Lahue
 6        (phonetic) mean anything to you?
 7    A   Yes.
 8    Q   All right.  Who is Frank Lahue?
 9    A   It sounds familiar, but I could not tell
10        you.
11    Q   Have you ever -- So, you don't recall if you
12        ever met a Frank Lahue before?
13    A   No.
14    Q   Do you know who else was interviewed for the
15        terminal manager position in Montgomery?
16    A   I know Ken Williams was and Jason Tipton and
17        myself, but other than that, no.
18    Q   Okay.  Who is Ken Williams?
19    A   He's the line of road trainmaster on the S
20        and A South for Calera.
21    Q   Okay.  And did he tell you that he was
22        interviewed?  Is that how you know that he
23        was interviewed?
```

1   A    Yeah, he'd come in and talked about applying

2         for the position.

3   Q    Uh-huh (positive response).  About how long

4         had he been a trainmaster?

5   A    Between five to ten years, I think.

6   Q    So, longer than you had, probably?

7   A    Yes.

8   Q    Okay.  Had he always been a line of road

9         trainmaster?

10  A    I'm not sure if he actually worked in the

11        Birmingham terminal or not.  All I can

12        recollect is the -- working around the

13        Calera location.

14  Q    Okay.  Now, Mr. Tipton was selected for that

15        position; is that right?

16  A    That's correct.

17  Q    And at the time he was selected, he was the

18        assistant terminal superintendent in

19        Atlanta; is that right?

20  A    That's correct.

21  Q    Prior to being the assistant terminal

22        superintendent in Atlanta, he was the

23        terminal manager in Mobile; is that right?

```
 1   A   That's correct.

 2   Q   Do you know what he did prior to being the

 3       terminal manager in Mobile?

 4   A   Repeat that.

 5   Q   Do you know what his position was before he

 6       was terminal manager in Mobile?

 7   A   I'm not sure if he was the trainmaster or

 8       assistant trainmaster.  For some reason, I'm

 9       thinking he worked in Flomaton.

10   Q   Okay.  Flomaton, Alabama?

11   A   That's correct.

12   Q   But you're not sure what his position was

13       there?

14   A   Assistant or terminal trainmaster.

15   Q   Okay.  The terminal manager position would

16       have been a promotion for you; is that

17       right?

18   A   That's correct.

19   Q   All right.  For Mr. Tipton, that was a

20       lateral move; is that right?

21   A   I would say so, yes.

22   Q   He was already in a position at that same

23       job grade?
```

```
 1    A    I would say Atlanta would have been a higher

 2         grade, the assistant.  That would be a

 3         higher grade in Atlanta.

 4    Q    Do you --

 5    A    But I couldn't swear to it.

 6    Q    Okay.  And you had never been a terminal

 7         manager before and he has --

 8    A    No.  That was hopefully my next step, either

 9         to be terminal manager or line of road

10         trainmaster.

11    Q    Okay.  Let me finish my question.

12    A    Okay.

13    Q    You had not been a -- a terminal manager

14         where Mr. Tipton had been terminal manager

15         in the past; is that right?

16    A    That's correct.

17    Q    Do you know who received the assistant

18         superintendent position in Atlanta after

19         Mr. Tipton vacated that position?

20    A    Yes, sir.  Mr. Terry Walton did.

21    Q    All right.  And how did you learn Mr. Walton

22         had received that position?

23    A    Running through -- It was probably
```

```
 1        Mr. Tipton because he -- he -- he come in in

 2        the office and asked me did I apply for it,

 3        that I would be a good candidate, and I

 4        would probably get it if I applied for it.

 5        So, I applied for it, but I never did

 6        receive an interview for the assistant

 7        superintendent in Atlanta.

 8   Q    Okay.  And how did you find out that

 9        Mr. Walton had received it?

10   A    Just by asking.  I'm not sure who exactly I

11        asked but --

12   Q    Do you have any idea how old Mr. Walton is?

13   A    I would say late 30 to early 40s.

14   Q    And that's just based on observation?  Have

15        you ever met Mr. Walton before?

16   A    Yes, I have.

17   Q    Okay.  And based on your observation, you

18        believe he's in his late 30s or early 40s?

19   A    Yes.

20   Q    Would it surprise you if Mr. Walton was

21        older than you were?

22   A    I wouldn't think so.

23   Q    Do you know Mr. Walton's qualifications for
```

```
 1          that position?

 2    A     For that position?  I know he's on the -- I

 3          think the terminal improvement team.

 4    Q     All right.  What is that exactly?

 5    A     That's where they go -- Well, he came to

 6          Montgomery and actually did some e-testing

 7          with the officers in the terminal.  Or they

 8          go to each terminal to see how we can

 9          improve in that terminal.

10    Q     And the terminal improvement team, is that a

11          position itself, or is that -- the people on

12          that position -- on that team and other

13          positions and that's just an assignment?

14    A     I'm not for sure about it.

15    Q     Do you know if Mr. Walton has a degree or

16          degrees?

17    A     Pretty sure he has a degree.  He's retired

18          military, I believe.

19    Q     Okay.  Do you have any idea what his rank

20          was in the military?

21    A     No, I do not.

22    Q     Do you have any idea what his -- other than

23          being on the terminal improvement team,
```

```
 1        what, his railroad history is?
 2   A    I know he wouldn't have 25 years of railroad
 3        behind him being retired from military.  I
 4        do know that.
 5   Q    Do you have any idea how much management
 6        experience he has in the -- with the
 7        railroad?
 8   A    No, I do not.
 9   Q    And the Pensacola trainmaster position, do
10        you know who received that position?
11   A    Seems like it was a William Setzer
12        (phonetic).
13   Q    Okay.  And -- and how did you find out who
14        obtained that position?
15   A    Actually, I asked Jerry Hoseworth
16        (phonetic), who was the road foreman of
17        engines for the Pensacola part because he
18        was interviewed for it.  And I asked him who
19        was awarded it.
20   Q    Uh-huh (positive response).  And what was
21        his response?
22   A    Said it was some -- How did he put it?  I'm
23        not sure if he said kid or some -- someone
```

```
 1        out of Jacksonville Moncrief Yard.
 2   Q    Okay.  Do you have any idea what
 3        Mr. Setzer's railroad history is?
 4   A    To be honest, other than the paperwork you
 5        gave me, I know he worked in Moncrief Yard
 6        for a short period of time.
 7   Q    Do you know who made the decision regarding
 8        the Atlanta terminal superintendent position
 9        or the assistant superintendent position?
10   A    I would say it would be Mike Pendergrass.
11   Q    And why do you believe that's the case?
12   A    Because through hearsay, Mr. David Hamby had
13        wanted another individual for the Atlanta
14        position, and he was overruled by
15        Mr. Pendergrass.
16   Q    All right.  And who was the position --
17        person Mr. Hamby wanted?
18   A    He was a little fellow that went to
19        Birmingham as the assistant superintendent
20        in Birmingham.
21   Q    Okay.  And who was -- Do you know the name
22        of the person is?
23   A    I can't swear to it.  But -- I think I have
```

```
 1          it in my notes.  But I -- I can't recall it.
 2    Q     Now, when you say you have it in your notes,
 3          what are you referring to?
 4    A     You should have everything we have.  So, it
 5          should be in that.
 6    Q     Okay.  The -- Do you know whoever made the
 7          decision regarding the Pensacola position?
 8    A     It would be a tossup between Mike
 9          Pendergrass and Mr. Frulla.
10    Q     Why do you think Mike Pendergrass was
11          involved in that?
12    A     Because he is the VP over the Southern
13          Region.
14    Q     Do you have any idea whether Mike
15          Pendergrass was involved in every management
16          promotion in the region or not?
17    A     Factual, no, but gut feeling, yes.
18    Q     Okay.  That's just your opinion at least?
19    A     Yes.
20    Q     Now, you said you had the -- you had heard
21          on hearsay that Mr. Hamby had wanted to
22          promote someone else to the Atlanta
23          assistant terminal -- terminal
```

```
 1        superintendent position and Mr. Pendergrass

 2        had overruled him?

 3   A    That's correct.

 4   Q    What was the basis of that hearsay?

 5   A    What was the basis?

 6   Q    I mean, who told you that?

 7   A    I can't recall because you -- you talk and

 8        discuss so much railroad with different

 9        individuals.  So, I just -- I can't honestly

10        pinpoint one person.

11   Q    All right.  And do you have any idea of what

12        the railroad background is of the individual

13        who received the assistant manager of

14        customer operations position?

15   A    Other than the paperwork you gave me, no.

16   Q    Okay.

17            MR. ATCHISON:  Can we take a break

18               shortly?

19            MR. BARKER:  Shortly, yeah.  Let me

20               finish this line of questions

21               before, please.

22   Q    Why do you believe that you were qualified

23        for the assistant manager of customer
```

1    operations position?

2  A    Because I was a clerk for close to 10, 11

3    years, yardmaster for ten more years, and,

4    actually, a manager for five.  So, I have a

5    working knowledge of, basically, the

6    railroad as a whole.

7  Q    And do you -- Which specific experiences

8    that you have do you believe relate to the

9    customer manager -- the assistant

10    customer -- assistant manager of customer

11    operations position?

12  A    Like I said, you've -- you've seen my

13    resume.  I mean, I've worked every clerical

14    position there was in the Montgomery area.

15    So, I have a broad knowledge of customer

16    service.

17  Q    And do you know specifically whether those

18    experiences relate to that particular

19    position, though?

20  A    I mean, it did say assistant manager to

21    customer service.  So, the description

22    itself should tell you.

23  Q    And you have not been in a clerical

1    position, though, in about 15 years; is that

2    right?

3  A  Or, actually, the yardmaster now does,

4    basically, some clerical work.  So, I'm

5    still in it.

6  Q  Do you have any idea that the clerical work

7    you do as the -- or have done as a

8    yardmaster is similar to the work that's

9    done in -- by the assistant manager of

10   customer operations?

11  A  I imagine he's just supervising clerical

12    people who are doing this type of work.  As

13    for him doing this type of work, I would

14    say, no, but he needs to be familiar with

15    it.

16  Q  Have you ever spoken with anybody who's in

17    an assistant manager of customer operations

18    position or related position about what they

19    do on a day-to-day basis?

20  A  Other than when the clerical supervisors

21    worked in Montgomery dealing with them on a

22    day-to-day basis.  I could see what they

23    actually did in the Montgomery area.

```
1    Q    But do you have any idea if what they do in

2         Jacksonville is anything like what they do

3         in Montgomery?

4    A    I would think it would be.  I mean, you're

5         basically dealing with the same things; it's

6         just moved from one location to the another.

7    Q    And the technology has changed as well?

8    A    It's a little faster.

9    Q    The terminal manager in Montgomery position,

10        what do you believe your qualifications were

11        for that position?

12   A    Like -- like I said, 25 years, this has

13        basically, been my home terminal.  I

14        basically know it inside and out.  I do have

15        some college background, some clerical,

16        yard -- yardmaster background, work

17        experience, work ethic; basically,

18        transportation railroad knowledge.

19   Q    Do you believe you're more qualified than

20        Mr. Tipton?

21   A    With the railroad experience, I would say

22        yes.

23   Q    But you acknowledge Mr. Tipton has been a
```

```
 1          terminal manager in the past.  So, he's held

 2          that position before?

 3   A      Yeah.

 4   Q      Some people might view that as making him

 5          more qualified to be in that position,

 6          wouldn't you agree?

 7   A      Well, actually coming from an assistant

 8          superintendent of a major hump terminal, I

 9          would say he would be overly qualified for

10          the Montgomery terminal.

11   Q      Did Mr. Tipton tell you that he wanted to be

12          the terminal manager in Montgomery?

13   A      You hear all kind of rumors.  There's rumors

14          that he was given the position before he

15          actually applied for it, that he was told

16          that he would go to Montgomery.  So, you

17          hear all kinds of stuff.

18   Q      Had Mr. Tipton ever told you anything like

19          that?

20   A      No, he has not.

21   Q      Has Rod -- Has Rod Workman or David Hamby

22          ever told you anything like that?

23   A      The only thing that Mr. Workman told me was
```

```
 1          when we was in and out-of-the-park meeting

 2          in Atlanta, Georgia, he pulled myself and

 3          Jason Tipton into his office, and he stated

 4          that I did very well on my interview.

 5          And -- I'm trying to remember how he replied

 6          to this.  He acted like the interview didn't

 7          have anything to do with it, that it was out

 8          of his control that -- who got the position.

 9   Q      Was -- Had Mr. Tipton already been awarded

10          the position at that point?

11   A      I'm trying to think of whether it was an

12          out-of-the-park meeting.  I would say yes.

13   Q      And this is a different out-of-the-park

14          meeting -- Was this before the

15          out-of-the-park meeting where the bonuses

16          were discussed?

17   A      Yes.

18   Q      Okay.  So, at that point at the

19          out-of-the-park meeting where the bonuses

20          were discussed, you had already been denied

21          the terminal manager position in Montgomery?

22   A      That's correct.

23   Q      All right.  Had you already been denied the
```

```
 1          assistant superintendent position in
 2          Atlanta?
 3     A    I would say no.
 4     Q    Okay.  Now, you said that you saw on the
 5          calendar that you were scheduled for an
 6          interview for the Pensacola trainmaster
 7          position?
 8     A    It wasn't on the calendar.  It was on the --
 9          actually, the -- You do a job search on the
10          Gateway.
11     Q    Uh-huh (positive response).
12     A    And it tells you what stage you're in
13          from -- that you applied for, that you were
14          not selected, or that you were in the
15          interview stage.
16     Q    Okay.  So, the -- the status of the -- of
17          the application on the -- the Gateway
18          indicated that you were in -- in the
19          interview stage, but you didn't receive any
20          information about an interview?
21     A    That's correct.
22     Q    Did you ever receive -- Okay.  Let me back
23          up for a second.
```

```
 1              When you were in your position as

 2       a terminal trainmaster, did you have company

 3       e-mail?

 4    A  Yes.

 5    Q  Did that e-mail include a calendar function?

 6       Is there a calendar in your e-mail?

 7    A  I'm not for sure.  I never did use it if it

 8       was.

 9    Q  Do you have Microsoft Outlook e-mail?

10    A  Yes, I do.

11    Q  Okay.  Do you recall ever receiving calendar

12       invites to participate in meetings?

13    A  No.

14    Q  Okay.  You don't recall ever having received

15       such a thing?

16    A  No.

17    Q  All right.  Do you know what I -- what I'm

18       referring to when I say calendar invite --

19       like an -- almost like an e-mail but it's

20       for a calendar instead of e-mail?

21    A  No, I do not.

22    Q  Okay.  Did you ever contact anybody about

23       the Pensacola interview to find out what was
```

```
 1          going on?

 2   A      Other -- I -- I was expecting to be called

 3          any day would be an interview stage to be

 4          interviewed.  Other than talking to Jerry

 5          Hoseworth and e-mailing Mr. Frulla, no.

 6   Q      But you e-mailed Mr. Frulla after you found

 7          out you didn't get the position; is that

 8          right?

 9   A      That's correct.

10   Q      You didn't e-mail Mr. Frulla while you were

11          waiting to hear about the position or hear

12          about the interviews, did you?

13   A      No.

14   Q      The terminal manager position, did someone

15          call you about the interview for that?

16   A      I want to say, yes, they did.

17   Q      Okay.  And you didn't receive an interview

18          for the assistant manager of customer

19          service position; is that right?

20   A      No, I did not.

21   Q      The assistant terminal superintendent

22          position, you didn't pursue an interview for

23          that?
```

```
 1   A    No, I did not.

 2   Q    Well, did you receive any communication

 3        about the interview process, that you

 4        wouldn't receive an interview or did you

 5        just check the Gateway and it said you

 6        wouldn't --

 7   A    I just never did receive any notification at

 8        all.

 9   Q    Do you have any idea who was interviewed for

10        that position?

11   A    It was one or two people out of the Atlanta

12        terminal I know of.  Then Mr. Walton, and

13        that was about it.

14   Q    Do you believe that you were more qualified

15        than Mr. Walton for that position?

16   A    I believe I had potential to work the

17        position, and I was willing to learn or do

18        whatever it took to -- to hold that

19        position.

20   Q    Right.

21   A    Yes, I was capable.

22   Q    Okay.  But you are not necessarily claiming

23        that you are more capable than Mr. Walton?
```

1    A    As per railroad knowledge, I would say yes.

2    Q    Okay.

3    A    As per running a terminal, I would say yes.

4    Q    So, because you had -- you -- But you don't

5         know if he had terminal management

6         knowledge -- experience; is that right?

7    A    I do not.

8    Q    Okay.  But you believe since you had 25

9         total years with the railroad that you were

10        more --

11   A    Yes.

12   Q    -- qualified --

13   A    Yes.

14   Q    -- than he was.  But you're not sure how

15        many years management experience he has

16        versus how many years of management

17        experience you have either?

18   A    No, I do not.

19   Q    And you know he has at least a Bachelor's

20        degree; is that right?

21   A    I'm not sure what kind of educational

22        background he has.  I just know he was

23        military.

```
 1   Q    He never told you he has an MBA as well?

 2   A    No.

 3   Q    Okay.  And you're not certain how old he is

 4        exactly, is that right, although you believe

 5        he's in his late 30s or early 40s?

 6   A    That's correct.

 7             MR. ATCHISON:  Break time?

 8             MR. BARKER:  Yeah, let's -- We can take

 9               a break.

10                     (At which time, a recess was

11                      taken.)

12   Q    I show you this document I've marked as

13        Exhibit Number 13, and ask you if you

14        recognize that.

15                     (At which time, the referred-

16                      to document was marked as

17                      Defendant's Exhibit No. 13 by

18                      the Reporter.)

19   A    Okay.

20   Q    Is that the job posting for the assistant

21        manager of customer operations position that

22        you saw?

23   A    Yes.
```

1   Q    Let me show you what I'm marking as Exhibit

2        Number 14.

3                         (At which time, the referred-

4                         to document was marked as

5                         Defendant's Exhibit No. 14 by

6                         the Reporter.)

7   Q    Do you recognize that document?

8   A    Yes.

9   Q    And that's the job posting for the -- the

10       terminal manager in Montgomery position that

11       you sought?

12  A    That's correct.

13  Q    I show you what I've marked as Number 15.

14                        (At which time, the referred-

15                        to document was marked as

16                        Defendant's Exhibit No. 15 by

17                        the Reporter.)

18  Q    Is that the trainmaster position in

19       Pensacola that you applied for?

20  A    Yes, it is.

21  Q    Why did you apply for the trainmaster

22       position in Pensacola?

23  A    Because I thought since he would not

```
 1        consider me for the terminal manager's

 2        position in Montgomery, maybe they would be

 3        willing to let me move to the Atlanta road

 4        trainmaster in Pensacola.

 5    Q   And that was the line of road trainmasters

 6        as opposed to terminal trainmasters?

 7    A   Well, it basically covered Pensacola.  So...

 8    Q   Okay.

 9    A   It says trainmaster.  They actually say line

10        of road, but --

11    Q   You understood it to be a line of road

12        trainmaster position?

13    A   Basically, I understood it to be a

14        trainmaster in Pensacola.

15    Q   Okay.  So, it wasn't a line of road

16        position, though?

17    A   No.

18    Q   Okay.  So, in -- Is it your understanding

19        that the -- Let me back up.  Let me rephrase

20        all that.

21                Is the Pensacola yard smaller or

22        larger than the -- the Montgomery yard?

23    A   I've never actually been there, so I cannot
```

```
 1        tell you.

 2    Q   Okay.  Did anyone ever suggest to you that

 3        you needed to seek positions outside of

 4        Montgomery to diversify your experience in

 5        the company if you wanted to move up?

 6    A   No.  Actually, no.

 7    Q   You never -- You never had a conversation

 8        with anybody who suggested that it might be

 9        valuable to you to work in another location

10        besides Montgomery?

11    A   Not that I can recall, no.

12    Q   Has anyone ever told -- Has anyone told you

13        recently that the company is no longer

14        promoting people from contract positions to

15        management positions in the same location

16        where they were a contract position?

17    A   That was sort of explained to me since I

18        applied for the Montgomery position back in

19        June, and I was not given an interview.

20    Q   Who -- who explained that to you?

21    A   Well, actually, from the day of the

22        interview, I called the steno clerk to ask

23        if they were interviewing for that position
```

1      that day, and she said yes.  So, I waited to

2      be notified about an interview and never did

3      receive one.  So, Mr. Tipton called me and

4      told me that Mr. Hamby had stated that,

5      since it was my own terminal, they would not

6      interview me to be promoted within your home

7      terminal.

8    Q   Do you know if that policy has been applied

9        in other locations as well?

10   A   I know it's been contradicted in Montgomery.

11   Q   And when was that?

12   A   Well, you have a road foreman of engines,

13       Mr. Perry, who's Montgomery -- this is his

14       home terminal.  He was promoted to the road

15       foreman of engines in Montgomery.

16   Q   And when was that?

17   A   It's different -- two different divisions,

18       but it's still his home terminal.

19   Q   When was that?

20   A   That was the last summer when T.J. was

21       demoted.

22   Q   Okay.  And do you know if this policy has

23       been put in place since that time?

```
 1   A    I think I was told this policy has been in

 2        effect for three years.  So, they can

 3        promote whoever they want to and who they

 4        don't want to.

 5   Q    The person who received the trainmaster

 6        position in Montgomery, somebody came from

 7        Birmingham; is that right?

 8   A    That's correct.

 9   Q    Has anybody explained to you that he was not

10        eligible for promotion in Birmingham because

11        he had been in the bargaining unit in

12        Birmingham?

13   A    But, however, he is still supervising,

14        e-testing people who he supervised and he

15        worked with in Birmingham.

16   Q    But the reason for that policy, supposedly,

17        is that people are not -- they want less

18        fraternization between first-line

19        supervisors and bargaining unit employees;

20        is that right?  They don't want somebody

21        supervising somebody who they were a

22        bargaining unit employee with the day

23        before?
```

```
 1   A    That -- that's what they say.

 2   Q    That's what they say, at least.

 3   A    That's what they say.

 4   Q    And that's why -- what's that individual who

 5        received a position in Montgomery recently?

 6   A    Darren Anderson.

 7   Q    Darren?

 8   A    Anderson.

 9   Q    Anderson.  And do you know if he sought a

10        position in Birmingham first and was told

11        that he would have to go to Montgomery?

12   A    I'm not for sure.  I know he was working the

13        TOPS position in Birmingham.

14   Q    All right.  And that's -- TOPS position is a

15        bargaining unit employee who's asked to work

16        as a temporary manager, essentially?

17   A    Temporary officer, that's correct.

18   Q    A temporary officer while there's a need for

19        someone in that position?

20   A    That's correct.

21   Q    So you, yourself -- You, yourself, have been

22        asked to work in that capacity at various

23        times; is that right?
```

```
 1    A    That's correct.

 2    Q    Do you have any objection of being asked to

 3         work in a TOPS position?

 4    A    I was a little hesitant, but as to -- I

 5         mean, I respect Jason Tipton.  He's a --

 6         he's a good manager.  And I -- No.

 7    Q    You feel like that was a -- Mr. Tipton's

 8         expression that he had confidence in your

 9         ability to perform those duties if you were

10         asked to do so?

11    A    Yes.  When he basically leaves me there to

12         operate the terminal and he's not there and

13         nobody else is there, I would say yes.

14    Q    Okay.  The time you have served in a TOPS

15         position at times in which there were no

16         other managers who were present at the

17         facility; is that correct?

18    A    That's correct.

19    Q    Okay.

20    A    And that's against the union agreement.

21         So...

22    Q    All right.  Did you tell -- say anything to

23         Mr. Tipton or anybody else about that?
```

```
 1   A    Well, he should be aware of the union

 2        contract or agreement.

 3   Q    I -- I understand that, but I'm asking if

 4        you said anything to him about that?

 5   A    No, I have not.

 6   Q    Did you ever say anything to anybody at the

 7        union about that?

 8   A    No, I have not.

 9   Q    Okay.  Let me show you this document I've

10        marked as Exhibit Number 16.

11                        (At which time, the referred-

12                        to document was marked as

13                        Defendant's Exhibit No. 16 by

14                        the Reporter.)

15   A    Okay.

16   Q    Is that the job description for the -- or

17        the job posting for the Atlanta terminal

18        assistant superintendent position?

19   A    I believe it is to be.

20   Q    The one that you sought?

21   A    Without a date, I would -- I would say it is

22        the same thing.

23   Q    Okay.  After your demotion, you applied for
```

```
 1        other positions you said?

 2    A   That's correct.

 3    Q   Do you recall what any of those positions

 4        were?

 5    A   They range from management trainee's

 6        position in the Atlanta Ready Center.  I

 7        applied for a trainmaster's position in

 8        Birmingham.  I applied for the terminal

 9        manager's position in Waycross, Georgia.

10        And I applied for one -- I think it was in

11        Greenwood, South Carolina.

12    Q   A terminal manager position?

13    A   I'm not sure if it was a terminal

14        trainmaster or trainmaster.  All of them are

15        listed in the Gateway.  So, it -- it's

16        too -- too numerous to recall.

17    Q   Do you have any idea who received any of

18        those positions?

19    A   Any interview of any notification of any?

20    Q   I'm sorry.  Do you have any idea who -- who

21        was awarded any of those positions --

22    A   Oh, no.

23    Q   -- you applied for?
```

```
 1   A    No, no.

 2   Q    Okay.  You don't -- You haven't heard or

 3        know otherwise who was awarded any of those

 4        positions?

 5   A    No, I'm not.

 6   Q    Do you believe your demotion would serve as

 7        a negative factor on your record as far as

 8        receiving a new promotion in management?

 9   A    I believe my demotion was in retaliation for

10        me questioning their promotional practices.

11   Q    My question -- well, I'll get to that in a

12        second.  But my question is:  Do you think

13        that your demotion would serve -- would

14        serve as a negative factor in your applying

15        for new promotions?

16             MR. ATCHISON:  I'm going to object.

17                  This may call for a

18                  legal conclusion.

19   Q    I'm asking for your personal opinion.  Do

20        you think this -- your demotion is a

21        negative factor on your application for new

22        positions?

23             MR. ATCHISON:  And renewing my
```

1          objection.

2    A    I would say my ethical and work history and

3          background should speak for itself.  I only

4          did what I was instructed to do by a manager

5          of CSX.

6    Q    If you were applying for a position and the

7          person didn't know you or anything about you

8          and just had your record that reflected that

9          you had been demoted, do you think that that

10         person would view that as a negative on your

11         record?

12              MR. ATCHISON:  Same objection.  Also

13                  this calls for speculation.

14   Q    If you received an application for somebody

15         for a promotion and you didn't know anything

16         about that person other than they had been

17         demoted, would you consider that a negative

18         on their record?

19   A    If I was a good manager, I would investigate

20         it myself.  I wouldn't assume anything.

21   Q    What if you had 20 candidates for a

22         position, would you investigate every single

23         one of them?

1    A    Well, like I stated before, I would look at

2         his work history, 25 years, only one

3         incident against his record.  I would

4         investigate it to see if it was factual or

5         not.

6    Q    Now, you said you made complaints about the

7         promotion practices at CSX.  Who did you

8         make the complaint about the promotion

9         practices at CSX to?

10   A    Like I stated, I -- I sent two e-mails out,

11        which was asking what to be done or why I

12        was not interviewed.

13   Q    What is your -- What is your understanding

14        of how the management trainee program works?

15   A    Well, there's two interpretations.  There's

16        one that these are freshly graduated college

17        students are put into the management

18        trainee's position to learn a -- I think

19        they're getting within a year to train then

20        be placed.

21   Q    Okay.  And is there -- you said there's --

22        there's two?  What's the other view of the

23        --

```
 1   A    There, however, is like Mr. Chandler Plots
 2        had, I think, resigned from CSX to work with
 3        his family's company, who was rehired back
 4        by Mr. Hamby, put into management trainee's
 5        position.
 6   Q    And do you know anything about the
 7        circumstances of why he was rehired or,
 8        perhaps, under --
 9   A    I think he was -- My understanding, he had
10        worked with Mr. Hamby in Atlanta and in New
11        Orleans.
12   Q    And is it your understanding that he's not a
13        recent college graduate?
14   A    Yes, sir, because we had a talk, and he was
15        actually attending -- I think taking some
16        courses from Troy State on line.
17   Q    Okay.  And do you know how far he was away
18        from completing that degree?
19   A    No, I do not.
20   Q    Do you know if one is -- one is eligible for
21        the manager trainee program if one has
22        substantially completed a degree or is, you
23        know, about to complete a degree in the
```

```
 1         foreseeable future?
 2    A    I'm not for sure that the two -- the two
 3         that we had were already working in -- in
 4         another field.  So, they'd already obtained
 5         their degree.
 6    Q    Do you know how long they obtained their
 7         degrees before they entered into that
 8         program, though?
 9    A    Well, one is in his mid to late thirties.
10         So, I would imagine he had been in the work
11         force a few years before he went into the
12         management trainee's position with CSX.
13    Q    Now, you have not completed a degree; is
14         that right?
15    A    That's correct.
16    Q    And -- And you have not been enrolled in a
17         degree program in -- in over ten years; is
18         that right?
19    A    That's probably accurate, yes.
20    Q    Why did you believe that you were eligible
21         for the management trainee program if having
22         a degree is a prerequisite for that?
23    A    I'm not sure that a degree was a
```

```
 1        prerequisite.
 2   Q    So, you --
 3   A    It -- It usually says -- like, stated down
 4        here below on the assistant super terminal
 5        manager or the line of road trainmaster:
 6        Bachelor's degree or equivalent experience.
 7        It says "experience."
 8             MR. ATCHISON:  What exhibit are you
 9                 looking at?
10             THE WITNESS:  It's Exhibit 15.
11             MR. ATCHISON:  Okay.
12   A    Exhibit 16, which is assistant terminal
13        superintendent, Atlanta, Georgia:  "High
14        school diploma/GED required.  Undergraduate
15        in business or related field preferred."
16   Q    I understand that that's what those say.
17        But do you know if the management trainee
18        program is different?
19   A    No, I do not.
20   Q    Okay.  Do you recall what the e-mails -- you
21        said you sent an e-mail to Mr. Workman and
22        an e-mail to Mr. Frulla.  And those -- and
23        you believe those e-mails constituted
```

```
 1         complaints about CSX's promotional
 2         practices?
 3    A    It was questioning me what do I need to do
 4         to obtain promotion with this company.  What
 5         do I need to do?  And Mr. Frulla was asking
 6         why I was not interviewed for that
 7         permission -- trainmaster position in
 8         Pensacola.
 9    Q    And you think that sending those e-mails
10         provoked some sort of retaliation against
11         you?
12    A    Well, verbally I had been questioning, I
13         mean, through other managers.  I mean, but
14         as to say written --
15    Q    Well, when you say verbally you had been
16         questioning, what do you mean by that?
17    A    Well, I mean, I knew Mr. Tipton had -- was
18         younger.  I -- I basically knew his hired
19         date.  So, actually, he was a younger
20         manager that they promoted.
21    Q    Mr. Tanoselle (phonetic) has four or five
22         years more management experience than you
23         do, too, doesn't he?
```

1    A    I would say, yeah.

2    Q    So, who -- Who did you have conversations

3         with where you felt like you were

4         questioning CSX's management practices?

5    A    I can't swear to it, but I'm pretty sure

6         Ms. Angie Averitte -- I talked to her about

7         it.

8    Q    Did you send her e-mails as well?

9    A    No, I did not.

10   Q    Did you just talk to her about how you --

11        what you needed to do to get promoted and

12        how you wanted to be promoted?

13   A    No, I -- I addressed Mr. Workman with that

14        issue.

15   Q    All right.  And what did you talk with Angie

16        about specifically?

17   A    Actually, when I applied for the Birmingham

18        position, she -- she talked to Scott Conner

19        about me, about my background, my work

20        ethics and all.  And from talking to her,

21        she said Scott wanted to interview me for

22        the position, but labor relations would not

23        let him or allow him.

1   Q    All right.  Now, when was this?

2   A    This was probably between June of '06 and

3        December of '06.

4   Q    Okay.  So, not long after you had been

5        demoted?

6   A    That's correct.

7   Q    You would agree if the job posting stated

8        that a person had to have been in their

9        job -- their current job for at least one

10       year before applying for a new position that

11       you would not have been eligible for that

12       position since you had just been put into a

13       yardmaster position?

14  A    That's not talking about contractual

15       positions.  It's talking about management

16       positions.

17  Q    In your opinion, you don't think that's

18       referring to contractual positions?

19  A    No, it's not.

20  Q    All right.  And what is your basis -- that

21       basis for that opinion?

22  A    It's like being promoted from terminal

23       manager -- from a trainmaster that says

```
 1        promoted in June of '06.  I cannot apply for
 2        a terminal manager or assistant
 3        superintendent for an entire another year.
 4    Q   Okay.  But if you were in a contract
 5        position, you don't think that applies?
 6    A   No, I don't because there's no moving
 7        expenses involved at all.  That's so you
 8        can't jump from location to location.  And I
 9        would assume that you're claiming all these
10        moving expenses and allowances.
11    Q   All right.  Has anyone ever told you that it
12        doesn't apply to contract positions or is
13        that just your -- your belief?
14    A   Well, we do not advertise contractual
15        positions, and it doesn't say anything about
16        contractual positions on these applications
17        or postings.
18    Q   If you -- But it does say on some of those
19        postings that you have to be in your current
20        position for a year before you're eligible
21        for that position; isn't that right?
22    A   Let's find it and read it.  Employees must
23        complete one year in your current position
```

```
 1        before applying for a new position.
 2   Q    And that doesn't say anything about limiting
 3        that to management positions, does it?
 4   A    It says, this is on that management
 5        position.  I would say it was applying to
 6        management positions.
 7   Q    All right.  That's your personal belief,
 8        though, correct?
 9   A    That's my personal belief.
10   Q    All right.  Have you discussed that with
11        anybody at the company?
12   A    No, I have not.
13   Q    Okay.  Other than the conversation you had
14        with Angie Averitte regarding the Birmingham
15        position, do you recall any other
16        conversations you had with managers at CSX
17        regarding your questions or concerns about
18        the promotion practices at CSX?
19   A    Let's see.  Well, shortly after I did not
20        get the terminal manager's -- terminal
21        manager's position in Montgomery, Ken
22        Dziwulski called me and asked what was
23        wrong.  And he says, it's -- it's because
```

```
 1        you did not get the terminal manager's
 2        position.  I said, yeah.  And he said, well,
 3        it -- it's very political is how he put it.
 4        And I told him I was not a political person.
 5        That your background or your merit should
 6        stand up over politics.
 7   Q    Why didn't Mr. Dziwulski think there was
 8        anything wrong -- Do you say he called you
 9        to ask what was wrong?  Why didn't --
10   A    Well, it wasn't in my usual, positive,
11        chipper self, you might call it.
12   Q    Okay.  And so, Mr. Dziwulski called you and
13        he told you that he thought that a lot of
14        these positions were very political, and you
15        told him that you were not a political
16        person; is that right?
17   A    Yes.  He said it was a political --
18        political atmosphere is the way he put it.
19   Q    Do you think that's inaccurate?
20   A    It's very accurate.
21   Q    So, what does the politics of that have to
22        do with your age?
23   A    Politics and my age?
```

1    Q    What is the politics of management positions

2         have to do with your age?

3    A    Basically, I would say everything because

4         most of these people that are promoted are

5         junior employees that I've had experience

6         with.  Even the person that took my position

7         was a junior, then the last three to four

8         that has come into Montgomery for a junior.

9         Even Mr. Anderson from Birmingham is junior.

10   Q    Junior in the sense that he's younger than

11        you are, or he has the --

12   A    That is correct.

13   Q    Okay.  And making sure you're not referring

14        to seniority or something else.  How old is

15        Mr. Anderson?

16   A    I would say late 30s, mid to late 30s.

17   Q    So, you think that politics has to do with

18        your age because you've seen people receive

19        positions who were -- who you think tend to

20        be younger than you are; is that --

21   A    That was what Mr. Ken referred to as being

22        very political.

23   Q    You think he was referring to age when he

```
 1           said that things were political?
 2    A      He just stated it was a very political
 3           atmosphere.
 4    Q      And you didn't understand that to mean about
 5           who was friends with who and, you know, who
 6           was trying to impress who and those kind of
 7           things?
 8    A      That's how I took it, yes.
 9    Q      All right.  But who's friends with who
10           doesn't have anything to do with your age,
11           does it?
12    A      Well, like I've -- I have not seen a senior
13           employee promoted, so I would say, yes.  I
14           have not seen anybody my age or older
15           promoted.  I have not --
16    Q      To your knowledge, at least.
17    A      To my knowledge, that's correct.
18    Q      And when you say you've not seen anybody,
19           you mean in Montgomery?
20    A      In the Montgomery area or Birmingham or
21           notably Mobile.  Because basically, you talk
22           to these individuals on a daily basis when
23           you was working the management position.
```

1        So, I have not noted any.

2   Q    Okay.

3            THE VIDEOGRAPHER:  We can go ahead and

4                switch tapes.

5            MR. BARKER:  Okay.  That's fine.

6                    (At which time, a recess was

7                    taken.)

8   Q    All right.  Now, Mr. Hollon, you mentioned

9        that you sent an e-mail to Rob Workman, an

10       e-mail to Bob Frulla.  You had a

11       conversation with Angie Averitte and a

12       conversation with Ken Dziwulski.  Are there

13       any other conversations that you had where

14       you feel like you were questioning or

15       challenging CSX's promotional practices?

16  A    I've talked to several people.

17  Q    You said you talked to several people?

18  A    Yes.

19  Q    Co-workers or managers?

20  A    Well, most of these were managers.  I've

21       talked to Melvin Murray, and I've talked

22       to --

23  Q    To who?

```
 1   A    Melvin Murray.

 2   Q    Okay.  Melvin Murray.

 3   A    Line of road trainmaster with M & M.

 4   Q    Uh-huh (positive response).

 5   A    Jerry Hoseworth, road foeman of engines for

 6        Pensacola.

 7   Q    Uh-huh (positive response).

 8   A    Basically, I talked to him about the age

 9        discrimination issue.  Even talked to him

10        that he needed to file since he did not

11        obtain the position of Pensacola also and

12        how many days with the EEOC he had to file

13        with in the State of Florida.

14   Q    You said Melvin Murray, Hoseworth, and who

15        was the other person?

16   A    It was Melvin Murray and just Jerry

17        Hoseworth.

18   Q    That's it?  And are those the only two

19        people you can recall having spoken with?

20   A    Right offhand that I can recall.

21   Q    And do you know if either one of them had

22        conversations with anybody else about the

23        conversations you've had with them?
```

```
 1   A    I'm pretty sure.  I mean, things travel on

 2        the railroad.  So, I can't swear to it.

 3   Q    You don't know one way or the other?

 4   A    No.

 5   Q    But you assume they may have?

 6   A    Yeah.

 7   Q    The conversations you had with Melvin Murray

 8        and Jerry Hoseworth, were those after you

 9        were demoted or before you were demoted?

10   A    Jerry Hoseworth was before I was demoted.

11   Q    Okay.  In other words, afterwards?

12   A    I think I talked to him before and after.

13   Q    Okay.  Angie Averitte was after, though; is

14        that right?

15   A    No.  Actually, I talked to her before and

16        after the fact.

17   Q    And were the conversations you had with her

18        were the nature of what is it -- what is it

19        going to take for me to get promoted?

20   A    That was directed to Mr. Workman.

21   Q    Okay.  What did you -- What exactly did you

22        talk about with Angie?

23   A    Well, when she was forced to Atlanta on the
```

```
 1        MOPS position out of Montgomery,

 2        Mr. Pendergrass, I believe, came in and had

 3        a conference with her in the conference

 4        room.  And she put my name and Josh Connell

 5        up for the next two candidates to replace

 6        her.

 7   Q    Okay.

 8   A    And she told me that she had talked to

 9        Mr. Pendergrass about me.

10   Q    And what did he say?

11   A    She didn't say anything.

12   Q    All right.  So, at some point, you had a

13        conversation with her where she told you

14        when she was going to Atlanta that she had

15        suggested to Mr. Pendergrass that you

16        were -- or Jason Connell would be --

17   A    Josh Connell.

18   Q    Josh Connell would be --

19   A    Good candidates.

20   Q    -- good candidates for the manager position?

21   A    Or that would be my next step in line would

22        be the terminal manager's position in

23        Montgomery.
```

| | | |
|---|---|---|
| 1 | Q | And what did you say in response to that? |
| 2 | A | Probably I'd -- I probably would have |
| 3 | | thanked her for her support. |
| 4 | Q | How old is Josh Connell? |
| 5 | A | Probably 25. |
| 6 | Q | Do you know if -- Have you talked with Angie |
| 7 | | Averitte about the terminal manager position |
| 8 | | in Montgomery after Jason Tipton was |
| 9 | | selected for it? |
| 10 | A | Actually, we -- we all had a gut feeling |
| 11 | | who -- who was going to get it.  There was |
| 12 | | rumor he already had it.  So -- So, |
| 13 | | basically, the day I was scheduled to |
| 14 | | interview I was talking to her about just |
| 15 | | pulling my application down, and she told me |
| 16 | | to go ahead and go on through the interview; |
| 17 | | it would be good experience. |
| 18 | Q | And you did that? |
| 19 | A | And I did that. |
| 20 | Q | Prior to January of 2006, had you applied |
| 21 | | for higher-level management positions with |
| 22 | | CSX? |
| 23 | A | Prior to January 2006? |

```
 1   Q   Uh-huh (positive response).  Or management
 2       positions in other locations.
 3   A   I'm trying to recall.  I'm trying to
 4       remember if it -- when I was a yardmaster/
 5       trainmaster that I had applied for -- I
 6       remember applying for one in Chattanooga,
 7       Tennessee, and I want to say Nashville.
 8   Q   Were those trainmaster positions?
 9   A   Yes, sir.
10   Q   All right.  And you don't recall if that was
11       when you -- a yardmaster or when you were a
12       trainmaster?
13   A   That's correct.
14   Q   Do you remember when you put in those
15       applications?
16   A   No, I do not.
17   Q   Was it more than a year before 2006?
18   A   I -- I could not tell you.
19   Q   Okay.  Do you have any idea who got those
20       positions?
21   A   No, I do not.
22   Q   When you were promoted to assistant terminal
23       trainmaster, you were, what, 41 years old;
```

263 of 392

```
 1         is that right?

 2    A    Around about, yeah.

 3    Q    Let me show you this document that I've

 4         marked as Exhibit 17.  Do you recognize this

 5         document?

 6                        (At which time, the referred-

 7                         to document was marked as

 8                         Defendant's Exhibit No. 17 by

 9                         the Reporter.)

10    A    Yes, I do.

11    Q    Is that your EEOC charge you filed?

12    A    Yes, it is.

13    Q    And you filled this out the day you were

14         demoted, is that right, the front page?

15    A    It was signed and dated on the date I was

16         demoted.

17    Q    Okay.  Did you personally go to the EEOC?

18    A    Did I personally go to the EEOC?

19    Q    Did you go to the EEOC's office in person?

20    A    Actually, before my attorney helped with the

21         EEOC charge later --

22    Q    Okay.

23    A    -- I had talked with the EEOC directly.
```

```
 1          That was back in probably April or so.  And

 2          she was telling me all the paperwork I

 3          needed to fill out.

 4     Q    So, you called the EEOC?

 5     A    Yes, I did.

 6     Q    All right.  Did you ever go to a physical

 7          EEOC office?

 8     A    No, I did not.

 9     Q    All right.  So, you called the EEOC in April

10          of 2006 --

11     A    Roughly.

12     Q    -- and spoke -- roughly -- and spoke with

13          somebody; is that correct?

14     A    Yes.

15     Q    When was the first time that you spoke with

16          your attorney regarding this matter?  Before

17          or after you were taken out of service?

18     A    I'm trying to recall.  Probably after I was

19          taken out of service.

20     Q    And you said -- and you said your attorney

21          helped you draft this document that's listed

22          as Exhibit A; is that correct?

23     A    That's correct.
```

```
 1   Q    And Exhibit A is what you presented to

 2        Mr. Frost and Mr. Workman during your

 3        demotion meeting; is that correct?

 4             MR. ATCHISON:  Well, wait.  I'm going

 5                  to object to the extent that this

 6                  shows receipt by the EEOC on June

 7                  the 20th.  And I believe

 8                  Mr. Workman's meeting with -- with

 9                  Mr. Hollon was the day before.

10                  So, to represent this is the

11                  document.

12             MR. BARKER:  My question to him was

13                  Exhibit A, the two-page document,

14                  on the back of the cover sheet, is

15                  that what he presented to Mr.

16                  Workman.

17             MR. ATCHISON:  Ah, Exhibit A.  Oh --

18                  Oh, of -- of Defendant's Exhibit

19                  17.

20             MR. BARKER:  Yes.

21             MR. ATCHISON:  Okay.  Okay.  With that,

22                  I withdraw my objection.

23             MR. BARKER:  Okay.  The pages that are
```

```
 1              phrased at the very top "Exhibit
 2              A."
 3         MR. ATCHISON:  And -- and still there
 4              is a note, though.  There is a
 5              received on June -- I guess the
 6              problem I'm having with your
 7              question is the date stamp that
 8              EEOC puts on these documents, and
 9              that date stamp on Exhibit A is
10              June the 20th.  So...
11         MR. BARKER:  It sure is.  But I'm
12              asking -- what I'm asking about is
13              about what happened the day before
14              is whether -- if this is -- if
15              this is a copy of what he handed
16              to Mr. Workman.
17         MR. ATCHISON:  If this is a print
18              matter that he sent without the
19              date stamp, I would withdraw my
20              objection, if that's your
21              question.
22    BY MR. BARKER:
23    Q    Yes.  My question is, is this -- the text of
```

```
 1        this the substance of what you handed to

 2        Mr. Workman and Mr. Frost?

 3              MR. ATCHISON:  With that question, I

 4                   withdraw my objection.

 5              MR. BARKER:  Okay.

 6              MR. ATCHISON:  That would not include

 7                   the date stamp on the front of

 8                   this Exhibit A.

 9   Q    Did you -- Do you want me to repeat my

10        question?

11   A    I understood it.

12   Q    Okay.

13   A    Yes, it is.  Exhibit A is.

14   Q    All right.  That's what you handed during

15        that meeting.

16              Let me show you this document I'm

17        going to mark as Exhibit Number 18.

18                   (At which time, the referred-

19                   to document was marked as

20                   Defendant's Exhibit No. 18 by

21                   the Reporter.)

22   Q    See if you recognize that.  Do you recognize

23        that document?
```

```
 1   A      Yes, I do.

 2   Q      Is that an -- an additional document that

 3          you filed with the EEOC?

 4   A      Correct.

 5   Q      Let me show you what I've marked as Exhibit

 6          Number 19.

 7                       (At which time, the referred-

 8                        to document was marked as

 9                        Defendant's Exhibit No. 19 by

10                        the Reporter.)

11   Q      Is that a document you received from the

12          EEOC, or have you ever seen it before?

13   A      Yes, I've seen this before.

14   Q      Okay.  And did you receive that document?

15   A      Did I receive it?

16   Q      Yes.

17   A      Yes.

18   Q      Okay.  Now, going back to the EEOC charge

19          itself in Exhibit A to that document, in the

20          charge here, it says that:  I believe

21          that -- that I -- that due to the exercise

22          of my particular activity when I complained

23          to fellow employees about the management age
```

```
 1        discrimination and denial of several

 2        promotions.  That refers to the e-mails you

 3        sent to Rob Workman and Bob Frulla?

 4    A   Yes.

 5    Q   And the conversations with Angie Averitte

 6        and Mel -- Melvin Murray and --

 7    A   Jerry Hoseworth.

 8    Q   Jerry Hoseworth we already discussed,

 9        correct?

10    A   That's correct.

11    Q   Those are the only conversations and

12        communications that this refers to; is that

13        right?

14    A   That I can recall.

15    Q   Do you recall if you expressly raised your

16        age with any of those people in any of those

17        communications?

18    A   Mr. Hoseworth I did because I -- he was in

19        his 50s.

20    Q   So, you told him you thought that the two of

21        you were being discriminated against because

22        of your age?

23    A   He brought it up too because he had a degree
```

```
 1          from the University of Florida.  So, it

 2          wasn't a degree issue or -- or being

 3          qualified issue.  That was not the issue.

 4    Q     Other than Mr. Hoseworth, is there anyone

 5          else you expressly discussed -- expressly

 6          remember discussing your age being a factor

 7          in promotions with?

 8    A     With the railroad?  Outside the railroad?

 9    Q     With the railroad.

10    A     I can't recall anybody else.

11    Q     Okay.  Now, you say here that you were

12          passed up -- that younger, less qualified

13          individuals were given promotions over you.

14          First, for the Montgomery terminal manager

15          position, then for the assistant

16          superintendent position, and then for the

17          trainmaster position, and then for the

18          customer service position; is that right?

19    A     That's correct.

20    Q     But until recently you had no idea who

21          received the customer service position; is

22          that correct?

23    A     That's correct.
```

```
1    Q    And until recently you had no idea who

2         received the trainmaster position; is that

3         correct?

4    A    No, I knew that.

5    Q    How did you know who received the

6         trainmaster?

7    A    Mr. Hoseworth.

8    Q    Oh, he knew who received the position?

9    A    Yes, he did.

10   Q    And you don't know why it was that you

11        were -- that you were referenced as being

12        scheduled for an interview, but you were

13        never actually interviewed for that

14        position?

15   A    I believe in your paperwork you state or

16        they state that I did not respond to the

17        interview.  I was never notified about an

18        interview.  I mean, I wanted the position.

19        So, I was just waiting to be either called

20        or notified.

21   Q    Right.  But that's -- You were not

22        interviewed, and there was this issue about

23        whether or not you were contacted to be
```

```
 1        interviewed?
 2    A   Well, I was not contacted.
 3    Q   You don't know why you were not contacted
 4        for the interview?
 5    A   That's why I sent Mr. Frulla the e-mail
 6        asking why I was not.
 7    Q   Yes.  And that was sometime after the
 8        position was filled; isn't that correct?
 9    A   Actually, it was probably on the same day I
10        signed the remote card issue.  So...
11    Q   But that was sometime after the position?
12    A   I'm trying to remember when that position
13        was filled.  I would say, yes.
14    Q   Okay.  The Atlanta position went to Terry
15        Walton; is that correct?
16    A   Yes.
17    Q   And you're not sure whether he's younger or
18        older than you are, or you believe he's
19        younger?
20    A   I believe he's younger.
21    Q   And the Montgomery position went to Jason
22        Tipton; is that right?
23    A   That's correct.
```

```
1    Q    And we discussed your qualifications for

2         each of those positions earlier; is that

3         right?

4    A    That's correct.

5    Q    Now, in the second document here, 18, I

6         believe, the second EEOC charge?

7    A    18 or 19?

8    Q    18.

9    A    Okay.

10             MR. ATCHISON:  Is this the amended?

11             MR. BARKER:  Yes.

12   Q    The amended EEOC charge you state, "There

13        were other similar employees who engaged in

14        allegedly more severe incidents who were

15        neither terminated nor demoted."  Who are

16        you referring to there?

17   A    I'm referring to every manager that was

18        working under Mr. Allen Snap in Mobile,

19        Alabama, when the alleged falsification of

20        the time periods took place.  I'm talking

21        about the assault between a manager and a

22        yardmaster in Birmingham, Alabama.  I'm

23        talking about the alleged assault between a
```

```
 1        yardmaster and a trainmaster in New Orleans,

 2        Louisiana.  Basically, those three.

 3   Q    All right.  Now, Allen Snap was the terminal

 4        manager in Mobile; is that right?

 5   A    That is correct.

 6   Q    And during Mr. Snap's tenure, it was

 7        discovered that he was approving falsified

 8        time sheets for employees in Mobile; is that

 9        right?

10   A    From working in Montgomery terminal, the

11        terminal manager does -- does not validate

12        the payroll.

13   Q    In --

14   A    It's either the yardmaster or the terminal

15        trainmaster that validates the payroll.

16   Q    All right.  In Montgomery that's how the

17        payroll is validated; is that what you're

18        saying?

19   A    I would say everywhere because you have to

20        be authorized to even get into that screen

21        to validate the payroll.

22   Q    And do you think terminal manager isn't

23        authorized to get into the payroll
```

```
 1        validation screen?
 2  A     I would say not because it would be a
 3        contractual -- contractual issue.
 4  Q     Do you know whether Mr. Snap directly
 5        authorized the payroll or instructed
 6        subordinate managers too falsify the
 7        payroll?
 8  A     From working with Allen Snap, he wouldn't --
 9        he wouldn't authorize falsifying.
10  Q     That's based on your -- just an opinion of
11        Allen Snap?
12  A     That's correct.
13  Q     You don't have any personal knowledge of
14        what happened exactly in Mobile, do you?
15  A     Just I -- I know -- I know that he was
16        relieved, put back in service, then demoted.
17  Q     You think he was demoted to a yardmaster
18        position in Florida; is that right?
19  A     That's correct.  Tampa, Florida.
20  Q     Tampa, Florida.  And he had been in a
21        terminal position in Mobile; is that right?
22  A     For several years, yes.
23  Q     Yes.  And, in fact, he had bumped Jason
```

```
 1        Tipton out of the terminal manager position

 2        in Mobile during the OEI; isn't that right?

 3   A    Yeah, I believe that's correct.

 4   Q    Before that, he had been district

 5        superintendent; is that right?

 6   A    That's correct.

 7   Q    Now, you have heard -- Are you aware that

 8        Mr. Snap has been demoted, but you're not

 9        personally familiar with what exactly

10        happened in the incidence in Mobile; is that

11        correct?

12   A    Just from hearsay.

13   Q    Just from what you've heard on the railroad?

14   A    That's correct.

15   Q    The situation in Birmingham you were

16        referring to, is that with Mr. Carnes?

17   A    That is correct.

18   Q    Mr. Carnes was accused by a trainmaster, is

19        that right -- or a yardmaster of assault --

20        of assault?

21   A    That's correct.

22   Q    Yes.  And how did you learn of this

23        situation?
```

```
 1    A    Through, I reckon, the conversation along
 2         the railroad.
 3    Q    Yes.  And do you know what the result of all
 4         that was?
 5    A    The results?
 6    Q    Yes.
 7    A    No, I do not.
 8    Q    All right.  Do you know if Mr. Carnes faced
 9         any -- was investigated over this issue?
10    A    I know he was put into jail.  I know that he
11         was not removed from service as I was.
12    Q    You said -- Do you know if Mr. Carnes was
13         exonerated in all that, too?
14    A    No, I do not.
15    Q    All right.  Have you heard that?
16    A    No, I do not.
17    Q    Have you heard anything other than the fact
18         that this trainmaster accused him of
19         assaulting in the course of a disciplinary
20         incident?
21    A    Well, it was a yardmaster.
22    Q    Yardmaster.  I'm sorry.
23    A    No.
```

```
1    Q    And do you have any idea who the employees

2         are who were involved in this alleged

3         assault in New Orleans?

4    A    No, I do not.

5    Q    You said it was a yardmaster and a

6         trainmaster got in a fight?  Is that

7         basically --

8    A    That's correct.  Yes.

9    Q    And it's your understanding that neither one

10        of them was demoted or fired?

11   A    To the best of my knowledge, yes.

12   Q    All right.  And your knowledge base about

13        that is -- is based on what you've heard on

14        the railroad; is that correct?

15   A    It's verbal, yes.

16   Q    Hearsay, essentially?

17   A    Yes.  There was one more incidence where a

18        junior trainmaster in Mobile allegedly or

19        falsified an efficiency test.  I do know

20        about that.

21   Q    All right.  And is that Ray Billingsley; is

22        that right?

23   A    That's correct.
```

1   Q   And do you have any idea whether that was

2       investigated and how that -- what the result

3       of that investigation was?

4   A   Well, no, he was not pulled out of service.

5       I know he was not demoted.

6   Q   If there was an FRA investigation?

7   A   I'm not sure about that because there should

8       have been if it was an efficiency test

9       falsification.

10  Q   You said you talked with Gill Cobar

11      (phonetic) about this case?

12  A   Actually, the -- probably the day of or the

13      day after I talked to him.

14  Q   Mr. Cobar is a former division manager of

15      CSX; is that right?

16  A   That is correct.

17  Q   And he left the company during the OEI; is

18      that correct?

19  A   Well, he was terminated.

20  Q   As part of the OEI; is that correct?

21  A   As part of OEI, no.

22  Q   Do you know what the circumstances of his

23      termination were?

```
 1   A    No, I do not.

 2   Q    Do you think that Jerry Hoseworth was more

 3        qualified than you for the Pensacola

 4        trainmaster position?

 5   A    I would say, yes, and I would have welcomed

 6        him being promoted over me.

 7   Q    What did Mr. Cobar say to you when you

 8        called him?

 9   A    He just couldn't believe that it had

10        happened to me and T.J. Dean with our work

11        history and work ethics.  And basically,

12        he -- he discussed the retirement issue a

13        little bit.  But I can't recall in detail

14        what all we talked about.

15   Q    His retirement?

16   A    Or being demoted before you were 50, you'll

17        lose so much percentage of your retirement.

18   Q    Is that according to the -- the pension plan

19        that CSX has?

20   A    From my knowledge from talking to him,

21        that's the way I understood it.

22   Q    Have you ever looked into that issue other

23        than speaking with Mr. Cobar?
```

```
 1   A    No, I have not.

 2   Q    Did you talk with Mr. Cobar about your

 3        signing of the FRA certification?

 4   A    Yes.  And he stated that employees signs

 5        documents all over the CSX railroad.

 6   Q    FRA documents or any kind of documents?

 7   A    Just documents, period.

 8   Q    All right.  Did you talk with him about FRA

 9        documents at all specifically?

10   A    Well, he -- he knew what we had done.

11   Q    How long has Mr. Cobar been gone from CSX?

12   A    Probably two thousand -- I'm not for sure.

13        2005.

14   Q    Let's talk about what I'm going to mark as

15        Exhibit Number 20.

16                     (At which time, the referred-

17                      to document was marked as

18                      Defendant's Exhibit No. 20 by

19                      the Reporter.)

20   Q    What is that document exactly?

21   A    It's just noting the person that was

22        assaulted in Birmingham, or allegedly

23        assaulted.
```

1    Q    Where did you come by this document exactly?

2    A    I'm thinking -- I can't swear to it, but I'm

3         thinking a union rep retrieved it for me.

4    Q    And who was that exactly?

5    A    I want to say Ronnie Putman at the time.  I

6         can't swear to it, but I'm pretty sure

7         that's where I got it.  It's got the whole

8         seniority district of Bolls, Gadsden,

9         Decatur, and Montgomery on it.

10   Q    I show you what's marked as Exhibit 21.

11                        (At which time, the referred-

12                        to document was marked as

13                        Defendant's Exhibit No. 21 by

14                        the Reporter.)

15   Q    How did come -- How did you obtain this

16        document?

17   A    Actually, this was left at the yard office

18        in an envelope for me.

19   Q    What's that?

20   A    I said this was left in an envelope at the

21        yard office for me.

22   Q    Just anonymously left in a -- in an envelope

23        at the yard office?

```
 1   A      Yes.

 2   Q      Do you know how it got there?

 3   A      No, I do not.

 4   Q      Has anyone ever contacted you regarding this

 5          document at all?

 6   A      Contacted me about it, no, they have not.

 7   Q      No one has ever said to you that they left

 8          it for you or anything like that?

 9   A      No.

10   Q      Let me show you this document, Exhibit

11          Number 22.

12                         (At which time, the referred-

13                         to document was marked as

14                         Defendant's Exhibit No. 22 by

15                         the Reporter.)

16   Q      How did you come about obtaining

17          Mr. Tipton's pay stub?

18   A      This was left in an envelope with my name on

19          it at the yard office.

20   Q      This was also left --

21   A      Yeah.

22   Q      -- in an envelope anonymously.

23   A      Because I don't have any access to this.
```

| 1  | Q | When was that exactly? |
| 2  | A | When I got the envelope? |
| 3  | Q | Uh-huh (positive response). |
| 4  | A | It could be from July, August. |
| 5  | Q | Of last year? |
| 6  | A | Yeah. |
| 7  | Q | What about the Carnes' envelope? |
| 8  | A | I'm not sure exactly when I received this. |
| 9  | Q | Before or after? |
| 10 | A | After my demotion? |
| 11 | Q | No.  Before or after you received this |
| 12 |   | envelope. |
| 13 | A | I'm not for sure.  I cannot swear to the |
| 14 |   | date or when I received it. |
| 15 | Q | It was after your demotion, then? |
| 16 | A | I'm not even for sure about that, to be |
| 17 |   | honest. |
| 18 | Q | If someone received a job that you applied |
| 19 |   | for and they were 45, would you think that |
| 20 |   | that was discrimination towards you based on |
| 21 |   | your age? |
| 22 |   | MR. ATCHISON:  Objection.  Calls for a |
| 23 |   | legal conclusion. |

```
 1              MR. BARKER:  I'm asking his opinion.

 2              MR. ATCHISON:  But he's not a lawyer.

 3              MR. BARKER:  I'm not asking for a legal

 4                  conclusion.  I'm asking his

 5                  opinion, when he thinks age

 6                  discrimination has occurred.

 7    Q    What do you think -- Do you think if someone

 8         is picked for a job and they're 45 and

 9         you're 47, do you think that's age

10         discrimination?

11              MR. ATCHISON:  I renew my objection.

12    Q    You can go ahead and answer.

13    A    What defines age discrimination?

14    Q    Well, in your opinion, if someone gets a job

15         over you, when do you think it -- that your

16         age has something to do with it?

17    A    Well, legally define age discrimination for

18         me.

19              MR. ATCHISON:  Same objection.

20              MR. BARKER:  I'm -- I'm not trying --

21              MR. ATCHISON:  Let -- let -- Let me do

22                  my objection, please.  Object.

23                  This calls for a legal conclusion.
```

```
 1              Now, if you want to answer or can

 2              answer, do your best.

 3   Q   You have alleged in this lawsuit that you

 4       believe you were discriminated against

 5       because of your age; is that right?

 6   A   That's correct.

 7   Q   All right.  So, you have -- What is your

 8       personal definition of age discrimination?

 9          MR. ATCHISON:  Same objections.  This

10              calls for a legal conclusion.

11   A   Age discrimination -- I'd say anybody

12       younger than myself or not equal to my age

13       or older.

14   Q   Okay.  So, anybody who's younger than you,

15       if they get a job that you applied for, that

16       could be age discrimination?

17          MR. ATCHISON:  Same objection.

18   Q   Is that your answer, that anybody who's

19       younger than you who received a job, that

20       could be age discrimination?

21          MR. ATCHISON:  Renew my objection.

22   A   If I was 42 and 38, yes, I would say age

23       discrimination.  So, 47, 45, I would say
```

```
 1          it -- it's still age discrimination.
 2    Q     All right.  And do you think that every job
 3          that you have not received since January of
 4          2006 is due to age discrimination -- every
 5          job you've applied for and not received?
 6    A     I would say my age would have a factor in
 7          it.  Yes, I would.
 8    Q     And why do you believe that to be the case?
 9    A     I reckon just from the past four
10          applications that I applied for, a younger
11          person was promoted.  A younger person was
12          promoted in Pensacola, Florida, over
13          Mr. Hoseworth, who is a man in his 50s with
14          a college degree.
15    Q     All right.  I -- I'm not sure I understood
16          what you just said.  Did you say the last
17          four positions you've applied for someone
18          younger than you has received?
19    A     Well, the last four that we're talking about
20          right here.
21    Q     Oh, the four in the spring of 2006?
22    A     That's correct.
23    Q     Okay.  So, the four positions in the spring
```

```
 1        of 2006, you think that a younger person

 2        received those positions?

 3   A    And from the positions filled in Montgomery,

 4        they have been filled by junior employees.

 5        So, yes.

 6   Q    Since your demotion?

 7   A    Since my demotion.

 8   Q    Other and the recent trainmaster position in

 9        Montgomery, what other positions have been

10        filled in Montgomery since your demotion?

11   A    There's been two other trainmasters'

12        positions.

13   Q    Okay.  And when were those filled?

14   A    Well, Jeremiah Grant filled the vacancy I

15        left.

16   Q    You obviously weren't going to get

17        re-promoted to the position you were just

18        demoted from, though; is that right?

19   A    Roger Jackson left.  He was promoted, I

20        believe, with Chandler Plots.  And Chandler

21        Plots quit.  And Arthur Jackson came from

22        Detroit.  Then when Warren left, you had

23        Bateman, Dan Bateman.
```

```
 1   Q   All right.  And -- hang on for a second.
 2       So, other than the position that was
 3       filled when you were -- Do you know who
 4       applied for the position that -- that you
 5       vacated when you were demoted?
 6   A   I'm not for sure if anybody applied for it
 7       or if they just filled it with a management
 8       trainee.
 9   Q   All right.  And that was one of the trainees
10       who was working in Montgomery at that time?
11   A   That's correct.
12   Q   Okay.  That was Jeremiah --
13   A   Grant.
14   Q   -- Grant.  And he was one of the manager
15       trainees who was working in Montgomery at
16       that time; is that right?
17   A   He was the management trainee being trained
18       on the Atlanta division.
19   Q   Right.  And he had worked in Montgomery
20       as -- as well?
21   A   He had trained in Montgomery.
22   Q   Okay.  And then Roger Jackson was the next
23       position that was vacated --
```

```
1   A    That's correct.

2   Q    -- that you listed?

3   A    Yes.

4   Q    And do you know who applied for that

5        position?

6   A    I'm not sure if anybody applied for it, but

7        it was filled with a management trainee,

8        Chandler Plots.

9   Q    Did you apply for that position when Mr.

10       Jackson was retired?

11  A    No, I did not.

12  Q    All right.  How about when Mr. Carr retired,

13       did you apply for his position?

14  A    No, I did not.

15  Q    All right.  Who filled Mr. Carr's position?

16  A    I'm -- I'm not for sure who filled what

17       position, but Arthur Jackson from Detroit

18       come in about that time.

19  Q    Do you know how old Arthur Jackson is?

20  A    Probably late 20s, early 30s.

21  Q    Do you have any idea what his railroad

22       background is?

23  A    He's a -- management trainee position.  I
```

```
 1          think he had worked somewhere around Detroit

 2          two or three years.

 3     Q    Okay.  The -- Do you know who all applied

 4          for Chandler Plot's position when he left

 5          the company?

 6     A    Chandler Plots?

 7     Q    Chandler Plots.

 8     A    Actually, I believe when he left, that's

 9          when Dan Bateman was pulled in from -- he

10          was a management trainee working, I think,

11          in -- at the tote ramp in Atlanta.

12     Q    All right.  Did you apply for Chandler

13          Plots' position?

14     A    No, I did not.

15     Q    All right.  So, the only position in

16          Montgomery you've applied for was the one --

17          the trainmaster position that the guy from

18          Birmingham filled?

19     A    In June.

20     Q    In June of 2007?

21     A    That's correct.

22     Q    Okay.  And what was that gentleman's name

23          who filled that position?
```

```
 1   A    Darren Anderson.

 2   Q    And how old is Mr. Anderson?

 3   A    I'd say mid to late 30s.

 4   Q    Okay.  Do you have any idea who else applied

 5        for that position besides you and

 6        Mr. Anderson?

 7   A    There isn't -- No.  There's a gentleman out

 8        of Jacksonville, but I think he ended up

 9        going to Birmingham.

10   Q    For the position that Mr. Anderson had

11        originally wanted in Birmingham?

12   A    I'm not for sure.

13   Q    Did you apply for the Birmingham position

14        too?

15   A    No, I did not.

16   Q    Is there any particular reason why you did

17        not apply for that position?

18   A    Actually, I was out of town at the time.

19   Q    Okay.  How long are positions posted for

20        normally?

21   A    Honestly, I couldn't tell you.  What, seven

22        days to two weeks, maybe a little longer,

23        maybe a month, I'm not for sure.
```

1    Q    How often do you check the -- the Gateway

2         for job postings?

3    A    Probably weekly.

4    Q    Okay.  Let me show you this document I've

5         marked as Exhibit Number 23.

6                        (At which time, the referred-

7                        to document was marked as

8                        Defendant's Exhibit No. 23 by

9                        the Reporter.)

10   Q    Do you recognize that document?

11   A    Yes.

12   Q    Is that your complaint that you filed in --

13        to start this lawsuit, as you understand it?

14   A    That is correct.

15   Q    Okay.  The -- Other than you and Mr. Dean,

16        are you aware -- and -- and the situation we

17        discussed about Allen Snap -- are you aware

18        of any other situations in which you know or

19        have heard that employees have in any way

20        falsified or, otherwise, signed someone

21        else's name to FRA documents?

22   A    Other than Ken Williams.

23             MR. ATCHISON:  Object to the form.

1    Q    Other than Ken Williams?  And we discussed

2         Mr. Williams earlier today.  You heard that

3         --

4    A    That is correct.

5    Q    You heard -- He's a line of road

6         trainmaster, and you heard he signed someone

7         else's name to an FRA certification?

8    A    Of an engineer.  That's correct.

9    Q    Of an engineer.  Do you know if that was

10        reported to anybody?

11   A    No, sir, I do not.

12   Q    We talked earlier today about the

13        out-of-park meeting, discussed the bonuses.

14        Do you -- Do you know what I'm referring to?

15   A    Yes, I do.

16   Q    Okay.  And that was in April of 2006; is

17        that right?

18   A    Roughly, yes.

19   Q    All right.  And the people who were present

20        were Rod Workman, you, Warren Carr, T.J.

21        Dean, Angie Averitte, and maybe Roger

22        Jackson and Josh Connell; is that right?

23   A    And Jeremiah Grant.

```
 1   Q    And Jeremiah Grant and Plots.

 2   A    That's correct.

 3   Q    All right.  At that time, the trainmasters

 4        in Montgomery were you, Warren Carr, Roger

 5        Jackson, and Josh Connell; is that right?

 6   A    That's right, yeah.

 7   Q    Warren Carr had already announced his

 8        retirement at that point; is that correct --

 9        or during that meeting --

10   A    Well, he just --

11   Q    -- and mentioned it?

12   A    -- mentioned he was probably going to retire

13        in October.

14   Q    All right.  And Roger Jackson had mentioned

15        at various times that he was considering

16        retirement as well?

17   A    Sometime that year, yes.

18   Q    All right.  Josh Connell, you said he was in

19        his mid-20s at that point; is that right?

20   A    That's correct.

21   Q    And there was -- You were the only other

22        trainmaster at that location at that time;

23        is that right?
```

1    A    That's correct.

2    Q    And had Angie Averitte -- was she already in

3         the process of leaving Montgomery at that

4         point?

5    A    Actually, she had been working in Atlanta

6         because the terminal manager's position was

7         already awarded to Jason Tipton.

8    Q    Okay.  But he wasn't there yet?

9    A    No.  He was in transition, you might call

10        it.

11   Q    Okay.

12   A    I would say she was still actually working

13        two positions at the time.

14   Q    Okay.

15             MR. BARKER:  Let's take just a quick

16                  break, and I'll see what else I

17                  have left.  And I think we're very

18                  close to being through.

19                       (At which time, a recess was

20                       taken.)

21   Q    Mr. Hollon, other than Chandler Plots, are

22        there any other people who were in the

23        management training program, to your

1      knowledge, who you believe were not recent

2      college graduates or in the final stages of

3      obtaining a -- a college degree?

4  A    None that I know of.

5  Q    Okay.  And you're not -- You know that

6      Mr. Plots knew David Hamby, but other than

7      that, you're not certain as to how he might

8      have gained admittance into the management

9      trainee program?

10  A    I would say through Mr. Hamby because he --

11      he made the statement that he had worked in

12      Atlanta and then went to New Orleans and

13      worked with Mr. Hamby as a yardmaster.  I'm

14      not sure what period he resigned to start

15      work with his daddy at their company.  Then

16      he thought he had made a mistake.  And he

17      called Mr. Hamby to see if he could get back

18      on.

19  Q    Okay.  And do you know -- And he was not a

20      management trainee when he was with the

21      company earlier; is that right?

22  A    As far as I know he was not.

23  Q    Okay.  Let me show you this document that

```
 1          I've marked as Exhibit Number 24.
 2                          (At which time, the referred-
 3                          to document was marked as
 4                          Defendant's Exhibit No. 24 by
 5                          the Reporter.)
 6     Q    Is that the e-mail you were referring to
 7          earlier that you sent to Mr. Frulla?
 8     A    That is correct.
 9     Q    Let me show you this document I've marked as
10          Exhibit Number 25.
11                          (At which time, the
12                          referred-to document was
13                          marked as Defendant's Exhibit
14                          No. 25 by the Reporter.)
15     Q    Is that the e-mail that you sent to
16          Mr. Workman contained in the text there that
17          you referenced earlier?
18     A    This is a copy of the e-mail I sent
19          Mr. Workman because this is a -- an e-mail
20          sent back from me from Ms. Angie Averitte.
21     Q    Okay.  But the -- the -- the e-mail that's
22          lowered down in the chain notes that
23          Mr. Workman -- that's the chain e-mail you
```

```
 1        sent to Mr. Workman?
 2   A    That is correct.
 3   Q    Okay.  Do you recall what you and Ms.
 4        Averitte discussed when you called her after
 5        that?
 6   A    I think she just replied it was a -- it was
 7        a good e-mail.
 8   Q    Okay.  Now, in your complaint, you claim
 9        that you have experienced mental anguish as
10        a result of your demotion and the denial of
11        the -- the positions that you claim to be
12        promotions from 2006; is that correct?
13   A    That's correct.
14   Q    Have you seen any doctors or mental health
15        professionals or counselors regarding any of
16        those issues?
17   A    Let's say I have a strong faith in God.
18   Q    Uh-huh (positive response).
19   A    And I have six brothers and sisters.  So, I
20        would say other than that, no, sir.
21   Q    So, you met -- You've talked with family
22        members about the issue, but you haven't
23        spoken with a medical professional or any
```

```
 1        other kind of counseling professional?
 2   A    No, I have not.
 3   Q    Okay.  Are there any physiological symptoms
 4        or -- that you have suffered as a result of
 5        this mental anguish?  Did that make --
 6        that -- that question make any sense?  Have
 7        you had any -- Have you had any physical
 8        medical conditions that you feel like are
 9        expressions of your mental anguish?
10   A    Physical medical conditions?
11   Q    Yes.
12   A    Physical medical conditions.  None that I
13        know of.
14   Q    Okay.  Have you spoken with a physician at
15        all about any mental anguish or any resulted
16        symptoms you feel like you may have had?
17   A    No, I have not.  I have not.
18   Q    I understand that because of your demotion,
19        you have -- that's resulted in a decrease in
20        your wages; is that right?
21   A    That's correct.
22   Q    As a contract employer, are you eligible for
23        a bonus at all?
```

```
 1   A    No, we're not.

 2   Q    Okay.  So, you're no longer eligible for the

 3        bonuses that management employees are

 4        eligible for as well as a salary reduction?

 5   A    That's correct.

 6   Q    Do you earn overtime in your yardmaster

 7        position?

 8   A    Yes, I do.

 9   Q    How frequently do you earn overtime?

10   A    Other than working the TOPS position, I

11        would say overtime is just rare.

12   Q    Okay.  There's not an opportunity to work

13        extra boards in a -- your yardmaster

14        position?

15   A    Well, I'm in the extra board --

16   Q    Okay.

17   A    -- guaranteed extra board position.

18   Q    Okay.  So, if there were overtime available,

19        you would be guaranteed it?  Is that how

20        that works?

21   A    Well, there's two on the board.  It's first

22        and first up; whoever is up for it, you

23        might say.
```

```
 1   Q    Okay.  Between you and one other person?
 2   A    Say if it's my off day and if he's worked
 3        and he refuses it, then it's a sequence of
 4        order you have to go in for overtime.
 5   Q    Okay.  And are you second on that list or
 6        first or where are you?  Because it depends
 7        on whose worked most recently.
 8   A    Well, if I had my -- my five guaranteed days
 9        in, where I've worked five straight time
10        days, it would go to the oldest yardmaster
11        first.
12   Q    The most senior?
13   A    That's correct.
14   Q    And who is the most senior yardmaster?
15   A    Ned Holley.
16   Q    All right.  And who's the next most senior?
17   A    Paul Buford.
18   Q    All right.  And where -- Do you know where
19        you are on the seniority list?
20   A    I'm number three.
21   Q    Okay.  Did you get -- Do you have any -- Did
22        you get any kind of seniority credit for
23        your time in management?
```

1    A    Oh, yes.  The seniority still avails.

2    Q    Okay.  So, it's all just based off your --

3         your first date in that craft?

4    A    That's correct.

5    Q    You don't have a gap that's bridged there?

6    A    No.  It's still paying union dues to protect

7         that.  That's correct.

8    Q    Okay.  When you were in management, you

9         continued to pay union dues to protect your

10        seniority?

11   A    Yes.  Yes, I did.

12   Q    Okay.  And you still pay affiliate dues to

13        the TCU to protect your clerical seniority?

14   A    That's correct.

15   Q    Do the dues you pay now -- are they more

16        than the dues you paid when you were in

17        management?

18   A    It was the same amount.

19   Q    Okay.  What was your last year management

20        salary?

21   A    I think it's -- I believe it was seventy-

22        three five.

23   Q    All right.  And what is -- Do you know what

```
 1        your two -- what your -- half year basically
 2        was last year for income?
 3    A   Are you referring to management or --
 4    Q   I'm sorry.  What -- You were in your
 5        contract position for about half a year last
 6        year; is that right?
 7    A   That's correct.
 8    Q   Do you know what your salary was or your pay
 9        was for that time including overtime?
10    A   I cannot recall, to be honest.
11    Q   All right.
12    A   It was substantial less.  I know that.
13    Q   All right.  And what was your last -- last
14        year management bonus?
15    A   I think it was -- last -- my last bonus?  My
16        last bonus I'm going to say was, like,
17        fifteen nine or fifteen seven.
18    Q   Is that based purely on your performance, or
19        is that based on company performance as
20        well?
21    A   It -- it's a little of both.  It's based on
22        our terminal performance in Montgomery,
23        Alabama, and your division performance as a
```

```
 1        whole and your performance on CSX as an

 2        entire company.

 3    Q   Do you have any idea what the terminal

 4        trainmasters received this year for bonuses?

 5    A   This year?  Let me see.  Josh Connell told

 6        me.  I think it was a -- it was a little

 7        less than last year.  It was -- I want to

 8        say he -- it was a hundred and thirty (130%)

 9        percent of his bonus potential.

10    Q   Okay.  And was the -- each individual's

11        bonus potential varied based on various

12        factors?

13    A   Yes, because your -- your work -- you're at

14        a different grade.

15    Q   Okay.

16    A   So I say yes.  Like grade three could have a

17        bonus potential of thirteen (13%) percent,

18        and grade four was, like, eighteen (18%)

19        percent, and it just moved on up the scale.

20    Q   What was your grade?

21    A   I was grade four.

22    Q   Okay.  So, do you have any idea what your

23        bonus would have been in dollars, roughly?
```

1   A    When -- when you would take eighteen (18%)

2        percent of my gross salary.  And I believe

3        you would multiply that times a hundred and

4        thirty (130%) percent.

5   Q    Okay.

6            MR. BARKER:  That's all I have.

7            MR. ATCHISON:  Okay.  I have a -- just

8                a few questions.

9                CROSS-EXAMINATION

10  BY MR. ATCHISON:

11  Q    Mr. Hollon, you remember on direct

12       examination Mr. Barker asked you some

13       questions about a matter involving an

14       out-of-park meeting.  What is -- What is

15       that term?  That occurred in April of 2006.

16       What is an out-of-park meeting?

17  A    It was a meeting out of the park.  It was

18       just a competition between different

19       terminals on the entire CSX properties

20       between large hump yards, large flat

21       switching yards, medium, and small flat

22       switching yards.

23  Q    Okay.  Do you recall a out-of-park

```
 1        meeting -- I believe it occurred maybe in

 2        Atlanta, April of 2006?  Was there such a

 3        meeting, or was it Montgomery?

 4   A    It was a meeting in Montgomery.

 5   Q    Montgomery?

 6   A    1st of April, yes.

 7   Q    Okay.  And I believe on -- on a direct

 8        examination you were asked a question and

 9        you talked about how that several people

10        were in attendance, Jeremiah Grant, Mr. --

11        is it Plats or Plots?

12   A    Plot.

13   Q    Mr. Carr; Mr. Dean; Mr. Workman, who is

14        management; Ms. Averitte; Mr. Jackson; and

15        Mr. Josh Connell, I believe that's right.

16   A    I believe those two were present.  That's

17        correct.

18   Q    Okay.  As well?  Okay.  And you were

19        present?

20   A    That's correct.

21   Q    And I believe you also in response to a

22        question made a statement to the effect that

23        during that meeting Mr. Workman -- I believe
```

```
 1        that's Rod Workman; is that correct?

 2    A   That's correct.

 3    Q   Looked to the management trainees and said

 4        to the effect, quote, "You have a bright

 5        future."

 6            MR. BARKER:  Object to the form.

 7                Leading.

 8    Q   Is that -- Is that what your direct response

 9        was to questions by Mr. Barker?

10    A   That is correct.

11    Q   Okay.  And then you also said in follow-up

12        to that statement that Mr. Rod Workman

13        turned around and then asked how old you

14        were.

15            MR. BARKER:  Object to the form.

16    Q   Is that -- Is that -- Was that your direct

17        response to questions by Mr. Barker?

18    A   Yes.

19            MR. BARKER:  Object to the form.

20                Leading.

21    A   He asked directly how old I was.

22    Q   Okay.  Now, how did that make you feel at

23        the time as an employee of CSX?
```

1 A It made me feel like there was no future for

2   me at all.

3 Q Due to what factor, sir?

4 A That he had bright, young managers that --

5   that they wanted the bright future for.  And

6   that I was not -- there was not a bright

7   future seen for me.

8 Q And how old were you at that time in 2006?

9 A At the -- at that time 46.

10 Q Okay.  Now, you have just been shown

11   Exhibits 24 and 25, which you have in front

12   of you?

13 A That's correct.

14 Q Okay.  Let's look at 24, if you could.  I

15   see there's a handwritten notation on the

16   bottom that says, "E-mail sent about

17   Pensacola.  I believe this is the same day

18   of the remote control."

19 A Incidence.

20 Q Yeah.  Is that what that's about?

21 A Yes, sir.

22 Q The remote control incident?

23 A That's correct.

```
 1   Q   Is that the same Saturday date on May the

 2       27th, 2006, in which you signed for Mr. Dean

 3       at his insistence?

 4   A   That's correct.

 5   Q   Okay.  When -- When did you send out this

 6       e-mail to the parties that is shown on the

 7       e-mail, Frulla, Frost, Averitte?  Do you

 8       know when in the day you sent this?

 9   A   The time it was actually sent is at the top

10       of the e-mail.  Mr. Frulla and Jack Frost

11       and Angie was 8:19 a.m. in the morning,

12       Saturday, May 27th.

13   Q   All right.  Do you -- Do you recall if that

14       was before or after you signed for Mr. Dean

15       in that day, the remote-control incident

16       signed in Mr. Dean's name?

17   A   The Y190 remote control job goes on duty at

18       0800.  So, it would be -- it'd be hard to

19       pinpoint if this was sent before or after.

20   Q   But certainly the same day.

21   A   This is exactly the same day.

22   Q   Okay.  All right.  And looking at the date

23       on the next document, Defendant's Exhibit
```

```
 1        25, it's the same date as 24, correct?

 2   A    Same date.  Different time.

 3   Q    Just a few hours later at 11:06 a.m.?

 4   A    Well, actually, the one sent to Mr. Workman

 5        was sent at 9:16 a.m.  Angie sent me back

 6        the e-mail at 11:06 a.m.

 7   Q    Okay.  All right.  So, about an hour later?

 8   A    That's correct.

 9   Q    I see at the bottom in handwriting it says,

10        "E-mail sent to Mr. Workman.  No reply."  Is

11        that your writing?

12   A    That is my writing.

13   Q    And the "no reply" is to the typewritten

14        part of the e-mail.  "Mr. Workman, I just

15        need some understanding why I was not

16        considered for the Montgomery or Atlanta

17        positions.  How can I improve my chances of

18        growing with this company?"

19   A    That's correct.

20   Q    So, Mr. Workman never replied to you in

21        writing or verbally?

22   A    No, he did not.

23   Q    You're agreeing with me?
```

```
 1    A    I'm agreeing with you.

 2    Q    Okay.  Why did you write, "I just need some

 3         understanding why I was not considered for

 4         the Montgomery or Atlanta positions," in

 5         this e-mail, Defendant's Exhibit 25?  Why

 6         did you write that statement?

 7    A    Well, after the out-of-the-park meeting

 8         where he asked me directly how old I was --

 9    Q    And -- and approximately what date was that?

10         April 2006?

11    A    April 2006.

12    Q    Okay.

13    A    And after searching the application for the

14         Pensacola trainmasters' position and finding

15         out that a junior employee was promoted over

16         myself, I was concerned with my age, that I

17         felt like it was an age discrimination.  And

18         I needed to hear from Mr. Workman what do I

19         need to do as an employee at my age to be

20         considered for further advancement with this

21         company.

22    Q    But -- that's the second sentence in that

23         paragraph.  But I'm looking at the first
```

```
 1        sentence.  "I just need some understanding

 2        why I was not considered for the Montgomery

 3        or the Atlanta positions," and why did you

 4        ask that question?

 5    A   Well, basically, I wanted to know if it

 6        was -- had I done anything wrong, had I --

 7        wasn't I qualified enough to work that

 8        position, or what do I need to do to improve

 9        myself so I can be promoted.

10    Q   Were you also asking whether or not age was

11        a factor in you being denied as those two

12        positions?

13            MR. BARKER:  Object to the form.

14                Leading.

15            MR. ATCHISON:  This is cross-

16                examination.

17    A   Basically, yes.

18            MR. BARKER:  It's your client.

19    A   Yes.

20    Q   Okay.  Anywhere in the time frame of April

21        or May 2006, did you contact the EEOC about

22        age discrimination matters?

23    A   Actually, I contacted the EEOC of three
```

```
 1      different states.

 2   Q  Okay.  Well, let's talk about the EEOC in

 3      Birmingham.

 4   A  Okay.

 5   Q  Did you contact the EEOC in the time period

 6      between the open park meeting and, say,

 7      this -- these memos of May the 27th, 2006?

 8   A  Yes, that's correct.

 9   Q  Okay.  And were you raising questions with

10      the EEOC about age discrimination, whether

11      or not you should file an age discrimination

12      complaint?

13          MR. BARKER:  I'm going to object to the

14              form.  Leading.

15   A  I was asking what was the procedure to file

16      an age discrimination complaint --

17   Q  Okay.

18   A  -- or what paperwork I needed to complete.

19   Q  Okay.  At any point to the present, did you

20      ever get any reply to this e-mail that you

21      sent, Defendant's Exhibit 25, from

22      Mr. Workman or anybody else?

23   A  No reply from Mr. Workman or Jack Frost.  No
```

```
 1        reply at all.

 2   Q    Okay.  All right.  That's all.

 3             MR. BARKER:  A couple of follow-up

 4                  questions to that.

 5             REDIRECT EXAMINATION

 6   BY MR. BARKER:

 7   Q    The handwriting on Exhibits 24 and 25,

 8        that -- that's your handwriting on both

 9        documents, correct?

10   A    That is correct.

11   Q    You said you contacted the EEOC of three

12        different states.  What states were those?

13   A    Alabama, Florida and Georgia.

14   Q    All right.  Why did you contact the EEOC in

15        Georgia?

16   A    Because, basically, I was trying to find out

17        the time period or what documents I needed

18        to do to file a complaint.

19   Q    Okay.  But you did not file your complaint

20        until June of 2006; is that right?

21   A    That is correct.

22   Q    All right.  And did you tell anyone at CSX

23        that you had called the EEOC?
```

```
 1   A    I think I had talked to Jerry Hoseworth
 2        about talking to the EEOC because I was
 3        telling -- talking to him -- telling him how
 4        many days he had to file his EEOC complaint.
 5   Q    Okay.  Anybody else?
 6   A    I'm not for sure if I talked to Angie about
 7        it or not, to be honest.
 8   Q    You don't know if you did or not?
 9   A    I'm not for sure if I did or not.
10   Q    Okay.  The e-mails that were number 24 and
11        25 there, you sent those on May 27th; is
12        that correct?
13   A    That is correct.
14   Q    And that was the same day as the card
15        incident?
16   A    That is correct.
17   Q    And on June 7th, you were taken out of
18        service as part of the investigation in the
19        card incident; is that right?
20   A    That is correct.
21   Q    And then on June 19th, you met with
22        Mr. Workman and Mr. Frost at which time they
23        expressed to you that you were going to be
```

```
 1        demoted; is that right?

 2   A    That is correct.

 3   Q    Do you believe that once the disciplinary

 4        issues came in the -- came up that promotion

 5        was really on the table at that time?

 6   A    Can you repeat that.

 7   Q    All right.  I'll rephrase it.  Do you really

 8        think that you were a likely candidate for

 9        promotion at the same time that you were

10        being investigated and were shortly

11        thereafter demoted?

12   A    The investigation and demotion was after the

13        fact of asking why I was not considered for

14        promotion.

15   Q    Yes, and after you had -- At the time that

16        you were being investigated and were

17        subsequently demoted, did you think that you

18        were a candidate for -- for promotion at

19        that point in time?

20   A    I was -- I would say yes.  I am a 25-year

21        loyal, career-oriented railroad person.

22        This is the only strike other than the

23        locomotive incident with Mr. Meadows that is
```

1    on my record.

2  Q    I understand.  But the company wasn't going

3       to demote you and then promote you two weeks

4       later, were they?

5  A    I would say not.

6  Q    Okay.  That's all I have.

7            MR. ATCHISON:  No questions.

8                    conclusion at 4:21.

9

10

11                 (Deposition concluded at

12                 approximately 4:21 p.m.)

13        *       *       *       *       *

14            FURTHER DEPONENT SAITH NOT

15

16

17

18

19

20

21

22

23

```
 1        R E P O R T E R'S   C E R T I F I C A T E

 2

 3    STATE OF ALABAMA)

 4    ELMORE COUNTY)

 5

 6           I, Jeana S. Boggs, Certified Professional

 7    Reporter and Notary Public in and for the State of

 8    Alabama at Large, do hereby certify on Wednesday,

 9    September 19th, 2007, that pursuant to notice and

10    stipulation on behalf of the Defendant, I reported

11    the deposition of RONALD A. HOLLON, SR., who was

12    first duly sworn by me to speak the truth, the whole

13    truth, and nothing but the truth, in the matter of

14    RONALD A. HOLLON, SR., Plaintiff, versus CSX

15    TRANSPORTATION, INC., Defendant, Civil Action No.

16    2:06-CV-1099-WKW, now pending in the United States

17    District Court for the Middle District, Northern

18    Division of Alabama; that the foregoing colloquies,

19    statements, questions and answers thereto were

20    reduced to 318 typewritten pages under my direction

21    and supervision; that the deposition is a true and

22    accurate transcription of the testimony/evidence of

23    the examination of said witness by counsel for the
```

1    parties set out herein; that the reading and signing

2    of said deposition was not waived by witness and

3    counsel for the parties.

4         I further certify that I am neither of

5    relative, employee, attorney or counsel of any of

6    the parties, nor am I a relative or employee of such

7    attorney or counsel, nor am I financially interested

8    in the results thereof.  All rates charged are usual

9    and customary.

10        This the 2nd day of October, 2007.

11

12

13

14   Jeana S. Boggs
     ACCR NO. 7

15   Certified Court Reporter and
     Notary Public

16   Commission expires: 8/7/2010

17

18

19

20

21

22

23

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| Ronald A. Hollon, Sr., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 2:06-CV-1099-WKW |
| | ) | |
| CSX Transportation, Inc., | ) | |
| | ) | |
| Defendant. | ) | |

## NOTICE OF VIDEOTAPED DEPOSITION OF
## PLAINTIFF RONALD A. HOLLON, SR.

Pursuant to Federal Rules of Civil Procedure 26 and 30, Defendant CSX Transportation, Inc. ("Defendant" or "CSXT"), will take the deposition of the Plaintiff Ronald A. Hollon, Sr., on September 19, 2007, beginning at 9:00 a.m., at the offices of Gary E. Atchison, 492 S. Court Street, Montgomery, Alabama, 36104. The deposition will be taken for the purposes of discovery and all other purposes allowed by law. The deposition will be taken before an officer authorized by law to administer oaths, will be recorded by stenographic means, as well as by videotape, and will continue from day to day until completed.

This 31st day of August, 2007.

PAUL, HASTINGS, JANOFSKY
  & WALKER, LLP
600 Peachtree Street, N.E.
Suite 2400
Atlanta, Georgia 30308
Telephone: (404) 815-2400
Facsimile: (404) 815-2424

Weyman T. Johnson, Jr.
Ga. Bar. No. 395775
William C. Barker
Ala. Bar. No. 3411-R-71W

Attorneys for Defendant
CSX Transportation, Inc.



DEFENDANT'S
EXHIBIT
1

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

Ronald A. Hollon, Sr.,                    )
                                          )
        Plaintiff,                        )
                                          )
v.                                        )        Civil Action No. 2:06-CV-1099-WKW
                                          )
CSX Transportation, Inc.,                 )
                                          )
        Defendant.                        )

## CERTIFICATE OF SERVICE

    This is to certify that the foregoing **NOTICE OF VIDEOTAPED DEPOSITION OF PLAINTIFF RONALD A. HOLLON, SR.** was served via First Class, U.S. Mail, postage pre-paid, upon the following counsel of record:

Gary E. Atchison
P.O. Box 2002
Montgomery, AL  36102-2002

This 31st day of August, 2007.

_____
Attorney for Defendant

```
212                        EMPLOYEE MASTER INQUIRY              06/24 15:40
      E ID: 1 182243   SSN:            NAME: R A HOLLON         PRINTER: ___
```

HISTORICAL DATES:                | CONTACT INFORMATION:  HOME PHONE: 334-365-7818
BIRTH DATE   11/14/1959          | WORK RNX 241 EXT 9230  ALT. PHONE: 334-241-9230
HIRE DATE    03/30/1981          | EMERGENCY CONTACT:
PROMOTION  :                     | FIRST: ROMONA        MI L  LAST HOLLON
TERMINATION :                    | ADDR : 2341 CO RD 61
LAST P/R RPT : 05/06/2001        | CITY : DEATSVILLE              ST: AL ZIP: 36022
LAST P/R CODE: AWP               | RELATION: WI PHONE: 334-365-7818 EXT:

----------------------------------------------------------------------------

ROSTERS  DEPT DIST CRAFT      | POSITION INFORMATION:          LOCATION :
HOME   : NOLN LN08 CLRK R     | PERMANENT BIDS THIS YEAR: 0  RED CIRCLE:
CURRENT: YMLN RE16 YMST R     | ASSIGNMENT POSITION TITLE                    SUB
SEN DT.: 11/21/1992      0    | PERMANENT: -
FROZEN :                      | TEMPORARY: -
CRAFT STATUS CODE : OC        | ACTIVE   : -
EMP. ACTIVITY CODE: PRO       |

----------------------------------------------------------------------------

GUAR TYP: GJ ENDS: 99/99/9999 RTE:    161.69 | ENGR PROT SLWT:
TOPD POS:     -               RTE:
NEXT FUNCTION
MESSAGES: PF5/17=UPDATE; PF10/22=CALENDAR; PF11/23=WORK HIST; PF12/24=ROST LIST

I have worked with this company and its affiliates since 1981. I was furloughed for about a year to a year and a half. I have trained and worked the following positions:

AWP Crew Caller ) yard + Road.
LN  Crew Caller
SCL Crew Caller

WA  Operator
SOU Operator
LN  Operator

Inbound 1050 operator
Outbound
Interchange
Connection
Assistant Chief Clerk
Chief Clerk.
Demmurage
Salvage Clerk
Janitor


DEFENDANT'S
EXHIBIT
2

P-000281

P2EX.P296          LIST ALL ROSTERS FOR AN EMPLOYEE      06/24 15:46   PAGE 1

```
EMP ID : 1 182243          BIRTH DATE: 11/14/1959   EMP ACT: PRO
  NAME: R A HOLLON         HIRE DATE : 03/30/1981   ACT POS:    -
=================================================================================
ROST 1  DEPT  : NOLN - NON-OPERATING - L&N
        DIST  : LN08 - MONTGOMERY AGENCY/YD/MECH CLRK
        CRAFT : CLRK - CLERICAL                         TYPE: REGULAR
        STATUS: OC      SENIORITY DATE: 03/30/1981  T.B.:    0  SEQ. STDG.:    9
--------------------------------------------------------------------------------
ROST 2  DEPT  : YMLN - YARDMASTERS - L&N
        DIST  : MOM1 - MONTGOMERY YARDMASTERS
        CRAFT : YMST - MONTGOMERY YARDMASTERS          TYPE: REGULAR
        STATUS: OR      SENIORITY DATE: 11/21/1992  T.B.:    0  SEQ. STDG.:    4
--------------------------------------------------------------------------------
ROST 3  DEPT  : YMLN - YARDMASTERS - L&N
        DIST  : RE16 - REGION 16/BOYL/GADS/DECA/MONTG
        CRAFT : YMST - REGION 16 YARDMASTERS           TYPE: REGULAR
        STATUS: OC      SENIORITY DATE: 11/21/1992  T.B.:    0  SEQ. STDG.:   17
--------------------------------------------------------------------------------
          SELECT OPTION _  (I,U) FOR ROSTER NUMBER _           PRINTER: ___
NEXT FUNCTION
MESSAGES: ENTER OPTION AND ROSTER NUMBER; PF12/24 = EMPLOYEE MASTER
```

P-000282



## CSX Code of Ethics

### Letter From the President, Chairman & CEO

Dear CSX Colleague:

Enclosed is a copy of CSX Corporation's updated and revised Code of Ethics. The Code is intended to inform all employees in the CSX family of companies of the Company's expectations and of employees' legal and ethical responsibilities and obligations. CSX and its affiliated companies strive to apply high ethical, moral and legal principles in every aspect of business conduct. That is what "Right results, right way" means.

Our corporate vision is to be the safest, most progressive North American railroad, relentless in the pursuit of customer and employee excellence. At its core, the Code of Ethics expresses the fundamental values that must drive our behavior. At CSX, we believe that living by a set of core values will guide the way we treat each other and how we make business decisions. These shared values are vital to securing and maintaining respect from our shareholders, employees, Government officials and the public at large. We regard the quality of our products and services, the safety of our employees and customers, and our integrity in business dealings among our most valuable assets. Our daily performance can add to, or detract from, our company's reputation and value as a freight transportation company, an employer, a member of our local communities and a national corporate citizen.

Although some of the policies included in this Code of Ethics may not apply to you, I ask that you read the entire booklet and agree to abide by its terms, as it applies to you. Each year, I will ask you to re-read the Code of Ethics.

Thank you for your part in maintaining our role as a leader in the marketplace and in making us a leader in legal and ethical behavior.

Sincerely,

Michael J. Ward
CSX Corporation
Chairman, President and Chief Executive Officer

D-000003

## CSX's Ethics and Compliance Program

CSX Corporation and its affiliated companies (referred to herein as "CSX" or the "Company") are committed to maintaining high ethical and legal standards in every aspect of its business conduct. CSX's reputation for adherence to laws, regulations and its written Code of Ethics is more important than the position or personal advancement of any one officer or employee. CSX's continued success and, most importantly, the lives and safety of its employees and customers, depends on the strength of the Company's efforts to detect, prevent and promptly remedy any actual or suspected misconduct.

CSX operates a corporate-wide program to coordinate, implement and monitor compliance with corporate values; laws and regulations applicable to the Company's business operations; and Company policies and procedures. Oversight of the Ethics and Compliance Program is the responsibility of Internal Audit & Compliance.

CSX expects its directors, officers and employees to understand and abide by all legal requirements governing the Company's business and operations. The Company provides ongoing education and guidance concerning applicable laws and regulations. Employees who wish to obtain more information on these issues should talk with their supervisor or call the CSX Ethics Information Hotline at 1-800-737-1663. Complying with the law, however, is just part of what we must do. Directors, officers and employees should continually try to avoid even the appearance of impropriety in matters involving legal obligations, the Company's Code of Ethics or other Company policies and procedures.

## CSX Code of Ethics

CSX Corporation has in place a Code of Ethics applicable to all directors, officers and employees of the corporation and its subsidiaries, wherever located.[1]  The Code covers conflicts of interest, insider trading, protection of confidential information and proper use of company assets, and compliance with laws and regulations applicable to the Company's business operations, among other issues central to our business and operations. This Code of Ethics provides the framework for the rules and policies of the subsidiary for which you work. Copies of those rules are available from your supervisor or Human Resources representative. Depending on your job description, you may be subject to additional and more specific rules covering one or more of the topics discussed in this Code of Ethics.

It is important for you to understand that:

- You are personally responsible for your own conduct in complying with all provisions of this Code of Ethics and for promptly reporting known or suspected violations of this Code of Ethics to your supervisor, manager or the CSX Ethics Information Hotline (1-800-737-1663).

- If you are a supervisor or manager, you are responsible and accountable for ensuring that your employees understand and comply with this Code of Ethics;

---

[1] CSX Corporation is comprised of principal business units, other transportation business units and non-transportation units.  Principal business units of CSX Corporation are CSX Transportation, CSX Intermodal and CSX World Terminals LLC.  Other transportation business units include CSX Technology; CSX Real Property; TRANSFLO; Total Distribution Services, Inc; and BridgePoint.  Non-transportation business units are The Greenbrier resort hotel and Yukon Pacific Corporation.

D-000004

- No one in this Company has the authority or right to order, request or even influence you to violate this Code of Ethics or the law;

- You will not be excused for violating this Code of Ethics for any reason, even at the request of another person, including your supervisors, managers or Company officers;

- Any attempt by any person to have another violate this Code of Ethics, whether successful or not, is itself a violation and may be a violation of the law;

- Any retaliation or threat of retaliation against any person for refusing to violate this Code of Ethics or for reporting in good faith a violation or suspected violation of this Code of Ethics is itself a violation and may be a violation of the law;

- Every reported violation of this Code of Ethics will be investigated, and every actual violation will constitute a basis for disciplinary action involving the person violating this Code of Ethics and may result in civil or criminal action against that person; and

- Any employee who acts contrary to this Code of Ethics, or who knowingly gives a false report regarding a violation of this Code, may be subject to disciplinary action, up to and including termination of employment.

As part of CSX's commitment to ethics and compliance, all directors, officers and employees of CSX and its affiliated companies have a duty to promptly report any actual or suspected misconduct. Failure to fulfill this duty is a violation of CSX's Code of Ethics and may result in disciplinary measures up to and including dismissal in appropriate cases. Failure to report actual or suspected misconduct also may expose the Company and its directors, officers and employees to potential criminal and civil penalties, and damages to the Company's reputation.

If you have questions about this Code of Ethics or concerns about someone's workplace conduct, first contact your manager. If you do not feel comfortable doing this, you may contact other CSX resources available to you:

- Law Department

- The CSX Ethics Information Hotline

**The CSX Ethics Information Hotline (1-800-737-1663)**

In support of its Code of Ethics and to facilitate reporting of any suspected misconduct, CSX maintains a toll-free **CSX Ethics Information Hotline**, which is available 24 hours a day, 7 days a week at 1-800-737-1663, for individuals to report actual or suspected misconduct, ask questions, or raise concerns about business ethics and compliance matters, without fear of retaliation. CSX has a non-retaliation policy that prohibits retaliation against an employee for raising a concern or reporting actual or suspected misconduct in good faith. Anyone may contact the CSX Ethics Information Hotline if they have compliance questions or concerns, and callers have the right to remain anonymous, if they wish. Investigations will be conducted in as confidential a manner as possible, depending upon the circumstances presented.

At the direction of CSX's management, the CSX Ethics Information Hotline is administered by the Director, Compliance & Ethics and is staffed by an outside agency to insure independence and anonymity. All reports to the Hotline will be reviewed and investigated promptly and appropriate remedial measures will be undertaken. The Director, Compliance & Ethics will report periodically to the Audit Committee on calls received by the Ethics Information Hotline, including reports concerning financial and accounting issues.

D-000005

## CSX Values

At CSX, we believe that living by a set of fundamental core values help define the true measure of a company – they guide the way we treat each other and how we make business decisions. When all employees are aligned to fundamental guiding principles, companies consistently deliver superior financial results that ensure long-term success.

At CSX, we have developed a core ideology that is the foundation for everything we do and is embodied in the motto: "Right results, right way." This creates an environment that allows us to maintain a focus on what is important, while challenging everything else in a drive for continuous improvement. There is nothing magical about this concept. It is the discipline of execution that distinguishes great companies. It is about building an organization that has purpose, focus and alignment; that lives its values every day; and that creates an environment that allows employees to grow and to produce superior results.

This core ideology – our vision, purpose and values – is the heart and soul of our Company. We believe that adhering to this core ideology will help us become an even stronger and sustainable organization – a leader in an evolving business world. For more information about CSX values, visit our web site at http://www.csx.com/?fuseaction=employees.values.

## Guide to Business Conduct

CSX is committed to maintaining high ethical and legal standards in its business conduct. We expect every director, officer and employee to conduct himself or herself in accordance with the following Guide to Business Conduct.

## Conduct Involving Ourselves and Our Fellow Employees

The basis of our values is dignity and mutual respect. These fundamental values drive our business.

## Management Responsibility

At CSX, leaders must show a commitment to CSX's values through their actions. They must also promote an environment where compliance is expected and ethical behavior is the norm. All CSX directors, officers and employees must comply with the Company's values and principles. No one may ask any CSX director, officer or employee to break the law or violate the Company's policies, procedures and values.

## Respect and Fair Treatment

CSX is firmly committed to the principles of equality of opportunity in employment and human relationships. Each CSX employee is expected to treat fellow employees with respect and dignity.

CSX offers employment, training, compensation and advancement on the basis of qualification, merit and business needs, regardless of race, color, religion, sex (including pregnancy, childbirth or related medical conditions), age, national origin or ancestry, physical or mental disability, veteran status, sexual orientation or any status protected by law not listed here. Fulfillment of our commitment to equal employment opportunity requires action by all employees throughout CSX. We all have a responsibility to promote equal employment opportunities. CSX is pledged to affirmative action programs that provide employment and promotional opportunities for minorities, women, individuals with disabilities and veterans. Employees are encouraged to contact their Human Resources representative to review the Affirmative Action Plan for the CSX company for which they work.

D-000006

Similarly, business relationships with competitors, suppliers and customers of CSX must always be conducted free of discrimination based on race, color, religion, sex (including pregnancy, childbirth, or related medical conditions), age, national origin or ancestry, physical or mental disability, veteran status, sexual orientation, marital status or any status protected by law not listed here. All CSX employees are responsible for implementing CSX's policy of non-discrimination. This may require special affirmative action by all levels of executive, managerial and supervisory personnel to seek out competent persons and business entities entitled to the benefits of the broad CSX commitment to equal opportunity.

Employees are encouraged to review the Equal Employment Opportunity policy for the CSX company for which they work and to direct any questions or complaints to the appropriate individuals designated in that policy.

## Harassment

Our policy is to provide a work environment that is pleasant, professional and free from intimidation, hostility or other offenses that might interfere with work performance. CSX does not tolerate any form of harassment -- verbal, physical or visual -- by supervisors, other employees, customers, suppliers, agents or other third parties. Harassment is personally offensive, lowers morale and interferes with the ability to work cooperatively. Accordingly, CSX companies have a zero tolerance for harassment based on sex, race, color, religion, national origin, age, physical or mental disability, veteran status, sexual orientation or any other status protected by applicable federal or state law.

> Employees are encouraged to review the Policy on Harassment for the CSX company for which they work and to direct any questions or complaints to the appropriate individuals designated in that policy.

## Employee Privacy

CSX companies respect the privacy of all employees. CSX will only use employee records as necessary for business needs, and will share employee information only for business reasons consistent with applicable laws. Some personal employee information is very sensitive and cannot be made public under many laws. This includes certain payroll records and medical history records.

## Conduct Involving Our Business Partners

Our values, honesty and standards of conduct do not stop with our actions, or at our doors. We expect the same from our suppliers, customers and others with whom we do business.

## Fair Competition and Antitrust Requirements

All business activities of the CSX companies are highly competitive, and it is the policy of CSX to compete aggressively, but fairly. A major part of CSX's commitment to compete fairly is a commitment to comply with the antitrust laws. In general, these complex laws prohibit any form of agreement or understanding -- whether formal or informal, written or oral, express or implied -- between or among competitors that unreasonably limits or restricts competition between them. Breaking these laws can bring very severe penalties (civil and criminal) to both the Company and the individual. CSX's commitment to compliance with the antitrust laws includes the following guidelines:

- CSX employees may not discuss, or enter into a formal or informal agreement with competitors about prices other than joint line rates (sometimes called "through rates"). This

D-000007

includes agreements about matters affecting price such as demurrage terms, credit terms and other "price-like" commercial terms.

- CSX employees may not discuss, or enter into a formal or informal agreement with competitors about dividing customers, sales territories, or lines of business between themselves.

- This policy also prohibits any unfair or untrue disparagement of a CSX competitor.

- Absent compelling special circumstances, CSX companies should select all suppliers and contractors on the basis of competitive bids.

## Gathering and Using Competitive Information

To compete in the marketplace, it is necessary and legal to gather competitive information. CSX employees may only gather information through lawful means. Information about competitors' rates and other actions in the marketplace can almost always be freely received from CSX customers. Employees should maintain the confidentiality of information entrusted to them by the Company or its customers, except when disclosure is authorized or legally mandated. CSX employees must never use any illegal or unethical means to obtain information about other companies.

CSX employees should not share confidential information from suppliers or customers with anyone outside CSX without written permission. Confidential information includes all non-public information that is shared with you in the reasonable expectation that it will be kept confidential and that might be of use to that company's competitors, or harmful to CSX or CSX customers, if disclosed. If agreements are signed to protect information, be sure to follow their terms and conditions. Do not steal trade secret information, and do not suggest or ask others to disclose trade secrets, especially new employees hired from a competitor. New hires may not bring papers or computer records from prior employers, if those papers or records contain proprietary or confidential information belonging to their prior employer.

## Accurate and Complete Books, Records and Accounting

A company's credibility is judged in many ways – one fundamental way is the integrity of its books, records and accounting. In addition to our own commitment to accurately report financial performance, CSX companies are required by securities laws to report financial information in accordance with generally accepted accounting principles.

Every CSX director, officer and employee must help ensure that reporting of business and financial information – computerized, paper or otherwise – is accurate, complete and timely. This includes accurate recording of costs, revenues, time sheets, vouchers, bills, payroll and benefits records, and regulatory data, among other business information.

In addition, all directors, officers and employees of CSX companies must:

- Follow all laws, accounting requirements and company procedures for reporting financial information;

- Never deliberately make a false or misleading entry in any report or record;

- Never suppress, alter or destroy company records without authorization;

- Never sell, transfer or dispose of company assets without proper documentation and authorization;

D-000008

- Cooperate with our internal and outside auditors;

- Contact the accounting or auditing organization with any questions about the proper recording of business and financial transactions; and

- Contact the Law Department with any legal questions you may have relating to these topics.

## Doing Business with the Government

Each year, CSX companies do substantial business with the U.S. and other Governments. While integrity is the foundation for our dealing with all customers, special rules apply when the Government is our customer, which are very different from those that govern our dealings with private sector companies. Violations of Government procurement laws can result in criminal and civil penalties, loss of contracts and ineligibility from doing further business with the Government. Under the civil False Claims Act, in particular, the Government can impose liability on a contractor for the submission of false claims to the Government, or a false statement in support of a claim, including the costs of the lawsuit, triple the amount of its actual damages, and a civil penalty of between $5,000 and $10,000 for each false claim. A "claim" is a request or demand for money or property submitted by a contractor to the Government, such as an invoice or contract billing. For this reason, it is important that all invoices or billings submitted by CSX to the Government be accurate and complete.

Those involved in bidding or providing products or services under a Government contract need to know these special rules, which include, but are not limited to, the following:

- Never seek or accept from any federal agency, or from any other source, a competitor's confidential bid or proposal information or an agency's source selection information prior to the award of the agency contract to which the information relates.

- Know the special rules on offering or providing gifts, gratuities or entertainment to Government employees, and obtain any advance approvals required by Company procedures.

- When dealing with a quasi-governmental body, know whether government procurement laws and/or ethics rules apply to your dealings with them.

- Know and follow the anti-kickback rules, including restrictions on gifts by those seeking business from the Government and from Government contractors.

- Understand "most favored customer" pricing and disclosure requirements and verify compliance.

- Conform strictly to the contract specifications, and all quality, quantity, delivery and testing requirements.

- Charging and allocation of costs, including employee time and overhead, provision of any cost or pricing data and billings to the Government must always be accurate, complete and in full compliance with applicable procurement rules and regulations.

- Be truthful, accurate, current and complete in all representations and certifications made to Government agencies.

- Do not falsify any document or provide any misleading information relating to the award, performance or payment under any Government contract or subcontract.

D-000009

- Know your Government customer's rules and regulations, including the requirements of standard contract clauses incorporated in the contract, either directly or by reference.

- Refrain from initiating any employment discussions with any current or former Government employee without first consulting with the Legal Department.

If you are involved with any aspect of a Government contract, you must not take any action that would violate any of these requirements.

## Dealing with Suppliers

CSX's Purchasing and Materials group handles the procurement, materials management and transport of items and services necessary for running a railroad and the Company, including investment recovery activities. The relationships we establish with our suppliers are important to us. The values of CSX are applicable in all of our dealings with suppliers, including a commitment to achieving the right results in the right way. CSX's policy is to base all procurement decisions on the best value received by CSX. CSX companies will not knowingly use suppliers who participate in any of the following activities: supply unsafe products or services; violate laws or regulations; or use child labor or forced labor.

Good procurement conduct – which is required of any CSX employee in any department who has dealings with suppliers or vendors – includes the following:

- Use established corporate-wide or regional supply (leveraged) agreements;

- Whenever possible, obtain competitive bids when leveraged agreements do not exist;

- Ensure the overall performance capability of the supplier, including delivery, quality and financial status;

- Make sure that purchase agreements clearly state the services or products to be provided, the basis for earning payment, and the applicable rate or fee;

- The fee or price paid for goods and services by CSX must represent the value of the goods or services provided;

- Avoid reciprocal agreements;

- Encourage support for minority and women-owned businesses; and

- Purchase in support of CSX's Environmental, Safety and Health values and policies.


## Relationships and Conflicts of Interest

**Fair Dealing:** Each CSX employee should endeavor to deal fairly with the Company's customers, suppliers, competitors and employees. No CSX director, officer or employee should take unfair advantage of anyone through manipulation, concealment, abuse of privileged information, misrepresentation of material facts or any other unfair-dealing practice.

**Conflicts of Interest:** A "conflict of interest" occurs when an individual's private interest interferes in any way – or even just appears to interfere – with the interests of the Company as a whole. A conflict situation can arise when a director, officer or employee takes actions or has interests that may make it difficult to perform his or her company work objectively and effectively. Conflicts of

D-000010

Interest also arise when a director, officer or employee, or a friend or member of his or her family, receives improper personal benefits as a result of his or her position in the Company. Loans to, or guarantees of obligations of, such persons are of special concern.

It is CSX policy that no director, officer or employee – or any member of his or her immediate family – should acquire a financial interest in, or accept employment by, an entity doing business with a CSX company if the interest or employment would conflict with the employee's performance of his or her duties. Similarly, no CSX director, officer or employee should take any business action for personal benefit, or to benefit a friend or relative.

**Corporate Opportunities:** Pursuant to CSX's policy prohibiting conflicts of interest, CSX directors, officers and employees are expected to make decisions in the best interests of the Company, and not for personal gain. CSX directors, officers and employees are prohibited from: (1) taking for themselves personally opportunities that are discovered through the use of corporate property, information or position; (2) using corporate property, information or position for personal gain; and (3) competing with the Company.

Directors, officers and employees owe a duty to the Company to advance its legitimate interests when the opportunity to do so arises. CSX directors, officers and employees also have a duty to report to the CSX Ethics Information Hotline any situation that may appear to present a conflict of interest.

### Entertainment and Gifts

Ethical considerations are extremely important in supplier, competitor and customer relationships. CSX's position is clear: no gift, favor, hospitality or entertainment should be accepted or provided if it will create a feeling of obligation, compromise judgement or appear to influence the recipient. Kickbacks, bribes, rebates or other forms of illegal consideration are never acceptable, and should never be given or accepted by anyone acting on behalf of a CSX company. Receiving or giving gifts of cash or cash equivalents, including gift certificates, prepaid credit or charge cards, or gift cards, is never permitted.

To help ensure that your decisions are the right ones, ask yourself the following questions when giving or receiving any form of business entertainment or gift:

- Is it legal, customary and in good taste?

- Is it clearly related to the conduct of CSX business?

- Would you feel comfortable giving or receiving the entertainment or gift in a public setting?

- Could the offer influence or appear to influence your business judgement in any way?

If any doubt exists as to the impact that giving or receiving entertainment or gifts could have on the reputation of the Company or your personal reputation, the entertainment or gift should not be offered or accepted. Because these judgements sometimes can be difficult, CSX has established certain standards for exchanging entertainment and gifts which are described below. Your organization may choose to establish entertainment and gift policies that are more restrictive than those described below.

It is generally accepted business practice to provide and accept meals and entertainment that occur in conjunction with business meetings and conferences provided the meals and entertainment are not lavish. It is also acceptable to accompany a supplier or customer to recreational or social outings that have a clear business goal or charitable purpose. Invitations that involve customer or supplier provided overnight accommodations may be accepted only with

D-000011

the prior written approval of the department head. Employees should never solicit entertainment from suppliers or customers.

Gifts are defined as items, products or services given to an employee by a competitor, supplier, customer or any other party with whom CSX does business. Tickets to sporting or other events where the supplier or customer has no intention of accompanying the employee are considered gifts.

Employees may accept nominal gifts defined as having a value of up to $100 per year from a single organization. Employees may not solicit gifts. No gift may be offered in violation of another organization's standards.

CSX employees dealing with Government officials should be particularly alert to the special rules that may limit or prohibit giving gifts, gratuities, entertainment or other favors to Government officials. In conducting business with Government officials, CSX will abide by all existing regulations and laws. Specific questions regarding Government officials should be directed to Government Affairs, the Law Department or the Ethics Information Hotline.

## Conduct Involving Our Business Resources

CSX is committed to protecting its business resources. We expect every director, officer and employee to follow the standards set forth in the following Conduct Involving our Business Resources.

## Responsible Use of Company Assets

CSX employees should respect Company property and use Company assets, including computers and related information technology assets, only in accordance with established company policies, including the CSX Information Users Policy. Theft, carelessness, misuse and waste of company property have a direct impact on the Company's profitability. Company assets and resources should be used only to conduct company business, and not for personal gain or any non-business purpose.

## Document and Records Management

CSX's records and information are Company assets. The Company's Records and Information Management program assists employees in managing these assets efficiently and in accordance with Company policy.

Records and information can exist in many ways, such as documents, files, graphs, and databases, and may be kept in hard copy, electronically or on film. In order to ensure that valuable business information is well-organized and available when needed, employees should properly label and carefully handle confidential and proprietary information in accordance with procedures set forth in the CSX Records and Information Management Manual.

The Company's Record and Information Management program includes records retention policies and procedures. Check with your supervisor or the Company's Record Manager for policies regarding the retention of documents and other records that you handle, if any. Keep in mind that certain records and information pertaining to our business must be maintained for specific periods of time for legal reasons or for review by regulatory authorities.

In addition, from time to time, we receive requests from Government agencies or other third parties for documents and records relating to our business. Once we have received such a request, we are often prohibited by law from destroying documents or information responsive to that request. CSX companies have developed a policy to suspend records disposition when such circumstances arise. This policy, known as a "Legal Hold Policy," is designed to ensure that all

D-000012

affected personnel and departments are promptly notified and relevant documents and information are identified, segregated and preserved when a legal obligation arises to preserve or retain them. If you are advised that the Company has received any such document request, you must not destroy any requested or related documents or records until you have been advised by the Law Department that you are permitted to do so.

**Insider Trading**

In the course of your employment with CSX, you may become aware of material information about CSX or other companies that has not been made public. The use of such "inside information" about CSX or another company for your financial or other benefit is not only unethical, but also may be a violation of strict Federal laws against "insider trading" in securities (for example, stocks, bonds and options).

"Inside information" means information that:

- is not available to the public, and

- is "material."

"Material information" means information that a reasonable investor would likely consider important in deciding whether to buy or sell a security. Many of our employees may have inside information simply by virtue of their positions. Inside information might include, for example:

- The purchase or sale of a major asset;

- Changes in dividend policy;

- Mergers, acquisitions and joint ventures;

- Significant changes in operations or business plans;

- Major developments in litigation;

- The financial condition or operating results of a company, including earnings statements and forecasts; and

- Regulatory developments.

If you have knowledge of any of these kinds of information — and the information is non-public — it is inside information, and no CSX employee may buy or sell securities while aware of inside information. Inside information can also be information you obtained confidentially during the course of your work about another company — for example, from a customer or supplier. You should also be aware that the insider trading prohibition applies to people outside of CSX· companies who obtain the information from one of our employees (for example, an employee's spouse, friends or broker). This means you must never give someone outside your company a "tip" regarding non-public inside information — this includes discussions on Internet "chat rooms." If you do, and the person you provided the information to uses it to trade, both you and the person you provided the information to are subject to action under the Federal securities law.

Securities law violations are taken very seriously and can be prosecuted even when the amount involved is small, or the "tipper" makes no profit at all. Government agencies regularly monitor trading activities through computerized searches. CSX employees (and outsiders they are associated with) who have inside information can lawfully trade in the market once the

D-000013

Information is made public through established channels and enough time has passed for the information to be absorbed by the public.

If you have questions or concerns about your responsibilities under the insider trading laws, contact the Law Department or the CSX Ethics Information Hotline for further guidance.

## Accuracy of Books, Records and Financial Reporting

Investors count on CSX to use and provide accurate information so they can make informed decisions. All CSX officers and employees must properly record many kinds of business information. All financial books, records and reports must correctly reflect transactions and events on a timely basis. These records must meet both generally accepted accounting principles and CSX's internal control requirements. The following are examples of activities that are not allowed:

- Failing to record or disclose funds or assets that should be recorded in a timely manner;

- Making false claims on an expense report, time sheet or any other report;

- Giving false or misleading quality or safety results or reports;

- Understating or overstating known liabilities or assets;

- Delaying the entry of items that should be current expenses;

- Hiding the true nature of any transaction; or

- Providing inaccurate or misleading information for Company benefit programs.

CSX directors, officers and employees must be sure that any document they prepare or sign is correct and truthful.

## Intellectual Property

CSX's intellectual property – patents, trade secrets, trademarks, copyrights and other proprietary information – is considered a valuable Company asset. It is CSX's policy to establish, protect, maintain and defend its rights in all commercially significant intellectual property and to use those rights in responsible ways. All CSX employees must take steps to safeguard those assets.

In addition to protecting CSX's intellectual property rights, CSX respects the valid intellectual property rights of others. Unauthorized use of the intellectual property rights of others may expose CSX to civil lawsuits and damages. Theft and misappropriation of trade secrets, proprietary information or other intellectual property may result in significant fines and criminal penalties to both CSX and to the individual. New CSX products, services (including e-commerce initiatives), processes and software, and any proposed use of the intellectual property of others, should be timely and reasonably reviewed for infringement.

## Use of Computer Resources

CSX companies have specific policies concerning employee use of Company e-mail, the Internet and Company intranet, and other electronic information sources while on Company time or using Company computers. E-mail and the Internet are powerful communication tools and valuable business assets. However, improper use of e-mail, Internet and Company intranet services can waste time and resources, and create legal liabilities and embarrassment for our employees and our Company. CSX's Information Users Policy explains what employees can and cannot do

D-000014

when using the Company's computer resources and includes policies pertaining to use of e-mail, the Internet and Company intranet, and the export of software and other information through CSX computer resources.

CSX employees should use extreme caution when using e-mail to transmit information that may contain our company trade secrets, business plans or any other confidential or proprietary information (including the confidential or proprietary information of others). CSX employees must not send e-mail messages or otherwise use our e-mail or Internet systems in connection with:

- Engaging in illegal, fraudulent or malicious activities;

- Copying or distributing copyrighted material – for example, software, database files, MP3 files, documentation or copyrighted articles using our Company e-mail systems;

- Engaging in activities on behalf of organizations with no professional or business affiliation with our Company;

- Sending or storing offensive, sexually explicit, obscene or defamatory material;

- Annoying or harassing other people;

- Using another person's identity without explicit authorization;

- Attempting to test, circumvent or defeat security or auditing systems, without prior authorization;

- Permitting any unauthorized person to access our company e-mail systems; or

- Distributing chain letters, solicitations or offers to buy or sell goods.

CSX does allow limited personal use of our Company e-mail and Internet systems, so long as such use is reasonable, does not violate any provision of this Code of Ethics or copyright laws, and does not interfere with your productivity or the productivity of your co-workers. You must assume that an e-mail message may be disclosed to or read by individuals other than the intended recipient(s), since messages can easily be forwarded to other individuals and retained indefinitely. Therefore, you should never create an e-mail message that you or the Company would not want used as evidence in any dispute, investigation or lawsuit. Because e-mail messages can often be read out of context, it is extremely important that you avoid writing any e-mail message that even appears to violate any provision of the law or this Code of Ethics. Finally, keep in mind that there is nothing personal about e-mail correspondence. The e-mail system provided by CSX is considered company property. CSX, like most companies, monitors e-mail and attachments and will take appropriate steps if e-mail contains information or comments that are unlawful, inappropriate or otherwise inconsistent with CSX policies.

### Conduct Involving Our Communities

At CSX, we are deeply committed to enhancing the quality of life in the communities we serve.

### Environmental Policy

As a global transportation leader, CSX is committed to protecting the environment and ensuring the safety and health of our employees and the public. We back our commitment by promoting best practices in environmental stewardship.

D-000015

CSX Ethics Information Hotline: 1-800-737-1663

Daily decisions and actions at CSX are guided by the following environmental principles:

- Comply with applicable environmental laws and regulations;

- Make operations safe for employees, customers and the environment;

- Minimize waste, prevent pollution, and incorporate recycling in all practices and operations;

- Strive to eliminate releases that impact the environment;

- Employ sound environmental practices to address and redevelop environmentally impacted property;

- Encourage open and candid communication with employees, customers, and the public regarding the Company's environmental program and any hazard that may arise from its operations;

- Strive continually to improve environmental performance.

### Safety Policy

The safe operation of CSX activities is always a primary goal. All CSX officers and employees, without exception, are responsible for ensuring that CSX operations are conducted safely. We are committed to provide transportation services in a manner that will ensure the safety of our employees, our customers and the communities we serve. Employees are expected to observe all safety rules and practices and to follow instructions concerning safe and efficient work practices. All employees should advise their supervisor or other management representatives immediately if they see a work practice or activity they consider to be conducted in an unsafe or careless manner.

CSX provides emergency planning assistance and training to local fire, police and emergency response personnel in communities served by our Company.

### Political Contributions and Public Service Involvement

CSX and its subsidiaries work hard to earn and maintain the respect of the communities in which they operate. As good neighbors and good corporate citizens, we seek to support the efforts of our many employee-volunteers who contribute time and talent to local organizations. At the same time, we support a wide variety of regional and national organizations dedicated to improving the health, safety and well-being of our nation's citizens. CSX employees are encouraged to speak out on important community issues. Employees must be careful, however, not to give the impression that they are speaking on behalf of a CSX company unless they are actually authorized to do so.

No CSX company is permitted to contribute, directly or indirectly, to any Federal political campaign. Employees may not use company expense accounts to pay for any personal political contributions or seek any other form of company reimbursement.

In addition, employees should not use company facilities or resources for the benefit of any party or candidate, including an employee individually running for office. Employees are encouraged to contribute to properly established political action committees.

D-000016

## The U.S. Foreign Corrupt Practices Act ("FCPA")

The FCPA prohibits the giving or offering of money or anything of value, either directly or through a third party, to an official of a foreign government, foreign government agency or instrumentality (which may include government monopolies, corporations, etc.) or to any foreign political party, party official or candidate, except for certain narrow exceptions as discussed below. The FCPA prohibits bribes and other improper payment regardless of the fact that they may be widely accepted or even seem necessary in the foreign country in question. A violation is a serious criminal offense for both companies and individuals, and may result in fines, loss of export privileges and imprisonment for individuals.

CSX's policy with respect to foreign corrupt practices and irregular transactions is to respect and adhere to the FCPA and laws of each country in which it does business, and never to engage in bribery. In certain circumstances, so-called "facilitating payments" – small payments to foreign government officials for routine governmental actions – are permissible under the FCPA. The purpose of such payments is to expedite the performance of a duty that the Government official is otherwise required to perform, and is distinguishable from a bribe, which is a payment given to persuade an official to give favorable treatment or exercise his discretion in favor of a payment-giver. CSX policy requires written pre-approval by the Law Department of any facilitating payment.

## International Business

CSX policy is to fully comply with the specific laws and regulations of all countries where we do business, and with all U.S. laws affecting international trade, such as anti-boycott, trade sanction, export control and foreign corrupt practices laws. Violations of these laws carry stiff civil and criminal penalties for individuals and the Company, and could cause serious damage not only to our corporate reputation, but also to the public at large. Employees involved in foreign operations should be aware of these laws, and should always consult with the Law Department to ensure that CSX companies do not violate any relevant laws.

D-000017



DEFENDANT'S
EXHIBIT
4

# CSX Transportation, Inc.
## Policy Statement on Equal Employment Opportunity

Effective: January 31, 2006

CSX Transportation, Inc. is committed to providing equal opportunity for applicants and for employees without regard to race, color, religion, sex (including pregnancy, childbirth or related medical conditions), age, national origin, physical or mental disability, veteran status, sexual orientation or any other basis protected by applicable federal or state law. This policy applies to all terms and condition of employment. Therefore,

- Persons are recruited, hired, placed, upgraded and promoted for all jobs without regard to race, color, religion, sex (including pregnancy, childbirth or related medical conditions), age, national origin, physical or mental disability, veteran status, sexual orientation or any other basis protected by applicable federal or state law;

- Other personnel actions, such as compensation, benefits, transfers, layoffs, returns or recalls from layoffs, company-sponsored training, terminations and all other privileges, terms and conditions of employment are administered without regard to race, color, religion, sex (including pregnancy, childbirth or related medical conditions), age, national origin, physical or mental disability, veteran status, sexual orientation or any other basis protected by applicable federal or state law;

- Reasonable accommodations are made to the religious practices of employees, unless such accommodation would result in undue hardship on the conduct of our business;

- CSXT will work to seek reasonable accommodation for applicants in the employment process, qualified employees with disabilities and for applicants with disabilities who have been offered employment in accordance with the Americans with Disabilities Act. As appropriate, CSXT will attempt to eliminate artificial barriers to employment in order to afford all individuals opportunities to pursue available employment to the extent of their abilities and talent;

- Discrimination, including harassment on the basis of race, color, religion, sex (including pregnancy, childbirth or related medical conditions), age, national origin, physical or mental disability, veteran status, sexual orientation or any other basis protected by applicable federal or state law is prohibited and violates Company policy. For information on the types of conduct that violate the Company's policy against harassment and the Company's internal procedure for making a compliant of harassment, please refer to the Company's Policy Statement on Harassment.

- Sexual harassment is prohibited and acts including but not limited to unwelcome sexual advances, request for sexual favors, or other verbal or physical conduct of a sexual nature violates Company policy. This is particularly the case when submission to such conduct is made a term or condition of employment or such conduct has an effect on wages, advancement, job performance, or creates an intimidating, hostile or offensive working environment. For further information on the types of conduct that violates the Company's policy against harassment and the Company's internal procedures for making a complaint of harassment, please refer to the Company's Policy Statement on Harassment.

- Retaliation against an individual who brings a complaint of harassment or discrimination or against an individual who participates in the investigation of a complaint of harassment or discrimination is strictly prohibited.

IT IS THE RESPONSIBILITY OF EVERY EMPLOYEE TO FOLLOW THIS POLICY CONSCIENTIOUSLY. IF YOU BELIEVE THERE HAS BEEN A VIOLATION OF THE POLICY YOU SHOULD REPORT IT IMMEDIATELY TO YOUR HUMAN RESOURCES MANAGER OR THE CSX ETHICS INFORMATION TOLL FREE HOTLINE AT 1-800-737-1663. THE HUMAN RESOURCES DEPARTMENT WILL INVESTIGATE EACH COMPLAINT AND

D-000001



WILL TAKE CORRECTIVE AND REMEDIAL ACTIONS WHERE NECESSARY. ANY EMPLOYEE WHO VIOLATES THIS POLICY IS SUBJECT TO DISCIPLINE UP TO AND INCLUDING DISMISSAL.

CSX Transportation is pledged to affirmative action programs that provide employment and promotional opportunities for minorities, women, individuals with disabilities and veterans. Current plan documents are maintained by the AVP of EEO and Diversity. Employees are encouraged to avail themselves of the Plan's benefits.

*Michael Ward*

Michael Ward
CSXT President

D-000002

06/07/06

Attn: Rodney Saunders



I Ronald A. Hellen Jr., Terminal Trainmaster Montgomery, AL. I can't recall the exact date of this incident. It was Sat or Sunday morning we had a crew issue filling a remote job, we were also short of Engineers so I did not want to convert a job. I asked the Crew caller to look in the M+M board to see if we had some ~~out~~ remote qualified people in it. I was checking it my self. J. R. Weeks was in the board I knew he had worked the remotes at one time. I told the crew caller to call him. He called him and said his remote ~~te~~ card had not been signed for the past 2 years. I ask him if It was still in date he stated yes. I told him to come on and we would get it signed. Thinking Wayne Powe or T.L. Dean

would be there. I called T. J. Dean to give him
some heads up. He told me to get Mr. Weeks
to call him. When Mr. Weeks showed up
he call T. J. Dean and he told me T. J. stated
for me to siqnd it and he would be in later.
I called T. J. Back to ask if I should be
signing their cards in a FRA document.
He tell me to siqn it and he would be in
later to take care of the rest.

I have been a manager in Montgomery, AL
for 5 years. Montgomery was the first terminal
for remote control operation. Myself, Doug you,
and Cedric Killiber were never afforded the
training to become a remote control trainer. The
three of us worked in the tower and terminal on
a daily basis, with issues of remote control problems,
we never afforded the training. We were never

afforded the training by CSX in hands on operation,
rules or FRA regulation.

Ronld A. Hollan
Terminal Trainmaster
Montgomery, AL

P-000326

RCO Certification Card Incident at Montgomery, AL
Incident Date May 27, 2006

## Description of Event

On the morning of Saturday, May 27th, 2006, Montgomery Yard needed to fill a RCO position on Y19027. Terminal Trainmaster Ron Hollon worked with the crew caller to find someone to fill the vacancy. Mr. Hollon was trying to prevent converting the job to a conventional job in order to not to have to use another engineer. Engineers were needed to run the projected trains for the day. Mr. Hollon found Mr. JR Weeks on the M&M extra board and told the crew caller to call him for the job. Mr. Weeks informed them that his RCO Certification card had not been signed in the past 2 years, but his certification had not yet expired. Mr. Hollon instructed Mr. Weeks to come to work, and they would get his card signed.

Mr. Hollon then contacted Mr. Dean to get his assistance in observing Mr. Weeks during his tour of duty and also to sign his card. Mr. Dean was on his off days and out of town but agreed to return to Montgomery to perform this duty. Mr. Dean did not remember that the FRA gave CSX a 60 day waiver on RCO operators who have not had an annual ride in the previous year. CSX can allow the employee to work as an RCO operator, but it is the company's responsibility to then give the employee an annual certification ride within 60 days of operating the RCO during that calendar year as long as the 3 year Certification had not expired.

Instead when Mr. Weeks contacted Mr. Dean after he arrived at the on duty location, Mr. Dean told Mr. Weeks to have Mr. Hollon sign his name (TJ Dean) to Mr. Weeks' RCO certification card until he could get there and sign his card himself. Mr. Hollon called Mr. Dean back and questioned whether he should be signing the card, and again, Mr. Dean told him to sign his name to the card so Mr. Weeks would go to work and not delay the job. Upon his return to Montgomery, Mr. Dean observed Mr. Weeks perform his switching duties to evaluate his proficiency. He then signed Mr. Weeks' card, completed the RCO Evaluation Form, and entered the score into the computer system for the records as required.

On Tuesday, June 6, 2006, FRA Inspector Marlo Owens arrived in Montgomery, AL to inquire into the incident. RFE TJ Dean was interviewed as to his involvement in the incident. TM RA Hollon was on vacation and not available for interview. Employee JR Weeks was out of terminal working and unavailable for interview.

On Wednesday, June 7, 2006, Mr. TJ Dean and Mr. RA Hollon were removed from service pending an investigation.



DEFENDANT'S EXHIBIT 6

D-000023

**Statement of Road Foreman of Engines TJ Dean**

Mr. Ron Hollen call my cell phone in the early morning of May 27, 2006. Mr. Weeks stated Mr. Weeks was call to work Y-190-27 RCO job but his RCO card needs to be signed. I stated to Mr. Hollon I could be in Montgomery somewhere early afternoon to sign Mr. Weeks RCO card account I was out of town. Mr. Hollon call me again stating Mr. Weeks RCO card needs to be sign. I told Mr. Hollon to sign my name to his RCO card and I would sign it myself when I got to Montgomery. I watch Mr. Weeks perform his switching duties and I sign his RCO card. I then went to the yard office to put his ride into the computer and mailed paperwork to Mr. Rodney Saunders. I made my decision and forgot the 60 day waiver from FRA trying to do the right thing. I made a bad decision. I didn't make this decision on trying to make false documentation to the FRA or CSX. I did it trying to avoid a employee sitting there and doing nothing for hours waiting on me. I'm truly sorry but everyone makes mistakes, and once again I'm sorry to embarrassed any of my supervisors concerning this incident.

**Statement of Trainmaster RA Hollon**

I, Ronald A. Hollon, Sr., Terminal Trainmaster Montgomery, AL. I can't recall the exact date of this incident. It was Sat or Sunday morning we had a crew issue filling a remote job, we were also short of Engineers so I did not want to convert a job. I asked the crew caller to look in the M&M board to see if we had some remote qualified people in it. I was checking it myself. JR Weeks was on the board. I knew he had worked the remotes at one time. I told the crew caller to call him. He called him and said his remote card had not been signed for the past 2 years. I ask him if it was still in date he stated yes. I told him to come on and we would get it signed thinking Wayne Powe or TJ Dean would be there. I called TJ Dean to give him some heads up. He told me to get Mr. Weeks to call him. When Mr. Weeks showed up he call TJ Dean and he told me TJ stated for me to sign it and he would be in later. I called TJ back to ask if I should be signing this card since it's an FRA document. He told me to sign it and he would be in later to take care of the rest. I have been a manager in Montgomery, AL for 5 years. Montgomery was the first terminal for remote control operations. Myself, Doug Yow and Cedric Killebrew were never afforded the training to become a remote control trainer. The three of us worked in the tower and terminal on a daily basis, with issues of remote control problems, but never afforded the training. We were never afforded the training by CSX in hands on operations, rules or FRA regulations.

Note: Written by Rodney Saunders, Sr. Road Foreman of Engines, Montgomery Alabama.

D-000024

Yahoo! Mail - jweekley1611@yahoo.com                                    Page 1 of 4

 Yahoo! My Yahoo! Mail                                    Search:                                          Web Search

 **YAHOO!** MAIL    Welcome, jweekley1611    Mail Home - Mail Tutorials - Help
[Sign Out, My Account]


**WELLS FARGO**    **Wells Fargo Home Equity**
• Low monthly payments  • Tax deductible interest    **Apply Now**

| Mail | Addresses ▼ | Calendar ▼ | Notepad ▼ |     Mail For Mobile - Mail Upgrades - Options

Check Mail    Compose                                    Search Mail ▼    Search the Web

TRY Blockbuster
for FREE!

Previous | Next | Back to Messages

**Folders**    [Add - Edit]    | Delete | Reply ▼ | Forward ▼ | Spam | Move... ▼ |

Inbox (1)    This message is not flagged. [ Flag Message - Mark as Unread ]        Printable View

Draft        **From:**    "DALE BARNETT" <DBARNETT@ELMORE.RR.COM>  View Contact Details  Add Mobile
Sent                                                                          Alert
Bulk    [Empty]
Trash    [Empty]    **To:**    "Jimmy Weekley" <jweekley1611@yahoo.com>

**Search Shortcuts**    **Subject:**    Fw: T.J. Dean

My Photos    **Date:**    Fri, 1 Dec 2006 12:03:09 -0600
My Attachments

What's your
credit score $0    ----- Original Message -----
From: "DALE BARNETT"
To: "John strength" ; "Jimmy Weekley"

Save about $27
over cable    Sent: Wednesday, June 21, 2006 11:15 PM
Subject: Fw: T.J. Dean                              P-000278

Bad Credit
Refinance Rates    > FYI, this was the email I sent to Mr. Pendergrass concerning T.J. and
Ron.
Degrees in as
fast as 1 year    > It is more of the proof of how I handled this situation. While this
email
> seemed to have no affect on the decision that management made on
6-20, it
> nonetheless was my best attempt to keep their jobs. As a union
> representative, I have NO choice but to report any and all violations
or
> issues that my members bring forth and wish to have exposed. These
very
> management people had NO choice but to report the violations of our
> members and they knew every time someone was charged it was just
business.
> I will not apoligize for the course taken because I followed the
requests
> of my members. While I do hate to see anyone lose their jobs, I was
not
> the one to report this to management but rather Mr. Dean turned
himself in
> when he talked to management in Jacksonville and they made the
decision.
> The matter was to be handled on a division level according to Tipton
with
> a coaching session with Mr. Saunders until the call by Mr. Dean. I
would
> have had no problem with this course of action and I told Mr. Tipton
such.


DEFENDANT'S
EXHIBIT
7

> Maybe the local BLET should decide if they support management or labor in
> any disputes that involve allegations of wrong doing. T.J. is a fine
> fellow and I hope he regains a management job but I think he understands
> that when he is a manager, he is faced with this chance every day.
> Management made a choice here not the FRA ( who have yet to complete a
> report on the issue and who have stated this would not have been a job
> costing violation), and certainly not the UTU nor myself. I repeat again,
> there was no motivation or agenda behind me reporting this incident other
> than the request of my members.
> Dale
>
> ----- Original Message -----
> From: "Barnett, Dale"
> To:
> Sent: Wednesday, June 21, 2006 11:51 PM
> Subject: FW: T.J. Dean
>
>
>
>
> _____
>
> From: Barnett, Dale
> Sent: Sat 6/17/2006 11:31 AM
> To: Pendergrass, Mike
> Cc: Workman, Rod
> Subject: T.J. Dean
>
>                                              P-000279
> Mr. Pendergrass,
>
> A few weeks back an incident occurred in Montgomery where some of my
> members of the UTU contacted me over what they believed to be a violation
> of FRA rules by Mr. T.J. Dean, the M&M RFE. Because of this request, I
> reported this violation directly to the local FRA agent for her handling
> and I informed the parties involved that the report had been sent. I later
> discovered that the issue was more of an error in judgment and that there
> were provisions allowed by the FRA that would have made the requirement of
> signing the RCO card moot until a later date.
>
> I never viewed this incident as unethical but as a possible FRA violation.
> I did not report the matter to any upper management of CSX because I did
> not feel it was an issue other than this possible FRA violation. I did
> speak with Terminal Trainmaster Jason Tipton concerning the matter to
> inform him that the report had been made to the FRA. I never felt either
> Trainmaster Ron Hollon nor RFE Dean had made any attempt to deceive anyone
> but merely made a error in judgment. If I ever felt this incident was more
> than an FRA violation and that these managers were attempting to do
> something truly against company policy or rules, I would have

Case 2:06-cv-01099-WKW-CSC    Document 18-2    Filed 11/30/2007    Page 348 of 392

Yahoo! Mail - jweekley1611@yahoo.com                                    Page 3 of 4

contacted
> Mr. Workman or Ms. Averitte immediately. Managers make mistakes and I try
> to point these out just as I do with our union members. We usually correct
> these mistakes on the Division level. Perfection is a goal that can never
> be achieved but can always be strived to reach. Mistakes and errors can
> happen, our goal should always be to reduce the chance and severity of
> these mistakes and errors.
>
> While this incident was not a well thought out idea by Mr. Dean, I do not
> believe he deserves to lose his job status. I certainly do not believe Mr.
> Hollon should be held out of service any longer and he should be allowed
> to return to his job. We can all make mistakes in judgment sometimes while
> making an attempt to do the right thing for the company. There should
> always be a level of understanding and forgiveness for our employees that
> are trying, everyday, to work hard for this company.
>
> Make examples of the mistakes, not the persons involved, so that the same
> mistakes do not occur again. But this is a matter for management to decide
> but I did want to let you know my opinion if it mattered.
> I thank you for your time.
>
> Dale Barnett
> UTU/CSX Safety Coordinator
> Atlanta Division
>
> --------------------------------------------
> This email transmission and any accompanying attachments may
> contain CSX privileged and confidential information intended only
> for the use of the intended addressee.  Any dissemination,
> distribution, copying or action taken in reliance on the contents
> of this email by anyone other than the intended recipient is
> strictly prohibited.  If you have received this email in error
> please immediately delete it and  notify sender at the above CSX
> email address.  Sender and CSX accept no liability for any damage
> caused directly or indirectly by receipt of this email.
>
>
>
> --
> No virus found in this incoming message.
> Checked by AVG Free Edition.
> Version: 7.1.394 / Virus Database: 268.9.1/369 - Release Date: 6/19/2006
>
>

P-000280

Delete    Reply ▼    Forward ▼    Spam    Move ▼

Yahoo! Mail - jweekley1611@yahoo.com



Mail | Addresses ▼ | Calendar ▼ | Notepad ▼          Mail For Mobile - Mail Upgrades - Options

Check Mail | Compose                            Search Mail | Search the Web

0% APR card
for good credit

Folders        [Add - Edit]

Inbox (2)

Draft

Sent

Bulk       [Empty]

Trash      [Empty]

Search Shortcuts

My Photos

My Attachments

What's your
credit score $0

Find old High
School friends

Mortgage rates
as low as 4.625%

Degrees in as
fast as 1 year

Previous | Next | Back to Messages

Delete | Reply ▼ | Forward ▼ | Spam | Move... ▼

This message is not flagged. [ Flag Message - Mark as Unread ]      Printable View

From:    "DALE BARNETT" <DBARNETT@ELMORE.RR.COM>   View Contact Details   Add
         Mobile Alert

To:      "Jimmy Weekley" <jweekley1611@yahoo.com>

Subject: FW: Re: RCO FRA Certification card falsification

Date:    Fri, 1 Dec 2006 12:03:43 -0600

—— Original Message ——
From: patrick.plumb@dot.gov
To: dbarnett@elmore.rr.com
Cc: elizabeth.hudd@dot.gov
Sent: Wednesday, November 22, 2006 11:32 AM
Subject: FW: Re: RCO FRA Certification card falsification

DEFENDANT'S
EXHIBIT

Re: 2006-CSX-006120

Dear Mr. Barnett:

This will respond to your complaint citing an incident occurring on May 27th
involving CSX employee Jeremy Weeks, Trainmaster Ron Hollon, and Road
Foreman of Engines T. J. Dean in the Montgomery yard. You alleged that CSX
required a Remote Control Operator (RCO) to work in Montgomery, AL
without having a proper check ride within the last two (2) years. You further
alleged that a non-qualified officer signed the RCO certification card.

After review of the circumstances and events on that date, FRA has
determined that CSX was not in violation of federal regulations governing
Remote Control Operations. FRA has allowed CSX a 60-day grace period for
an RCO that has not had a check ride for the previous year which allows an
RCO to operate as such for 60 days prior to the completion of a check ride. If
applied, the employee could have performed his duties on JobY190 without a
check ride until July 26, 2006. Therefore, no further action is warranted at
this time and this office considers this matter closed.

I understand that the investigating inspector advised you of our findings and
that you were satisfied with the results.

We appreciate your continued effort to identify and resolve issues that affect
rail safety.

                                                    P-000276

Yahoo! Mail - jweekley1611@yahoo.com                                    Page 2 of 2

Sincerely,


Patrick Plumb
Deputy Regional Administrator
Federal Railroad Administration
Region 3

------------------------------------------------------------------

No virus found in this incoming message.
Checked by AVG Free Edition.
Version: 7.1.409 / Virus Database: 268.14.13/546 - Release Date: 11/22/2006

| Delete | Reply ▾ | Forward ▾ | Spam | Move... ▾ |

Previous | Next | Back to Messages                    Save Message Text | Full Headers

| Check Mail | Compose |                          | Search Mail | Search the Web |

Copyright © 1994-2006 Yahoo! Inc. All rights reserved. Terms of Service - Copyright/IP Policy - Guidelines - Ad Feedback
NOTICE: We collect personal information on this site.
To learn more about how we use your information, see our Privacy Policy

P-000277

**Hollon, Ron Sr**

| | |
|---|---|
| From: | Hollon, Ron Sr |
| Sent: | Friday, June 30, 2006 6:35 AM |
| To: | Ward, Michael |
| Cc: | Hollon, Ron Sr |
| Subject: | Wrongful Termination |



Mr. Ward:

We as a company state that people make a difference, up until now I whole heartedly believed that.

I have been employed with this company for 25 years. I have worked as a clerk ten of those years, as a yardmaster ten more of those years, and as
an Assistant and Terminal Trainmaster for the last five of those years. I have trained for every clerical position in Montgomery, Alabama. There were
quite a few positions in those days, from operator, crew caller, demurrage, chief clerk, inbound, outbound (to name a few) to porter driver. I have worked
every position as a yardmaster in this terminal. I have worked as an Assistant and Terminal Trainmaster here. I have trained on alot of positions
on my own time, gone to meetings and even E-tested on my on time so I could do my job to the best of my ability. In the 25 Years that I have
worked for this company there has been nothing on my record but a couple of recommendation letters from my Supervisors - J. Giles, and Larry Harper.

I was pulled out of service on June 7th in the middle of my vacation before CSX or FRA had a statement from me in writing. I was terminated as a company
officer on June the 19th. This is my statement:

I was working Terminal Trainmaster position on memorial day weekend. We were short of Engineers in every direction and I did not have a remote
qualified person to fill one of my first shift jobs. I didn't want to convert the job and take an engineer away from moving a train.
I talked to crew management on the M&M side to see if I might have a remote qualified person in the brakeman's board. I myself was looking at the
same time as the crew caller to see if I might see a person that I thought had worked remote in the past. Mr. J. R. Week's name appears.
I knew he had worked remote for me in the past. I instructed the crew caller to call him and double check. The crew caller called me and stated that he was qualified but his remote card had not been signed. I asked him if the card was in date he stated yes and that it
was good until 2007. I instructed him to give him the call and tell him we would have someone here to sign the card. I then called Road Foreman of Engines
T. J. Dean to give him a heads up. He told me to have Mr. Weeks give him a call when he showed up. When Mr. Weeks showed up for work
I gave him the message and he called Mr. Dean. Mr. Dean told him to tell me to sign the card and I replied that I was not for sure I could do that so then
in turn I called Mr. Dean back and at that time I was instructed to sign the card by the Road Foreman of Engines.

I was removed from service for forging an FRA Document. I didn't forge or deceptively hide anything I signed the card with the instruction and permission
of the Road Foreman of Engines. Upon investigating with the FRA there is a 60 day wavier. The card would have had to be signed within 60 days
from date he first worked remote again.

I hope you will investigate this matter and reinstate me as an officer. I know good and fair people make a difference.

1

P-000327

Thanks
R. A. Hollon, Sr
182243

P-000328

**Hollon, Ron Sr**

| | |
|---|---|
| **From:** | Whittington, Ivy |
| **Sent:** | Monday, October 02, 2006 4:06 PM |
| **To:** | Hollon, Ron Sr |
| **Subject:** | EEOC Charge |

Dear Mr. Hollon:

You currently have pending an EEOC charge with the Birmingham District Office. This letter is to advise you that this charge was received before we received a letter from you concerning the same matter. Therefore, you should not expect a response from Mr. Ward's office since your complaint is being handled within our Human Resources department with the EEOC.

Should you have any questions or concerns regarding your case, please speak with the EEOC Investigator at the Birmingham office handling your case.

Thank you and have a safe day.

*Ivy Whittington*
*Manager, EEO & Diversity*
*CSX Transportation*
*500 Water Street*
*Jacksonville, FL 32202, J-400*
*(904) 366-4233*



DEFENDANT'S
EXHIBIT
10

1/9/2007

## Hollon, Ron Sr

**From:** Hollon, Ron Sr
**Sent:** Sunday, July 30, 2006 11:19 PM
**To:** Dziwulski, Ken
**Subject:** FW: Wrongful Termination



-----Original Message-----
**From:** Hollon, Ron Sr
**Sent:** Friday, June 30, 2006 7:35 AM
**To:** Ward, Michael
**Cc:** Hollon, Ron Sr
**Subject:** Wrongful Termination


Mr. Ward:


We as a company state that people make a difference, up until now I whole heartedly believed that.

I have been employed with this company for 25 years. I have worked as a clerk ten of those years, as a yardmaster ten more of those years, and as
an Assistant and Terminal Trainmaster for the last five of those years. I have trained for every clerical position in Montgomery, Alabama. There were
quite a few positions in those days, from operator, crew caller, demurrage, chief clerk, inbound, outbound (to name a few) to porter driver. I have worked
every position as a yardmaster in this terminal. I have worked as an Assistant and Terminal Trainmaster here. I have trained on alot of positions
on my own time, gone to meetings and even E-tested on my on time so I could do my job to the best of my ability. In the 25 Years that I have
worked for this company there has been nothing on my record but a couple of recommendation letters from my Supervisors - J. Giles, and Larry Harper.

I was pulled out of service on June 7th in the middle of my vacation before CSX or FRA had a statement from me in writing. I was terminated as a company
officer on June the 19th. This is my statement:

I was working Terminal Trainmaster position on memorial day weekend. We were short of Engineers in every direction and I did not have a remote
qualified person to fill one of my first shift jobs. I didn't want to convert the job and take an engineer away from moving a train.
I talked to crew management on the M&M side to see if I might have a remote qualified person in the brakeman's board. I myself was looking at the
same time as the crew caller to see if I might see a person that I thought had worked remote in the past. Mr. J. R. Week's name appears.
I knew he had worked remote for me in the past. I instructed the crew called to call him and double checked. The crew caller called me and stated that he was qualified but his remote card had not been signed. I asked him if the card was in date he stated yes and that it
was good until 2007. I instructed him to give him the call and tell him we would have someone here to sign the card. I then called Road Foreman of Engines
T. J. Dean to give him a heads up. He told me to have Mr. Weeks give him a call when he showed up. When Mr. Weeks showed up for work
I gave him the message and he called Mr. Dean. Mr. Dean told him to tell me to sign the card and I replied that I was not for sure I could do that so then
in turn I called Mr. Dean back and at that time I was instructed to sign the card by the Road Foreman of Engines.

P-000329

I was removed from service for forging an FRA Document.   I didn't forge or deceptively hide anything I signed the card with the instruction and permission
of the Road Foreman of Engines.   Upon investigating with the FRA there is a 60 day wavier.  The card would have had to be signed within 60 days
from date he first worked remote again.

I hope you will investigate this matter and reinstate me as an officer.   I know good and fair people make a difference.

Thanks
R. A. Hollon, Sr
182243

P-000330

## Hollon, Ron Sr

| | |
|---|---|
| **From:** | Hollon, Ron Sr |
| **Sent:** | Saturday, July 29, 2006 3:12 AM |
| **To:** | Hamby, David |
| **Subject:** | FW: Wrongful Termination |

-----Original Message-----
**From:**      Hollon, Ron Sr
**Sent:**      Friday, June 30, 2006 7:35 AM
**To:**        Ward, Michael
**Cc:**        Hollon, Ron Sr
**Subject:**   Wrongful Termination

Mr. Ward:

We as a company state that people make a difference, up until now I whole heartedly believed that.

I have been employed with this company for 25 years. I have worked as a clerk ten of those years, as a yardmaster ten more of those years, and as
an Assistant and Terminal Trainmaster for the last five of those years. I have trained for every clerical position in Montgomery, Alabama. There were
quite a few positions in those days, from operator, crew caller, demurrage, chief clerk, inbound, outbound (to name a few) to porter driver. I have worked
every position as a yardmaster in this terminal. I have worked as an Assistant and Terminal Trainmaster here. I have trained on alot of positions
on my own time, gone to meetings and even E-tested on my on time so I could do my job to the best of my ability. In the 25 Years that I have
worked for this company there has been nothing on my record but a couple of recommendation letters from my Supervisors - J. Giles, and Larry Harper.

I was pulled out of service on June 7th in the middle of my vacation before CSX or FRA had a statement from me in writing. I was terminated as a company
officer on June the 19th. This is my statement:

I was working Terminal Trainmaster position on memorial day weekend. We were short of Engineers in every direction and I did not have a remote
qualified person to fill one of my first shift jobs. I didn't want to convert the job and take an engineer away from moving a train.
I talked to crew management on the M&M side to see if I might have a remote qualified person in the brakeman's board. I myself was looking at the
same time as the crew caller to see if I might see a person that I thought had worked remote in the past. Mr. J. R. Week's name appears.
I knew he had worked remote for me in the past. I instructed the crew called to call him and double checked. The crew caller called me and stated that he was qualified but his remote card had not been signed. I asked him if the card was in date he stated yes and that it
was good until 2007. I instructed him to give him the call and tell him we would have someone here to sign the card. I then called Road Foreman of Engines
T. J. Dean to give him a heads up. He told me to have Mr. Weeks give him a call when he showed up. When Mr. Weeks showed up for work
I gave him the message and he called Mr. Dean. Mr. Dean told him to tell me to sign the card and I replied that I was not for sure I could do that so then
in turn I called Mr. Dean back and at that time I was instructed to sign the card by the Road Foreman of Engines.

1

I was removed from service for forging an FRA Document.   I didn't forge or deceptively hide anything I signed the card with the instruction and permission
of the Road Foreman of Engines.   Upon investigating with the FRA there is a 60 day wavier.  The card would have had to be signed within 60 days
from date he first worked remote again.

I hope you will investigate this matter and reinstate me as an officer.   I know good and fair people make a difference.

Thanks
R. A. Hollon, Sr
182243

2

P-000332

## Hollon, Ron Sr

| | |
|---|---|
| **From:** | Hollon, Ron Sr |
| **Sent:** | Friday, July 21, 2006 4:16 PM |
| **To:** | Ingram, Tony |
| **Subject:** | FW: Wrongful Termination |

Mr. Ward:

We as a company state that people make a difference, up until now I whole heartedly believed that.

I have been employed with this company for 25 years. I have worked as a clerk ten of those years, as a yardmaster ten more of those years, and as
an Assistant and Terminal Trainmaster for the last five of those years. I have trained for every clerical position in Montgomery, Alabama. There were
quite a few positions in those days, from operator, crew caller, demurrage, chief clerk, inbound, outbound (to name a few) to porter driver. I have worked
every position as a yardmaster in this terminal. I have worked as an Assistant and Terminal Trainmaster here. I have trained on alot of positions
on my own time, gone to meetings and even E-tested on my on time so I could do my job to the best of my ability. In the 25 Years that I have
worked for this company there has been nothing on my record but a couple of recommendation letters from my Supervisors - J. Giles, and Larry Harper.

I was pulled out of service on June 7th in the middle of my vacation before CSX or FRA had a statement from me in writing. I was terminated as a company
officer on June the 19th. This is my statement:

I was working Terminal Trainmaster position on memorial day weekend. We were short of Engineers in every direction and I did not have a remote
qualified person to fill one of my first shift jobs. I didn't want to convert the job and take an engineer away from moving a train.
I talked to crew management on the M&M side to see if I might have a remote qualified person in the brakeman's board. I myself was looking at the
same time as the crew caller to see if I might see a person that I thought had worked remote in the past. Mr. J. R. Week's name appears.
I knew he had worked remote for me in the past. I instructed the crew called to call him and double checked. The crew caller called me and stated that he was qualified but his remote card had not been signed. I asked him if the card was in date he stated yes and that it
was good until 2007. I instructed him to give him the call and tell him we would have someone here to sign the card. I then called Road Foreman of Engines
T. J. Dean to give him a heads up. He told me to have Mr. Weeks give him a call when he showed up. When Mr. Weeks showed up for work
I gave him the message and he called Mr. Dean. Mr. Dean told him to tell me to sign the card and I replied that I was not for sure I could do that so then
in turn I called Mr. Dean back and at that time I was instructed to sign the card by the Road Foreman of Engines.

I was removed from service for forging an FRA Document. I didn't forge or deceptively hide anything I signed the card with the instruction and permission
of the Road Foreman of Engines. Upon investigating with the FRA there is a 60 day wavier. The card would have had to be signed within 60 days
from date he first worked remote again.

I hope you will investigate this matter and reinstate me as an officer. I know good and fair people make a difference.

Thanks
R. A. Hollon, Sr

1

P-000333

182243

P-000334

2

## Hollon, Ron Sr

| | |
|---|---|
| **From:** | Hollon, Ron Sr |
| **Sent:** | Monday, August 07, 2006 6:44 PM |
| **To:** | Ward, Michael |
| **Subject:** | FW: Wrongful Termination |

-----Original Message-----
| | |
|---|---|
| **From:** | Hollon, Ron Sr |
| **Sent:** | Friday, June 30, 2006 6:35 AM |
| **To:** | Ward, Michael |
| **Cc:** | Hollon, Ron Sr |
| **Subject:** | Wrongful Termination |

Mr. Ward:

We as a company state that people make a difference, up until now I whole heartedly believed that.

I have been employed with this company for 25 years. I have worked as a clerk ten of those years, as a yardmaster ten more of those years, and as
an Assistant and Terminal Trainmaster for the last five of those years. I have trained for every clerical position in Montgomery, Alabama. There were
quite a few positions in those days, from operator, crew caller, demurrage, chief clerk, inbound, outbound (to name a few) to porter driver. I have worked
every position as a yardmaster in this terminal. I have worked as an Assistant and Terminal Trainmaster here. I have trained on alot of positions
on my own time, gone to meetings and even E-tested on my on time so I could do my job to the best of my ability. In the 25 Years that I have
worked for this company there has been nothing on my record but a couple of recommendation letters from my Supervisors - J. Giles, and Larry Harper.

I was pulled out of service on June 7th in the middle of my vacation before CSX or FRA had a statement from me in writing. I was terminated as a company
officer on June the 19th. This is my statement:

I was working Terminal Trainmaster position on memorial day weekend. We were short of Engineers in every direction and I did not have a remote
qualified person to fill one of my first shift jobs. I didn't want to convert the job and take an engineer away from moving a train.
I talked to crew management on the M&M side to see if I might have a remote qualified person in the brakeman's board. I myself was looking at the
same time as the crew caller to see if I might see a person that I thought had worked remote in the past. Mr. J. R. Week's name appears.
I knew he had worked remote for me in the past. I instructed the crew caller to call him and double check. The crew caller called me and stated that he was qualified but his remote card had not been signed. I asked him if the card was in date he stated yes and that it
was good until 2007. I instructed him to give him the call and tell him we would have someone here to sign the card. I then called Road Foreman of Engines
T. J. Dean to give him a heads up. He told me to have Mr. Weeks give him a call when he showed up. When Mr. Weeks showed up for work
I gave him the message and he called Mr. Dean. Mr. Dean told him to tell me to sign the card and I replied that I was not for sure I could do that so then
in turn I called Mr. Dean back and at that time I was instructed to sign the card by the Road Foreman of Engines.

P-000335

I was removed from service for forging an FRA Document.   I didn't forge or deceptively hide anything I signed the card with the instruction and permission
of the Road Foreman of Engines.   Upon investigating with the FRA there is a 60 day wavier.  The card would have had to be signed within 60 days
from date he first worked remote again.

I hope you will investigate this matter and reinstate me as an officer.   I know good and fair people make a difference.

Thanks
R. A. Hollon, Sr
182243

P-000336

Ronald Alexander Hollon, Sr.                    SSN:        420-84-
3974
2341 County Road 61                    DOB:        11/14/59
Deatsville, Alabama 36022              Telephone:  334-365-
7818

OBJECTIVE          To join a company that offers growth and development.


STRENGTHS          * Works well under pressure
                   *  Career oriented
                   *  Highly motivated
                   *  Problem solver
                   *  Flexible
                   *  Fast Learner
                   *  Postive Attitude


EDUCATION          Marbury High School  - Graduated 1978
                   Major: Math and science

                   Massey-Draughon Junior College - 1978 to 1979
                   Certificate in Accounting
                   Courses:

                   Auburn University at Montgomery - 1979 to 1984
                   Major :
                   Courses:

                   CSX Railroad - 1981
                   Data entry training

                   Trenholm Technical College - 1985 to 1986
                   Certificate in Emergency Medical Technician
                   Courses: Basic Life Support
                            Advanced Life Support
                            Drug Therapy

                   Troy State University at Montgomery - 1985 to 1986
                   Major:
                   Courses:


EXPERIENCE:


DEFENDANT'S
EXHIBIT
12

D-000028

5/2002 - 5/2003
Assistant Trainmaster      CSX Railroad, Montgomery, Alabama
Managing yard production and safety issues. Job briefing crews and
Subordinator. Efficient testing and safety audit of employees.

Working

With power desk and merchants desk to help move train in a timely


Page 2
EXPERIENCE cont.

5/2003 - 6/2006
Terminal Trainmaster      CSX Transportation, Montgomery, Alabama
Managing yard production and safety issues. Job briefing crews and
Subordinators. Efficient testing and safety audit of employees. Working
With power desk and merchants desk to help move train in a timely

11/1992 to 5/2002
Extra Board Yardmaster   CSX Transportation, Montgomery, Alabama
Various duties from issuing switch list, calling trains, making sure local
industries are worked, taling about the safety rule of the week with the yard
crews, various other duties.

9/1986 to 5/1992
Data Entry Operator      CSX Transportation, Montgomery, Alabama
Extra board floater - functioned in any needed capacity. Checked daily
schedule to determine that all personnel were accounted for; if not contacted
necessary personnel to fill the vacancy. Problem solver between customers
and management, from customer car orders to placement and releases of
equipment. Data entry - payroll of train and clerical personnel, input of data
information into the computer from waybilling to input of location of freight
cars. Kept logs on demurrage records on inbound and outbound
shipments. Typed train orders, as the dispatcher dictated them over the
radio, to give to outbound train crews. Keypunched information from
foreign waybills onto various formatted keypunch cards; waybilled for
outbound shipments.

10/1984 to 9/1986
Firefigher II, EMT III     City of Prattville, Prattville, Alabama
Answered fire and resuce calls. Cleaned facilities, trucks, and ambulances.
Performed basic and advanced life support.

1/1982 to 8/1984
Data Entry Operator      L&N Railroad, Montgomery, Alabama

D-000029

Extra board floater - functioned in any needed capacity. Checked daily schedule to determine tat all personnel were accounted for; if not contaced necessary personnel to fill the vacancy. Problem solver between customers and management, from customer car orders to placement and releases of equipment Data entry - payroll of train and clerical personnel, input of data information into the computer from waybilling to input of location of freight cars. Kept logs on demurrage records on inbound and outbound shipments. Typed train orders, as the dispatcher dicated them over the radio, to give to outbound train curews. Keypunched information from foreign waybills onto various formatted keypunch cards; waybilled for outbound shipments.

Page 3
EXPERIENCE cont.

6/1981 to 12/1981
Data Entry Operator        WofA Railroad,
Extra board floater - functioned in any needed capacity. Checked daily schedule to determine tat all personnel were accounted for; if not contaced necessary personnel to fill the vacancy. Problem solver between customers and management, from customer car orders to placement and releases of equipment Data entry - payroll of train and clerical personnel, input of data information into the computer from waybilling to input of location of freight cars. Kept logs on demurrage records on inbound and outbound shipments. Typed train orders, as the dispatcher dicated them over the radio, to give to outbound train curews. Keypunched information from foreign waybills onto various formatted keypunch cards; waybilled for outbound shipments.

7/1979 to 8/1980
Accounting Clerk         Maddox Transportation,
Billed invoices on outbound shipments for accounts receivable, and received payments and posted to accounts receivable. Completed payroll for clerical staff, the owners, and truck drivers. Reconciled monthly bank statements. Completed worksheet of accounts payable and receivable monthly for the CPA.

REFERENCES

Present Employer:        CSX Transportation
                         1250 Louisville Street
                         Montgomery, Alabama 36104
                         Telephone: 334-241-9257 or 334-241-9230

D-000030

HOBBIES              Family time, running, volleyball, gardening, antiques, water sports, and
                     Horseback riding.

### (A)

1. The heaviest traffic subdivision that I have worked on would be Montgomery, Alabama. The traffic that comes into Montgomery comes from Atlanta, Birmingham, Thomasville, Selma, Mobile and an industry cut from Autauga Creeek. I have worked as an extra board yardmaster for     nearly five years.

2. Montgomery, Alabama is a three shift terminal in which I have worked nearly five years.

3. I am acquainted with the TCU and UTU agreements, L7N, WofA, AWP, and SCL. I have worked     in the crew callers office when it was located in Montgomery, Alabama.

4. I have performed under the clerical and yardmaster crafts.

5. I have not had the experience of an on a road or yard assignment serving industries, but I have been responsible in making sure these industries were worked on a timely basis.

6. I am acquainted with some interchange traffic. Montgomery has a small southern cut which interchanges three days a week. We also have a cut which interchanges to and from the MBR at Myrtlewood, Alabama every day of the week.

### (B)

1. Being a yardmaster I discuss with my yard crews the safey rule of the week, the conditions of the     yard, what tracks (if any) out of service, and what traffic will be coming in and leaving the yard.

2. The toughest problem I have encountered thus far would be cutting a shut down car for Colonial Bakery out of a train that was leaving the yard. The car was set out and was placed at industry that day, however the train made an hour ITD.

3. My philosophy for building a successful team would first be to show all crafts respect for their decision making and experience. Listen and respond to their suggestions. I also believe that as a team we all need credit for a job well done not just upper level management. We also need to let all crafts know that they have a secure job.

D-000031

4. My philosophy on safety would be in work or play safety is the only way.

5. I see managing as just getting by.  Leading you are ahead of all others.

6. Six factors that would make CSXT the best:

    (a) Lets make CSXT a family oriented company.
    (b) Employee involvement in decision making and profit sharing.
    (c) Training and educating our employees to be the best.
    (d) Equipment to work with, power and eots.  Shortages of these vital tools can back log
trains and stagnate yards which delays service to our life support, the customer.

D-000032

Job Requisition Data.

New Window | Help | Customize Page | http

## View Job Postings

**Job Title:**      Asst Mgr Customer Operations

**Location:**      Jacksonville FL - Southpoint I

**Reference #:**    015882

### Department Marketing Statement

CSX Transportation is the largest company in the CSX family employing 34,000 management and union employees. CSXT's primary focus is the operation, maintenance and management of the largest railroad in the eastern United States.

### Responsibilities

Demonstrate a commitment to safety in daily work by conducting safety briefings, performing safety observations and ensuring that all employees perform their duties with safety in mind. Provide day-to-day coaching and direction for Customer Operations Representatives in a 24 x 7 environment. Facilitate the day-to-day processing of work orders (including OBWO), interchange reporting, TYMS inventory management, Car and Train reporting, and IIDS. Manage STEPS tasks and data summaries. Engage in the process of satisfying internal and eternal customer information needs. Conduct root cause analysis and engage in problem solving activities. Proactively monitor various data reports for accuracy and timeliness of information. Assist with planning and monitoring Customer Operations Representative staffing. Assist with delivering financial strength by increasing productivity and controlling costs.

### Qualifications

An undergraduate degree or equivalent experience is preferred. Proficiency in various legacy systems is required. These systems include: Work Orders, Yard System, Car & Train, IIDS, and Interline Received. Candidate must also have working knowledge of STEPS, AEI Studio, OBWO and COPS. Applicant must be willing to work varied shifts, weekend, holidays and extended work schedule when required. Must possess ability to react quickly and communicate effectively, with solid interpersonal skills.

### Who May Apply

Employees must complete one year in your current position before applying for a new position.

### Conditions of Employment

This position will require working nights, weekends and holidays.

There is currently one vacant position however qualified applicants may be placed in a pool to fill future vacancies.

### Closing Statement

At CSX, two of the company's core values are People Make The Difference and Safety Is A Way of Life. We are committed to offering our team members the most competitive compensation and benefits package available, unlimited opportunities for development and growth throughout an exciting and rewarding career, and the safest work environment possible.

As an equal opportunity employer, CSX encourages workforce diversity. It is the policy of CSX to afford equal employment opportunity to all individuals, regardless of their race, color, creed, religion, sex, national origin, age, marital status, military/veteran status, protected characteristics, or any non-job-related disability or medical condition.

| Return |



DEFENDANT'S
EXHIBIT
13

D-000018

Managing Requisitions

New Window | Help | Customize Page | ?

## View Job Postings

**Job Title:**      Terminal Manager

**Location:**      Montgomery AL - TOFC Ramp

**Reference #:**   015807

### Department Marketing Statement

CSX Transportation is the largest company in the CSX family employing 34,000 management and union employees. CSXT's primary focus is the operation, maintenance and management of the largest railroad in the eastern United States.

### Responsibilities

Analyze/forecast trends to recommend improvements in terminal performance, identify and plan for resource needs/disruptions (48+ hrs out), choose tools/processes to improve productivity and safety, lead KFAs for major incidents. PRODUCTION: Develop, plan and launch tools and processes, create medium and long-term resource plan for the terminal, manage and coordinate execution/implementation, provide decision-support in crisis situations and determine when to provide additional resources as needed to recover to plan, manage the maintenance of non-E&M physical plant at the terminal, coordinate with E&M to develop maintenance plans and approve curfew plans, review performance and identify areas for improvement, identify challenges in executing the operating plan, document them and propose solutions to Service Design and/or terminal personnel, own and resolve systemic service/performance issues relating to other units (e.g., Crew Mgmt, Loco Mgmt, E&M, Customer Svc, Intermodal, Network Ops). SAFETY: Develop, plan and launch tools and processes, identify and communicate high-risk safety issues requiring funding beyond the Terminal budget to the division Manager of Operating Practices and Safety, manage and coordinate execution/implementation, periodically accompany Trainmasters on observations to develop and improve effectiveness of their observations, drive and complete investigation of major incidents and injuries (KFAs), customize message for daily safety briefings to be delivered by Trainmasters, review performance and identify areas for improvement, create an action plan to address systemic safety issues in the Terminal and execute with the assistance of MOPS as needed, drive the identification and monitoring of at risk employees and accelerate through the exit process (follow up with T.M.), participate in quarterly safety review with Unions. MANAGING PEOPLE: Train, equip and certify people and materials, reward and discipline to create desired behavior, determine appropriate discipline for rules and safety infractions, promote and develop future leaders, coach, create development plans for, and evaluate the performance of Non-Contract personnel in the terminal, serve as primary contact for local representative and own local relations.

### Qualifications

High School Diploma/GED required. Undergraduate degree in business or related field preferred. Applicant must have at least 5 years experience in the Transportation Dept (line of road; terminal). Prior supervisory/management experience. Must have good oral and written communication skills. Must be committed to safety, self-motivated and willing to work nights, weekends and holidays. Should be knowledgeable in accident and derailment investigations, and competent in operating rules and practices. Computer proficiency with MS Office Outlook, Word, Excel, and CSX Mainframe. Communication skills, understanding how to make trade-offs, skill balancing standing up for good process and meeting customer desires, consulting skills, coaching skills, composure, command skills and decision making skills.

REQUIRED CORE COMPETENCIES
Accountability
Action oriented
Customer Focus
Integrity, Trust & Diversity
Functional/technical agility
Teamwork
Strategic agility
Drive for results
Developing people
Composure



DEFENDANT'S
EXHIBIT
14

Job Requisition Data.                                                    Page 1 of 2

New Window | Help | Customize Page | http

## Internal Posting Description

| | | View External Posting |
| --- | --- | --- |
| **Job Title:** | Trainmaster | |
| **Location:** | Pensacola FL | |
| **Reference #:** | 016101 | |

### Department Marketing Statement

CSX Transportation is the largest company in the CSX family employing 34,000 management and union employees. CSXT's primary focus is the operation, maintenance and management of the largest railroad in the eastern United States.

### Responsibilities

Production: Develop, plan and launch tools and processes. Provide input to LOR Supt, Terminal Supt or Terminal Manager for medium/long-term resource planning. Manage and coordinate execution/implementation. Develop and communicate tactical plans to Dispatchers for managing the local resources in order to achieve the operating plan within budget. Resolve daily resource (power, crew) issues in order to stay on or recover to the operating plan. Proactively communicate service failures or customer problems to Customer Service and respond to service inquiries from Customer Service. Attend customer meetings with Commercial when: developing new relationships to define service requirements, addressing service performance issues for existing customers, and ensure customers utilize defined customer service processes for all other interactions with CSX, including orders, service changes, status checks, daily performance issues, etc. Serve as contact for local Connecting Lines. Plan, monitor and address any problems with local service delivery. Determine when to close-out incomplete trains. Review performance and identify areas for improvement. Daily monitoring of train crew performance and support of Chief Dispatcher in managing dispatchers; Perform regular O-Tests, document performance and submit data promptly and accurately. Ensure the accurate completion of work orders by conductors and Yardmasters to ensure proper tracking of work performed. SAFETY: Develop, plan and launch tools and processes: Deliver Safety Skills Seminars. Manage and coordinate execution/implementation. Perform safety observations, collect safety performance data and submit promptly and accurately. Communicate/execute safety plan detailed by the Safety committee and LOR Supt. Communicate work hazards and importance of safety to crews and dispatchers in safety briefings. Build relationships with assigned employees to encourage safety practices (FELT Leadership). Closely communicate with and report on at risk employees. Investigate minor incidents and injuries (KFAs). Resolve immediate, short-term hazards and safety issues within LOR territory; Review performance and identify areas for improvement.
MANAGING PEOPLE:Train, equip and certify people and materials. Reward and discipline to create desired behaviors. Identify needs for discipline or reward/ recognition and communicate them to LOR Supt. Promote and develop future leaders. Coach crews to enhance their decision-making, efficiency and effectiveness.

### Qualifications

Bachelor degree or equivalent experience. Must have proven leadership skills and terminal or operations experience. Must have proven safety record. Requires extensive knowledge in operating rules. Excellent oral and written communication skills required. Working knowledge of derailments and re-railing cars recommended. Must be able to endure long hours and be willing to accept calls 24 hours per day, 7 days per week. Position requires good computer skills (ability to use computers and job-related software).

REQUIRED COMPETENCIES: Motivating good performing team members to sustain their performance. Deal with unacceptable behavior by coaching individuals regarding their substandard performance when necessary. Hold team members accountable by communicating clear expectations on desired results and following up to ensure goals are attained. Communicate how the company vision and goals relate to the work team members perform daily. Be a true safety champion through leading by example in exemplary personal safety conduct, using the Safety Contact process to praise good safety performance, and inform team members of any unsafe work habits, and absolutely refusing to allow team members to work unsafely.

### Who May Apply

DEFENDANT'S
EXHIBIT
FSMJ 800-631-6989
15

D-000021

Employees must complete one year in your current position before applying for a new position.

**Conditions of Employment**

Applicant must submit a resume to be considered.

Safety is a way of life at CSX. All candidates' safety records will be reviewed and considered when evaluating the candidate pool.

Return

D-000022

Managing Requisitions

New Window | Help | Customize Page | 🖶

## View Job Postings

**Job Title:**      Asst Terminal Superintendent

**Location:**      Atlanta GA - Marietta

**Reference #:**   016091

### Department Marketing Statement

CSX Transportation is the largest company in the CSX family employing 34,000 management and union employees. CSXT's primary focus is the operation, maintenance and management of the largest railroad in the eastern United States.

### Responsibilities

PRODUCTION: Develop, plan and launch tools and processes. Manage and coordinate execution/implementation. Provide decision-support in crisis situations occurring during night shifts and determine when to provide additional resources as needed to recover to plan. Review performance and identify areas for improvement. Identify challenges in executing the operating plan during night shifts, document them and propose solutions to Service Design and/or terminal personnel. Own and resolve systemic service/performance issues occurring night shifts relating to other units (e.g., Crew Mgmt, Loco Mgmt, E&M, Customer Svc, Intermodal, Network Ops).

SAFETY: Develop, plan and launch tools and processes. Manage and coordinate execution/implementation. Periodically accompany Trainmasters on observations to develop and improve effectiveness of their observations. Drive and complete investigation of major night shift incidents and injuries (KFAs). Customize message for nightly safety briefings to be delivered by Trainmasters Review performance and identify areas for improvement:. Create an action plan to address systemic night time safety issues in the Terminal and execute with the assistance of MOPS as needed. Drive the identification and monitoring of at-risk night shift employees and accelerate through the exit process (follow up with T.M.). Participate in quarterly safety review with Unions.

PERSONNEL: Train, equip and certify people and materials. Reward and discipline to create desired behavior. Determine appropriate discipline for rules and safety infractions. Promote and develop future leaders. Coach, create development plans for, and evaluate the performance of night shift Non-Contract personnel in the terminal.

### Qualifications

High School Diploma/GED required. Undergraduate degree in business or related field preferred. Applicant must have at least 5 years experience in the Transportation Dept (line of road; terminal). Must have good oral and written communication skills. Must be committed to safety, self-motivated and willing to work nights, weekends and holidays. Should be knowledgeable in accident and derailment investigations, and competent in operating rules and practices.

### Who May Apply

Employees must complete one year in your current position before applying for a new position.

### Conditions of Employment

"Safety is a way of life at CSX. All candidates' safety records will be reviewed and considered when evaluating the candidate pool."

Applicants must submit resume to be considered.

### Closing Statement

At CSX, two of the company's core values are People Make The Difference and Safety Is A Way of Life. We are committed to offering our team members the most competitive compensation and benefits package available, unlimited opportunities for development and growth throughout an exciting and rewarding career, and the safest work environment possible.

As an equal opportunity employer, CSX encourages workforce diversity. It is the policy of CSX to afford equal employment opportunity to all individuals, regardless of their race, color, creed, religion, sex, national origin, age, marital status, military/veteran status, protected characteristics, or any non-job-related disability or medical condition.

DEFENDANT'S EXHIBIT
16
PENGAD 800-631-6989

D-000020

# CHARGE OF DISCRIMINATION

This form is affected by the Privacy Act of 1974; See ... y Act ... ment before completing this form.

| AGENCY | CHARGE NUMBER |
|---|---|
| [ ] FEP | |
| [X] EEOC | |

_____ and EEOC

State or local Agency, if any

| NAME (Indicate Mr., Ms., Mrs.) 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 | HOME TELEPHONE (Include area code) |
|---|---|
| Mr.Ronald A. Hollon, Sr. | 334-365-7818 |

| STREET ADDRESS    CITY, STATE AND ZIP CODE | DATE OF BIRTH |
|---|---|
| 2341 County Rd. 61, Deatsville, AL 36022 | 11-14-59 |

NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY, APPRENTICESHIP COMMITTEE, STATE OR LOCAL GOVERNMEN AGENCY WHO DISCRIMINATED AGAINST ME (If more than one list below.)

| NAME CSX Transportation Inc. | NUMBER OF EMPLOYEES, MEMBERS at 500 employees | TELEPHONE (Include Area Code 334-241-9297 |
|---|---|---|

| STREET ADDRESS    CITY, STATE AND ZIP CODE | COUNTY |
|---|---|
| 1250 Louisville St., Montgomery, AL 36104 | Montgomery |

| NAME | TELEPHONE NUMBER (Include Area Code) |
|---|---|
| | |

| STREET ADDRESS    CITY, STATE AND ZIP CODE | COUNTY |
|---|---|
| | |

| CAUSE OF DISCRIMINATION BASED ON (Check appropriate box(es)) | DATE DISCRIMINATION TOOK PLACE |
|---|---|
| [ ] RACE    [ ] COLOR    [ ] SEX    [ ] RELIGION    [ ] AGE<br>[ ] RETALIATION    [ ] NATIONAL    [ ] DISABILITY    [X] OTHER (Specify)<br>ORIGIN    retalistion | EARLIEST    LATEST<br>April 2006  June 2006<br>[X] CONTINUING ACTION |

THE PARTICULARS ARE (If additional paper is needed, attach extra sheet(s)):

RECEIVED

JUN 20 2006

DEFENDANT'S
EXHIBIT

17

_Rosita Suggella Melish
Johnny Public
Alabama State at Large
My Comm. Exp. 05-05-2009_

I want this charge ... with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or telephone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures.

I declare under penalty of perjury that the foregoing is true and correct.

Signature: _Ronald A. Hollon, Jr._

Date 06/19/06    Charging Party (Signature)

EEOC FORM 5 (Test 10/94)

NOTARY - (When necessary for State and Local Requirements)

Signature: _Rosita Suggella Melish_

I swear or affirm that I have read the above charge and that it is true to the ... of my knowledge, information and belief.

SIGNATURE OF COMPLAINANT

_Ronald A. Hollon, Jr._

SUBSCRIBED AND SWORN TO BEFORE ME ON THIS DATE (DAY, MONTH, AND YEAR)

19th June 2006

**Exhibit A**

I, Ronald Alexander Hollon, Sr., am employed at CSX Transportation Inc.  I believe I am a victim of age discrimination and retaliation as follows by my employer.

I have been employed by CSX Transportation Inc. (CSX) or a subsidiary since 1981.  I have always been in good standing with the company and until June 2006 have not been subjected to any substantial disciplinary actions until this month, June 2006, when I was wrongfully taken out of service, with pay.  I fear that my employer has a plan to take further and substantial disciplinary action against me in the near future, and this disciplinary scenario I believe is due to exercise of my protected activity when I have complained of, to fellow employees and to management, age discrimination in denial of several promotions prior to this recent disciplinary scenario.

In the interim in April, and May 2006, I had been improperly and illegally passed over in promotions due to my age, 46 years old.  Younger, less qualified individuals were given promotions over me, first in April or May 2006 in Montgomery, Alabama for the position of terminal manager, in April, or May 2006 in Atlanta, Georgia for the position of Asst. Superintendent; in April or May 2006 for the position of Trainmaster; and finally in April or May 2006 for the position of Customer Service. All of said positions were denied me by the same supervisor except for the positions in Florida, however all positions that were denied me have a higher level supervisor who I believe was also involved in said denials of positions in Florida.

In the past my direct supervisor has addressed several younger simmerlarly situated employees stating that they had a "bright future" with the company whereas he then questioned how old I was, all at a time I had gray hair showing.  In my most recent disciplinary scenario,

another co-worker, over forty years old, has also been wrongfully disciplined.  All positions where I have been denied promotion went to individuals under forty, except one, and all were given to individuals younger than me.

In summary I have been discriminatorilly illegally denied promotions due to my age, over 40, and thereafter I have been subjected to retaliation and or threats of further retaliation.  I have suffered lost wages, damages of mental anguish, incurred attorneys fees, etc. and seek promotion to a position equivalent to the prior position denied me, a position that is to be located in Montgomery, Alabama. Finally, I seek protection under the law from further or future retaliation.

RECEIVED
EEOC

JUN 2 0 2006

BIRMING



**US Equal Employment Opportunity Commission**
**Birmingham District Office**
**Ridge Park Place– Suite 200**
**1130 22ᵈ Street, South**
**Birmingham, Alabama 35205**

| | |
|---|---|
| Ronald Alexander Hollon, Sr., | ) |
| | ) |
| Charging Party, | ) |
| | ) |
| v. | ) Charge No. 420-2006-03422 |
| | ) |
| CSX Transportation, Inc., | ) |
| | ) |
| Respondent. | ) |

### Amended EEOC Charge

I, Ronald Alexander Hollon, Sr., hereby amend my EEOC Charge filed on or about June 20, 2006, by incorporating by reference my prior EEOC Charge, Charge No. 420-2006-03422, and further stating as follows:

That on June 19, 2006 my co-worker T.J. Dean, Road Foreman of Engines, and I who also was over 40 yrs. old, met with management, Mr. Rodney Workman, Division Manager and Mr. Jack Frost, Human Resources in Montgomery, Alabama.

On that date, said management personnel, as predicted by my original EEOC Charge, presented to them at said meeting, demoted me from my management position of Terminal Trainmaster, Montgomery, Alabama, to the position of Yardmaster. By said demotion, I took a cut in pay over twenty thousand plus dollars per year and over a fifteen thousand dollar bonus cut; all due to my demotion, which I hereby allege was my employer's retaliation against me for my exercising my protected activity in complaining about being passed over for better positions that were given to younger, less-qualified individuals.

My co-worker T.J. Dean was also similarly demoted in large part I believe due to his age,

P-000252

over 40, and his association with me and my age discrimination complaints.

Neither Mr. Dean, nor I, had committed an infraction, if at all, that was great enough to justify said demotions, whereas in recent times other similar employees who were engaged in allegedly more severe incidents were neither terminated or demoted.  Said undisciplined, or under disciplined, employees had not exercised protected activity and or they were over forty years old.

I believe further that my employer is motivated by economics and finances to keep and maintain a younger management workforce, under 40 years old, in that the employer often prevents management employees from contributing toward the CSX Pension Plan Retirement Manager Program when a manager employee is prematurely relieved or demoted from said management program before he can get vested and or reach the age of 55 or even younger.

I suffer, as stated, lost wages, lost bonuses, lost benefits including retirement, increased mental anguish, attorneys fees and costs, etc. and seek such relief as afforded by law.

Date: 08/14/06

Ron A. Hollon, Sr.

EEOC Form 161-B (3/98)

## U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

## NOTICE OF RIGHT TO SUE *(ISSUED ON REQUEST)*

| | |
|---|---|
| To: Ronald A. Hollon, Sr.<br>2341 County Road 61<br>Deatsville, AL 36022 | From: Birmingham District Office - 420<br>Ridge Park Place<br>1130 22nd Street, South<br>Birmingham, AL 35205 |

☐ On behalf of person(s) aggrieved whose identity is
CONFIDENTIAL (29 CFR § 1601.7(a))

| Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| 420-2006-03422 | Julia Y. Hodge,<br>Investigator | (205) 212-2147 |

*(See also the additional information enclosed with this form.)*

**NOTICE TO THE PERSON AGGRIEVED:**

**Title VII of the Civil Rights Act of 1964 and/or the Americans with Disabilities Act (ADA):** This is your Notice of Right to Sue, issued under Title VII and/or the ADA based on the above-numbered charge. It has been issued at your request. Your lawsuit under Title VII or the ADA must be filed in federal or state court <u>WITHIN 90 DAYS</u> of your receipt of this Notice or your right to sue based on this charge will be lost. (The time limit for filing suit based on a state claim may be different.)

☐ More than 180 days have passed since the filing of this charge.

☐ Less than 180 days have passed since the filing of this charge, but I have determined that it is unlikely that the EEOC will be able to complete its administrative processing within 180 days from the filing of the charge.

☐ The EEOC is terminating its processing of this charge.

☐ The EEOC will continue to process this charge.

**Age Discrimination in Employment Act (ADEA):** You may sue under the ADEA at any time from 60 days after the charge was filed until 90 days after you receive notice that we have completed action on the charge. In this regard, the paragraph marked below applies to your case:

☒ The EEOC is closing your case. Therefore, your lawsuit under the ADEA must be filed in federal or state court <u>WITHIN 90 DAYS</u> of your receipt of this Notice. Otherwise, your right to sue based on the above-numbered charge will be lost.

☐ The EEOC is continuing its handling of your ADEA case. However, if 60 days have passed since the filing of your charge, you may file suit in federal or state court under the ADEA at this time.

**Equal Pay Act (EPA):** You already have the right to sue under the EPA (filing an EEOC charge is not required.) EPA suits must be brought in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that backpay due for any violations that occurred <u>more than 2 years (3 years)</u> before you file suit may not be collectible.

If you file suit based on this charge, please send a copy of your court complaint to this office.

On behalf of the Commission

*Beverly S. Hinton for*                    10/30/06
Bernice Williams-Kimbrough,                *(Date Mailed)*
**District Director**

Enclosure(s)

cc: Gary E. Atchison, Charging Party's Attorney
P. O Box 2002
Montgomery, AL 36102-2002

Linda Massey, Respondent's Representative
CSX TRANSPORTATION
500 Water Street –J400
Jacksonville, FL 32202

DEFENDANT'S
EXHIBIT

19

SENIORITY ROSTER
AS OF JUNE    24, 2006
YMLN RE16
CSX TRANSPORTATION
REGION 16/BOYL/GADS/DECA/MONTG
REGION 16 YARDMASTERS

DISTRICT: NO. RE16
TITLE: REGION 16/BOYL/GADS/DECA/MONTG

DEFENDANT'S EXHIBIT
2d

COPY TO DISTRICT CHAIRMAN: _____

SIGNED: _____    DATE POSTED: _____

PAGE    1

| SEQ NO. | H E | ST | NUMBER | EMPLOYEE NAME | SEN. DATE | PRNO | POSITION | LOCATION | PAY |
|---|---|---|---|---|---|---|---|---|---|
| 1 | | OC | 1180787 | G W CUNNINGHA | 011775 | -- | OFFICIAL | | |
| 2 | | OC | 1140174 | R D JACKSON | 032875 | -- | OFFICIAL | | |
| 3 | | OC | 2087617 | R D  JACKSON | 032875 | -- | OFFICIAL | | |
| 4 | | RD | 1157525 | E W SMITH | 012076 | -- | RETIRED DIS | | |
| 5 | | OC | 1180758 | S M PEARMAN | 032978 | -- | OFFICIAL | | |
| 6 | | OC | 1182493 | J F NICHOLS | 040178 | -- | OFFICIAL | | |
| 7 | | 39 | 1181794 | W H FISHER JR | 100684 | 4A74-150 | YARDMASTER | BIRMINGH | 203.12 |
| 8 | | 39 | 1181600 | R L INGRAM | 052485 | 4A74-YM1 | YARDMASTER | BIRMINGH | |
| 9 | | 39 | 1178457 | R M PUTMAN | 061685 | 4N85-203 | YARDMASTER | DECATUR | 199.19 |
| 10 | | OC | 1182057 | J G FALKNER | 101387 | -- | OFFICIAL | | |
| 11 | | 42 | 1182233 | H N HOLLEY | 110489 | 4A79-101 | YARDMASTER | MONTGOME | 203.12 |
| 12 | | 39 | 1182274 | B   COOK | 070690 | 4A74-102 | YARDMASTER | BIRMINGH | 203.12 |
| 13 | | 39 | 1182338 | R J HICKS | 031991 | 4A74-103 | YARDMASTER | BIRMINGH | 203.12 |
| 14 | | 42 | 1193980 | P A BUFORD | 081092 | 4A79-301 | YARDMASTER | MONTGOME | 203.12 |
| 15 | | 39 | 1180404 | G W ROGERS | 081192 | 4A74-302 | YARDMASTER | BIRMINGH | 203.12 |
| 16 | | 40 | 1191812 | O E WHITT | 100192 | 4N85-101 | GENERAL YAR | DECATUR | 199.19 |
| 17 | | OC | 1182243 | R A HOLLON | 112192 | -- | OFFICIAL | | |
| 18 | | 39 | 1184772 | W A THOMAS JR | 112392 | 4A74-104 | YARDMASTER | BIRMINGH | 203.12 |
| 19 | | 39 | 1320296 | G P COYLE | 010194 | 4A74-203 | YARDMASTER | BIRMINGH | 203.12 |
| 20 | | 41 | 1181795 | T C FRY | 050594 | 4N85-YM1 | YARDMASTER | DECATUR | |
| 21 | | 39 | 1184767 | R M GANDY JR | 050495 | 4A74-204 | YARDMASTER | BIRMINGH | 203.12 |
| 22 | | WP | 1160958 | J R JONES | 080895 | -- | WORKING AT | | |
| 23 | | 42 | 1182238 | C L MOSELEY | 073097 | 4A79-201 | YARDMASTER | MONTGOME | 203.12 |
| 24 | | 37 | 1208016 | B W HAMILTON | 081798 | 4A74-YR4 | YARDMASTER | BIRMINGH | |
| 25 | | 39 | 1202476 | V   SMITH | 020499 | 4A74-YM2 | YARDMASTER | BIRMINGH | |
| 26 | | | 1240685 | J A LOVELADY | 060499 | 4A74-303 | YARDMASTER | BIRMINGH | 203.12 |
| 27 | | | 1239757 | R D FRANKLIN | 041501 | 4A74-YM3 | YARDMASTER | BIRMINGH | |
| 28 | | LA | 1240247 | L D FALKNER | 052501 | -- | LEAVE OF AB | | |
| 29 | | OC | 1239783 | R R TAYLOR JR | 091601 | -- | OFFICIAL | | |
| 30 | | EY | 1192180 | H R PICKARD | 121001 | -- | EX YM UNASS | | |
| 31 | H | | 1182244 | B H DORMAN | 062202 | 4A79-992 | YARDMASTER | MONTGOME | 197.16 |

P-000263

| SEQ NO. | H E | ST | EMPLOYEE NUMBER | NAME | SEN. DATE | PRNO | POSITION | LOCATION | PAY |
|---|---|---|---|---|---|---|---|---|---|
| 32 | | | 1201706 | D L ANDERSON | 082302 | 4A74-303 | YARDMASTER | BIRMINGH | 203.12 |
| 33 | | OC | 1202755 | S L SCHOFFSTA | 082402 | -- | OFFICIAL | | |
| 34 | | | 1201987 | C J BENNETT | 071304 | 4A74-992 | YARDMASTER | BIRMINGH | 197.16 |
| 35 | | | 1239825 | D D WEBB | 120904 | 4A74-992 | YARDMASTER | BIRMINGH | 197.16 |
| 36 | | | 1381968 | R A SNAPP | 072005 | 4A74-202 | YARDMASTER | BIRMINGH | 203.12 |
| 37 | | | 1653950 | L J NEESE | 090205 | 4A79-YR1 | YARDMASTER | MONTGOME | 3054.74 |
| 38 | | | 1535380 | C G DAVIS | 100305 | 4A79-992 | YARDMASTER | MONTGOME | 197.16 |
| 39 | N | | 1574410 | S S STEPHENSO | 999999 | 4A74-523 | SUBSTITUTE | BIRMINGH | 131.42 |
| 40 | N | | 1573564 | J L DAVIS | 999999 | 4A74-524 | SUBSTITUTE | BIRMINGH | 146.77 |
| 41 | N | | 1195419 | K N SHARITT | 999999 | 4A74-525 | SUBSTITUTE | BIRMINGH | 134.95 |
| 42 | N | EY | 1201776 | G B SMITHSON | 999999 | -- | EX YM UNASS | | |
| 43 | N | | 1199259 | D G FALKNER | 999999 | 4A74-992 | YARDMASTER | BIRMINGH | 197.16 |

P-000264

IF NOT DELIVERED IN 3 DAYS RETURN TO
**MIKE HALE**
**SHERIFF OF JEFFERSON COUNTY**
MELVIN BAILEY JUSTICE CENTER
601 RICHARD ARRINGTON, JR. BLVD.N.
BIRMINGHAM, ALABAMA 35203

JONATHAN GEORGE CARNE:
5717 CARRINGTON WAY    3
TRUSSVILLE AL

**CSX** TRANSPORTATION

35173†2á661-17 R0ii

DEFENDANT'S
EXHIBIT
21

P-000265

LAW OFFICES OF

# REDDEN, MILLS & CLARK

940 FINANCIAL CENTER

505 TWENTIETH STREET NORTH

## BIRMINGHAM, ALABAMA 35203

WILLIAM H. MILLS
WILLIAM N. CLARK
GERALD L. MILLER
STEPHEN W. SHAW
LAURA S. GIBSON
KEITH E. BRASHIER

TELEPHONE (205) 322-0457
FACSIMILE (205) 322-8481

OF COUNSEL
L DREW REDDEN

June 27, 2006

Mr. Jonathan Carnes
5717 Carrington Way
Trussville, AL 35173

Re:    State of Alabama v. Jonathan Carnes

Dear Mr. Carnes:

Your case is set for trial at 1:30 p.m. on Wednesday, July 19, 2006 before Judge Cahill on the 2nd floor of the Mel Bailey Criminal Justice Center.  Mr. Clark has another case set for trial that day, so it is likely that your case will have to be continued to another date.  However, keep July 19 open just in case.  We will be in touch with you before that time.

Please contact me if you have any questions.

Very truly yours,

REDDEN, MILLS & CLARK

Keith E. Brashier

P-000266

MAJOR ALLEN FARLEY
Assistant Sheriff


MIKE HALE
Sheriff, Jefferson Cou
Melvin Bailey Justice Center * 801 N
Birmingham, Alabama 3520


JONATHAN GEORGE CARNES
5717 CARRINGTON WAY
TRUSSVILLE AL        35173


Warrant
Charge:
Amount

Dear  JONATHAN GEORGE CARNES

A warrant for your arrest has been placed in ou

Rather than cause you the unnecessary embarrass
arrested, we prefer to give you this notice so
the Warrant Office at 801 21st St. N. Room 101,

hours of 8a.m. to 4p.m., Mon.-Fri. or at the Je
St. N., Birmingham, Al. after hours.  You may a
make arrangements for bond beforehand.  Bond in
Pretrial Release at 325-5716.


P-000268

## JEFFERSON COUNTY SHERIFF'S DEPARTMENT

ur case will be tried in the following court:

A- District Court, Second or Third Floor, Jefferson County Criminal
Justice Center.
1. Call 325-5309 for date, time, and room.
2. You may **NOT** receive a notice.
3. Give your name and charge when you call.
4. It is your responsibility to be there on time.

B- Circuit Court, Fourth, Fifth, or Sixth Floor, Jefferson County
Criminal Justice Center.
1. Call 325-5285 or 325-5286 for date, time, and room.
2. Give your name and charge when you call.
3. You will receive a notice, but it is your responsibility to be
there on time.

**Defendant is released on bond on the forementioned sum with
the following conditions:** (1) Appear to answer and submit to the orders
and process of the Court having jurisdiction of the case: (2) Refrain from
committing any criminal offense; (3) Not depart the State without leave of
the Court; Promptly notify the Court of any change of address; (5) The
defendant shall have no contact or communication, in any form, with the
Complainant / Alleged Victim. In furtherance of this condition, Defendant
shall not be in or upon the premises of the Complainant / Alleged Victim;
and (6) the following conditions, if applicable:

(6:) _____

_____

(7:) _____

_____

(8:) _____

.... HALE SHERIFF

P-000269

MAJOR ALLEN FARLEY                                          MURRAY TANNER
Assistant Sheriff                                           Executive Assistant


MIKE HALE
Sheriff, Jefferson County
Melvin Bailey Justice Center * 801 North 21st Street *
Birmingham, Alabama 35203-0122

JUNE 16, 2006


JONATHAN GEORGE CARNES
5717 CARRINGTON WAY
TRUSSVILLE AL        35173


                              Warrant No.   487249      (01)
                              Charge: HARASSMENT
                              Amount of Bond:    500

Dear  JONATHAN GEORGE CARNES

A warrant for your arrest has been placed in our office for the above charge

Rather than cause you the unnecessary embarrassment of being physically
arrested, we prefer to give you this notice so that you may turn yourself in
the Warrant Office at 801 21st St. N. Room 101, Birmingham, Al., between the

hours of 8a.m. to 4p.m., Mon.-Fri. or at the Jefferson County Jail at 809 21
St. N., Birmingham, Al. after hours.  You may also want to contact an attorn
make arrangements for bond beforehand.  Bond information is available throug
Pretrial Release at 325-5716.


                              Sincerely,


                              MIKE HALE
                              Sheriff


P-000267



CSX Rail Payroll Services, Inc
As the agent for
CSX Transportation, Inc

Your individual mainframe
user ID:    D6931

| | | |
|---|---|---|
| Pay Group | M01 | Check #:    3225618 |
| Pay Begin Date | 06/22/06 | |
| Pay End Date | 06/28/06 | Check Date    07/03/06 |

Jason B Tipton
2853 LOST LAKES WAY
POWDER SPRINGS GA 30127-6019

| | |
|---|---|
| Employee ID: | 199744 |
| Department: | Southern Region |
| Location: | Direct Deposit |
| Job Title: | |
| Pay Rate: | $95,200.00    Annual |

| Tax Data: | Federal | State GA |
|---|---|---|
| Marital Status: | M | M |
| Allowances: | 0 | 0 |
| Addl. Pct.: | | |
| Addl. Amt.: | | |

## HOURS AND EARNINGS

| Description | Rate | Current Hours | Current Earnings | YTD Hours | YTD Earnings |
|---|---|---|---|---|---|
| Imputed Mov Exp No Grossup Ven | | | 2,599.00 | | 2,599.00 |
| Incentive Pay | | | | | 23,157.00 |
| Moving Expenses No Gross-up | | | | | 16,452.80 |
| Move Expense To Locate | | | | | 20,575.00 |
| Communication Allowance | | | | | 695.00 |
| Total Relocation Gross-Up | | | | | 10,053.95 |
| Imputed Move Exp To Loca  Vend | | | | | 2,483.50 |
| Regular | | | | 1216.00 | 52,536.11 |
| Total: | | | | 1,216.00 | 123,469.86 |

## TAXES

| Description | Current | YTD |
|---|---|---|
| Fed Withholdng | | 24,983.74 |
| RR MDCARE | | 1,790.77 |
| RR TIER II | | 3,075.60 |
| RRTIER 1 | | 5,840.40 |
| AL Withholdng | | 1,857.53 |
| GA Withholdng | | 4,187.89 |
| Total: | | 41,735.93 |

## BEFORE-TAX DEDUCTIONS

| Description | Current | YTD |
|---|---|---|
| Health Insurance | 1,751.00 | |
| Dental Insurance | 103.00 | |
| 401K deduction onl | 3,152.17 | |
| Total: | | 5,006.17 |

## AFTER-TAX DEDUCTIONS

| Description | Current | YTD |
|---|---|---|
| Metropolitan-CSX Ins Co C | | 852.68 |
| CSX Choices Vision | | 51.78 |
| RYA/UTU 1962 | | 525.00 |
| Total: | | 1,429.46 |

## EMPLOYER PAID BENEFITS

| Description | Current | YTD |
|---|---|---|
| Basic Life* | | 97.12 |
| * Taxable | | 97.12 |

| | TOTAL GROSS | FED TAXABLE GROSS | TOTAL TAXES | TOTAL DEDUCTIONS | NET PAY |
|---|---|---|---|---|---|
| Current: | | 2,599.00 | | | |
| YTD: | 123,469.86 | 122,948.31 | 41,735.93 | 6,435.63 | 75,298.30 |



DEFENDANT'S
EXHIBIT
22

P-000300

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
## NORTHERN DIVISION

RECEIVED

Ronald A. Hollon, Sr.,                )
                                       )        2006 DEC 11  A 11: 36
     Plaintiff,                     )
                                       )        DEBRA P. HACKETT, CLK
                                       )          U.S. DISTRICT COURT
v.                                     )        MIDDLE DISTRICT ALA.
                                       ) Civil Action No. 2:06-CV-1099-WKW
                                       )
CSX Transportation, Inc.,             ) Jury Demand
                                       )
     Defendant.                     )

### COMPLAINT

Comes now Ronald A. Hollon, Sr. and files this complaint pursuant to the Age

Discrimination in Employment Act, age discrimination and retaliation, and alleges as follows:

### JURISDICTION AND VENUE

(1) This action arises under the Age Discrimination in Employment Act, 29 USC 621 et

seq., for age discrimination and retaliation. Subject matter jurisdiction is proper for the United

States District Court pursuant to 28 USC 1331.

(2) Venue is proper in the United States District Court for the Middle District of Alabama

as most material events occurred within the Middle District of Alabama.

### PARTIES

(3) Ronald A. Hollon, Sr., herein after "Hollon," is a male over nineteen (19) years old

and is a resident of Autauga County, Alabama.

(4) Defendant CSX Transportation, Inc. is a railroad company doing business in the State

of Alabama.



DEFENDANT'S EXHIBIT 23

## FACTS

(5) That during all times material Plaintiff Hollon was over forty (40) years old, date of birth November 14, 1959.

(6) That during all times material Plaintiff Hollon has been employed by Defendant CSX Transportation, Inc., hereafter "CSX," or a subsidiary thereof; all employment being since 1981.

(7) That Plaintiff Hollon had been in good standing with Defendant CSX until June 19, 2006, when he was wrongfully demoted and taken out of service from his position of Terminal Trainmaster, Montgomery, Alabama, and thereafter placed in the lower position of Yardmaster. By said demotion Plaintiff Hollon received an approximate twenty thousand dollars per year cut in pay, and he lost more than fifteen thousand dollars per year in bonuses.

(8) That said demotion by Defendant CSX of Plaintiff Hollon, from Terminal Trainmaster to Yardmaster, was an intentional act of age discrimination due to his age by Defendant CSX and or retaliation by Defendant CSX for Plaintiff Hollon's exercise of protected activity.

(9) That prior to said June 19, 2006, demotion Plaintiff Hollon had been improperly and illegally passed over during April and or May 2006 for positions of Trainmaster, Customer Service, etc. by Defendant CSX, and that Plaintiff was as well or better qualified for said positions than younger, under- 40- years- old employees who were placed in said positions by Defendant CSX.

(10) That Plaintiff Hollon prior to said demotion had engaged in protected activity by complaining to Defendant CSX about being passed over for said positions and not receiving said positions in April and or May 2006, by his orally complaining to Defendant CSX and by his subsequently submitting a proposed written EEOC Charge to Defendant CSX on June 19, 2006.

(11) That on June 19, 2006 Defendant CSX by and through its agents and or employees, accused Plaintiff Hollon of "forging," etc. another employee's name to a document which statement was a pretext for its action of demoting Plaintiff Hollon.

(12) That prior to June 19, 2006 Plaintiff Hollon had been authorized by a co-employee to sign said employee's name to said referenced document due to the fact that said employee was not able to be on the site to timely sign said document.

(13) That prior to Plaintiff Hollon's signing, for another employee, said referenced document as per said employee's instruction, Plaintiff Hollon had engaged in protected activity, regarding being passed over for said April and or May 2006 positions.

(14) That Defendant CSX has at all material times had a pattern and practice of intentional discrimination against older employees, over the age of forty (40) years old.

(15) That subsequent to June 19, 2006, Plaintiff Hollon has been further denied promotion to other higher level positions by Defendant CSX, and that he was as well or better qualified than the younger or under-40-year-old employees who received said positions.

(16) That Plaintiff Hollon has been denied promotions subsequent to June 19, 2006, due to age discrimination and or retaliation by Defendant CSX.

(17) That Defendant CSX has engaged in a pattern or practice of selectively ignoring major employment infractions of younger, or under- 40-year-old employees, and or those employees who have not engaged in protected activity, and Defendant CSX has failed to demote or terminate said employees for said major employment infractions of said employees.

(18) That Defendant CSX has in times subsequent to June 19, 2006, not terminated or demoted certain under-40-year-old employees, and or employees who had not engaged in protected activity for infractions that were as serious as the alleged infraction used by Defendant

CSX to demote Plaintiff Hollon.

(19) That as a result of the intentional acts and or omissions of Defendant CSX, as herein alleged, Plaintiff Hollon has lost wages, lost benefits including retirement, lost promotions, incurred mental anguish, attorneys fees, cost of litigation, etc.

(20) That Plaintiff Hollon has exhausted all required administrative legal remedies through the Equal Employment Opportunity Commission (Charge No. 420-2006-03422), has received a Right to Sue Letter, and timely has filed the instant action against Defendant CSX.

## Count I

## Age Discrimination

(21) That Plaintiff incorporates paragraphs one(1) through twenty (20) above.

(22) That through the intentional acts and or omissions of Defendant CSX, as herein alleged, Plaintiff Hollon has been a victim of age discrimination in violation of the Age Discrimination in Employment Act, 29 USC 621 et seq.

(23) That due to the intentional acts or omissions of Defendant CSX as herein alleged, Plaintiff Hollon has lost wages, lost benefits including retirement, lost promotions, incurred mental anguish, attorneys fees, cost of litigation, etc.

**Wherefore Premises Considered** Plaintiff Hollon prays that Defendant CSX be enjoined to place Plaintiff in said Trainmaster or equivalent position and that:

(A) Plaintiff be awarded back pay and past benefits, including retirement, of the position;

(B) Attorneys fees and costs; and

(C) Plaintiff be awarded such other relief as allowed by law.

**Count II**

**Retaliation**

(24) That Plaintiff incorporates paragraphs one(1) through twenty (20) above.

(25) That through the intentional acts and or omissions of Defendant CSX, as herein

alleged, Plaintiff Hollon has been a victim of retaliation in violation of the Age Discrimination in

Employment Act, 29 USC 621 et seq.

(26) That due to the intentional acts or omissions of Defendant CSX, as herein alleged,

Plaintiff Hollon has lost wages, lost benefits including retirement, lost promotions, incurred

mental anguish, attorneys fees, cost of litigation, etc.

**Wherefore Premises Considered** Plaintiff Hollon prays that Defendant CSX be enjoined

to place Plaintiff in said Trainmaster or equivalent position and that:

(A) Plaintiff be awarded back pay and past benefits, including retirement, of the position;

(B) Attorneys fees and costs; and

(C) Plaintiff be awarded such other relief as allowed by law.

**Trial by Jury is hereby demanded.**

Respectfully submitted

Gary E. Atchison (ATC004)
Attorney for
Plaintiff Ronald A. Hollon, Sr.

**Of Counsel:**
PO Box 2002
492 S. Court St.
Montgomery, AL 36102-2002
(334) 262-7232

**Hollon, Ron Sr**

| | |
|---|---|
| From: | Hollon, Ron Sr |
| Sent: | Saturday, May 27, 2006 8:19 AM |
| To: | Frulla, Bob Jr.; Frost, Jack Jr.; Averitte, Angie |
| Cc: | Hollon, Ron Sr |
| Subject: | PENSACOLA POSITION |

Mr. Frulla

While checking on my status, for the position in Pensacola, in the computer.
It showed that I was in the interview stage but I was never interviewed.
I just need a little help in understanding this if you can help me.

Thanks

R. A. Hollon
Terminal Trainmaster
Montgomery, AL

*Email sent about Pensacola pror.*
*I believe this is the same day of*
*the remote control*

DEFENDANT'S
EXHIBIT
24

P-000337

**Hollon, Ron Sr**

| | |
|---|---|
| **From:** | Averitte, Angie |
| **Sent:** | Saturday, May 27, 2006 11:06 AM |
| **To:** | Hollon, Ron Sr |
| **Subject:** | RE: MONTGOMERY AND ATLANTA POSITIONS |

**call me on the cell when you get a break...**

-----Original Message-----
**From:** Hollon, Ron Sr
**Sent:** Saturday, May 27, 2006 9:16 AM
**To:** Workman, Rod; Frost, Jack Jr.; Averitte, Angie
**Subject:** MONTGOMERY AND ATLANTA POSITIONS

Mr. Workman:

I just need some understanding why I was not considered for
the Montgomery or the Atlanta positions? How can I improve
my chances of growing with this company?

Thanks
Ron

*Email Sent to Mr. Workman*
*no reply*



P-000338

**Copy of Transcript**

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

Ronald A. Hollon, Sr.,

        Plaintiff,

   vs.

CSX Transportation, Inc.,

        Defendant.

~~~~~~~~~~~~~~~~~~~~~~~~~

Civil Action No.:
2:06-CV-1099-WKW

**DEPOSITION OF**

**TRAVIS MIKEL PENDERGRASS**

October 29, 2007
2:00 p.m.

500 Water Street
Jacksonville, Florida

Richetta R. Brown, Court Reporter
and Notary Public in and for
the State of Florida at Large



BROWN & GALLO
LLC

Telephone (404) 495-0777  (404) 876-8979
Toll Free  (877) 495-0777  (800) 637-0293
Fax (404) 495-0766

101 Marietta Street, Suite 2700
Atlanta, GA 30303

1740 Peachtree Street, NW
Atlanta, GA 30309

www.galloreporting.com

Travis Mikel Pendergrass                                        October 29, 2007

2

APPEARANCES OF COUNSEL

1

2

3

4  On behalf of the Plaintiff:

5  GARY ATCHISON, Esquire (via telephone)

6  492 S Court Street

7  Montgomery, Alabama 36104

8  (334) 262-7232

9

10

11  On behalf of the Defendant:

12  WILLIAM C. BARKER, Esquire

13  Paul, Hastings, Janofsky & Walker, LLP

14  600 Peachtree Street, NE, Suite 2400

15  Atlanta, Georgia 30308-2222

16  (404) 815-2379

17  (404) 815-2424 (facsimile)

18  corybarker@paulhastings.com

19

20

21

22

23

24  ALSO PRESENT:  Sarah Hall, Esquire

25



BROWN & GALLO
LLC

101 Marietta Street, Suite 2700
Atlanta, GA 30303

1740 Peachtree Street, NW
Atlanta, GA 30309

Telephone  (404) 495-0777    (404) 876-8979
Toll Free  (877) 495-0777    (800) 637-0293
Fax (404) 495-0766

www.galloreporting.com

3

1    DEPOSITION OF TRAVIS MIKEL PENDERGRASS

2    OCTOBER 29, 2007

3         MR. ATCHISON:  My name is Gary Atchison.

4    I'm an attorney for Ron Hollon and I'm appearing

5    here today for him on his behalf involving the

6    lawsuit that's styled Hollon v. CSX

7    Transportation, Inc., okay.  And who else is

8    present?

9         MR. BARKER:  The witness, Mike

10   Pendergrass is here.  This is Cory Barker for

11   CSX Transportation and also present is Sara Hall

12   who's legal counsel for CSX internally.

13        MR. ATCHISON:  All right.  Do you wish to

14   be formal and call each other by our last names,

15   or do you wish to call each other by the first

16   name for this deposition?  It doesn't matter

17   with me either way.

18        MR. BARKER:  Well, as long as we're on

19   the record I think it would be -- I'd prefer it

20   be formal.

21        MR. ATCHISON:  Okay.  All right,

22   Mr. Barker.  Of course, I'm Gary Atchison, the

23   attorney and I'll be taking Mr. Pendergrass's

24   deposition today.  Is he present?

25        MR. BARKER:  He is present.



BROWN & GALLO
                    LLC

Telephone  (404) 495-0777    (404) 876-8979
Toll Free   (877) 495-0777    (800) 637-0293
         Fax (404) 495-0766

101 Marietta Street, Suite 2700
              Atlanta, GA 30303

1740 Peachtree Street, NW
        Atlanta, GA 30309
www.galloreporting.com

4

1           MR. ATCHISON:  Okay.  Could we get him

2      sworn in.

3           TRAVIS MIKEL PENDERGRASS, having been

4   first duly sworn, was examined and testified as

5   follows:

6           THE WITNESS:  Yes.

7   DIRECT EXAMINATION

8   BY-MR.ATCHISON:

9      Q.     Okay.  And, Mr. Pendergrass, you were

10  present when we initially expressed who we are.

11  Present with me also is Mr. Ron Hollon, Mr.

12  Pendergrass.

13     A.     Okay.  Thank you.

14     Q.     And my legal assistant, Douglas Smith.

15  And we're taking your deposition today by telephone.

16  I'm in Montgomery, Alabama in my office, and what is

17  your location, sir?

18     A.     I'm on the 6th floor of the CSX

19  Transportation building.

20     Q.     And what is that address, sir?

21     A.     500 Water Street.

22     Q.     Jacksonville, Florida?

23     A.     Yes, sir.

24     Q.     Okay.  And this is October the 29th, and

25  we're starting approximately one o'clock my time; two



BROWN & GALLO
                              LLC

Telephone  (404) 495-0777   (404) 876-8979
Toll Free   (877) 495-0777   (800) 637-0293
         Fax (404) 495-0766

101 Marietta Street, Suite 2700
            Atlanta, GA 30303

1740 Peachtree Street, NW
            Atlanta, GA 30309

www.galloreporting.com

                                    5

1    o'clock your time?

2        A.      Yes, sir.  I've got 2:05 p.m. eastern

3    standard time.

4        Q.      Okay, sir.  Would you state for the

5    record your full, legal name.

6        A.      Yes, sir.  My name is Travis Mikel

7    M-i-k-e-l Pendergrass.

8        Q.      Okay, sir.  And what is your office

9    mailing address, sir?  Is it the same address that

10   you're at?

11       A.      Yes, sir.

12       Q.      Okay.  What is the zip code there, sir?

13       A.      I don't know.

14       Q.      Okay.  Will you provide that to your

15   counsel so that we'll have that?

16       A.      We sure will.

17       Q.      All right.  And what is your home

18   address, sir?

19       A.      My home address is 101 Queens Way, Ponte

20   Vedra Beach, Florida.

21       Q.      Okay.  And if someone needed to reach

22   your office there, what would be your office address,

23   sir?

24       A.      500 Water Street.

25       Q.      The same address that you're at right



101 Marietta Street, Suite 2700
Atlanta, GA 30303

1740 Peachtree Street, NW
Atlanta, GA 30309

Telephone (404) 495-0777   (404) 876-8979
Toll Free (877) 495-0777   (800) 637-0293
Fax (404) 495-0766

www.galloreporting.com

6

1    now?

2           A.      Yes, sir.

3           Q.      Okay.  And I may have cut you off, but do

4    you have a zip code for your home address, sir?

5           A.      32082.

6           Q.      Okay.  All right, sir, do you understand

7    that you're here regarding a lawsuit that was filed

8    by Mr. Hollon --

9           A.      Yes, sir.

10          Q.      -- you're here as a witness?  Okay.  Are

11   you under any influence of any drugs or alcohol today

12   that may impair your judgment or your ability to

13   testify?

14          A.      No, sir.

15          Q.      Do you have any other disabilities or

16   difficulties that would impair your judgment or your

17   ability to testify today?

18          A.      No, sir.

19               MR. ATCHISON:  Okay.  I did not ask, Mr.

20          Barker, but do we have the same stipulations for

21          this deposition as with Mr. Hollon's deposition?

22               MR. BARKER:  Well, yeah, we have the

23          stipulations provided for by Rule 30.  And he'd

24          also like to exercise his right to read and sign

25          the transcript.



BROWN & GALLO
                                    LLC

Telephone  (404) 495-0777    (404) 876-8979
Toll Free  (877) 495-0777    (800) 637-0293
            Fax (404) 495-0766

101 Marietta Street, Suite 2700
            Atlanta, GA 30303

1740 Peachtree Street, NW
            Atlanta, GA 30309

www.galloreporting.com

7

1          MR. ATCHISON:  Fine.  Okay.  All right.

2      And that's something you can cover with the

3      court reporter.

4          Q.    All right.  Mr. Pendergrass, who are you

5  employed with, sir?

6          A.    CSX Transportation.

7          Q.    And what is your current capacity or

8  position with that employer?

9          A.    I'm vice president of the Southern

10 Region.

11         Q.    How long have you been VP or vice

12 president of the Southern Region?

13         A.    I've been president of the Southern

14 Region since March of 2005.

15         Q.    Okay.  All right.  Do you know Mr. Ron

16 Hollon?

17         A.    Yes, sir.

18         Q.    Okay.  How long have you known

19 Mr. Hollon?

20         A.    Off and on for, I know, the last six

21 years on several occasions.

22         Q.    Have you been to Montgomery and seen

23 Mr. Hollon here?

24         A.    Yes, sir, I believe I have.

25         Q.    Okay.  All right.  And what was his last



BROWN & GALLO
                                    LLC

Telephone  (404) 495-0777    (404) 876-8979
Toll Free  (877) 495-0777    (800) 637-0293
Fax (404) 495-0766

101 Marietta Street, Suite 2700
Atlanta, GA 30303

1740 Peachtree Street, NW
Atlanta, GA 30309

www.galloreporting.com

Travis Mikel Pendergrass                         October 29, 2007

8

1    position that he held in Montgomery when you came

2    here?

3         A.        He was one of our trainmasters in

4    Montgomery, Alabama.

5         Q.        Okay.  All right, sir.  Let me back up

6    and talk about your background, if I could.  You've

7    been the VP of the Southern Region since 2005,

8    correct?

9         A.        Yes, sir, March of 2005.

10        Q.        All right.  And what does that position

11   entail?

12        A.        I'm responsible for the transportation

13   operations on the southern half of our railroad.

14        Q.        What does that mean?

15        A.        I'm not sure I understand your question.

16        Q.        What does that mean?  Are you the head

17   person in the Southern Region and just report to,

18   say, the president?

19        A.        I'm responsible for all the

20   transportation employees that work on the Southern

21   Region in the five southern divisions, Mr. Atchison,

22   and that's --

23        Q.        And what southern divisions are those?

24   What is your geographic area that you're over?

25        A.        I'm responsible for the Huntington



BROWN & GALLO
LLC

Telephone  (404) 495-0777   (404) 876-8979
Toll Free   (877) 495-0777   (800) 637-0293
Fax (404) 495-0766

101 Marietta Street, Suite 2700
Atlanta, GA 30303

1740 Peachtree Street, NW
Atlanta, GA 30309

www.galloreporting.com

9

1    division, the Nashville division, the Atlanta

2    division, the Florence division and the Jacksonville

3    division.

4        Q.    Huntington is Huntington what, sir?  What

5    state is that?

6        A.    The city of Huntington is Huntington,

7    West Virginia.  It incorporates several states.

8        Q.    What are those, sir?

9        A.    Well, the Huntington division operates

10    from Newport News over to Cincinnati.

11        Q.    All right.  Newport News is what?  You

12    need to go with the states, if you could.

13        A.    Newport News, Virginia.

14        Q.    Okay.

15        A.    To but not including Cincinnati, Ohio.

16        Q.    Okay.

17        A.    And it also has limited operations in

18    Kentucky, West Virginia, Pennsylvania and Tennessee

19    on that division.

20        Q.    All right.  And I think you said the

21    Nashville area.  What states would that be, please,

22    sir, that you're over?

23        A.    Well, the Nashville division operates

24    from Danville, Illinois down to but not including

25    Birmingham, Alabama.  It operates to St. Louis and to



BROWN & GALLO
                                            LLC

101 Marietta Street, Suite 2700
Atlanta, GA 30303

1740 Peachtree Street, NW
Atlanta, GA 30309

Telephone (404) 495-0777    (404) 876-8979
Toll Free  (877) 495-0777   (800) 637-0293
Fax (404) 495-0766

www.galloreporting.com

10

1    Washington, Indiana.

2         Q.       Washington.  That's a city in Indiana?

3         A.       Yes, sir.

4         Q.       Okay.  All right.  And then you said the

5    Atlanta division?

6         A.       Yes, sir.

7         Q.       And what areas -- what states would that

8    involve?

9         A.       The Atlanta division operates in portions

10   of Georgia, Tennessee, Alabama, Mississippi, and

11   Louisiana.

12        Q.       Okay.  Would that be the division that

13   Ron would be reporting out of here in Montgomery?

14        A.       Yes, sir, that's correct.

15        Q.       Okay.  The Florence, now, I'm not sure

16   what Florence that is.  Is that Florence, Alabama

17   maybe?

18        A.       No, that's Florence, South Carolina.

19        Q.       Okay.  I figured it was.  Two of just the

20   same names, okay.  And what states does that involve

21   or that division?

22        A.       The Florence division has portions of

23   Virginia, North Carolina, South Carolina, if I didn't

24   say Georgia.

25        Q.       Would it include portions?



BROWN & GALLO
LLC

Telephone  (404) 495-0777   (404) 876-8979
Toll Free  (877) 495-0777   (800) 637-0293
Fax (404) 495-0766

101 Marietta Street, Suite 2700
Atlanta, GA 30303

1740 Peachtree Street, NW
Atlanta, GA 30309

www.galloreporting.com

11

```
 1        A.      Portions of Georgia, yes, sir.

 2        Q.      Okay.  Anything else?

 3        A.      Not off the top of my head.

 4        Q.      Okay.  All right.  And I think you said

 5   the Jacksonville division, and I assume that's

 6   Jacksonville, Florida.  Maybe I'm wrong on that one,

 7   too.

 8        A.      No, sir, that's Jacksonville, Florida is

 9   the division headquarters.

10        Q.      Okay.  And what states would that be

11   involved in?

12        A.      The Jacksonville division operates in

13   portion of Florida and Georgia.

14        Q.      Okay.  All right, sir.  Now --

15        A.      And Alabama.

16        Q.      And Alabama, okay.  I assume each one of

17   these divisions would have a manager that directly

18   reported to you that would head that division --

19        A.      Yes, sir.

20        Q.      -- am I correct about this?  And who is

21   the manager that -- over the last several years has

22   reported to you in the Atlanta division?

23        A.      Currently Gary Bethel.  Prior to that it

24   was Rod Workman.

25        Q.      When did Mr. Workman be replaced by Gary
```



BROWN & GALLO
                     LLC

Telephone (404) 495-0777    (404) 876-8979
Toll Free (877) 495-0777    (800) 637-0293
          Fax (404) 495-0766

101 Marietta Street, Suite 2700
Atlanta, GA 30303

1740 Peachtree Street, NW
Atlanta, GA 30309

www.galloreporting.com

Travis Mikel Pendergrass                          October 29, 2007

                                12

1    Bethel?

2        A.      In early 2007, I believe.

3        Q.      When you say early, could you give us a

4    month or a better time just than early?

5        A.      I believe in January or February of this

6    year.

7        Q.      Okay.  What was the reason he was

8    replaced, sir?

9        A.      Managerial realignment.

10       Q.      And what caused that, sir?  What caused

11   the need for managerial realignment?  I'm not sure I

12   know what that is.

13       A.      We shuffled a couple of division managers

14   on our railroad, and that was one of the positions

15   that we changed division managers on.

16       Q.      Okay.  What position is Mr. Rod Workman

17   working in now?

18       A.      He's in our safety department.

19       Q.      So he's not a division director?

20       A.      Not currently, no, sir.

21       Q.      Okay.  Each of those divisions, the head

22   person over each division, are they called division

23   directors?  I throw out that term, but is that the

24   correct term?

25       A.      In transportation which is, I believe,



BROWN & GALLO
                                    LLC

Telephone  (404) 495-0777   (404) 876-8979
Toll Free  (877) 495-0777   (800) 637-0293
         Fax (404) 495-0766

101 Marietta Street, Suite 2700
        Atlanta, GA 30303

1740 Peachtree Street, NW
       Atlanta, GA 30309

www.galloreporting.com

13

1   the position you're talking about, they're called

2   division manager.

3        Q.    Division managers, okay.  So currently

4   Gary Bethel is the division manager over the Atlanta

5   division?

6        A.    Yes, sir, that's correct.

7        Q.    And formerly, just immediately before

8   him, was Rod Workman, correct --

9        A.    Yes, sir.

10       Q.    -- serving as division manager?  How long

11  did Mr. Rod Workman have that position as division

12  manager over the Atlanta division?

13       A.    Somewhere around March or April of 2005

14  until somewhere around the first of this year.

15       Q.    Okay.  Is Mr. Rod Workman making the same

16  salary or amount of money as he had in the division

17  manager position that he is now working in the safety

18  department making?

19       A.    I do not know.

20       Q.    Okay.  Were you the one that made the

21  decision to change him from division manager to have

22  him placed in the safety department?

23       A.    No, sir, not exclusively.

24       Q.    Well, were you involved?

25       A.    Yes, sir.



BROWN & GALLO
                              LLC

Telephone  (404) 495-0777   (404) 876-8979
Toll Free  (877) 495-0777   (800) 637-0293
         Fax (404) 495-0766

101 Marietta Street, Suite 2700
           Atlanta, GA 30303

1740 Peachtree Street, NW
         Atlanta, GA 30309

www.galloreporting.com

14

1      Q.      Okay.  Does CSX consider that Rod Workman

2   had a lateral transfer?  That is a transfer without

3   either an increase in status or pay or a decrease in

4   status or pay?

5      A.      I am not certain what the band of his

6   current position.

7      Q.      Okay.  All right.  Would you rely on what

8   he says in his deposition as to his status going from

9   one job to the other?

10     A.      Well, yes, sir, I'm sure he knows.

11     Q.      Okay.  All right.  Very good.  When we

12  have him deposed we'll ask those questions to him.

13  All right.  When you said that you were vice

14  president, I think you said vice president of the

15  Southern Region.  You were over transportation

16  operations, correct, that's your basic job duties?

17     A.      Yes, sir.

18     Q.      And that involves making decisions

19  regarding CSX personnel that are working under you;

20  is that correct?

21     A.      Yes, sir.

22     Q.      Okay.  Now, a person in a position that

23  Ron Hollon had been in, say, a year or two ago, if he

24  were to be demoted or terminated, would that decision

25  come to you?



BROWN & GALLO
LLC

101 Marietta Street, Suite 2700
Atlanta, GA 30303

1740 Peachtree Street, NW
Atlanta, GA 30309

Telephone  (404) 495-0777    (404) 876-8979
Toll Free   (877) 495-0777    (800) 637-0293
Fax (404) 495-0766

www.galloreporting.com

15

1        MR. BARKER:  Object to the form.

2    Q.    You can go ahead and answer.

3    A.    Could I ask you to ask it again, please?

4    Q.    If a person in a position of Ron Hollon

5    had been either terminated or demoted in the last

6    couple of years, would that decision ultimately come

7    to your desk for your involvement?

8        MR. BARKER:  Same objection.

9    A.    Yes, sir.

10   Q.    And what would be your involvement, sir,

11   in your position of vice president of the Southern

12   Region?

13   A.    That is my ultimate decision to make --

14   to act upon recommendations that come to my office.

15   Q.    Okay.  Now, I believe you have heard

16   about or probably even seen the lawsuit that Mr. Ron

17   Hollon filed against your company?

18   A.    I have heard about it, yes, sir.

19   Q.    Okay.  And you understand that Mr. Hollon

20   is basically alleging that he's been a victim of age

21   discrimination?

22   A.    All right, sir.

23   Q.    And you understand that he's basically

24   complaining that he's been a victim of retaliation

25   for making statements of protective activity under



BROWN & GALLO
                                    LLC
Telephone  (404) 495-0777    (404) 876-8979
Toll Free  (877) 495-0777    (800) 637-0293
Fax (404) 495-0766

101 Marietta Street, Suite 2700
Atlanta, GA 30303

1740 Peachtree Street, NW
Atlanta, GA 30309

www.galloreporting.com

Travis Mikel Pendergrass                           October 29, 2007

16

1    the Age Act?

2         A.      I don't really understand any of that

3    that you just said.

4         Q.      Okay.  Would you like me to repeat it?

5         A.      If it's important for me to know, yes,

6    sir.

7         Q.      Okay.  Do you understand that in this

8    lawsuit that he's also alleging that he's been a

9    victim of retaliation for making statements

10   complaining about age discrimination?

11        A.      Okay, sir, I was not aware of that.

12        Q.      Okay.  Do you understand that he filed

13   EEOC charges against CSX?

14        A.      Yes, sir.

15        Q.      Okay.  Do understand that Mr. Workman saw

16   all of those EEO charges or drafted those EEOC

17   charges, I believe, on July -- excuse me -- June

18   19th, 2006?

19        A.      All right, sir.

20        Q.      You're aware of that?

21        A.      You're telling me about it.

22        Q.      Okay.  But are you otherwise aware of

23   that?

24        A.      Not those specific dates or the -- I've

25   never seen the actual document, to my knowledge.



BROWN & GALLO
LLC

Telephone  (404) 495-0777   (404) 876-8979
Toll Free  (877) 495-0777   (800) 637-0293
Fax (404) 495-0766

101 Marietta Street, Suite 2700
Atlanta, GA 30303

1740 Peachtree Street, NW
Atlanta, GA 30309

www.galloreporting.com

17

1      Q.      Okay.  All right.  Well, let me ask you

2   this.  CSX has an EEO policy, does it not?

3      A.      Yes, sir.

4      Q.      Okay.  And you've had training as a

5   manager, have you not, that the CSX Railroad Company

6   has to follow federal laws?

7      A.      Well, certainly.

8      Q.      Okay.  And among those federal laws are

9   federal laws that prohibit age discrimination?

10     A.      Yes, sir.

11     Q.      Okay.  Prohibits the Railroad, CSX -- and

12  I'll call it the railroad sometimes in this

13  deposition -- but it prohibits the railroad from

14  discriminating against people who are over 40 years

15  old on the basis of their age, do you understand

16  that's the law?

17            MR. BARKER:  Object to the form, calls

18        for a legal conclusion.  You can answer it.

19     Q.      Your understanding, sir.  I know you're

20  not a lawyer.

21     A.      Yes, sir.

22     Q.      You understand that?

23     A.      I believe so, yes, sir.

24     Q.      And you had that understanding for

25  several years now, have you not?


BROWN & GALLO
LLC

Telephone  (404) 495-0777    (404) 876-8979
Toll Free  (877) 495-0777    (800) 637-0293
Fax (404) 495-0766

101 Marietta Street, Suite 2700
Atlanta, GA 30303

1740 Peachtree Street, NW
Atlanta, GA 30309

www.galloreporting.com

                                    18
1          A.       Yes, sir.
2          Q.       Okay.  Let me ask you this, when people
3    in management want to get promoted, what is the
4    system by -- whereby people are screened for
5    promotions when they go and apply for jobs?  How does
6    that take place?
7          A.       Could I get you to be a little more
8    specific?  There are multiple ways that people are
9    identified for a promotion.  Could I get you to
10   explain exactly what you're asking?
11         Q.       Yes, sir.  Okay.  Let's do this.
12   Mr. Hollon applies for an assistant customer service
13   manager's position, okay, in Jacksonville, Florida.
14   That's where you are right now, right?
15         A.       Yes, sir.
16         Q.       Okay.  And that position was up for
17   consideration -- I think the start date was 3/1/06.
18   And my question to you, sir, is, how did CSX make
19   evaluations of prospective applicants for that
20   position, if you know?
21         A.       I do not know.
22         Q.       Do you know how generally applicants are
23   screened for positions when they seek promotions?
24         A.       Yes, sir, their performance is
25   reviewed --



BROWN & GALLO
LLC

Telephone  (404) 495-0777   (404) 876-8979
Toll Free   (877) 495-0777   (800) 637-0293
       Fax (404) 495-0766

101 Marietta Street, Suite 2700
Atlanta, GA 30303

1740 Peachtree Street, NW
Atlanta, GA 30309

www.galloreporting.com

19

1    Q.    Okay.

2    A.    -- on their existing job.

3    Q.    Okay.

4    A.    And their evaluations are made in regard

5    to their educational background --

6    Q.    Okay.

7    A.    -- their diversity of their experience on

8    other positions on our railroad and other geographies

9    and their knowledge of our network, and what

10   particular skills they might bring to the job.

11   Q.    Okay.  All right.  And I take it that

12   based on the EEO policy -- and I think that that's

13   been previously Exhibit 4 of a deposition taken of

14   Mr. Hollon.  And that's basically for your attorney's

15   reference and mine later on.  But based on that

16   policy and these decisions on promotion, CSX is not

17   going to discriminate against people based on their

18   age or religion or sex or gender, are they?  That's a

19   policy of CSX not to discriminate, am I correct?

20   A.    You're exactly correct.

21   Q.    Okay.  And if the evaluation system is

22   arbitrary and capricious, would that be in compliance

23   with CSX's goals so that they would not be

24   discriminatory in its decision of promotions?

25   MR. BARKER:  Object to the form.



BROWN & GALLO
LLC

Telephone  (404) 495-0777    (404) 876-8979
Toll Free    (877) 495-0777    (800) 637-0293
Fax (404) 495-0766

101 Marietta Street, Suite 2700
Atlanta, GA 30303

1740 Peachtree Street, NW
Atlanta, GA 30309

www.galloreporting.com

Travis Mikel Pendergrass                          October 29, 2007

                                    20

1          Q.      Do you understand the question, sir?

2          A.      I really don't.

3          Q.      Okay.  Well, let's see if I can rephrase

4    it.  The way you evaluate people for promotions -- I

5    think you talked about you look at their experience;

6    is that correct?

7          A.      That is definitely a component, yes, sir.

8          Q.      And you look at their education; is that

9    correct?

10         A.      Yes, sir.

11         Q.      And then there's the interview process;

12   is that correct?

13         A.      In some cases.

14         Q.      Okay.  And then you total it up, the

15   scores of education, experience, and you come up with

16   a final score, am I correct?

17         A.      No.  You left out results in their

18   current position and you left out recommendations and

19   references from the people they work for and a number

20   of other things.

21         Q.      Okay.  All right.  Well, there finally

22   would be a final score, would there not be after all

23   that's tallied?

24         A.      You're talking about through the

25   interview process?



BROWN & GALLO
                              LLC

Telephone  (404) 495-0777    (404) 876-8979
Toll Free   (877) 495-0777    (800) 637-0293
            Fax (404) 495-0766

101 Marietta Street, Suite 2700
Atlanta, GA 30303

1740 Peachtree Street, NW
Atlanta, GA 30309

www.galloreporting.com

21

1    Q.    Yeah.  From the final process each

2    applicant for a position to be promoted would get a

3    final score?  Would he or she not get the final

4    score?

5              MR. BARKER:  Object to the form.

6    A.    The individuals that are interviewed are

7    ranked base on how they do in the interview.

8    Q.    And is that a final score, sir?  Is it a

9    score process, the ranking or rate, ranking?

10   A.    I'm sure there's a scoring component to

11   it, yes, sir.

12   Q.    Okay.  And I assume the higher the score

13   the better the rating or ranking would be?

14   A.    Well, definitely the higher ranking it

15   would be, yes, sir.

16   Q.    Okay.  And if after interviewing several

17   people, the highest rated person or ranked person

18   most likely would get the job?  Would he or she not

19   get the job?

20   A.    The highest ranked person in the

21   interview would most likely be the recommendation

22   from an interview panel.  They might or might not get

23   the job, depending upon various other criteria, who

24   we had available for the position.

25   Q.    And what would overrule the highest



BROWN & GALLO
                                          LLC

Telephone  (404) 495-0777    (404) 876-8979
Toll Free   (877) 495-0777    (800) 637-0293
         Fax (404) 495-0766

101 Marietta Street, Suite 2700
        Atlanta, GA 30303

1740 Peachtree Street, NW
       Atlanta, GA 30309

www.galloreporting.com

22

1    ranking?  What would be the other things that would

2    make a person who is highest rated or ranked

3    rejected?

4         A.     A person with more ability, more success,

5    more aptitude that was in another position that we

6    needed to broaden their network expertise.

7         Q.     Would that be a person within the pool of

8    those who are ranked and rated or a person outside

9    the pool?

10        A.     I would say it would be outside of the

11   pool, generally speaking.

12        Q.     Okay.  All right.  So assuming all things

13   equal, if all applicants that we talk about are rated

14   or ranked and given the score, then most likely the

15   highest rated or ranked person, based on the scoring

16   of this interview process, would get a position, am I

17   correct?

18        A.     They would get the recommendation from

19   that panel, but they would not necessarily get the

20   job.

21        Q.     All right.  Why wouldn't they necessarily

22   get the job?

23        A.     Because the pool might not be the best

24   qualified people for the position.

25        Q.     Okay.  Well, assuming that the person or



BROWN & GALLO
LLC

Telephone  (404) 495-0777    (404) 876-8979
Toll Free   (877) 495-0777    (800) 637-0293
Fax (404) 495-0766

101 Marietta Street, Suite 2700
Atlanta, GA 30303

1740 Peachtree Street, NW
Atlanta, GA 30309

www.galloreporting.com

23

1    the -- the person who got the job is in the pool,

2    that wouldn't be applicable, right?  In other words,

3    let's assume the pool had everybody that was

4    considered.  So that would not be an issue, okay, in

5    my hypothetical okay.  Why additionally would

6    somebody with a lower score within the pool get a

7    position given to them?

8              MR. BARKER:  Object to the form.

9         A.     I would really need to see the specifics

10   of what you're talking about to try to understand.

11   There's multiple reasons why people are selected for

12   jobs.  Their geographical experience, where they've

13   been.  They've worked multiple locations where they

14   were trying to broaden their development, a number of

15   things.

16        Q.     Okay.  Well, that would be all part of

17   the interview process in the rating or ranking

18   process, would it not?  Would not all that be part of

19   the process?  It would come out in the ratings or

20   rankings?

21        A.     Well, if your ratings and rankings are --

22   I'd have to see this -- you're really asking a

23   general question here that I've never seen.

24        Q.     Okay.  All right.  That's fair.  All

25   right.  Now, who was the division manager over



BROWN & GALLO
LLC

Telephone  (404) 495-0777    (404) 876-8979
Toll Free   (877) 495-0777    (800) 637-0293
Fax (404) 495-0766

101 Marietta Street, Suite 2700
Atlanta, GA 30303

1740 Peachtree Street, NW
Atlanta, GA 30309

www.galloreporting.com

24

1    Jacksonville, Florida in 2006?

2         A.       Bob Frulla.

3         Q.       And regarding the assistant customer

4    service manager's position in 2006, he would have

5    brought a recommendation to you and you would have

6    either upped or downed the recommendation for the

7    position of assistant customer service manager

8    promotion?

9         A.       No, sir.

10        Q.       How would that have happened then, sir?

11        A.       I would have had nothing to do with that

12   position.  It's not inside my --

13        Q.       Been totally in his hands?

14        A.       No, sir, it's not in his authority --

15   under his position of authority either.

16        Q.       Whose authority would it be under?

17        A.       That's in our customer service center.

18   It's run by Vice President Shelly Cooper.

19        Q.       Where is Shelly Cooper?

20        A.       She's headquartered in Jacksonville,

21   Florida.

22        Q.       All right.  Is she over just the

23   Jacksonville, Florida area, or does she involve

24   herself with decisions regarding promotions in other

25   areas such as Atlanta and Pensacola and Montgomery?



BROWN & GALLO
LLC

Telephone  (404) 495-0777    (404) 876-8979
Toll Free   (877) 495-0777    (800) 637-0293
Fax (404) 495-0766

101 Marietta Street, Suite 2700
Atlanta, GA 30303

1740 Peachtree Street, NW
Atlanta, GA 30309

www.galloreporting.com

25

1       A.      She is in charge of the customer service

2   center where I believe the position you're talking

3   about reports.

4       Q.      Well, let's go down to another position.

5   A terminal manager position.  I think Mr. Jason

6   Tipton got that job in Montgomery, Alabama in the

7   last couple of years.  Who would be the person who

8   would be in management over making that decision for

9   promotion that Mr. Tipton received his position?

10      A.      I would be.

11      Q.      You would be?  Okay.  All right.  And how

12  about the assistant superintendent position in the

13  last couple of years that was in Atlanta, Georgia,

14  who would be over that position?

15      A.      The assistant division or the assistant

16  terminal superintendent position.

17      Q.      The assistant superintendent -- terminal

18  superintendent.

19      A.      Which one, sir.

20      Q.      In Atlanta, Georgia?

21      A.      The assistant terminal superintendent in

22  Atlanta, Georgia?

23      Q.      Yes, sir.

24      A.      That would be -- I would make those

25  ultimate decisions.



BROWN & GALLO
LLC

Telephone (404) 495-0777   (404) 876-8979
Toll Free  (877) 495-0777   (800) 637-0293
Fax (404) 495-0766

101 Marietta Street, Suite 2700
Atlanta, GA 30303

1740 Peachtree Street, NW
Atlanta, GA 30309

www.galloreporting.com

Travis Mikel Pendergrass                          October 29, 2007

26

1      Q.      That would be you, right?

2      A.      Yes, sir.

3      Q.      And how about trainmaster, Pensacola,

4   Florida?

5      A.      Ultimately me.

6      Q.      All right.  Do you know who the assistant

7   terminal superintendent, who was awarded that

8   position in the last couple of years?

9      A.      Yes, sir.

10     Q.      Who was that, sir?

11     A.      Terry.  I'm drawing a blank right now but

12  I know him.

13     Q.      Terry.  What's his age, sir?

14     A.      I really don't know.

15     Q.      Do you know Mr. Hollon's age?

16     A.      No, sir, I really don't.

17     Q.      Don't really know.  You're -- you have

18  access to records that show the ages of each of these

19  employees, don't you?

20     A.      I can request that information from our

21  HR department.

22     Q.      CSX maintains an HR department, that's

23  human resources department, the age, date of birth of

24  each of your employers, right?

25     A.      I believe it's -- yes, sir.



BROWN & GALLO
LLC

Telephone  (404) 495-0777   (404) 876-8979
Toll Free   (877) 495-0777   (800) 637-0293
Fax (404) 495-0766

101 Marietta Street, Suite 2700
Atlanta, GA 30303

1740 Peachtree Street, NW
Atlanta, GA 30309

www.galloreporting.com

27

1      Q.      Okay.  And it's readily available to you
2   as a manager and to other managers, am I correct?
3              MR. BARKER:  Object to the form.
4      A.      I don't know how readily available it is.
5   I don't have access to a system that I can pull up
6   and see anyone's age.  I can -- you asked me
7   specifically if I could find out about these two
8   individuals, and, yes, I could.
9      Q.      Okay.  You certainly could have found Mr.
10  Hollon's age in the last several years, couldn't you?
11     A.      If I needed to know it I could call our
12  HR department and ask them to furnish me that
13  information, yes, sir.
14     Q.      Why would somebody in your railroad with
15  an ongoing employee want to know the age of an
16  employee?
17             MR. BARKER:  Object to the form.
18     Q.      Do you see a need for that, sir?
19     A.      No, not particularly.  I think it's
20  always -- I think it's -- I mean, we all talk about
21  our age in our -- and different things, but I don't
22  have a particular need to know anybody's age.
23     Q.      When you say we all talk about our age,
24  I'm assuming you're reflecting on yourself.  You talk
25  about your age?



BROWN & GALLO
                                LLC

Telephone  (404) 495-0777   (404) 876-8979
Toll Free  (877) 495-0777   (800) 637-0293
Fax (404) 495-0766

101 Marietta Street, Suite 2700
Atlanta, GA 30303

1740 Peachtree Street, NW
Atlanta, GA 30309

www.galloreporting.com

28

1        A.      Oh, sure.

2                MR. BARKER:   I'd like to object.   You

3        actually didn't -- obviously didn't state the

4        facts correct.   He said he talks about his age.

5        Q.      I understand.   What is your age, sir?

6    What is your date of birth and age?

7        A.      I'm 54 years old.   I was born April the

8    1st, 1953.

9        Q.      Okay.   All right.   And other than

10   discussing your age, have you had the occasion to ask

11   other employees from CSX their age?

12       A.      I'm sure I have.

13       Q.      Why, sir?

14       A.      Just in conversation.

15       Q.      What was your motivation, sir?

16       A.      I really didn't have any motivation.

17   It's generally just a conversation.

18       Q.      To your knowledge, has CSX had other EEOC

19   charges brought against it because of age

20   discrimination complaints or complaints about

21   retaliation regarding age issues?

22       A.      I've had none brought to my attention.

23       Q.      Okay.   You don't know of any?

24       A.      No, sir.

25       Q.      Okay.   What is the age of Mr. Jason



BROWN & GALLO
                          LLC

Telephone (404) 495-0777   (404) 876-8979
Toll Free  (877) 495-0777  (800) 637-0293
         Fax (404) 495-0766

101 Marietta Street, Suite 2700
           Atlanta, GA 30303

1740 Peachtree Street, NW
           Atlanta, GA 30309

www.galloreporting.com

```
                              29
1    Tipton, do you know?
2         A.     No, sir.
3         Q.     Would you agree that he would be under
4    40?
5         A.     I'll be honest with you, Mr. Atchison,
6    I'm not trying to be evasive.  I just don't know
7    what -- how old Jason is.
8         Q.     I believe in the assistant customer
9    service manager position that Timothy Grayson got and
10   Alfred Odom got, they're both younger gentlemen than
11   Mr. Hollon, wouldn't you agree?
12        A.     I don't believe I know the two
13   individuals you just mentioned.
14        Q.     Okay.  All right.  Well, you talked about
15   in the assistant terminal superintendent's position
16   in Atlanta, Georgia that Terry blank got.  You don't
17   know his last name.
18        A.     I can't recall it.  I can -- I mean, I
19   can get it real quick if it matters.  Does it matter?
20   Okay.
21        Q.     Yeah, it does matter.  I'd like to have
22   his name, if you can remember it, or look at
23   something to help you recall.
24        A.     Could I get your permission to step out
25   of the room?
```



BROWN & GALLO
                LLC

Telephone  (404) 495-0777    (404) 876-8979
Toll Free  (877) 495-0777    (800) 637-0293
        Fax (404) 495-0766

101 Marietta Street, Suite 2700
           Atlanta, GA 30303

1740 Peachtree Street, NW
        Atlanta, GA 30309

www.galloreporting.com

30

1    Q.    Oh, yes.

2          MR. BARKER:  We're not -- he's supposed

3    to testify about his personal knowledge.  He's

4    not supposed to go research documents for you in

5    the middle of this deposition.

6          MR. ATCHISON:  If he's just offering.  I

7    don't have a problem if he offers.  Now, if you

8    tell him he can't do it, that's -- you know,

9    that's up to you.

10         MR. BARKER:  No, this deposition is about

11   his personal knowledge.

12         MR. ATCHISON:  Okay.  Well, I'd like for

13   him to see if he can find it so he can amend

14   this so that we can have his name.

15         MR. BARKER:  Well, I'm sure that you have

16   access to documents that would have his name on

17   it right in front of you, so...

18         MR. ATCHISON:  Okay.  Thank you very

19   much.

20   BY MR. ATCHISON:

21   Q.    Now, Mr. Pendergrass, do you know who got

22   the trainmaster's position in Pensacola, Florida?

23   And I think you said that you were involved in that

24   decision.

25   A.    Yes, sir.  It's open right this second.



BROWN & GALLO
                    LLC

Telephone  (404) 495-0777   (404) 876-8979
Toll Free  (877) 495-0777   (800) 637-0293
         Fax (404) 495-0766

101 Marietta Street, Suite 2700
        Atlanta, GA 30303

1740 Peachtree Street, NW
       Atlanta, GA 30309

www.galloreporting.com

31

1    We haven't filled the job right this second, but the

2    person that just vacated it was Bill Setzer.

3         Q.    Bill Setzer.  Okay.  How long did Bill

4    Setzer have a job?

5         A.    I don't recall.  Somewhere around a year.

6         Q.    Do you know why he vacated it?

7         A.    He was promoted to a position in another

8    part of our railroad.

9         Q.    Has the newly opened position of

10   trainmaster been reposted?

11        A.    I am not certain if we reposted it or if

12   we're filling it through direct placement.

13        Q.    Okay.  All right.  Now, do you understand

14   that Mr. Hollon was accused of being involved --

15   being involved in an incident regarding an FRA

16   document in May of 2006?

17        A.    Yes, sir.  I don't recall a specific

18   date, but I remember the incident.

19        Q.    Okay.  What do you recall about the

20   incident?

21        A.    I recall that there was an employee

22   called to work a job that didn't believe he was --

23   his RCO certification was in date.

24        Q.    What is RCO, please?

25        A.    Remote control operator.



BROWN & GALLO
LLC

Telephone  (404) 495-0777    (404) 876-8979
Toll Free  (877) 495-0777    (800) 637-0293
Fax (404) 495-0766

101 Marietta Street, Suite 2700
Atlanta, GA 30303

1740 Peachtree Street, NW
Atlanta, GA 30309

www.galloreporting.com

Travis Mikel Pendergrass                        October 29, 2007

                                    32

1          Q.        Okay.  And do you remember his name?

2          A.        No, sir, I don't.

3          Q.        Okay.  And what else happened?

4          A.        Well, Mr. Hollon and the Road Foreman of

5    Engine Dean, discussed the situation and Mr.

6    Hollon -- going right to the chase -- Mr. Hollon

7    signed Mr. Dean's name to the card indicating that he

8    had been certified.

9          Q.        What card are we talking about, sir, if

10   you can tell the court?

11         A.        The RCO operator's certification card.

12         Q.        Okay.  Is that a document that's a -- a

13   document required by the federal government?

14         A.        Yes, sir, I believe so.

15         Q.        Okay.  And did you participate in the

16   demotion of Mr. Hollon due to this alleged incident?

17         A.        Yes, sir, I made the determination to

18   demote Mr. Hollon and Mr. Dean.

19         Q.        Okay.  And what is the FRA?  What is that

20   acronym?

21         A.        Federal Railroad Administration.

22         Q.        And that document was an FRA document,

23   correct?

24         A.        I believe that's the case.

25         Q.        Okay.  Do you have a secretary or an



BROWN & GALLO
                              LLC

101 Marietta Street, Suite 2700
Atlanta, GA 30303

1740 Peachtree Street, NW
Atlanta, GA 30309

Telephone  (404) 495-0777   (404) 876-8979
Toll Free   (877) 495-0777   (800) 637-0293
Fax (404) 495-0766

www.galloreporting.com

Travis Mikel Pendergrass                                    October 29, 2007

                                    33

1    administrative assistant?

2         A.       Yes, sir.

3         Q.       Okay.  Have you, from time to time,

4    instructed him or her to sign your name to documents

5    and letters?

6         A.       Documents and letters, yes, sir.

7         Q.       Okay.  Has CSX ever tried to terminate or

8    demote you because of that?

9         A.       No, sir, they have not.

10        Q.       Okay.  All right.  And you don't -- you

11   didn't see anything fraudulent when you asked your

12   secretary or administrative assistant to sign

13   documents for you, do you?

14        A.       I never asked them to sign anything that

15   hadn't occurred.

16        Q.       That had not occurred?

17        A.       Yes, sir.  That certified something had

18   occurred that hadn't.

19        Q.       Okay.  Are you saying that something had

20   not occurred when Mr. Hollon signed upon a request

21   from Mr. Dean the FRA document, the document we're

22   talking about of May 2006?

23        A.       I'm saying that the -- my understanding

24   is is that the signature indicated that a

25   certification ride had been made that wasn't.



BROWN & GALLO
                              LLC

Telephone  (404) 495-0777    (404) 876-8979
Toll Free   (877) 495-0777    (800) 637-0293
Fax (404) 495-0766

101 Marietta Street, Suite 2700
Atlanta, GA 30303

1740 Peachtree Street, NW
Atlanta, GA 30309

www.galloreporting.com

34

1      Q.      A certification, what now, sir --

2      A.      Qualification had been done at the time

3  that wasn't done.

4      Q.      Okay.  And it's your understanding that

5  it wasn't done?

6      A.      Not at the time it was signed.

7      Q.      Okay.  Was there an investigation by the

8  FRA about this matter?

9      A.      I think the FRA -- my recollection is is

10 that the FRA was made aware of the situation.  I'm

11 not sure of any FRA investigation, per se.

12     Q.      Did the FRA make a finding that there was

13 no known violation in this matter?

14     A.      With regard to federal law I believe

15 that's -- that's -- I believe my understanding is

16 that there was no violation of federal law because we

17 have a grace period.

18     Q.      Right.  So the FRA found nothing wrong

19 with what Mr. Hollon had done; is that correct?

20         MR. BARKER:    Object to the form.  You can

21     answer.

22     A.      I don't believe that's accurate at all.

23 I believe that everybody realized that Mr. Hollon

24 should not have signed the card indicating that

25 something had been done that had not been done.  I



BROWN & GALLO
LLC

Telephone  (404) 495-0777   (404) 876-8979
Toll Free   (877) 495-0777   (800) 637-0293
Fax (404) 495-0766

101 Marietta Street, Suite 2700
Atlanta, GA 30303

1740 Peachtree Street, NW
Atlanta, GA 30309

www.galloreporting.com

Travis Mikel Pendergrass                                    October 29, 2007

35

1    believe Mr. Hollon and Mr. Dean both acknowledged

2    that.

3         Q.    I'm looking at a document, sir, that was

4    previously marked as number -- Exhibit No. 8 and

5    attached to Mr. Hollon's deposition.  I'm going to

6    read from part of it.  And it says, quote, after

7    review of the circumstances and events on that date,

8    FRA determined that CSX was not in violation of

9    federal regulations governing remote control

10   operations.  FRA has allowed CSX a 60-day grace

11   period for an RCO that has not had a check ride for

12   the previous year which allows an RCO to operate for

13   such -- as such for 60 days prior to the completion

14   of the check ride, end quote.

15        A.    Yes, sir.

16        Q.    Do you disagree with that finding or that

17   statement, sir?

18        A.    Well, I'm not going to disagree with that

19   statement.  That statement is pretty clear.

20        Q.    And that statement was from Patrick Plumb

21   of -- at dot gov.  Do you know who that is, sir?

22        A.    No, sir, I don't.

23        Q.    Okay.  If we represent that he was an FRA

24   person in the bureaucracy of the FRA making that

25   statement, would you have anything to dispute that



BROWN & GALLO
LLC

Telephone (404) 495-0777    (404) 876-8979
Toll Free   (877) 495-0777    (800) 637-0293
Fax (404) 495-0766

101 Marietta Street, Suite 2700
Atlanta, GA 30303

1740 Peachtree Street, NW
Atlanta, GA 30309

www.galloreporting.com

36

1    statement of that disposition?

2         A.       I don't have anything to refute or to

3    acknowledge.

4         Q.       Okay.  All right.  Now, you've expressed

5    that you're vice president and have been for the last

6    several years.  I think you said since 2005.  Who do

7    you report to, sir?

8         A.       I report to David Brown.

9         Q.       All right.  And what is his position?

10        A.       He's vice president and chief

11   transportation officer.

12        Q.       So a vice president reports to another

13   vice president?

14        A.       The chief transportation officer, yes,

15   sir.

16        Q.       That's pretty confusing.  I'm sorry.  Who

17   is the president of the company, do you know, sir?

18        A.       I don't think we have the president

19   position right this second.  We've got chairman and

20   CEO, but I'm not sure about the president.

21        Q.       Okay.  And who is the CEO?

22        A.       Mr. Michael Ward.

23        Q.       Michael Ward.  Who is between you and

24   Michael Ward in the line of progression up that

25   ladder?



BROWN & GALLO
LLC

Telephone  (404) 495-0777   (404) 876-8979
Toll Free   (877) 495-0777   (800) 637-0293
Fax (404) 495-0766

101 Marietta Street, Suite 2700
Atlanta, GA 30303

1740 Peachtree Street, NW
Atlanta, GA 30309

www.galloreporting.com

Travis Mikel Pendergrass                                    October 29, 2007

37

```
1        A.      Well, in the area of transportation,
2   there's my boss, David Brown.
3        Q.      Okay.
4        A.      His boss, Mr. Tony Ingram.
5        Q.      What is his position?
6        A.      Executive vice president of operations, I
7   believe, is Mr. Ingram's title.
8        Q.      Okay.  Who else?
9        A.      And he reports to Mr. Ward.
10        Q.      Okay.  Did you ever get any e-mails,
11   telephone calls, letters, in-person communication or
12   otherwise from Mr. Ward, the CEO, about any
13   complaints that Ron Hollon made regarding his
14   employment there at CSX?
15        A.      Not that I can remember any substance to.
16   I don't recall anything.
17        Q.      Okay.  After, say, July 30th of 2006, to
18   refresh you, do you know if anyone from Mr. Michael
19   Ward's office or anybody that was instructed by him
20   to contact you -- contacted you regarding Ron Hollon?
21        A.      No, sir, not to my knowledge.
22        Q.      You don't remember.  Okay.  Would you
23   find it strange that several positions that employees
24   apply for and get highly ranked are positions in
25   which women are passed over that are highest ranked?
```



BROWN & GALLO
LLC

101 Marietta Street, Suite 2700
Atlanta, GA 30303

1740 Peachtree Street, NW
Atlanta, GA 30309

Telephone  (404) 495-0777    (404) 876-8979
Toll Free  (877) 495-0777    (800) 637-0293
Fax (404) 495-0766

www.galloreporting.com

38

1    Would you find that to be strange?

2              MR. BARKER:  Object to the form.

3        A.      I'd find that -- if I'm understanding

4    your question correctly, I believe I'd find that very

5    strange.

6        Q.      Okay.  And would you look into such a

7    matter as being arbitrary and capricious or just

8    something that would catch your attention?

9              MR. BARKER:  Object to the form.

10       A.      If the complaint came to me, I would turn

11   it over to our HR department for review.

12       Q.      Okay.  All right.  If somebody doesn't

13   get interviewed for a position, is there any sort of

14   explanation given to him or her when they apply for a

15   position?

16       A.      I don't believe there's a formal process

17   for that.  I'm sure there are instances where

18   people -- or that might know someone who's on the

19   panel or whatever is talked to about it or knows --

20   and asks someone about it informally, but I don't

21   believe there's a process for it.

22       Q.      Mr. Workman, when he was taken off the

23   position of district manager in the Atlanta division,

24   had he had any disciplinary actions against him

25   before that decision to take him off of that



BROWN & GALLO

LLC

Telephone  (404) 495-0777    (404) 876-8979
Toll Free   (877) 495-0777    (800) 637-0293
Fax (404) 495-0766

101 Marietta Street, Suite 2700
Atlanta, GA 30303

1740 Peachtree Street, NW
Atlanta, GA 30309

www.galloreporting.com

Travis Mikel Pendergrass                                    October 29, 2007

                                39
1    position?

2         A.      No disciplinary actions to my knowledge

3    had been taken against Rod Workman.

4         Q.      Were there any threats of disciplinary

5    actions?

6         A.      None to my knowledge.

7         Q.      Okay.  In several of the years there's

8    been several scenarios or instances that we're

9    interested in.  Do you recall an instance involving

10   Alan Snapp, a terminal manager in Mobile where it's

11   alleged there were payroll accounts that were

12   falsified?

13        A.      There -- to my knowledge there were no

14   allegations of payroll being falsified.

15        Q.      Okay.  Do you recall an incident

16   involving Alan Snapp?

17        A.      I've known Alan Snapp for 18 years.  Yes,

18   sir, there's been lots of incidents with Alan Snapp.

19        Q.      And what -- in the last couple of years,

20   what incidences do you recall involving him that were

21   disciplinary in nature?

22        A.      Well, disciplinary in nature, I only

23   remember one.

24        Q.      Which is?

25        A.      His demotion from his position as



BROWN & GALLO
                                    LLC

Telephone  (404) 495-0777    (404) 876-8979
Toll Free  (877) 495-0777    (800) 637-0293
Fax (404) 495-0766

101 Marietta Street, Suite 2700
Atlanta, GA 30303

1740 Peachtree Street, NW
Atlanta, GA 30309

www.galloreporting.com

Travis Mikel Pendergrass                                October 29, 2007

40

1    terminal manager of Mobile.

2        Q.      Why was he demoted, sir?

3        A.      Because he had allowed early quits to

4    occur within his terminal.

5        Q.      He allowed what, sir?

6        A.      Early quits, jobs to leave prior to

7    completion of their tour of duty.

8        Q.      Okay.  In other words, let's see if I

9    understand you.  Say, I'm due to work till five

10   o'clock and I leave at four o'clock, is that the type

11   of situation you were just talking about?

12       A.      Yes, sir.

13       Q.      Okay.  Early quits.  And that means

14   you're actually leaving from the work site earlier

15   than you're required to stay there, right?

16       A.      They leave the work site while they're

17   still under pay.

18       Q.      Under pay.  And do you know what type of

19   documentation was involving that demotion?  Did

20   Mr. Snapp have any documents showing that they had

21   stayed there the full time, but indeed they had not?

22   Was that the scenario that involved his demotion?

23       A.      What involved his demotion, Mr. Atchison,

24   one more time.  You didn't let me finish a minute

25   ago.  There were two --



BROWN & GALLO
                                    LLC

101 Marietta Street, Suite 2700
Atlanta, GA 30303

Telephone  (404) 495-0777   (404) 876-8979
Toll Free   (877) 495-0777   (800) 637-0293
Fax (404) 495-0766

1740 Peachtree Street, NW
Atlanta, GA 30309

www.galloreporting.com

41

1      Q.      I'm sorry.  And please tell me if I don't
2  because I may cut you off.
3      A.        There were two things that led to
4  Mr. Snapp's demotion.  One was the not curtailing
5  jobs from leaving duty prior to completion of their
6  shift, early quits, and the other was allowing -- not
7  determining that these jobs were shown off in the
8  computer as to having left at the completion of their
9  tour of duty.
10     Q.      Okay.  And the computer is a form of
11 documentation at CSX, is it not, computer entries?
12     A.        Our train and engine service employees
13 register their time via the computer.
14     Q.        And that would be a form of
15 documentation?
16     A.        Yes, sir.
17     Q.        Just another form -- a computerized form
18 of documentation.  And so in other words, it appeared
19 on the computer documentation that these employees
20 had stayed their full shifts; is that correct?
21     A.        Yes, sir.
22     Q.        Whereas they had really not, in all
23 actuality, stayed their full shifts, am I correct?
24     A.        Yes, sir, there were cases of that.
25     Q.        Okay.  And would that be a violation of


BROWN & GALLO
LLC

Telephone  (404) 495-0777    (404) 876-8979
Toll Free   (877) 495-0777    (800) 637-0293
Fax (404) 495-0766

101 Marietta Street, Suite 2700
Atlanta, GA 30303

1740 Peachtree Street, NW
Atlanta, GA 30309

www.galloreporting.com

42

1    CSX's policy, sir?

2        A.      Yes, sir.

3        Q.      And what violation would that be?  How

4    would that come under a violation?

5        A.      You're talking about for the jobs or are

6    you're talking about for Mr. Snapp?

7        Q.      For Mr. Snapp, sir.  He was the one that

8    was demoted.

9        A.      Mr. Snapp was responsible for knowing

10   when his crews went on and off duty and he was

11   responsible for seeing to it that they properly

12   reflected that time on and off duty via the computer.

13   He did neither.

14       Q.      And who made the entries showing that

15   they had worked there the whole time whereas they

16   really had not?  Was it the employees or Mr. Snapp?

17       A.      Neither.  In the cases we're talking

18   about, other crew members on other jobs showed the

19   people off duty when they got there.

20       Q.      Okay.  But Mr. Snapp knew that those

21   entries were incorrect as far as your findings went;

22   is that correct?

23       A.      My findings were that he should have

24   known that the jobs were leaving early and the fact

25   that he should have known that they were leaving



BROWN & GALLO
                                    LLC

Telephone  (404) 495-0777    (404) 876-8979
Toll Free  (877) 495-0777    (800) 637-0293
        Fax (404) 495-0766

101 Marietta Street, Suite 2700
        Atlanta, GA 30303

1740 Peachtree Street, NW
        Atlanta, GA 30309

www.galloreporting.com

43

1  early, he should have known that the times shown in

2  the computer were not accurate.

3      Q.    Okay.  Was Trainmaster Ray Billingsley

4  involved in this matter?

5      A.    Trainmaster Ray Billingsley was a

6  trainmaster that worked for Mr. Snapp at the time,

7  but to my knowledge, Mr. Snapp was the senior and

8  accountable manager for the Mobile terminal, and he

9  was the one that I held accountable.

10     Q.    At the time of his demotion, was he, Mr.

11 Snapp, over 40 years old?

12     A.    Yes, sir.

13     Q.    How did you know that?

14     A.    Because I've known him for 18 or 19

15 years.

16     Q.    Okay.  And was Mr. Ray Billingsley

17 demoted or disciplined regarding this matter?

18     A.    Mr. Billingsley and the other managers

19 that were there were counseled about the importance

20 of people reporting their time correctly and the

21 manager's responsibility to make certain that it was

22 done.  But being as how Mr. Billingsley and the other

23 managers at Mobile worked for Mr. Snapp, the ultimate

24 person accountable was Mr. Snapp.  But all the

25 managers at Mobile were talked to about the incident



BROWN & GALLO
LLC

Telephone  (404) 495-0777   (404) 876-8979
Toll Free  (877) 495-0777   (800) 637-0293
Fax (404) 495-0766

101 Marietta Street, Suite 2700
Atlanta, GA 30303

1740 Peachtree Street, NW
Atlanta, GA 30309

www.galloreporting.com

44

1    and all of them were made aware of the decisions that

2    were made that had been incorrect.

3         Q.      Was Mr. Ray Billingsley over 40 or under

4    40 at the time of this incident?

5         A.      I'm not sure right now today how old Mr.

6    Billingsley is or how old he was at the time of the

7    incident.

8         Q.      Okay.   What about Gary Jackson?   Was he

9    involved in this incident?

10        A.      Yes, sir, he's one of the managers that

11   was at Mobile, I believe.

12        Q.      I believe he was the trainmaster at the

13   time, wasn't he?

14        A.      And still is.

15        Q.      Okay.   Was he over 40 or under 40 at the

16   time of this incident with Mr. Snapp?

17        A.      Gary is over 40.

18        Q.      Okay.   And do you know if there was any

19   disciplinary action against him?

20        A.      I believe he got the same disciplinary

21   action all of the other trainmasters at Mobile got

22   was the counseling and the correction of the behavior

23   that had been observed.

24        Q.      Okay.

25        A.      But again, Mr. Snapp was the senior



BROWN & GALLO
LLC

Telephone  (404) 495-0777   (404) 876-8979
Toll Free   (877) 495-0777   (800) 637-0293
Fax (404) 495-0766

101 Marietta Street, Suite 2700
Atlanta, GA 30303

1740 Peachtree Street, NW
Atlanta, GA 30309

www.galloreporting.com

45

1    manager and the manager accountable for the terminal.

2        Q.      All right.  I'm going to ask similar

3    questions about two other gentlemen.  Elliot Davis --

4        A.      Yes, sir.

5        Q.      -- was he over 40 or under 40 at the time

6    of this incident involving Snapp?

7        A.      I don't know.

8        Q.      Okay.  And was he counseled?

9        A.      I believe he was counseled as was all the

10   other trainmasters at Mobile.

11       Q.      Which would involve Mike Hyler,

12   H-y-l-e-r?

13       A.      Mike Hyler was also a trainmaster there.

14   I believe Mike Hyler -- and again, I'm working off my

15   recollection -- I believe Mike Hyler had brought this

16   issue to the attention of Mr. Snapp.  So he was one

17   of the people who really was trying to correct this

18   behavior, was our determination.

19       Q.      So you didn't counsel him?

20       A.      He was counseled because we wanted to

21   make sure everybody understood the importance of it.

22       Q.      All right.  At the time of this accident,

23   was he over 40 or under 40?

24       A.      I'm not certain.

25       Q.      Who validates or approves the payroll for



BROWN & GALLO
                                    LLC

Telephone  (404) 495-0777    (404) 876-8979
Toll Free   (877) 495-0777    (800) 637-0293
          Fax (404) 495-0766

101 Marietta Street, Suite 2700
          Atlanta, GA 30303

1740 Peachtree Street, NW
          Atlanta, GA 30309

www.galloreporting.com

Travis Mikel Pendergrass                              October 29, 2007

46

1  the yard crews, do you know?

2       A.      It's done different ways at different

3  locations.  Generally a yardmaster or a trainmaster

4  will validate it.

5       Q.      In Mobile, how would it have been done,

6  do you know?

7       A.      I don't know.

8       Q.      Okay.  Was there any discipline in this

9  matter given to the contract crews?

10      A.      I'm trying to remember.  I just don't

11  recall.  I don't think so, but I don't recall.

12      Q.      Okay.  All right.  Well, let's shift

13  gears a little bit.  Do you know who W.E. McClellan

14  is?

15      A.      Yes, sir.

16      Q.      Who is Mr. McClellan?

17      A.      Ed McClellan is a retired employee of the

18  CSX Transportation Company.

19      Q.      When did he retire?

20      A.      I don't recall the exact date.

21      Q.      Well, would it have been this year, sir?

22      A.      This year or late last year.

23      Q.      Okay.  Did his retirement have anything

24  to do with a disciplinary action or a threat in

25  disciplinary action?



BROWN & GALLO
                                            LLC

Telephone  (404) 495-0777   (404) 876-8979
Toll Free   (877) 495-0777   (800) 637-0293
Fax (404) 495-0766

101 Marietta Street, Suite 2700
Atlanta, GA 30303

1740 Peachtree Street, NW
Atlanta, GA 30309

www.galloreporting.com

Travis Mikel Pendergrass                          October 29, 2007

47

1        A.        Retirement occurred at the -- after an

2    incident had occurred that was -- had discipline

3    pending.

4        Q.        Okay.  And in 2006, February of 2006,

5    would he have been over 40 or under 40?

6        A.        Ed would have been over 40.

7        Q.        I believe he was involved in an incident

8    involving not submitting a rule violation report, am

9    I correct?

10       A.        No.  My recollection is is that the

11   incident that happened immediately prior to his

12   retirement involved him giving bad advice to a road

13   foreman and a trainmaster concerning the reporting of

14   a derailment.

15       Q.        Reporting of a derailment?

16       A.        Yes, sir.  Sideswipe damage, I believe,

17   was the actual cause.

18       Q.        Where was Mr. McClellan working out of as

19   of February 2006?

20       A.        He was the manager of operating practices

21   on the Atlanta division headquartered in Atlanta,

22   Georgia.

23       Q.        Okay.  And would that have been where he

24   retired from?

25       A.        Yes, sir.  He lives in the Marietta area


BROWN & GALLO
LLC

Telephone  (404) 495-0777    (404) 876-8979
Toll Free   (877) 495-0777    (800) 637-0293
Fax (404) 495-0766

101 Marietta Street, Suite 2700
Atlanta, GA 30303

1740 Peachtree Street, NW
Atlanta, GA 30309

www.galloreporting.com

48

1    or at least did.

2         Q.       Okay.  What is the procedure in reporting

3    a rule violation of a train accident?

4         A.       Well, it must immediately be reported to

5    the division management and the proper company

6    required accident reports need to be filled out.

7         Q.       Do you know at that time period, in

8    February of 2006, whether or not trainmaster Greg

9    Kent was involved in that incident of the derailment?

10        A.       I'm trying to remember.  There were -- I

11   can't remember because Greg had an accident and was

12   off.  I can't remember if Greg was the trainmaster.

13   And I don't remember who the trainmaster and who the

14   road foreman were.  I remember that they were -- the

15   road foreman and the trainmaster on the W&A

16   subdivision.  I do not recall who the players were.

17        Q.       Do you remember if trainmaster Greg Kent

18   got any disciplinary action involving this incident?

19        A.       No.  The disciplinary action -- since the

20   trainmaster -- if it was Greg Kent, it was Greg Kent.

21   But the trainmaster and the road foreman both

22   reported that they had been given this advice by the

23   management of operating practices on the Atlanta

24   division, Ed McClellan, and when they reported that

25   they had not done that properly, I do not believe


BROWN & GALLO
LLC

Telephone  (404) 495-0777   (404) 876-8979
Toll Free   (877) 495-0777   (800) 637-0293
Fax (404) 495-0766

101 Marietta Street, Suite 2700
Atlanta, GA 30303

1740 Peachtree Street, NW
Atlanta, GA 30309

www.galloreporting.com

49

1    that we disciplined them --

2        Q.      Okay.

3        A.      -- formally.

4        Q.      Was Mr. Greg Kent at the time under 40?

5        A.      I don't know.

6        Q.      Would you say probably he was?

7        A.      Greg is right in that area as has been a

8    couple of the other names you've mentioned.

9        Q.      How about Joe Tatum, the road foreman of

10   engines?

11       A.      Joe was older than 40.

12       Q.      Was he disciplined?  I'm trying to

13   remember your testimony.  I'm sorry.

14       A.      Neither the -- to my knowledge, neither

15   the road foreman nor the trainmaster were disciplined

16   because they both reported the violation and they

17   were both given this counsel by a senior person named

18   Ed McClellan.

19       Q.      How about was there an engineer by the

20   name of C.D. G-r-a-y -- excuse -- G-r-a-v-l-e-y,

21   involved in this incident?

22       A.      I'm not certain who the employees were

23   that caused the damage.  I was mainly focused on the

24   fact that the damage was not reported appropriately

25   and took action based on that.



BROWN & GALLO
LLC

Telephone  (404) 495-0777    (404) 876-8979
Toll Free  (877) 495-0777    (800) 637-0293
Fax (404) 495-0766

101 Marietta Street, Suite 2700
Atlanta, GA 30303

1740 Peachtree Street, NW
Atlanta, GA 30309

www.galloreporting.com

Travis Mikel Pendergrass                          October 29, 2007

50

1      Q.      Okay.

2      A.      I'm certain that the crew was counseled,

3   but I don't know what -- the issue was not the damage

4   that was caused.  That was easily dealt with.  The

5   problem I had was it had not been properly reported.

6      Q.      And you don't know whether or not Gravley

7   was involved, a guy named T.G. Powell who was the

8   conductor, was involved?

9      A.      I don't recall the crew members.

10     Q.      Okay.  At the time of the accident, Rod

11  Workman was the division manager there at the Atlanta

12  division, was he not?

13     A.      Yes, sir.

14     Q.      Okay.  All right.  Do you know an

15  incident involving trainmaster Ray Billingsley of

16  Mobile for falsifying an efficiency test?

17     A.      My recollection of that was that there

18  was an accusation of that, but the investigation

19  turned out that it was a typographical error and no

20  falsification was involved.

21     Q.      Who made that finding?  Was that the

22  Federal Railroad Administration, FRA?

23     A.      I don't -- that wouldn't have been who I

24  relied upon.  I relied on the Atlanta division, but

25  the FRA may or may not have checked it out.  I don't



BROWN & GALLO

LLC

Telephone  (404) 495-0777    (404) 876-8979
Toll Free   (877) 495-0777    (800) 637-0293
Fax (404) 495-0766

101 Marietta Street, Suite 2700
Atlanta, GA 30303

1740 Peachtree Street, NW
Atlanta, GA 30309

www.galloreporting.com

51

1    know.  We get -- from time to time we get a lot of

2    these accusations that we research and follow up.

3    From time to time they're accurate, most of the time

4    they're not.  In this particular case it was not.

5        Q.    And you get these complaints from various

6    sources but particularly I assume union sources

7    complaining about management?

8        A.    Most of the time, yes, sir.

9        Q.    Okay.  Do you recall an incident

10   involving Ron Dunlap of Montgomery where he was

11   caught sleeping in his vehicle?

12       A.    I vaguely remember the incident.

13       Q.    Now -- and I want to say in the last

14   couple of years -- at that point the terminal manager

15   was Angie Averitte, okay, would that be correct?

16       A.    I don't know who the terminal

17   superintendent was at the time of the incident.  I

18   know Angie Averitte has been the terminal manager of

19   Montgomery.  She's not currently on that position.

20       Q.    I was going to say -- that's my next

21   question.  Where is she now, sir?

22       A.    She's the manager of operating practices

23   in Atlanta, Georgia.

24       Q.    Is that a higher position than the

25   Montgomery position she formerly held?



BROWN & GALLO
LLC

Telephone  (404) 495-0777    (404) 876-8979
Toll Free  (877) 495-0777    (800) 637-0293
Fax (404) 495-0766

101 Marietta Street, Suite 2700
Atlanta, GA 30303

1740 Peachtree Street, NW
Atlanta, GA 30309

www.galloreporting.com

52

1      A.      It's a lateral position.

2      Q.      A lateral.  Okay.  So you understand the

3  term when I used lateral last time?

4      A.      I understand how I use it, yes, sir.

5      Q.      Now, how do you use it, sir?  How do you

6  define a lateral position or a lateral transfer?

7      A.      Same salary band.

8      Q.      Okay.  Same salary band, okay.  And she's

9  currently there in Atlanta?

10     A.      Yes, sir.

11     Q.      And what position does she currently

12  hold?

13     A.      She's the manager of operating practices.

14     Q.      What does that job do?

15     A.      That job is a direct report of the

16  division manager on each of the ten operating

17  divisions.  And it's responsible for safety in

18  accident and injury prevention and reporting.

19     Q.      Okay.  Do you know an incident involving

20  John Carnes, assistant superintendent, Birmingham,

21  Alabama where he was accused of assaulting a female

22  yardmaster?

23     A.      Yes, sir.

24     Q.      Okay.  When was that, sir?

25     A.      I don't recall the specific dates.



BROWN & GALLO
                                    LLC

Telephone  (404) 495-0777   (404) 876-8979
Toll Free  (877) 495-0777   (800) 637-0293
Fax (404) 495-0766

101 Marietta Street, Suite 2700
Atlanta, GA 30303

1740 Peachtree Street, NW
Atlanta, GA 30309

www.galloreporting.com

53

1        Q.      Would it have been in the last couple of
2    years?
3        A.      Yes, sir.
4        Q.      All right.  And Mr. Carnes, at that time,
5    was under 40 or over 40?
6        A.      I don't know for certain.  I believe he's
7    under 40.
8        Q.      And after that incident he would have
9    been under 40?
10       A.      I don't know.
11       Q.      Okay.
12       A.      I'm thinking he's right in that area, but
13   I don't really know.
14       Q.      Was he pulled out of service until that
15   matter was investigated?
16       A.      No, sir, I don't believe because -- no,
17   sir, I don't believe.  I believe we knew right from
18   the very beginning that that incident was not -- was
19   false and that Mr. Carnes had acted appropriately
20   from the very beginning.
21       Q.      Okay.  You know, I had asked you a
22   question about Angie Averitte.  She's currently
23   manager of operating practices in Atlanta, Georgia.
24   How many women in, say, the Atlanta division are
25   trainmasters?



BROWN & GALLO
                        LLC

Telephone  (404) 495-0777    (404) 876-8979
Toll Free   (877) 495-0777    (800) 637-0293
          Fax (404) 495-0766

101 Marietta Street, Suite 2700
            Atlanta, GA 30303

1740 Peachtree Street, NW
            Atlanta, GA 30309

www.galloreporting.com

54

1          MR. BARKER:   What does this have to do

2     with anything?

3          MR. ATCHISON:   I think it has a lot to do

4     with arbitrary divisions.

5          MR. BARKER:   Whatever.  If you're going

6     to go down this road, then we can go ahead and

7     call the magistrate up because this is not a

8     gender discrimination case, and I'm fairly

9     certain Mr. Hollon is not a woman.

10         MR. ATCHISON:   Well, are you instructing

11    the witness not to answer?

12         MR. BARKER:   I'm not going to instruct

13    the witness not to answer the question because

14    that's not proper, but if you're going to go

15    down this road, then we're going to call the

16    magistrate, because allegations of gender

17    discrimination, that you seem to be trying to

18    make, have nothing to do with this case.

19         MR. ATCHISON:   Calm down.  Let me say

20    this.  I'll reserve my right to call -- ask this

21    question later.  We'll move on.  Calm down.

22  BY MR. ATCHISON:

23    Q.     All right.  Mr. Workman -- let me ask you

24  this -- was involved in the demotion of Ron Hollon,

25  was he not, on June of 2006 and this is regarding the



BROWN & GALLO
                                    LLC

Telephone  (404) 495-0777    (404) 876-8979
Toll Free  (877) 495-0777    (800) 637-0293
Fax (404) 495-0766

101 Marietta Street, Suite 2700
Atlanta, GA 30303

1740 Peachtree Street, NW
Atlanta, GA 30309

www.galloreporting.com

55

1    FRA card incident, right, sir?

2        A.      Mr. Workman brought the situation to my

3    attention.   As I said earlier, I made the

4    determination to demote Ron.

5        Q.      Okay.   What did you do to make that

6    determination?   How did you investigate?   What did

7    you do?  I don't think I clarified that fully when I

8    was asking you about that.

9        A.      I read the statements from the two

10   employees involved and they were pretty much -- it

11   was very clear to me and I think it was very clear in

12   their statements that they had decided to sign a

13   document that was not accurate and instruct people to

14   go to work with a document that was false.

15       Q.      And you demoted both or you recommended

16   the demotion of both Mr. Hollon and Mr. Dean?

17       A.      I demoted both of them.

18       Q.      Okay.   You made the final decision on

19   demoting both of them, correct, the reasons you

20   stated?

21       A.      Yes, sir, it was my decision.

22       Q.      Okay.   And I take it that you -- before

23   you made that decision you had not consulted with the

24   FRA or anybody with the FRA?

25       A.      It really wasn't an FRA matter from my



BROWN & GALLO
                                          LLC

Telephone  (404) 495-0777    (404) 876-8979
Toll Free   (877) 495-0777    (800) 637-0293
            Fax (404) 495-0766

101 Marietta Street, Suite 2700
            Atlanta, GA 30303

1740 Peachtree Street, NW
            Atlanta, GA 30309

www.galloreporting.com

56

1    perspective.  I knew when I read the statements that
2    we did not have an FRA violation, but we had a matter
3    of integrity issue here and we had the leadership at
4    Montgomery, Alabama, Mr. Dean and Mr. Hollon, sign a
5    document falsely and instructed our people to go to
6    work with a false document.  That's not the kind of
7    leadership I can allow to have happen on our
8    railroad.
9         Q.    Okay.  And I take it after the FRA had
10   made its decision in this matter, CSX railroad was
11   never fined, am I correct about that?
12        A.    No.  We were never -- not about that.
13   There was never any doubt in my mind that there was
14   no federal regulation.  Again, the violation was --
15   an ethical violation of two of my managers had a card
16   signed indicating that something had occurred that
17   hadn't.
18        Q.    All right, sir.
19              MR. ATCHISON:  Can we take a very short
20        break, Mr. Barker?
21              MR. BARKER:  That's fine.
22              (Break taken.)
23   BY MR. ATCHISON:
24        Q.    Okay.  All right.  Mr. Pendergrass, you
25   understand you're still under oath, aren't you?



BROWN & GALLO
                                        LLC

101 Marietta Street, Suite 2700
Atlanta, GA 30303

1740 Peachtree Street, NW
Atlanta, GA 30309

Telephone  (404) 495-0777    (404) 876-8979
Toll Free   (877) 495-0777    (800) 637-0293
Fax (404) 495-0766

www.galloreporting.com

57

1      A.      Yes, sir.

2      Q.      Okay.  All right.  Do you recall whether

3  or not Mr. Hollon applied for a trainmaster's

4  position in Montgomery in June of 2007?

5      A.      No, sir.

6      Q.      You don't recall that?

7      A.      No, sir.

8      Q.      You don't recall any of that scenario?

9      A.      I don't -- I mean, I almost never see who

10 applies for trainmaster jobs.

11     Q.      Okay.  All right.  Do you know if CSX has

12 a policy of not providing people on their home

13 terminal because they would be supervising and

14 managing people they think -- that they had worked

15 with in the past?

16     A.      We don't have a policy of that.  We have

17 found over the years that when you promote somebody

18 from their home location that it's a real disservice

19 to the person you're promoting.

20     Q.      Okay.  Sir, I'm going to try to put you

21 on speakerphone.  I'm sorry.  I'm just holding this

22 thing up.  Hang on just a moment.

23          Mr. Pendergrass, have you or CSX promoted

24 a person named David Perry to a road foreman of

25 engines at the M&M sub?  Did you hear me, sir?



LLC

101 Marietta Street, Suite 2700
Atlanta, GA 30303

1740 Peachtree Street, NW
Atlanta, GA 30309

Telephone  (404) 495-0777    (404) 876-8979
Toll Free   (877) 495-0777    (800) 637-0293
Fax (404) 495-0766

www.galloreporting.com

58

1    A.        I'm hearing you.  I'm trying to remember

2   who our current road -- I don't know who our current

3   road foreman is on the M&M sub.  No, sir, I don't

4   recall who's there.  It could very well be who you

5   said.

6    Q.        Do you know if Montgomery was his home

7   terminal?

8    A.        Again, I don't know -- I don't recall the

9   particulars around that particular assignment.

10    Q.        Do you know if Mr. Perry worked in the

11   Montgomery terminal?

12    A.        Again, I don't recall Mr. Perry, per se,

13   period.

14    Q.        Okay.  All right.  Mr. Pendergrass, on

15   the Atlanta division, what was your percentage of

16   trainmasters that were over, say, 40 years of age?

17    A.        I don't know.

18    Q.        Do you have any best knowledge or

19   recollection?

20    A.        You're talking about right this second?

21    Q.        Yes, sir.

22    A.        I don't know.

23    Q.        Okay.  Mr. Pendergrass, since CSX

24   maintains a policy of the EEOC and the EEOC

25   guidelines, why have you -- why do you have appointed



BROWN & GALLO

LLC

Telephone  (404) 495-0777   (404) 876-8979
Toll Free  (877) 495-0777   (800) 637-0293
Fax (404) 495-0766

101 Marietta Street, Suite 2700
Atlanta, GA 30303

1740 Peachtree Street, NW
Atlanta, GA 30309

www.galloreporting.com

59

1   positions within the company?

2           MR. BARKER:  Object to the form.

3       Q.      Okay.  Do you understand my question?

4       A.      No, sir, I don't.

5       Q.      Well, for all positions, do you publicly

6   advertise the positions?

7       A.      No, sir.

8       Q.      Okay.  Why not, sir?

9       A.      Because you generally get a lot of people

10  that apply for positions that they're dramatically

11  under qualified for and we have a formalized

12  succession planning process for most of our senior

13  positions.

14      Q.      Okay.  So you just promote within for

15  your senior positions, is that what you do?

16          MR. BARKER:  Object to the form.

17      A.      What we do within for our senior

18  positions is we develop a succession plan.  Each of

19  our divisions are responsible for the development of

20  the managers that work for them, and we have frequent

21  meetings where we discuss the qualifications and the

22  performance of these managers to determine who are

23  our high potentials based on their results.

24      Q.      Okay.  Mr. Pendergrass, if you had a

25  manager that quit his position, would you later on



BROWN & GALLO
                                LLC

Telephone  (404) 495-0777    (404) 876-8979
Toll Free    (877) 495-0777    (800) 637-0293
Fax (404) 495-0766

101 Marietta Street, Suite 2700
Atlanta, GA 30303

1740 Peachtree Street, NW
Atlanta, GA 30309

www.galloreporting.com

60

1    promote him?

2         A.         That has happened.  It's not very

3    frequent.

4         Q.         Okay.  Does CSX have a policy on this

5    matter?

6         A.         A policy stating what?

7         Q.         On that issue of when a person quits a

8    position and then they seek promotion?

9         A.         We don't have a policy that excludes

10   anyone from consideration if they've quit a position.

11        Q.         What about being demoted, do you not

12   consider the person for promotion later on?

13        A.         It depends on what they were demoted for.

14        Q.         And what type of policy of demotion would

15   not let somebody go up for promotion in the future?

16        A.         It would be probably a laundry list of

17   things.

18        Q.         Has Mr. Hollon ever been denied a

19   promotion since the time of his demotion due to the

20   demotion?

21             MR. BARKER:   Object to the form.

22        A.         Not to my knowledge.

23        Q.         Do you know if he's ever been denied an

24   interview because of his prior demotion?

25        A.         No, sir, not to my knowledge.



101 Marietta Street, Suite 2700
Atlanta, GA 30303

1740 Peachtree Street, NW
Atlanta, GA 30309

www.galloreporting.com

Telephone  (404) 495-0777    (404) 876-8979
Toll Free  (877) 495-0777    (800) 637-0293
Fax (404) 495-0766

61

1     Q.    Okay.  But you would agree that he has
2     been denied interviews in the past after his
3     demotion?
4     A.    I don't have any records about what
5     Mr. Hollon has been granted or denied.
6     Q.    Okay.  Regarding the matter of a person
7     quitting his position and then seeking promotion, do
8     you recall a Mr. Chandler Plott that quit the company
9     and then was rehired?
10    A.    I don't recall any of the particulars
11    around that.
12    Q.    Okay.  Do you recall a manager named Matt
13    Meadows that quit, a line of road trainmaster at the
14    M&M?
15    A.    I remember that Matt Meadows had been a
16    manager for us at one time, had gone back to
17    seniority and was later promoted.
18    Q.    You promoted him again as road foreman of
19    the engines around Atlanta?
20    A.    I remember him being promoted again, yes,
21    sir.
22    Q.    Okay.  Was he over 40 or under 40 at the
23    time of his promotion?
24    A.    I don't know.
25    Q.    Don't have any judgment?


BROWN & GALLO
LLC

Telephone  (404) 495-0777    (404) 876-8979
Toll Free   (877) 495-0777    (800) 637-0293
Fax (404) 495-0766

101 Marietta Street, Suite 2700
Atlanta, GA 30303

1740 Peachtree Street, NW
Atlanta, GA 30309

www.galloreporting.com

62

1        A.      No, sir.

2        Q.      Okay.  Do you recall him being promoted

3    in -- in the position of trainmaster?

4        A.      Yeah.  I remember Matt Meadows being

5    promoted a couple of different times over the years,

6    yes, sir.

7        Q.      And after that did he have a signal

8    violation and there was a derailment of a train on

9    its way towards Birmingham?

10       A.      Involving him?

11       Q.      Well, yeah, involving him.

12       A.      I don't recall what you're talking about,

13   no, sir.

14       Q.      Okay.  Is there a CSX policy on employees

15   and fighting?

16       A.      Yes, sir.

17       Q.      Okay.  What is the policy, sir?

18       A.      Fighting is not to be condoned or

19   tolerated.

20       Q.      Is that a terminable offense by itself?

21       A.      The fighting, yes, sir.

22       Q.      Okay.  Do you recall an incident

23   involving an altercation between a manager and a

24   engineer in Montgomery in the last couple of years?

25       A.      No, sir, I don't.


BROWN & GALLO
LLC

Telephone  (404) 495-0777    (404) 876-8979
Toll Free   (877) 495-0777    (800) 637-0293
Fax (404) 495-0766

101 Marietta Street, Suite 2700
Atlanta, GA 30303

1740 Peachtree Street, NW
Atlanta, GA 30309

www.galloreporting.com

63

1      Q.      Okay.  All right.  What about CSX's

2  policy on threats, physical threats?  What is it,

3  sir?

4      A.      Well, obviously it will not be tolerated.

5      Q.      And do you recall an incident involving

6  Charlie Brown, Superintendent Charlie Brown

7  threatening to kill an employee because of a

8  derailment at Chester Yard?

9      A.      No, sir, I don't.

10     Q.      Okay.  What is the policy of -- well, let

11  me ask you this.  I'm sorry -- strike that.

12             Okay.  I want to go right back into the

13  incident involving Mr. Dean and the FRA and see if I

14  can really clarify that demotion scenario some bit

15  further.  Now, in that situation, Mr. Workman made

16  the initial recommendation to demote Mr. Ron Hollon;

17  is that correct?

18     A.      I don't recall him making a

19  recommendation to demote.  I remember him bringing to

20  my attention the incidents.

21     Q.      And at that meeting of June 19th, 2006,

22  Mr. Jack Frost was also present, right?

23     A.      What meeting?

24     Q.      I believe there was a meeting between

25  Mr. Hollon and Mr. Workman and Jack Frost.  Do you



BROWN & GALLO
                                    LLC

Telephone  (404) 495-0777    (404) 876-8979
Toll Free  (877) 495-0777    (800) 637-0293
        Fax (404) 495-0766

101 Marietta Street, Suite 2700
        Atlanta, GA 30303

1740 Peachtree Street, NW
        Atlanta, GA 30309

www.galloreporting.com

64

1    know of such a meeting?

2        A.      I need to have more specifics on that.    I

3    was not at that meeting.

4        Q.      Okay.  You weren't told about that

5    meeting?

6        A.      I don't know what you're talking about.

7        Q.·     Okay.

8        A.      I mean, I know -- I don't understand

9    exactly the question you're asking.

10       Q.      Okay.  This is a FRA violation in which

11   it's claimed that Ron Hollon signed for Mr. Dean on

12   an FRA railroad card, government card.

13       A.      I understand that, yes, sir.

14       Q.      Okay.  And do you recall subsequent to

15   that May incident, May 2006, in June, there was a

16   meeting involving Mr. Hollon, Mr. Workman and

17   Mr. Frost at which point Mr. Hollon was told that he

18   was being demoted.

19       A.      Oh, okay.  Yeah, I know of that meeting.

20   I'm not specific with the dates, but I know that

21   there was a meeting held with Mr. Dean and Mr. Hollon

22   to advise them that they were being terminated from

23   their management position.

24       Q.      Had the decision been made by you before

25   that meeting that Mr. Hollon was to be demoted?



BROWN & GALLO
LLC

Telephone  (404) 495-0777   (404) 876-8979
Toll Free  (877) 495-0777   (800) 637-0293
Fax (404) 495-0766

101 Marietta Street, Suite 2700
Atlanta, GA 30303

1740 Peachtree Street, NW
Atlanta, GA 30309

www.galloreporting.com

65

1      A.      I made the decision that they would be

2   demoted and I -- my recollection is is that the

3   purpose of that meeting was to advise them of that

4   decision.

5      Q.      Okay.  The purpose of the meeting of June

6   19th with Workman, Frost and Mr. Hollon.

7      A.      You keep saying June 19th.  I don't know

8   the date of that meeting.

9      Q.      -- the date.  I understand you may not

10  remember the specific date.

11     A.      I know that I made the decision that

12  Mr. Dean and Mr. Hollon were to be terminated from

13  their management position.  And I know that I asked

14  Rod Workman to advise them of that decision.

15     Q.      And was it your understanding that matter

16  of advising Ron Hollon was in a personal meeting

17  between Mr. Workman, Mr. Frost and Mr. Hollon?

18     A.      That's my recollection.

19     Q.      Okay.  And you had already instructed

20  Mr. Workman to inform Mr. Hollon that he was being

21  demoted before that meeting occurred, whether it was

22  June 19th or not?

23     A.      I don't know if there were multiple

24  meetings held or not.  I know that I made the

25  determination that Mr. Hollon and Mr. Dean were to be



BROWN & GALLO
                                          LLC

Telephone  (404) 495-0777    (404) 876-8979
Toll Free  (877) 495-0777    (800) 637-0293
         Fax (404) 495-0766

101 Marietta Street, Suite 2700
                Atlanta, GA 30303

1740 Peachtree Street, NW
          Atlanta, GA 30309

www.galloreporting.com

66

1    demoted because of their actions, and that

2    Mr. Workman was to convey that to them.

3         Q.    All right.  Now, I know you've already

4    said in your testimony that your recommendation and

5    your decision to demote Mr. Hollon was not based on

6    any legal or FRA violation, correct?

7         A.    My decision to demote Mr. Dean and

8    Mr. Hollon was that they conspired to falsify a

9    document.

10        Q.    Okay.  This is what I want to ask a

11   specific question about that.  What matter was

12   falsified on that document?

13        A.    The document signified that Mr. Dean had

14   made a certification check with that employee and he

15   had not done so.

16        Q.    In other words, are you saying that

17   Mr. Dean had been there and observed that employee?

18   Is that what you're saying that he wrote on that

19   document?

20        A.    That's what that document signified.

21        Q.    Okay.  All right.  Do you know if the

22   date of that signature of that document that Mr. Dean

23   indeed had watched that employee operate that remote

24   controlled engine or whatever it was?

25        A.    I know that in Mr. Dean's statement that



BROWN & GALLO
LLC

Telephone  (404) 495-0777   (404) 876-8979
Toll Free  (877) 495-0777   (800) 637-0293
Fax (404) 495-0766

101 Marietta Street, Suite 2700
Atlanta, GA 30303

1740 Peachtree Street, NW
Atlanta, GA 30309

www.galloreporting.com

67

1   he admitted that he asked Mr. Hollon or told

2   Mr. Hollon to sign the card and he would get down

3   there later and do what was required.  And that he

4   had not done it at the time that they falsely signed

5   the card.

6        Q.     Do you know if he -- if Mr. Dean was

7   there at the date of signing the card and did the

8   observation?

9        A.     I know at the time that they conspired to

10  falsely indicate that they had completed the work,

11  that it had not been done.  I don't know when

12  Mr. Dean finally got down there and did what he

13  needed to have done.

14       Q.     What work was to be completed?  What are

15  you talking about there, sir?

16       A.     The check ride of the RCO operator.

17       Q.     On the day that Mr. Hollon signed for

18  Mr. Dean, had Mr. Dean observed the remote control

19  operator operating on that day?

20            MR. BARKER:  Object to the form.  This

21       has been asked and answered.

22       Q.     Okay.  Do you understand the question,

23  Mr. Pendergrass?

24       A.     Well, I think I do.  Mr. Dean indicated

25  in his statement, and I believe Mr. Hollon did, that



LLC

Telephone  (404) 495-0777   (404) 876-8979
Toll Free  (877) 495-0777   (800) 637-0293
Fax (404) 495-0766

101 Marietta Street, Suite 2700
Atlanta, GA 30303

1740 Peachtree Street, NW
Atlanta, GA 30309

www.galloreporting.com

Travis Mikel Pendergrass                      October 29, 2007

68

1   they signed it prior to him performing the work that

2   he needed to perform.

3       Q.      But do you know if Mr. Dean saw the

4   remote control operator operate the engine that day?

5       A.      You mean later in the day?

6       Q.      Yeah, or any time during that day?

7       A.      Well, I don't know about that.

8       Q.      Okay.

9       A.      I don't -- it's not relevant to my

10  conclusion.

11      Q.      I see.  Okay.  All right.

12              MR. ATCHISON:  Mr. Barker, I'm going to

13          look at my notes for a few minutes.  I may be

14          finishing with him.

15              MR. BARKER:  Okay.

16              MR. ATCHISON:  And this time if I need to

17          take a moment I'll just go out in the hallway.

18              MR. BARKER:  Okay.

19              (Break taken.)

20  BY MR. ATCHISON:

21      Q.      I've just got a few more questions of

22  you, Mr. Pendergrass.

23      A.      Okay.

24      Q.      I think I had earlier asked you about a

25  position of -- a trainmaster position that was filled



BROWN & GALLO
                        LLC

Telephone  (404) 495-0777   (404) 876-8979
Toll Free  (877) 495-0777   (800) 637-0293
         Fax (404) 495-0766

101 Marietta Street, Suite 2700
        Atlanta, GA 30303

1740 Peachtree Street, NW
        Atlanta, GA 30309

www.galloreporting.com

69

1   in Pensacola, Florida in the last couple of years.

2   And I believe you indicated that a Bill Setzer got

3   the position.

4       A.      Yes, sir.

5       Q.      Okay.  Do you recall whether or not he

6   was over 40 or under 40?  I can't remember if you

7   responded to that question.

8       A.      I don't think you asked it, but he's

9   under 40.

10      Q.      Under 40.  And do you recall a gentleman

11  by the name of Jerry Holsworth that applied for that

12  job?

13      A.      I know Jerry Holsworth, yes, sir.  I

14  didn't recall him being an applicant for that job but

15  I know Jerry Holsworth.

16      Q.      Can you spell his name for the court

17  reporter?

18      A.      No, sir.

19      Q.      Could it be H-o-l-s-w-o-r-t-h?

20      A.      It could be, or H-o-l-z.  I'm not

21  certain.

22      Q.      Okay.  Now, at the time he applied for

23  the job, Mr. Holsworth was over 50, wasn't he?

24      A.      He's over 40, but I don't know about over

25  50.


BROWN & GALLO
LLC

Telephone (404) 495-0777    (404) 876-8979
Toll Free  (877) 495-0777    (800) 637-0293
Fax (404) 495-0766

101 Marietta Street, Suite 2700
Atlanta, GA 30303

1740 Peachtree Street, NW
Atlanta, GA 30309

www.galloreporting.com

70

1      Q.      Okay.  And don't you agree that at the

2  time he applied for the job he had a college degree?

3      A.      I don't recall that.

4      Q.      Okay.  Well, Mr. Bill Setzer did not have

5  a college degree, am I correct?

6      A.      I don't know that.

7      Q.      All right.  Was Mr. Hollon scheduled to

8  be interviewed for this position that Mr. Bill Setzer

9  got in Pensacola, Florida?

10      A.      I do not know.

11      Q.      Okay.  Do you know if he was ever

12  notified for an interview?

13      A.      No, sir.

14      Q.      Who is Mr. Bob Frulla, F-r-u-l-l-a?

15      A.      Mr. Bob Frulla is the division manager of

16  the Jacksonville division.

17      Q.      Do you know if Mr. Hollon, he ever

18  inquired of Mr. Frulla why he was not interviewed for

19  that job?

20      A.      No, sir, I don't.

21      Q.      Okay.  We're almost finished,

22  Mr. Pendergrass, so if you could bear with me.

23              MR. ATCHISON:  I believe that's all.

24              MR. BARKER:  All right.  With the

25          deposition tomorrow -- we can go off the record.



BROWN & GALLO
LLC

Telephone  (404) 495-0777   (404) 876-8979
Toll Free   (877) 495-0777   (800) 637-0293
Fax (404) 495-0766

101 Marietta Street, Suite 2700
Atlanta, GA 30303

1740 Peachtree Street, NW
Atlanta, GA 30309

www.galloreporting.com

71

1        MR. ATCHISON:   Yeah.

2

3        (Deposition concluded at 3:44 p.m.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



BROWN & GALLO
LLC

Telephone  (404) 495-0777    (404) 876-8979
Toll Free   (877) 495-0777    (800) 637-0293
Fax (404) 495-0766

101 Marietta Street, Suite 2700
Atlanta, GA 30303

1740 Peachtree Street, NW
Atlanta, GA 30309

www.galloreporting.com

72

CERTIFICATE OF OATH

STATE OF FLORIDA)
                )
COUNTY OF DUVAL )


        I, the undersigned authority, certify

that TRAVIS MIKEL PENDERGRASS personally appeared

before me and was duly sworn.



        WITNESS my hand and official seal this 7th

day of November 2007.




                    /s/ Richetta R. Brown
                        Richetta R. Brown

BROWN & GALLO
                          LLC

Telephone  (404) 495-0777   (404) 876-8979
Toll Free  (877) 495-0777   (800) 637-0293
           Fax (404) 495-0766

101 Marietta Street, Suite 2700
Atlanta, GA 30303

1740 Peachtree Street, NW
Atlanta, GA 30309

www.galloreporting.com

73

1                REPORTER'S DEPOSITION CERTIFICATE

2

3    STATE OF FLORIDA)

4                    )

5    COUNTY OF DUVAL )

6

7            I, Richetta R. Brown, Court Reporter,

8    certify that I was authorized to and did

9    stenographically report the deposition of TRAVIS

10   MIKEL PENDERGRASS; that a review of the transcript

11   was requested; and that the transcript is a true and

12   complete record of my stenographic notes.

13           I further certify that I am not a relative,

14   employee, attorney, or counsel of any of the parties,

15   nor am I a relative or employee of any of the

16   parties' attorney or counsel connected with the

17   action, nor am I financially interested in the

18   action.

19

20

21           DATED this 7th day of November 2007.

22

23

24   _____

25               Richetta R. Brown


BROWN & GALLO
LLC

101 Marietta Street, Suite 2700
Atlanta, GA 30303

1740 Peachtree Street, NW
Atlanta, GA 30309

Telephone  (404) 495-0777    (404) 876-8979
Toll Free   (877) 495-0777    (800) 637-0293
Fax (404) 495-0766

www.galloreporting.com

74

1                          CAPTION

2              The Deposition of TRAVIS MIKEL PENDERGRASS,

3    taken in the matter, on the date, and at the time and

4              It was requested that the deposition be taken

5    by the reporter and that same be reduced to

6    typewritten form.

7              It was agreed by and between counsel and the

8    parties that the Deponent will read and sign the

9    transcript of said deposition.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

BROWN & GALLO

LLC

Telephone  (404) 495-0777   (404) 876-8979
Toll Free   (877) 495-0777   (800) 637-0293
Fax (404) 495-0766

101 Marietta Street, Suite 2700
Atlanta, GA 30303

1740 Peachtree Street, NW
Atlanta, GA 30309

www.galloreporting.com

**Copy of Transcript**

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

Ronald A. Hollon, Sr.,

        Plaintiff,

vs.

CSX Transportation, Inc.,

        Defendant.

~~~~~~~~~~~~~~~~~~~~~~~~

Civil Action No.:
2:06-CV-1099-WKW

**DEPOSITION OF**

**RODNEY STEVEN WORKMAN**

October 30, 2007
10:00 a.m.

50 North Laura Street, Suite 2225
Jacksonville, Florida

Richetta R. Brown, Court Reporter
and Notary Public in and for
the State of Florida at Large



BROWN & GALLO
LLC

Telephone  (404) 495-0777   (404) 876-8979
Toll Free   (877) 495-0777   (800) 637-0293
Fax (404) 495-0766

101 Marietta Street, Suite 2700
Atlanta, GA 30303

1740 Peachtree Street, NW
Atlanta, GA 30309

www.galloreporting.com

2

## APPEARANCES OF COUNSEL

On behalf of the Plaintiff:

GARY ATCHISON, Esquire

492 S. Court Street

Montgomery, Alabama 36104

(334) 262-7232




On behalf of the Defendant:

WILLIAM C. BARKER, Esquire

Paul, Hastings, Janofsky & Walker, LLP

600 Peachtree Street, NE, Suite 2400

Atlanta, Georgia 30308-2222

(404) 815-2379

(404) 815-2424 (facsimile)

corybarker@paulhastings.com




ALSO PRESENT:  Sarah Hall, Esquire

              Ronald Hollon



BROWN & GALLO
LLC

Telephone  (404) 495-0777    (404) 876-8979
Toll Free   (877) 495-0777    (800) 637-0293
        Fax (404) 495-0766

101 Marietta Street, Suite 2700
Atlanta, GA 30303

1740 Peachtree Street, NW
Atlanta, GA 30309

www.galloreporting.com

3

1                    DESCRIPTION OF EXHIBITS

2

3     EXHIBIT   IDENTIFICATION

4

5      1          E-mail From Patrick Plumb

6

7      2          E-mail From Angie Averitte

8

9      3          E-mail From Ron Hollon

10

11     4          Bates Stamp 586 through 592

12

13     5          Bates Stamp 563 through 584

14

15     6          To Whom It May Concern Letter

16

17

18

19

20

21

22

23

24

25

BROWN & GALLO
LLC

Telephone  (404) 495-0777   (404) 876-8979
Toll Free  (877) 495-0777   (800) 637-0293
Fax (404) 495-0766

101 Marietta Street, Suite 2700
Atlanta, GA 30303

1740 Peachtree Street, NW
Atlanta, GA 30309

www.galloreporting.com

4

1        DEPOSITION OF RODNEY STEVEN WORKMAN

2                OCTOBER 30, 2007

3        RODNEY STEVEN WORKMAN, having been first duly

4    sworn, was examined and testified as follows:

5            THE WITNESS:  Yes.

6    DIRECT EXAMINATION

7    BY-MR.ATCHISON:

8        Q.      My name is Gary Atchison.  I'm an

9    attorney for Mr. Ron Hollon in this case that's

10   styled Ronald A. Hollon, Sr., Plaintiff, v. CSX

11   Transportation, Inc., Case No. CV-1099WKW.  It's been

12   filed in the United States Middle District of Alabama

13   Northern Division.

14           If I should ask you, Mr. Workman, any

15   questions that you don't understand, you have a right

16   to ask me to repeat the question or rephrase the

17   question, okay --

18       A.      Yes, sir.

19       Q.      -- do you understand that?  Before I

20   start asking you questions about this case, are you

21   under any influence of any drugs or alcohol today?

22       A.      No, sir.

23       Q.      Are you under any sort of disability that

24   would impair your judgment or your ability to testify

25   today truthfully?



BROWN & GALLO
LLC

Telephone  (404) 495-0777   (404) 876-8979
Toll Free   (877) 495-0777   (800) 637-0293
Fax (404) 495-0766

101 Marietta Street, Suite 2700
Atlanta, GA 30303

1740 Peachtree Street, NW
Atlanta, GA 30309

www.galloreporting.com

5

1        A.      No, sir.

2        Q.      Okay.  Would you state for the record

3    your full, legal name.

4        A.      Rodney Steven Workman.

5        Q.      Also as a matter of housekeeping you've

6    got a right to read and sign.  And I'll assume that

7    your counsel will want you to read and sign this

8    deposition.

9            MR. BARKER:  Yes.  We'd like to exercise

10        that right.

11       Q.      Rodney C. Workman?

12       A.      Rodney Stevens.

13       Q.      And sir, what is your home address, here?

14       A.      Oh, my.  It's Church Street, but I don't

15   know the exact location.  It's on the corner of

16   Church and Pearl here in Jacksonville, Florida.

17       Q.      Would you be in the directory service if

18   I called up --

19       A.      CSX.

20       Q.      You don't live at your work.  I said what

21   is your home address?

22       A.      That's correct.  You can get it from the

23   CSX directory if you need it.  I don't have a

24   telephone.

25            MR. BARKER:  Well, you still don't have



BROWN & GALLO
                              LLC

Telephone  (404) 495-0777  (404) 876-8979
Toll Free  (877) 495-0777  (800) 637-0293
        Fax (404) 495-0766

101 Marietta Street, Suite 2700
Atlanta, GA 30303

1740 Peachtree Street, NW
Atlanta, GA 30309

www.galloreporting.com

6

1          permission to contact him at home.  Let's just

2          make that clear on the record here, too.

3                    MR. ATCHISON:  If I serve a subpoena for

4          him at work, it will be honored?

5                    MR. BARKER:  We can discuss the terms of

6          that later on if you want to serve a subpoena

7          for him.

8          Q.       Sir, where do you work?

9          A.       I work at CSX Transportation, 500 Water

10   Street, Jacksonville, Florida.

11         Q.       And what is your current position?

12         A.       General manager of operating rules and

13   practices.

14         Q.       Do you know Mr. Pendergrass?

15         A.       Yes, sir.

16         Q.       We took his deposition by telephone

17   yesterday and he testified that he thought you were

18   assigned to a position in safety?

19         A.       That's correct.

20         Q.       Okay.

21         A.       In the safety department.

22         Q.       When did you assume this position of

23   general manager of rules and practices in the safety

24   department?  When did you start?

25         A.       Approximately January 10th, 2007.


BROWN & GALLO
LLC

Telephone  (404) 495-0777   (404) 876-8979
Toll Free  (877) 495-0777   (800) 637-0293
Fax (404) 495-0766

101 Marietta Street, Suite 2700
Atlanta, GA 30303

1740 Peachtree Street, NW
Atlanta, GA 30309

www.galloreporting.com

7

1       Q.      What was your prior position just before
2    that position?
3       A.      Division manager of the Atlanta division.
4       Q.      And how long had you held that position?
5       A.      Approximately 20 months.
6       Q.      So approximately what month did you start
7    that position of division manager of Atlanta?
8       A.      March 16, 2005.
9       Q.      Okay.
10      A.      Excuse me.  Yeah, March 16, 2005.
11      Q.      And what did that position -- what was
12   its job responsibilities?  What did it detail?
13      A.      Overseeing the administrative and
14   operational aspects of the Atlanta division.
15      Q.      Did that include being over personnel?
16      A.      Yes, sir.
17      Q.      Did you make personnel decisions in that
18   position of, I'll call it, division manager?
19      A.      Yes, sir.
20      Q.      Within the division, were you the highest
21   manager?
22      A.      Yes, sir.
23      Q.      The highest ranking manager over
24   employees?
25      A.      Yes, sir.



BROWN & GALLO
LLC

Telephone  (404) 495-0777    (404) 876-8979
Toll Free   (877) 495-0777    (800) 637-0293
Fax (404) 495-0766

101 Marietta Street, Suite 2700
Atlanta, GA 30303

1740 Peachtree Street, NW
Atlanta, GA 30309

www.galloreporting.com

8

1     Q.     Did you make decisions to demote,

2     discipline, terminate, et cetera, employees?

3            MR. BARKER:  Object to the form.  You can

4     answer.

5     A.     I didn't make ultimate decisions but

6     would make recommendations.

7     Q.     Okay.  And of the recommendations that

8     you made, say, to demote, where did they go once you

9     made the recommendation?

10    A.     To the regional vice president.

11    Q.     And that would have been Mr. Pendergrass

12    during that time period?

13    A.     That's correct.

14    Q.     And how many recommendations to demote do

15    you think you made during the time that you worked as

16    division manager?

17    A.     For all personnel?

18    Q.     Yes.

19    A.     Contract and noncontract.

20    Q.     Let's just say personnel equivalent to

21    the plaintiff here, Mr. Hollon.

22           MR. BARKER:  Object to the form.  You can

23    answer.

24    Q.     Manager, supervisors.  I'm not talking

25    about independent contractors.



BROWN & GALLO
                        LLC

Telephone (404) 495-0777  (404) 876-8979
Toll Free  (877) 495-0777  (800) 637-0293
           Fax (404) 495-0766

101 Marietta Street, Suite 2700
           Atlanta, GA 30303

1740 Peachtree Street, NW
           Atlanta, GA 30309

www.galloreporting.com

9

1     A.     I understand.  I'm sitting here thinking

2   about how many I did.  I'd say approximately three or

3   four.

4     Q.     Okay.  And of those three or four, did

5   Mr. Pendergrass approve each of your recommendations.

6     A.     Mr. Pendergrass listened to my

7   recommendations and did what he felt he had to do.

8     Q.     Okay.  But did he go along with your

9   recommendations?

10     A.     Not always.

11     Q.     Which ones did he not go along with?

12     A.     I can't recall.

13     Q.     You said three or four, so...

14     A.     Right.  I can't recall a total number of

15   ones, but he did -- he made the ultimate decision on

16   Mr. Snapp after reviewing the total facts.  He made

17   the ultimate decision on Ed McClellan after reviewing

18   the total facts.  He made an administrative decision

19   on personnel changes as far as Angie Averitte after

20   reviewing the total facts.  And he also made the

21   ultimate decision on a personnel in terms of moving

22   William Faulkner or John Faulkner in terms of

23   reviewing the total facts in Birmingham.

24     Q.     All right.  I'll come back to these with

25   more specificity.  But just quickly, did he agree



BROWN & GALLO
LLC

Telephone  (404) 495-0777   (404) 876-8979
Toll Free  (877) 495-0777   (800) 637-0293
Fax (404) 495-0766

101 Marietta Street, Suite 2700
Atlanta, GA 30303

1740 Peachtree Street, NW
Atlanta, GA 30309

www.galloreporting.com

10

1   with you on the Snapp matter?

2       A.      Based upon the facts, yes.

3       Q.      Did he agree with you on the Ed McClellan

4   matter?

5       A.      Yes, sir, based on the facts.

6       Q.      Did he agree with you on the -- on your

7   recommendations regarding the Angie Averitte matter?

8       A.      Yes, sir, based on the facts.

9       Q.      And did he agree with you on Faulkner's

10  matter?

11      A.      Yes, sir.

12      Q.      Okay.  Can you think of any other

13  examples that would be similar to or equivalent to

14  Mr. Hollon's demotion that you made recommendations

15  to demote somebody and you forwarded that

16  recommendation to Mr. Pendergrass?

17      A.      Other than T.J. Dean that was involved

18  with Mr. Hollon.

19      Q.      All right.

20      A.      And again, that was solely based on the

21  facts.

22      Q.      Okay.  And he agreed with you on T.J.

23  Dean as well, did he not?

24      A.      Yes, sir, that's correct.

25      Q.      So all of those similar to or equivalent



BROWN & GALLO
                        LLC

Telephone  (404) 495-0777   (404) 876-8979
Toll Free   (877) 495-0777   (800) 637-0293
         Fax (404) 495-0766

101 Marietta Street, Suite 2700
Atlanta, GA 30303

1740 Peachtree Street, NW
Atlanta, GA 30309

www.galloreporting.com

11

1    demotions during your time frame as working as the
2    district manager of the Atlanta division,
3    Mr. Pendergrass agreed with your recommendations?
4         A.      He agreed with the decision that needed
5    to be made based upon the facts.
6         Q.      Okay.  Regardless of the facts, he agreed
7    with your recommendation in each case?
8         A.      Based on the facts.
9         Q.      All right.  Now, when you went from
10   district manager of the Atlanta division to your
11   current position of general manager of rules and
12   practices in the safety department, did you get the
13   same salary --
14        A.      Yes, sir.
15        Q.      -- when you transferred?
16        A.      Yes, sir.
17        Q.      Do you know why you were transferred from
18   one position to the other?
19        A.      Yeah.  The reason why was because at the
20   time the organization itself, CSX, was making
21   basically some overall leadership changes and those
22   leadership changes comprised of moving different
23   officers, if you will, to different positions
24   throughout the organization.  Now, I was moved to
25   Jacksonville because of my overall strength in field



BROWN & GALLO

LLC

Telephone  (404) 495-0777    (404) 876-8979
Toll Free  (877) 495-0777    (800) 637-0293
Fax (404) 495-0766

101 Marietta Street, Suite 2700
Atlanta, GA 30303

1740 Peachtree Street, NW
Atlanta, GA 30309

www.galloreporting.com

12

1    operations and knowledge of rules.  So they felt that

2    there was a need to basically upgrade the rules

3    department in terms of my knowledge, and they brought

4    me down here as a leadership change.

5         Q.      Did anyone in management at CSX mention

6    any displeasure with your performance as a general

7    manager -- excuse me -- a district manager of the

8    Atlanta division?

9         A.      No, sir, that was never discussed.  When

10   I had the initial meeting with Mr. Brown in

11   Indianapolis, his indication was that they were

12   making changes in terms of the overall leadership,

13   putting people where they felt that they needed to be

14   within the organization to help strengthen the

15   organization.  And he felt that with my background

16   that I needed to be in the operating rules and

17   compliance part.

18        Q.      Okay, sir.  Now, just before we started

19   this deposition, I assembled a series of documents

20   that were marked as defendant's exhibits and you have

21   those before you, sir.

22        A.      Yes, sir.

23        Q.      Red tabs.  Okay.  Have you had -- flip to

24   the second red tab there.  And I think that's Exhibit

25   23.  That's the complaint or the lawsuit in this



BROWN & GALLO
                              LLC
Telephone  (404) 495-0777   (404) 876-8979
Toll Free  (877) 495-0777   (800) 637-0293
       Fax (404) 495-0766

101 Marietta Street, Suite 2700
Atlanta, GA 30303

1740 Peachtree Street, NW
Atlanta, GA 30309

www.galloreporting.com

Rodney Steven Workman                                    October 29, 2007

13

1    matter.

2              MR. BARKER:  Second red tab.

3        Q.    Second red tab, sir.

4        A.    I'm getting to it.

5        Q.    That's the defendant -- that's marked as

6    Defendant's Exhibit 23.  Yeah, you'll get them really

7    lost if you take your clip off, sir.

8        A.    I'm trying to get to it.  What if I put

9    it like that?

10       Q.    That's up to you.  All right.  Have you

11   had the opportunity to read this lawsuit, sir,

12   before?

13       A.    No, sir.

14       Q.    You want to -- you want to take a moment

15   to look at it?

16       A.    Sure.

17       Q.    All right, sir.  You understand that

18   Mr. Hollon is in this lawsuit complaining that he has

19   been a victim of age discrimination?

20       A.    Yes, sir, I understand that.

21       Q.    And you understand he's complaining that

22   he had made comments and complaints about being a

23   victim of age discrimination to CSX and that as a

24   result he had been retaliated against; do you

25   understand that?



BROWN & GALLO
LLC

Telephone  (404) 495-0777   (404) 876-8979
Toll Free   (877) 495-0777   (800) 637-0293
         Fax (404) 495-0766

101 Marietta Street, Suite 2700
Atlanta, GA 30303

1740 Peachtree Street, NW
Atlanta, GA 30309

www.galloreporting.com

14

1        MR. BARKER:   Object to the form.   You can

2     answer, if you can.

3        Q.      Okay.

4        A.      I wasn't aware that he had been in any

5   way discriminated as a result of his age.

6        Q.      Well, I just wanted to make you aware of

7   what some of the basic allegations were before

8   starting into this examination with you.

9            During the time period you were division

10  manager of the Atlanta division, what position did

11  Mr. Hollon hold?

12       A.      Initially, when I first started as the

13  division manager, Mr. Hollon held the position of

14  terminal trainmaster at Montgomery, Alabama.

15       Q.      Okay, sir.   And he held that position to

16  on or about June 19th, 2006, am I correct?

17       A.      That's correct.

18       Q.      Okay.   And there was a meeting on June

19  19th, 2006?

20       A.      That's correct.

21       Q.      In which you participated and Mr. Hollon

22  participated?

23       A.      That's correct.

24       Q.      And where did that meeting occur, sir?

25       A.      That meeting occurred at Montgomery,



BROWN & GALLO
LLC

Telephone  (404) 495-0777   (404) 876-8979
Toll Free   (877) 495-0777   (800) 637-0293
Fax (404) 495-0766

101 Marietta Street, Suite 2700
Atlanta, GA 30303

1740 Peachtree Street, NW
Atlanta, GA 30309
www.galloreporting.com

15

1    Alabama.

2        Q.      And who else participated in that

3    meeting?

4        A.      Jack Frost who was at that time manager

5    of human resources, basically represented the

6    Southern Region along with T.J. Dean the -- at that

7    time he was still the road foreman of engines.

8        Q.      And what was the purpose of having that

9    meeting, sir?  Did you call that meeting?

10       A.      That's correct.

11       Q.      Okay.

12       A.      The purpose of the meeting was to sit

13   down and discuss what the facts initial -- or the

14   facts indicated in regards to the said incident

15   that's obviously a part of this lawsuit that you

16   showed.

17       Q.      Okay.  All right.  That will be -- you're

18   pointing to Defendant's Exhibit 23?

19       A.      That's correct.

20       Q.      And was there a particular event that had

21   occurred that led to that meeting, sir?

22       A.      That's correct.

23       Q.      What was that event?

24       A.      The event was an RCO position that

25   apparently had an certification issue for his license



BROWN & GALLO
                                    LLC

Telephone  (404) 495-0777   (404) 876-8979
Toll Free  (877) 495-0777   (800) 637-0293
           Fax (404) 495-0766

101 Marietta Street, Suite 2700
Atlanta, GA 30303

1740 Peachtree Street, NW
Atlanta, GA 30309

www.galloreporting.com

16

1   to operate the RCO.

2        Q.      Let's do this for the court.  I don't

3   know and I maybe would be guessing at it, but what is

4   an RCO for the court's purpose?

5        A.      An RCO is a remote control operation.

6        Q.      And again, you know, you and I assume

7   things that we know but remote control what, sir?

8        A.      A remote control locomotive.

9        Q.      All right.  Explain what a remote control

10  locomotive is and how it works and in what context it

11  works in.

12       A.      A remote control locomotive is a --

13  basically a communication.  You have a communication

14  device that's linked to a locomotive in an electronic

15  way, if you will, a mechanical way that you can

16  operate a locomotive without having a locomotive

17  engineer inside the cab to operate it.  You can do it

18  on the ground as a result of the communication device

19  setup and linked to that locomotive.

20       Q.      Is this kind of equivalent to a child's

21  toy to where he has a car or a truck that he has a

22  little radio box with a joystick, and he can control

23  the car at a distance and not actually be touching

24  the car when he controls it?

25       A.      To some degree, yes, but it's far more



BROWN & GALLO
                                            LLC

Telephone  (404) 495-0777   (404) 876-8979
Toll Free  (877) 495-0777   (800) 637-0293
       Fax (404) 495-0766

101 Marietta Street, Suite 2700
            Atlanta, GA 30303

1740 Peachtree Street, NW
        Atlanta, GA 30309

www.galloreporting.com

17

1   sophisticated than that.

2       Q.    I understand.  But that's the general

3   idea.  It's a remote control box?

4       A.    Radio control.

5       Q.    Radio control box and the engine is also

6   hooked with the radio that receives a signal from

7   that radio control box?

8       A.    That's correct.

9       Q.    And the operator is not actually in the

10  locomotive operating it as a normal locomotive would

11  be operating it, correct?

12      A.    That's correct.

13      Q.    Okay.  All right.  So this event was on

14  what day that we're talking about, the event in

15  question?

16      A.    I can't remember the exact date.  I know

17  it was in May, but the exact date I can't remember.

18      Q.    Was it May 26th, does that refresh your

19  recollection, of 2006?

20      A.    I know it was in the latter part of May,

21  but the exact date I can't tell you.

22      Q.    Okay.  If Mr. Hollon would testify that

23  it was on May the 26th, 2006, would you have any

24  proof to show otherwise?

25      A.    No, sir.  I'd accept what Mr. Hollon



BROWN & GALLO
                    LLC

Telephone  (404) 495-0777    (404) 876-8979
Toll Free   (877) 495-0777    (800) 637-0293
          Fax (404) 495-0766

101 Marietta Street, Suite 2700
Atlanta, GA 30303

1740 Peachtree Street, NW
Atlanta, GA 30309

www.galloreporting.com

18

1    said.

2          Q.      Okay.   And the same way would be if

3    Mr. Dean testified it occurred on May the 26th, would

4    you have any problems with that?

5          A.      No, sir.

6          Q.      Do you have a clear recollection of what

7    happened that day?

8          A.      The only -- this is --

9                  MR. BARKER:   Which day are you referring

10         to?

11         Q.      May the 26th.   The day of the event.

12   Whatever day it may be.   The day involving the event

13   of the RCO incident, that's what I'll call it, the

14   RCO incident.

15         A.      My recollection comes from my senior road

16   foreman.

17         Q.      Who is your senior road foreman?

18         A.      Rodney Saunders.

19         Q.      And where was he located on May the 26th?

20         A.      He was located in Atlanta, Georgia.

21         Q.      Does he directly report to you?

22         A.      That's correct.

23         Q.      All right.   Well, let's do this,

24   regarding the remote control incident -- and we'll

25   say it's on May the 26th, unless you recall another



BROWN & GALLO
                                        LLC

Telephone  (404) 495-0777   (404) 876-8979
Toll Free   (877) 495-0777   (800) 637-0293
          Fax (404) 495-0766

101 Marietta Street, Suite 2700
Atlanta, GA 30303

1740 Peachtree Street, NW
Atlanta, GA 30309

www.galloreporting.com

19

1    day -- what was the first moment or date that you

2    heard about that incident?

3         A.      Again, the exact date, I can't give you

4    the exact specific date, but it was sometime in early

5    June.

6         Q.      You heard about it first in June?

7         A.      Yes, sir.

8         Q.      And that was June of 2006?

9         A.      That's correct.

10        Q.      And how did you hear about it, sir?

11        A.      Senior road foreman Rodney Saunders had

12   called me on my cell phone to indicate that there was

13   an issue with the license on an RCO operator at

14   Montgomery, Alabama.  He then went on to tell me that

15   T.J. Dean, who was the road foreman of engines, had

16   basically had a discussion with Ron and had indicated

17   to Mr. Hollon that it was okay for him to go ahead

18   and sign the license for that particular employee.

19        Q.      Okay.  The document that was signed

20   allegedly by Mr. Hollon for Mr. Dean with Mr. Dean's

21   name, I'm assuming that's what you're saying, that

22   Mr. Hollon signed for Mr. Dean on that document,

23   right?

24        A.      That's correct.

25        Q.      What was that document called?



BROWN & GALLO
                                LLC

101 Marietta Street, Suite 2700
Atlanta, GA 30303

1740 Peachtree Street, NW
Atlanta, GA 30309

Telephone (404) 495-0777   (404) 876-8979
Toll Free  (877) 495-0777   (800) 637-0293
          Fax (404) 495-0766

www.galloreporting.com

20

1      A.      It was an RCO license, basically,

2   certification.

3      Q.      Okay.  Certification is the term I've

4   heard before not license.

5      A.      Yes.

6      Q.      RCO.  All right.  And was that a

7   government document?

8      A.      Yes, sir.

9      Q.      Okay.  And what did Rodney Saunders say?

10  Did he initiate the entire matter with you, or did

11  you hear about it maybe before Mr. Saunders?

12     A.      No, sir.  I heard it when Mr. Saunders

13  contacted me, and Mr. Saunders had indicated that

14  apparently the FRA had arrived at Montgomery to

15  investigate an issue where a certification license,

16  if you will, had been signed by Mr. Hollon.

17     Q.      Okay.  And it is your understanding --

18  it's your clear understanding that the FRA -- now,

19  what is the FRA?

20     A.      The FRA is the Federal Railway

21  Administration.

22     Q.      Okay.  It's your understanding that the

23  FRA was involved before Mr. Saunders learned about it

24  then?

25     A.      That's my understanding.



BROWN & GALLO
                    LLC
Telephone  (404) 495-0777  (404) 876-8979
Toll Free  (877) 495-0777  (800) 637-0293
        Fax (404) 495-0766

101 Marietta Street, Suite 2700
          Atlanta, GA 30303

1740 Peachtree Street, NW
       Atlanta, GA 30309

www.galloreporting.com

21

```
1        Q.      Okay.  Who in the FRA was involved in
2    early June first?
3        A.      I understand it was -- again, from the
4    facts that we had gathered that it was from Marlo.
5        Q.      Marlo who?
6        A.      I can't remember her last name.  Her
7    office is out of Atlanta.
8        Q.      Would that be Marlo Owens?
9        A.      Yes, that's correct.
10       Q.      And do you -- did you understand from Mr.
11   Saunders that Marlo Owens had gone to the Montgomery
12   site and had investigated or looked into the matter
13   of the RCO certification --
14       A.      Yes, sir, that's correct.
15       Q.      -- incident of March the 26th?
16       A.      That's correct.
17               MR. BARKER:  You mean May the 26th?
18       Q.      I mean, May the 26th.  Thank you very
19   much.
20               And at that point did you ever talk to
21   Ms. Owens, Marlo Owens?
22       A.      No, sir.
23       Q.      Do you know if anybody at CSX had talked
24   to her regarding her findings?
25       A.      Not that I'm aware of.
```

BROWN & GALLO
LLC

Telephone  (404) 495-0777   (404) 876-8979
Toll Free   (877) 495-0777   (800) 637-0293
Fax (404) 495-0766

101 Marietta Street, Suite 2700
Atlanta, GA 30303

1740 Peachtree Street, NW
Atlanta, GA 30309

www.galloreporting.com

22

1       Q.      At that point did you talk to Mr. Hollon?

2       A.      No, sir, not at that point.

3       Q.      Okay.

4       A.      Not that I can recall.

5       Q.      Prior to June the 19th of 2006, did you

6   talk to Mr. Hollon regarding this alleged RCO

7   incident of May the 26th?

8       A.      Prior to June 19th Mr. Hollon called me

9   on the phone.

10      Q.      Okay.  Did he candidly talk to you?

11      A.      Candidly?

12      Q.      Uh-huh (affirmative).

13      A.      I guess you can say.  I mean, I'm not

14  sure it was candidly.

15      Q.      He told you what happened?

16      A.      Well, he had indicated to -- initially to

17  Jason Tipton because Jason Tipton was the terminal

18  manager, the chronology of this thing after I was

19  contacted by Rodney Saunders.  And obviously I had to

20  talk to Mr. Pendergrass and tell him that we got a

21  situation.  Mr. Saunders had indicated after he got

22  the initial report of this issue, if you will, that

23  he had talked to Dean Manafee, who is the system road

24  foreman down here in Jacksonville, to review the

25  federal requirements in terms of RCO operations and



BROWN & GALLO
LLC

Telephone  (404) 495-0777   (404) 876-8979
Toll Free   (877) 495-0777   (800) 637-0293
Fax (404) 495-0766

101 Marietta Street, Suite 2700
Atlanta, GA 30303

1740 Peachtree Street, NW
Atlanta, GA 30309

www.galloreporting.com

23

1    certification license to get his interpretation.  And

2    from that interpretation Mr. Manafee indicated or

3    advised, if you will, Mr. Saunders to contact me

4    because there was a federal issue here involved.

5         Q.    Okay.  Did Mr. Dean Manafee tell you that

6    there was a federal violation?

7         A.    No, he did not tell me.  Mr. Saunders

8    did.

9         Q.    Mr. Saunders told you it was a federal

10   violation?

11        A.    Based upon the advice that he was given

12   by Mr. Manafee.

13        Q.    But later on you found that Mr. Saunders

14   was incorrect.  The FRA found there was no violation,

15   did it not?

16        A.    As far as the signature there was an

17   issue.

18        Q.    The FRA said there was found -- had a

19   finding of no violation, did it not?

20        A.    The FRA indicated that there would not

21   have been a violation other than the fact that

22   Mr. Hollon had signed Mr. Dean's signature.

23        Q.    All right.  I'd like to show you what has

24   been marked as Plaintiff's 1, sir, and I think your

25   counsel has previously marked this as an exhibit.



BROWN & GALLO
                                    LLC

Telephone  (404) 495-0777   (404) 876-8979
Toll Free   (877) 495-0777   (800) 637-0293
           Fax (404) 495-0766

101 Marietta Street, Suite 2700
Atlanta, GA 30303

1740 Peachtree Street, NW
Atlanta, GA 30309

www.galloreporting.com

24

1    I'm not sure what the number is, but it's a defense

2    exhibit, but I'll mark it as Plaintiff's 1.

3              (Plaintiff's Exhibit-1 was marked for

4    identification.)

5         A.        Okay.

6         Q.        Sir, does this document involve itself

7    with the RCO incident of May the 26th, 2006?

8         A.        Yes, sir.

9         Q.        Okay.  And look at the second paragraph

10   of this document.  Well, let's back up, if we could.

11   This is from Patrick Plumb at dot gov.  Do you see

12   that?

13        A.        Yes, sir.

14        Q.        Do you know who Mr. Patrick Plumb is?

15        A.        No, sir.

16        Q.        Okay.  Well, if we represent to you he's

17   FRA, would you have any proof to the contrary?

18        A.        I wouldn't know.

19        Q.        Okay.  All right.  Well, the second

20   paragraph says, quote, After review of the

21   circumstances and events on that date, FRA has

22   determined that CSX was not in violation of federal

23   regulations governing remote control operations.  Do

24   you see that statement?

25        A.        The second paragraph?



BROWN & GALLO
LLC

Telephone  (404) 495-0777   (404) 876-8979
Toll Free   (877) 495-0777   (800) 637-0293
Fax (404) 495-0766

101 Marietta Street, Suite 2700
Atlanta, GA 30303

1740 Peachtree Street, NW
Atlanta, GA 30309

www.galloreporting.com

25

1       Q.      Yes, sir.

2       A.      Okay.  Would you please read it again?

3       Q.      It says, quote, After review of the

4   circumstances and events on that day, FRA has

5   determined that CSX was not in violation of federal

6   regulations governing the remote control operations.

7       A.      Yes, sir, I see that.

8       Q.      Okay.  So does that refresh your

9   recollection the FRA did not have any finding of any

10  violation of rules, regulation, law regarding the

11  remote control operation matter?

12              MR. BARKER:  Object to the form.  You can

13      answer.

14      A.      I think that what's applicable is the

15  next sentence.

16      Q.      All right.  And I'll read it.  It says,

17  FRA has allowed CSX a 60-day grace period for an RCO

18  that has not had a check ride for the previous year

19  which allows an RCO to operate as such for a 60-day

20  period prior to the completion of the check ride.

21              Okay.  And what -- how does that change

22  the finding that there's no FRA violations?

23      A.      If Mr. Hollon had not signed the

24  certification license, this employee still had a

25  60-day grace period in which to operate.  The problem



BROWN & GALLO
                                    LLC

Telephone  (404) 495-0777    (404) 876-8979
Toll Free  (877) 495-0777    (800) 637-0293
         Fax (404) 495-0766

101 Marietta Street, Suite 2700
            Atlanta, GA 30303

1740 Peachtree Street, NW
            Atlanta, GA 30309

www.galloreporting.com

26

```
1    was he signed a federal document with another
2    officer's name.
3         Q.    Well, again, my question was, did the FRA
4    find any violation?  And you said you thought they
5    did.  And is there any showing by you through this
6    document or otherwise that FRA found any violation of
7    any federal rule, regulation, law or otherwise?
8         A.    My answer was is that the FRA
9    investigated the matter at Montgomery.  I did not say
10   at that time what their reaction was or response.
11        Q.    Well, my question is not at that time but
12   at any time to this very moment --
13        A.    The only advice that my senior road
14   foreman had was from the system road foreman, Dean
15   Manafee, who had -- who obviously oversees the
16   regulatory issues of RCO for CSX and his advice was
17   to our senior that it was in violation for allowing
18   one of our officers to sign another officer's name to
19   a federal document.
20        Q.    Sir, if you could listen to my question.
21   And I want to clarify this question so you can
22   understand it.  My question is, At any time to this
23   very moment, has the FRA ever found any violation of
24   any rule, regulation or law regarding the RCO
25   incident of May the 26th, 2006?
```



BROWN & GALLO
                                    LLC

Telephone  (404) 495-0777   (404) 876-8979
Toll Free   (877) 495-0777   (800) 637-0293
Fax (404) 495-0766

101 Marietta Street, Suite 2700
Atlanta, GA 30303

1740 Peachtree Street, NW
Atlanta, GA 30309

www.galloreporting.com

27

1          A.       Has CSX, as far as I know, received a

2     citation in regards to an FRA violation at Montgomery

3     over this issue, to my knowledge, they haven't.

4          Q.       Thank you.

5          A.       But that doesn't make it --

6          Q.       Thank you.  That was my question.  And

7     you answered my question.  Thank you.  All right.

8                   Now, in June you learned of the May

9     incident.  Do you recollect approximately when in

10    June -- how much earlier than the June 19th meeting

11    did you learn about this alleged incident of May the

12    26th?

13         A.       Approximately ten days.

14         Q.       So approximately on the 10th of June?

15         A.       It was probably the first week of June

16    between probably, I think, the 5th to the 9th of

17    June.  Somewhere in that time frame.

18         Q.       All right.  In your own words, what was

19    the problem involving Mr. Hollon signing the document

20    for Mr. Dean, that's the RCO certification?

21         A.       The issue was that we had an officer,

22    Mr. Hollon, who had signed a federal document, which

23    was the certification license with Mr. Dean's name.

24         Q.       Sir, do you have a secretary?

25         A.       Do I have a secretary?



BROWN & GALLO
LLC

Telephone  (404) 495-0777    (404) 876-8979
Toll Free  (877) 495-0777    (800) 637-0293
Fax (404) 495-0766

101 Marietta Street, Suite 2700
Atlanta, GA 30303

1740 Peachtree Street, NW
Atlanta, GA 30309

www.galloreporting.com

28

1        Q.      Yes, sir.

2        A.      I have a chief clerk, yes, sir.

3        Q.      A clerk, secretary, administrative

4    assistant, someone to assist you with your clerical

5    duties?

6        A.      No.

7        Q.      Have you ever had one?

8        A.      Have I ever had one?

9        Q.      Yes, sir.

10       A.      No.

11       Q.      Well, do you know people that have them

12   and told their administrative assistant or secretary

13   to sign their names for them on certain documents?

14       A.      Yes, sir.

15       Q.      In fact, we had Mr. Pendergrass say that

16   he had yesterday.  That's with authorization, is it

17   not?

18            MR. BARKER:  I'm going to object to the

19        form of your misstating the evidence from

20        yesterday's deposition.

21       Q.      If someone tells another person that he

22   or she can sign his or her name on a document,

23   letter, whatever, that's with authorization, is it

24   not?

25            MR. BARKER:  I'm going to object to the



BROWN & GALLO
                                LLC

Telephone  (404) 495-0777  (404) 876-8979
Toll Free   (877) 495-0777  (800) 637-0293
        Fax (404) 495-0766

101 Marietta Street, Suite 2700
Atlanta, GA 30303

1740 Peachtree Street, NW
Atlanta, GA 30309

www.galloreporting.com

29

1       form.

2           A.      Are you asking do I do that?  Are you

3       asking us in generalities?

4           Q.      You said that you don't have people --

5       you haven't had an administrative assistant or

6       secretaries before.  Is that your testimony?

7           A.      I said I've had a chief clerk, but she

8       was not an administrative.

9           Q.      Okay.  Your chief clerk, did you ever ask

10      your chief clerk to sign your name to documents --

11          A.      No, sir.

12          Q.      -- with your authorization?  But you know

13      of other managers that have in the past?

14          A.      I'm sure there has been others.

15          Q.      And I believe yesterday Mr. Pendergrass

16      had testified he had done that before himself, okay.

17      So it's not uncommon, right?  That's okay if it's

18      authorized, is it not?

19          A.      If it's a federal document I wouldn't

20      want somebody signing my name without me looking at

21      it.  I'd sign it myself.

22          Q.      Okay.  Do you know the law on

23      authorization of signatures, authorizing somebody, do

24      you know the federal law on that?

25          A.      Other than the process of moving and



BROWN & GALLO
LLC

Telephone (404) 495-0777   (404) 876-8979
Toll Free  (877) 495-0777   (800) 637-0293
Fax (404) 495-0766

101 Marietta Street, Suite 2700
Atlanta, GA 30303

1740 Peachtree Street, NW
Atlanta, GA 30309
www.galloreporting.com

30

1    having my wife sign my documents.

2         Q.      Okay.  You had your wife sign your

3    documents?

4         A.      Right.

5         Q.      Okay.  And what documents did you have

6    your wife sign?

7         A.      I had to have a power of attorney to do

8    that.

9         Q.      Okay.  What documents did you have your

10   wife sign?

11        A.      She signed basically all of our moving

12   agreements, so -- but I had to have a power of

13   attorney to do that.

14        Q.      Okay.  All right.  You had the power of

15   attorney, but do you know if you had to have it for

16   her signing your documents?

17        A.      Yes, sir.

18        Q.      To the matter of the RCO signing by

19   Mr. Hollon of Mr. Dean's signature, do you have any

20   proof that Mr. Dean had not authorized the signing of

21   a RCO certification on or about May the 26th, 2006?

22               MR. BARKER:  Object to the form.

23        A.      You need to re- -- I didn't understand

24   that question.

25        Q.      Okay.  Do you have any proof that



BROWN & GALLO
                                         LLC

Telephone  (404) 495-0777   (404) 876-8979
Toll Free  (877) 495-0777   (800) 637-0293
Fax (404) 495-0766

101 Marietta Street, Suite 2700
Atlanta, GA 30303

1740 Peachtree Street, NW
Atlanta, GA 30309
www.galloreporting.com

31

1    Mr. Dean did not authorize -- request and authorize

2    Mr. Hollon to sign Mr. Dean's name on that RCO

3    certification today?

4              MR. BARKER:   Object to the form.

5        A.      Prior to --

6        Q.      Uh-huh (affirmative).

7        A.      -- his signature?

8        Q.      Yes, sir.

9        A.      No, sir, I had no knowledge.

10       Q.      Okay.  And to this moment you don't have

11   any knowledge, do you?

12       A.      Other than the fact that -- what was

13   explained to me by Senior Road Foreman Saunders.

14       Q.      Okay.  What did Saunders explain to you?

15       A.      Saunders explained that in the testimony

16   or the statement that he had secured from Mr. Dean,

17   that he had requested that Mr. Hollon sign his name

18   to a federal document.

19       Q.      Do you know how this matter had come to

20   the attention of Mr. Saunders?  Did he ever tell you?

21       A.      Again, the only thing that I know, again,

22   my recollection was is that Marlo Owens in the FRA

23   had apparently come to Montgomery to review an

24   incident where a federal license was signed by

25   Mr. Hollon from Mr. Dean.

BROWN & GALLO
LLC

Telephone  (404) 495-0777   (404) 876-8979
Toll Free  (877) 495-0777   (800) 637-0293
Fax (404) 495-0766

101 Marietta Street, Suite 2700
Atlanta, GA 30303

1740 Peachtree Street, NW
Atlanta, GA 30309

www.galloreporting.com

32

1          Q.      Do you know who made the complaint that

2    brought the FRA, i.e., Marlo Owens to Montgomery,

3    Alabama to do this investigation --

4          A.      No, sir.

5          Q.      -- okay, at CSX?  Before May the 26th,

6    2006 and this incident, had you had some issues with

7    Mr. Hollon?

8                  MR. BARKER:  Object to the form.

9          A.      Me?

10         Q.      Yes, sir.

11         A.      No, sir.

12         Q.      No issues?

13         A.      No, sir.

14         Q.      On the date of May 26th, 2006, did

15   Mr. Hollon raise any issues with you, sir, that same

16   date of the alleged RCO incident?

17         A.      I can't recall any.

18         Q.      Okay.  I assume your company is probably

19   more modern than I am.  Does it have a computer

20   system?

21         A.      Yes, sir, it does.

22         Q.      I don't use the computer, but you do

23   don't you, sir?

24         A.      Do I utilize the systems that we have?

25   Yes, sir.



BROWN & GALLO
                          LLC

Telephone  (404) 495-0777   (404) 876-8979
Toll Free   (877) 495-0777   (800) 637-0293
         Fax (404) 495-0766

101 Marietta Street, Suite 2700
            Atlanta, GA 30303

1740 Peachtree Street, NW
            Atlanta, GA 30309
            www.galloreporting.com

33

1      Q.      Yes, sir.  And my law clerk does, but do

2  you personally use the computer?

3      A.      Do I personally use the computer at work?

4      Q.      At CSX?

5      A.      Yes, sir.

6      Q.      Okay.  All right.  Do you review the

7  e-mails sent to you, sir?

8      A.      Yes, sir, I do.

9      Q.      Do you review e-mails each day, sir?

10     A.      Each day, no, sir.

11     Q.      How often do you review e-mails?

12     A.      I would say approximately -- at least

13 every -- it wouldn't go any longer than two or three

14 days.

15     Q.      Okay.  Maximum?

16     A.      Yes, sir.

17     Q.      Unless you're off on vacation?

18     A.      Even on vacation.

19     Q.      Okay.  Do you have a laptop you carry

20 with you?

21     A.      No.  We have capability at home to pull

22 it up under our current systems.

23             (Plaintiff's Exhibit-2 was marked for

24 identification.)

25     Q.      I'd like to show you Plaintiff's Exhibit

BROWN & GALLO
LLC

Telephone  (404) 495-0777   (404) 876-8979
Toll Free  (877) 495-0777   (800) 637-0293
Fax (404) 495-0766

101 Marietta Street, Suite 2700
Atlanta, GA 30303

1740 Peachtree Street, NW
Atlanta, GA 30309

www.galloreporting.com

34

1    No. 2.

2          A.      Okay.

3          Q.      Okay.  Did you receive this e-mail, sir?

4          A.      Yes, sir, I did.

5          Q.      Okay.  And when I've been talking about

6    the incident on May the 26th, I may be in error.  It

7    may have been -- the RCO incident was on a Saturday,

8    May the 27th the day of this e-mail.  With that

9    understanding, do you believe you received this

10   e-mail on the 27th, that's addressed to you,

11   Mr. Workman?

12         A.      Do I remember receiving it on the 27th,

13   that exact date?

14         Q.      Uh-huh (affirmative).

15         A.      No, sir, I don't remember that.

16         Q.      But certainly based on your pattern and

17   practice, you would have received it within a couple

18   or three days, correct?

19         A.      That's correct.

20         Q.      Okay.  And assuming that fact of your

21   pattern and practice of receiving e-mails within --

22   certainly within two or three days, you would have

23   received this e-mail before you got the message from,

24   was it Mr. Saunders that told you about the RCO --

25         A.      That's correct.



BROWN & GALLO
LLC

Telephone (404) 495-0777  (404) 876-8979
Toll Free   (877) 495-0777  (800) 637-0293
Fax (404) 495-0766

101 Marietta Street, Suite 2700
Atlanta, GA 30303

1740 Peachtree Street, NW
Atlanta, GA 30309

www.galloreporting.com

35

1  Q.  -- incident? Okay. So you certainly

2 received this e-mail before Mr. Saunders had informed

3 you about the RCO incident of, I believe it's

4 Saturday May the 27th. I stand corrected. I've been

5 saying May the 26th, but I think it too occurred on

6 the same date. So I would be correct Mr. Saunders

7 informed you of the RCO incident after you received

8 Plaintiff's Exhibit 2, the e-mail, that's in front of

9 you?

10  A.  I think you're safe to say that because

11 normally around Memorial Day, and I do believe this

12 was around Memorial Day, if I can remember, I'm

13 always on vacation. So it just depends on whether I

14 was still in town or out of town, but I'm sure that I

15 probably read it either the latter part after

16 Memorial Day, but it would have been prior to

17 Mr. Saunders.

18  Q.  I believe on Plaintiff's Exhibit 2 there

19 is a handwritten note here. It says, quote, E-mail

20 sent to Mr. Workman, no reply.

21  A.  Uh-huh (affirmative).

22  Q.  And I assume that handwritten note was

23 not on the e-mail that you received since it's an

24 electronic transmittal?

25  A.  No, it wasn't.



BROWN & GALLO
LLC

Telephone (404) 495-0777 (404) 876-8979
Toll Free (877) 495-0777 (800) 637-0293
Fax (404) 495-0766

101 Marietta Street, Suite 2700
Atlanta, GA 30303

1740 Peachtree Street, NW
Atlanta, GA 30309

www.galloreporting.com

36

1    Q.    Okay.  And I think that my client will

2    testify that those are his notes that were on that

3    document that he applied.

4    A.    Okay.

5    Q.    You would agree this e-mail was sent to

6    you, but what I want to ask you is did Mr. Hollon

7    correctly note on here there was no reply by you to

8    this e-mail?

9    A.    That's correct.

10    Q.    Okay.  And having received this e-mail,

11    sir, I know you've testified that you were over

12    personnel for the Atlanta division.  Why didn't you

13    respond to the e-mail to Mr. Hollon?

14    A.    I can't recall why I didn't respond to

15    the e-mail.  I mean, it's not a case of where -- I

16    mean, there's e-mails I don't respond to in a lot of

17    times.  I mean, it's just not Mr. Hollon.

18    Q.    All right.  So -- and I guess I'm asking

19    why didn't you respond to this e-mail with another

20    e-mail.  I assume that you didn't respond with

21    another e-mail based on your recollection, correct?

22    A.    That's correct.

23    Q.    But did you respond by a letter?

24    A.    No, sir, not that I'm aware of.

25    Q.    Did you respond by a telephone call to



BROWN & GALLO
LLC

Telephone  (404) 495-0777   (404) 876-8979
Toll Free   (877) 495-0777   (800) 637-0293
Fax (404) 495-0766

101 Marietta Street, Suite 2700
Atlanta, GA 30303

1740 Peachtree Street, NW
Atlanta, GA 30309

www.galloreporting.com

37

1    Mr. Hollon --

2        A.      No, sir.

3        Q.      -- to this e-mail, Plaintiff's Exhibit 2?

4        A.      Not after that date, no, sir.

5        Q.      Okay.  To this day, have you ever

6    responded to this e-mail to Mr. Hollon?

7        A.      No, sir.

8        Q.      Okay.  Having read this e-mail, again and

9    refreshed yourself to this e-mail, do you know what

10   Mr. Hollon was talking about?

11       A.      About the two respective places in terms

12   of where he -- that he submitted his resumé for?

13       Q.      Uh-huh (affirmative).

14       A.      Yes.  I was aware that there was an

15   opening at both Montgomery as terminal manager and

16   Atlanta as assistant superintendent.

17       Q.      Okay.  So your response was not because

18   you didn't have sufficient information as to what he

19   was talking about, correct?

20       A.      That's correct.

21       Q.      Okay.  Were you just too busy to respond?

22       A.      I'd be speculating.  I don't know.  I

23   can't -- I can't recall whether I was too busy or

24   what.

25       Q.      Okay.  Did this e-mail upset you, sir?



BROWN & GALLO
                                    LLC

Telephone  (404) 495-0777   (404) 876-8979
Toll Free  (877) 495-0777   (800) 637-0293
            Fax (404) 495-0766

101 Marietta Street, Suite 2700
        Atlanta, GA 30303

1740 Peachtree Street, NW
        Atlanta, GA 30309

www.galloreporting.com

38

1          A.       No, sir.

2          Q.       Did it make you curious why he was

3     writing this e-mail and sending it to you?

4          A.       Did it make me curious?

5          Q.       Uh-huh (affirmative).

6          A.       Well, I can say it didn't upset me, but I

7     can't remember whether it made me curious or not.

8          Q.       Let me ask you this.  Regarding this

9     e-mail, Mr. Hollon had been passed over for other

10    positions, hadn't he, sir, by you under you; is that

11    correct?

12         A.       In what way?

13         Q.       Well, I'm just asking, do you recall if

14    he had?

15         A.       No.

16         Q.       Okay.  All right.  Now, regarding this

17    e-mail, did this e-mail prompt you to retaliate

18    against Mr. Hollon?

19                  MR. BARKER:  Object to the form.

20         A.       No, sir.

21         Q.       And investigate and demote Mr. Hollon in

22    the June 19th, 2006 meeting?

23         A.       No, sir.

24         Q.       It didn't motivate you at all, sir?

25         A.       No, sir.



BROWN & GALLO
                           LLC

Telephone  (404) 495-0777   (404) 876-8979
Toll Free  (877) 495-0777   (800) 637-0293
Fax (404) 495-0766

101 Marietta Street, Suite 2700
Atlanta, GA 30303

1740 Peachtree Street, NW
Atlanta, GA 30309
www.galloreporting.com

39

1      Q.      Okay.  All right.  How old are you, sir?
2    What's your date of birth?
3      A.      My date of birth is August 2nd, 1953.
4      Q.      Okay.  That makes you what, about 54
5    years old now?
6      A.      That's correct.
7      Q.      Okay.  In 2006; 53?  You have known
8    Mr. Hollon's age, haven't you, sir?  Since you've
9    been the division manager in line, you've known his
10   age?
11             MR. BARKER:  Is that a question?
12     Q.      Yes.  That's a question.
13     A.      Do I know his exact age?
14     Q.      Not exact.  I'm talking about his...
15     A.      I would be probably speculating in terms
16   of what I knew of his age.
17     Q.      Since you have known Mr. Hollon, you knew
18   he was over 40 years old that was clear?
19     A.      There's a lot of officers over 40
20   years --
21     Q.      Now, I'm not talking about other
22   officers.  I'm talking about Mr. Hollon.  You knew
23   since you've known him that he was over 40 years old?
24     A.      I would assume that he was over 40.
25     Q.      Okay.  And you assumed that in 2006,



BROWN & GALLO
                      LLC

Telephone  (404) 495-0777   (404) 876-8979
Toll Free  (877) 495-0777   (800) 637-0293
         Fax (404) 495-0766

101 Marietta Street, Suite 2700
         Atlanta, GA 30303

1740 Peachtree Street, NW
        Atlanta, GA 30309
www.galloreporting.com

40

1    correct, sir?

2          A.      Did I assume that?

3          Q.      No.  You would have assumed that in 2006,

4    that's last year, sir.

5          A.      That he was in his 40s?  Yes, sir.

6          Q.      Okay.  Thank you.  Thank you.  Now, do

7    you have a problem with older men working and older

8    people working for CSX, sir?

9          A.      No, sir.

10         Q.      Do you give advantages for people under

11   40 that work at CSX, employment advantages?

12         A.      No, sir.

13         Q.      Do you punish people over 40 at CSX --

14         A.      Have we punished --

15         Q.      -- because of their age?

16         A.      -- because of their age?

17         Q.      Yes, sir.

18         A.      No, sir.

19         Q.      You're not motivated by age whatsoever

20   are you, sir?

21         A.      No, sir.

22         Q.      You're agreeing with me that you're not

23   motivated by age whatsoever in making an employment

24   decision at CSX?

25         A.      I'm telling you there was never ever in



BROWN & GALLO
                              LLC

Telephone  (404) 495-0777   (404) 876-8979
Toll Free   (877) 495-0777   (800) 637-0293
           Fax (404) 495-0766

101 Marietta Street, Suite 2700
        Atlanta, GA 30303

1740 Peachtree Street, NW
        Atlanta, GA 30309
     www.galloreporting.com

41

1   my mind in any decision that I made that was

2   motivated by age.

3       Q.      Okay.  At CSX?

4       A.      At CSX.

5       Q.      And that includes in the year 2006?

6       A.      That's correct.

7       Q.      Okay.  All right.  Is there a reason why

8   you are anybody in management like you would inquire

9   about somebody's age?  Can you think of a reason?

10      A.   .  Only for retirement purposes.

11      Q.      Okay.

12      A.      We may be in -- you know, in discussion

13  of how much time you've got with the railroad and

14  might be seeing how many more years you may have.

15      Q.      Let's talk about eligibility for

16  retirement.  What's eligibility for retirement?  What

17  constitutes it, sir?

18      A.      55, if you're pension-wise you're a

19  company officer in the noncontract ranks that pay 55

20  plus 30.

21      Q.      When you say noncontract ranks, you're

22  talking about nonunion ranks?

23      A.      That's correct.

24      Q.      55 years old plus you have to have 30

25  years of service?



BROWN & GALLO
                                    LLC

Telephone  (404) 495-0777   (404) 876-8979
Toll Free  (877) 495-0777   (800) 637-0293
Fax (404) 495-0766

101 Marietta Street, Suite 2700
Atlanta, GA 30303

1740 Peachtree Street, NW
Atlanta, GA 30309

www.galloreporting.com

42

1    A.    That's correct.

2    Q.    All right.  And why would you be

3  inquiring about retirement for people?

4    A.    Because, I mean, there's always going to

5  be attrition in, you know, any organization or any

6  company is going to be concerned about attrition.

7    Q.    Does CSX have a policy that once you hit

8  55 years old and you've got 30 years with the

9  railroad, you have to retire?

10    A.    No, sir.

11    Q.    Mandatory retirement?

12    A.    No, sir.

13    Q.    It's the option of the employee to

14  continue to work at 55 assuming they're healthy

15  mentally and physically and want to continue to work,

16  they have that option --

17    A.    Thank goodness.

18    Q.    -- at CSX?

19    A.    Yeah, thank goodness.  They'll be here

20  the next year.

21    Q.    And that was true in 2006, correct?

22    A.    That's correct.

23    Q.    That nonmandatory retirement policy was

24  in effect in 2006 at CSX, correct?

25    A.    Again, yes.


BROWN & GALLO
LLC

101 Marietta Street, Suite 2700
Atlanta, GA 30303

1740 Peachtree Street, NW
Atlanta, GA 30309

Telephone  (404) 495-0777    (404) 876-8979
Toll Free  (877) 495-0777    (800) 637-0293
Fax (404) 495-0766

www.galloreporting.com

43

1      Q.      Okay.  All right.  Now, you assume that

2   Mr. Hollon was certainly in his 40s last year, 2006,

3   that would be some ten years or so short of

4   retirement eligibility under CSX rules, right?

5      A.      Again, if he's in his 40s, yes, sir,

6   that's right.

7      Q.      Okay.  What is the term out of park or

8   out-of-park meeting?  That's a term I just heard

9   about in the railroad business and I don't know -- if

10  you could tell the court what does that mean and what

11  is that term?

12     A.      Out of park was an initiative created by

13  the operational department of CSX to improve overall

14  operational performance within the organization.

15     Q.      Is it like a big meeting or a big

16  gathering or a big kind of affair or party or

17  something?

18     A.      No.  Initially it was a meeting by the

19  senior leaders of our organization to decide how we

20  could better improve our, again, operational

21  performance whether it was originations or safety,

22  and out of that meeting of the senior leaders, an

23  initiative was created called out of park.  It

24  concentrated on five separate policies, if you will.

25     Q.      How often are out-of-park meetings held,

BROWN & GALLO
LLC

Telephone  (404) 495-0777   (404) 876-8979
Toll Free  (877) 495-0777   (800) 637-0293
Fax (404) 495-0766

101 Marietta Street, Suite 2700
Atlanta, GA 30303

1740 Peachtree Street, NW
Atlanta, GA 30309

www.galloreporting.com

44

1    sir, at CSX?

2         A.      The initial ones we had this was -- May

3    of 2005 was the initial meeting that kicked off this

4    initiative.  It was a three-day meeting.

5         Q.      Where was it held, sir?

6         A.      At Welaka.

7         Q.      Pardon?

8         A.      Welaka, Florida.

9         Q.      Spell that, please?

10        A.      W-e-l-a-k-a.  It was an off-site meeting,

11   if you will, of the senior leaders.

12        Q.      Between 2005 and 2007, how many

13   out-of-park meetings did CSX have in the Atlanta

14   division?

15        A.      On the Atlanta division?  Now, that's

16   separate.  That would have been ones that I --

17   obviously.

18        Q.      Well, the ones -- let's just strike that

19   question and ask about the ones that you were

20   involved with, the Atlanta division or not.

21        A.      Approximately, I think, at least 15, 16,

22   meetings total.

23        Q.      Okay.

24        A.      Both system and division.

25        Q.      Did you ever have out-of-park meetings in



BROWN & GALLO
                        LLC
Telephone  (404) 495-0777   (404) 876-8979
Toll Free   (877) 495-0777   (800) 637-0293
Fax (404) 495-0766

101 Marietta Street, Suite 2700
Atlanta, GA 30303

1740 Peachtree Street, NW
Atlanta, GA 30309

www.galloreporting.com

45

1    Atlanta, Georgia?

2         A.      Yes, sir.

3         Q.      And approximately when were those held?

4         A.      We held them approximately about every

5    five to six weeks apart.  Sometimes it would be a

6    month.

7         Q.      Did Mr. Hollon ever attend --

8         A.      Yes, sir.

9         Q.      -- the Atlanta out-of-park meetings?

10        A.      Yes, sir.  He represented the Montgomery

11   terminal.

12        Q.      Okay.  In what capacity did he represent

13   the Montgomery terminal?

14        A.      He was representing -- basically in the

15   absence of the terminal manager he was there to

16   represent the terminal itself.

17        Q.      All right.  Now, at some point in time he

18   became the terminal trainmaster at Montgomery,

19   Alabama, correct?

20        A.      Correct.

21        Q.      Do you know who he succeeded?  Who was

22   the prior terminal trainmaster at Montgomery?

23        A.      I don't know who Ron succeeded.

24        Q.      And at the out-of-park meetings in

25   Atlanta, do you know if he was working as the



BROWN & GALLO
LLC

Telephone  (404) 495-0777   (404) 876-8979
Toll Free  (877) 495-0777   (800) 637-0293
Fax (404) 495-0766

101 Marietta Street, Suite 2700
Atlanta, GA 30303

1740 Peachtree Street, NW
Atlanta, GA 30309

www.galloreporting.com

46

1    terminal manager at Montgomery when he attended the

2    Atlanta --

3         A.      No, sir, he was working as terminal

4    trainmaster.

5         Q.      You know, I'm sorry.  I'm reading

6    something and saying something else.  He was the

7    terminal trainmaster when he -- at Montgomery,

8    Alabama when he attended the out-of-park meetings in

9    Atlanta --

10        A.      That's correct.

11        Q.      -- in 2006?  Okay.  And also in 2006 was

12   there an out-of-park meeting in Montgomery in April

13   of 2006?

14        A.      Yes, sir.  We had them at different

15   locations on the division.

16        Q.      Did you attend that meeting, sir?

17        A.      Yes, sir.

18        Q.      Okay.  And other than Mr. Hollon and

19   yourself -- he was the trainmaster at that time,

20   right?

21        A.      He was the terminal trainmaster, yes,

22   sir.

23        Q.      Okay.  Terminal trainmaster.  Other than

24   his attendance and your attendance, who else was

25   there.



BROWN & GALLO
                                    LLC

Telephone  (404) 495-0777   (404) 876-8979
Toll Free   (877) 495-0777   (800) 637-0293
           Fax (404) 495-0766

101 Marietta Street, Suite 2700
         Atlanta, GA 30303

1740 Peachtree Street, NW
         Atlanta, GA 30309
         www.galloreporting.com

47

1        A.        We had -- the representation from the

2    different terminals could range from an assistant

3    superintendent to a terminal trainmaster representing

4    a terminal because either the superintendent or the

5    assistant could not make it, or a terminal manager

6    from the other respective terminals could not make

7    it, so they would be there representing the terminal.

8        Q.        Can you just rattle off some of the

9    names, if you recall?

10       A.        Gary Jackson probably would have attended

11   as the terminal trainmaster out of Mobile for the

12   absence of the terminal manager.  Tommy May, he was

13   terminal manager, he represented New Orleans.  At

14   times he would bring another trainmaster with him.

15   Terminal Superintendent Scott Connor from Birmingham.

16   If he couldn't make it it was generally John Carnes

17   who was the assistant superintendent at that time.

18   Atlanta was either Bill Dunlap or Terry Walton would

19   attend.  But we also had representation from -- they

20   had cross-functional departments as well from those

21   terminals.

22       Q.        In these out-of-park meetings, did you

23   have people that were seasoned veterans of the CSX

24   Railroad System and also the younger managers, you

25   had a mix, didn't you?



BROWN & GALLO
                                                LLC

Telephone  (404) 495-0777    (404) 876-8979
Toll Free   (877) 495-0777    (800) 637-0293
        Fax (404) 495-0766

101 Marietta Street, Suite 2700
            Atlanta, GA 30303

1740 Peachtree Street, NW
          Atlanta, GA 30309

www.galloreporting.com

48

1          MR. BARKER:  Object to the form.

2       A.      We had a mix.  I mean, it could have been

3  seasoned.  It could have been, you know, could have

4  not have been because we were trying to get the

5  initiative down to the grass roots level, so it could

6  have been a mix.

7       Q.      And you had managers that were low on the

8  management hierarchy and those up higher mixed there

9  again?

10      A.      On their division, yes, sir.

11      Q.      Okay.  Approximately -- do you recall at

12  that meeting that -- do you recall in Montgomery an

13  out-of-park meeting in which there were only

14  Montgomery managers in April 2006?  I think you

15  rattled off in the general when you had out-of-park

16  meetings, who would attend and you talked about

17  people in Mobile, New Orleans and Birmingham, et

18  cetera, but do you recall specifically an April 2006

19  out-of-park meeting in which it was a reward

20  meeting -- that was a reward meeting involving

21  Montgomery's winning of the first quarter out of the

22  park?

23      A.      Yes, sir, I recall.

24      Q.      Okay.  And so having refreshed you of

25  this reward meeting, this out-of-park meeting of



BROWN & GALLO
LLC

Telephone  (404) 495-0777   (404) 876-8979
Toll Free   (877) 495-0777   (800) 637-0293
Fax (404) 495-0766

101 Marietta Street, Suite 2700
Atlanta, GA 30303

1740 Peachtree Street, NW
Atlanta, GA 30309
www.galloreporting.com

49

1    April 2006, that only involved Montgomery CSX manager

2    personnel, correct?

3        A.      That's correct.

4        Q.      And who would that have been from that

5    meeting?

6        A.      That would have been Angie Averitte and

7    the terminal trainmasters.  Angie was the terminal

8    manager.

9        Q.      And who were the other people, do you

10   recall?

11       A.      The mechanical representative should have

12   been there, and I can't recall whether they were or

13   not.  I don't believe engineering showed up.  Again,

14   that's been almost two years ago.

15       Q.      Do you have a good recollection of that

16   meeting, sir?

17       A.      Yes, sir.  I attended that meeting to

18   basically indicate to the terminal group that I was

19   incorrect in terms of what reward that they would be

20   receiving as far as their position as number one

21   out-of-park competition for their level, which was

22   a -- basically a middle yard, flat yard competition.

23       Q.      What did that reward -- what did you

24   initially think or tell them that reward was going to

25   be for them?



LLC

Telephone (404) 495-0777    (404) 876-8979
Toll Free   (877) 495-0777   (800) 637-0293
Fax (404) 495-0766

101 Marietta Street, Suite 2700
Atlanta, GA 30303

1740 Peachtree Street, NW
Atlanta, GA 30309

www.galloreporting.com

50

1      A.      I initially thought it was going to be

2   10- to $15,000, into that neighborhood, for some of

3   the officers of that, that they would be sharing, but

4   the out-of-park process had changed and I

5   inadvertently never caught it thinking that it would

6   be like, you know, the prior quarter. So I came down

7   to indicate to them that, Hey --

8      Q.      The bad news?

9      A.      Yeah, the bad news and it was my fault

10  and I should have caught it.

11     Q.      And what did you -- did you make kind of

12  a joke about it or tell them that they were getting

13  like a consolation prize or something?

14             MR. BARKER:  Object to the form.

15     A.      Not that I can recall there was never a

16  joke over this.

17     Q.      Okay.  Well, what did you tell them?

18     A.      I indicated to them that -- you know,

19  that I would try my best maybe to get them, you know,

20  something else as a reward rather than just the

21  reward that they were going to have as far as

22  basically us paying for a party at their location.

23     Q.      Okay.  Of those people attending that,

24  I'll call it the reward or award meeting, out-of-park

25  meeting of April of 2006, you were over 40, Angie



LLC

Telephone  (404) 495-0777   (404) 876-8979
Toll Free   (877) 495-0777   (800) 637-0293
Fax (404) 495-0766

101 Marietta Street, Suite 2700
Atlanta, GA 30303

1740 Peachtree Street, NW
Atlanta, GA 30309
www.galloreporting.com

51

1    Averitte, the terminal manager was over 40, was she

2    not, correct?

3         A.    Yes, sir, correct.  I would assume she's

4    over 40.

5         Q.    Okay.  You would assume that back then,

6    too, that was a year ago, correct?

7         A.    Uh-huh (affirmative).

8         Q.    And Mr. Hollon, you've already said you

9    assumed in 2006 he was over 40.  Now, anybody else in

10   attendance would you assume was over 40?

11        A.    Roger Jackson.  I would have assumed he

12   was in his 50s, and I would have assumed that Ron

13   Carr was in his 50s.

14        Q.    Are those people that attended that

15   meeting?

16        A.    Yes, sir.

17        Q.    What was Mr. Carr's job at that time?

18        A.    Terminal trainmaster.

19        Q.    Okay.  And what was Mr. Jackson's

20   position?

21        A.    Terminal train -- Mr. Roger Jackson was

22   terminal trainmaster.

23        Q.    What was Mr. Carr's again?

24        A.    Terminal trainmaster.

25        Q.    Okay.  And they both were out of the



BROWN & GALLO
LLC

Telephone  (404) 495-0777   (404) 876-8979
Toll Free   (877) 495-0777   (800) 637-0293
Fax (404) 495-0766

101 Marietta Street, Suite 2700
Atlanta, GA 30303

1740 Peachtree Street, NW
Atlanta, GA 30309

www.galloreporting.com

52

1    Montgomery CSX office?

2         A.      Yes, sir, that's correct.

3         Q.      Okay.  Now, did you ever tell the people

4    under 40, the younger people, that they had a bright

5    future --

6                 MR. BARKER:  Object to the form.

7         A.      I can't recall.

8         Q.      -- in that meeting?

9         A.      I can't recall saying to anybody in there

10   that they had a bright future.  Now, I mean, I felt

11   that the entire organization had a bright future, not

12   specifically anybody, because our organization

13   obviously at that time was improving.  Our loads and

14   volumes was increasing, and I felt that as far as

15   where Montgomery was positioned that it had a bright

16   future.  Now, specifically saying only certain people

17   did and others didn't, no, I didn't say that.

18        Q.      You just testified you can't recall

19   turning to the younger managers and saying they had a

20   bright future, but can you recall in that meeting

21   asking Mr. Hollon how old he was, sir?

22        A.      No, sir, I can't recall that.

23        Q.      Okay.  Well, we had asked you before you

24   started answering questions specifically about this

25   out-of-park meeting as to what would be your



BROWN & GALLO
                    LLC

Telephone  (404) 495-0777   (404) 876-8979
Toll Free  (877) 495-0777   (800) 637-0293
       Fax (404) 495-0766

101 Marietta Street, Suite 2700
            Atlanta, GA 30303

1740 Peachtree Street, NW
        Atlanta, GA 30309
www.galloreporting.com

53

1   motivation as a manager, particularly your position

2   of division manager of the Atlanta division, to ask

3   an employee his or her age.  If you had asked

4   Mr. Hollon his age in that meeting, would you recall

5   why?

6               MR. BARKER:  Object to the form.

7       A.      I can't recall asking Mr. Hollon his age.

8       Q.      Okay.  Would you know any reason to

9   question Mr. Hollon's recall of what you asked in

10  that meeting?

11      A.      I have no reason to.

12      Q.      Question his memory?

13      A.      Yeah.

14              MR. ATCHISON:  Okay.  Let's take a short

15      break.

16              (Break taken.)

17  BY MR. ATCHISON:

18      Q.      Okay.  Back on the record, sir.  The last

19  question I asked was did you know any reason to

20  question Mr. Hollon's recall of that meeting and when

21  I mean that meeting, I'm talking about the

22  out-of-park meeting of April 2006 in Montgomery,

23  Alabama?

24      A.      Do I have any?  I mean, no, I wouldn't

25  have any -- I have no idea what he was referring to,



BROWN & GALLO
                    LLC

Telephone  (404) 495-0777   (404) 876-8979
Toll Free   (877) 495-0777   (800) 637-0293
Fax (404) 495-0766

101 Marietta Street, Suite 2700
Atlanta, GA 30303

1740 Peachtree Street, NW
Atlanta, GA 30309

www.galloreporting.com

54

1    but if he says that I said it, I don't know.

2        Q.      If he says he has a specific recall of

3    that meeting, would you have any reason to question

4    his specific recall of that meeting of April 2006 in

5    Montgomery, Alabama?

6                MR. BARKER:   Object to the form.

7        A.      I mean, again --

8        Q.      You didn't note him under drugs or

9    intoxicated or anything like that during that

10   meeting, of course?

11       A.      No.

12       Q.      He didn't look like he was asleep in that

13   meeting, did he?  I mean, there's no reason for you

14   to question his recall of that meeting, am I correct?

15       A.      No, he was not asleep.  Nobody was.

16       Q.      Okay.  He appeared alert in taking in the

17   meeting, correct?

18       A.      Correct.

19       Q.      Okay.  Great.  Now, in that meeting, that

20   was regarding the matter of the award that you

21   thought you were able to give to the managers and you

22   were explaining to them indeed you had made a

23   mistake, correct?  Was there any question or issue in

24   that meeting regarding retirement matters?

25       A.      First of all, to answer your first



BROWN & GALLO
                              LLC

Telephone  (404) 495-0777    (404) 876-8979
Toll Free   (877) 495-0777    (800) 637-0293
        Fax (404) 495-0766

101 Marietta Street, Suite 2700
Atlanta, GA 30303

1740 Peachtree Street, NW
Atlanta, GA 30309

www.galloreporting.com

55

1    question, correct.  The second issue as far as

2    retirement issues, we may have had a discussion about

3    that.  I can't recall any specifics as far as talking

4    about, you know, retirements, but I knew that there

5    would be attrition at Montgomery downstream.  That

6    there had been some discussion by a couple of the

7    officers to Angie who had indicated they may be

8    stepping down in a couple of months or so, but other

9    than that --

10        Q.    Okay.  My specific question is, did

11   you -- let's just do this.  My specific question to

12   you is, did you mention at that meeting any issue

13   regarding retirement matters?

14        A.    Issues regarding -- no.

15        Q.    Okay.  Thank you.  Now, sir, I asked you

16   about Plaintiff's Exhibit 2.  It was an e-mail sent

17   to you by Mr. Hollon on May the 27th, 2006.  Okay.

18   I'm going to mark another exhibit as Plaintiff's

19   Exhibit 3.

20            (Plaintiff's Exhibit-3 was marked for

21   identification.)

22        Q.    Sir, I do not see a cc to you on this

23   e-mail, am I correct?

24        A.    That's correct.

25        Q.    Okay.  Now, if you would read the e-mail,



BROWN & GALLO
LLC

Telephone  (404) 495-0777   (404) 876-8979
Toll Free  (877) 495-0777   (800) 637-0293
Fax (404) 495-0766

101 Marietta Street, Suite 2700
Atlanta, GA 30303

1740 Peachtree Street, NW
Atlanta, GA 30309

www.galloreporting.com

56

1    nonetheless.  Have you had a moment to read it?

2         A.        Yes, sir.

3         Q.        It's addressed to Mr. Frulla,

4    F-r-u-l-l-a.  Who is Mr. Frulla?

5         A.        The division manager for the Jacksonville

6    division.

7         Q.        Okay.  It's also cc'd or sent to Jack

8    Frost.  Who is he, sir?

9         A.        Jack Frost was the manager -- at that

10   time he was the manager of human resources for the

11   Southern Division.

12        Q.        Indeed that Jack Frost is the same Jack

13   Frost that attended the June 19th, 2006, meeting at

14   Montgomery in which Mr. Hollon was demoted?

15        A.        That's correct.

16        Q.        Okay.  And it's also addressed to Angie

17   Averitte.  And she was the manager -- terminal

18   manager at Montgomery at that time of May 27, 2006?

19        A.        No, sir.  She was manager of operating

20   practices for the Atlanta division.

21        Q.        She had been transferred at that point?

22        A.        Yes, sir.

23        Q.        Okay.  All right.  Now, regarding this

24   exhibit -- Plaintiff's Exhibit 3, did you or --

25   excuse me, did Mr. Frulla ever discuss the matters



BROWN & GALLO
                              LLC

Telephone  (404) 495-0777  (404) 876-8979
Toll Free  (877) 495-0777  (800) 637-0293
         Fax (404) 495-0766

101 Marietta Street, Suite 2700
Atlanta, GA 30303

1740 Peachtree Street, NW
Atlanta, GA 30309
www.galloreporting.com

57

1   involving this e-mail, Plaintiff's Exhibit 3, with

2   you?

3       A.      No, sir.

4       Q.      Did Mr. Jack Frost ever discuss the

5   matters involving this e-mail with you?

6       A.      Not that I can recall.

7       Q.      Did Ms. Angie Averitte ever discuss the

8   matters of this e-mail with you?

9       A.      Not that I can recall.

10      Q.      Okay.  I see there's a handwritten note

11  that we will represent as Mr. Hollon's on the bottom.

12  It says:   E-mail sent about Pensacola job.

13              I believe this is the same day of the

14  remote control.  Do you see that handwritten

15  statement?

16      A.      Uh-huh (affirmative).

17      Q.      Does this refresh you that indeed this is

18  the same date of the remote control incident?

19      A.      According to what documents I've seen it

20  was May 27th.

21      Q.      Okay.  The remote control incident was?

22      A.      Yes, sir.

23      Q.      Okay.  Very good.  Did you ever consult

24  with or talk to Jack Frost regarding -- let's go back

25  to Plaintiff's Exhibit 2.

BROWN & GALLO
LLC

Telephone. (404) 495-0777   (404) 876-8979
Toll Free  (877) 495-0777   (800) 637-0293
Fax (404) 495-0766

101 Marietta Street, Suite 2700
Atlanta, GA 30303

1740 Peachtree Street, NW
Atlanta, GA 30309

www.galloreporting.com

58

```
 1        A.        Yes, sir.

 2        Q.        Do you see Plaintiff's Exhibit 2?  That's

 3   another e-mail that was sent to you by Mr. Hollon.  I

 4   see it's cc'd to Jack Frost.  Did you ever discuss

 5   the matter involving this e-mail with Jack Frost?

 6        A.        No, sir.

 7        Q.        Did you ever discuss the matter of

 8   Plaintiff's Exhibit 2 with Angie Averitte?

 9        A.        Not that I can recall.

10        Q.        Okay.  Prior to this e-mail date of May

11   the 27th, 2006, did you ever have any knowledge of

12   any disciplinary matters involving Mr. Hollon?

13        A.        No, sir.

14        Q.        Prior to that date, did his record ever

15   reflect any disciplinary matters?

16        A.        Not that I'm aware of.

17        Q.        He had been with CSX a good quarter of a

18   century at that point, 25 years, right?

19        A.        Again, I haven't looked at Ron's --

20        Q.        Approximately --

21        A.        Okay.

22        Q.        -- you'd agree?  And you knew of no

23   disciplinary matters?

24        A.        No.

25        Q.        Okay.  All right.  Does CSX -- well, did
```



BROWN&GALLO
LLC

Telephone  (404) 495-0777   (404) 876-8979
Toll Free   (877) 495-0777   (800) 637-0293
Fax (404) 495-0766

101 Marietta Street, Suite 2700
Atlanta, GA 30303

1740 Peachtree Street, NW
Atlanta, GA 30309

www.galloreporting.com

59

1    CSX have at that time have what we call a progressive

2    discipline system?

3        A.    Yes, sir.

4        Q.    Okay.  And what did that entail, if you

5    could tell the court?

6        A.    It was an -- it had the type disciplinary

7    policy that was basically for noncontract employees.

8        Q.    Okay.  And when you say noncontract

9    employees, you're talking about nonunion employees,

10   correct?

11       A.    Excuse me, for contractual employees.

12   I'm sorry.

13       Q.    Okay.  For contractual employees?

14       A.    That's correct.

15       Q.    Okay.  And the contractual employees are

16   what type of employees?  Are those the union

17   employees?

18       A.    That's correct.

19       Q.    Okay.  And so did CSX in 2006 have a

20   progressive discipline procedure for managers such as

21   yourself and Mr. Hollon, et cetera?

22       A.    None that I'm aware of.

23       Q.    Okay.  No guidelines, no policy, no

24   procedure?

25       A.    It would probably be based upon the



BROWN & GALLO
                                    LLC

Telephone  (404) 495-0777   (404) 876-8979
Toll Free  (877) 495-0777   (800) 637-0293
Fax (404) 495-0766

101 Marietta Street, Suite 2700
Atlanta, GA 30303

1740 Peachtree Street, NW
Atlanta, GA 30309

www.galloreporting.com

60

1   infraction itself, the significance of it.

2        Q.        Okay.   Just a question of the discretion

3   of the manager who is making the decision?

4        A.        Yeah.   It's a matter of leadership.   It's

5   a matter of -- you're the one that basically sets the

6   example, credibility.

7        Q.        Okay.   All right, sir.   Earlier on in

8   your deposition we talked about several decisions

9   that Mr. Pendergrass affirmed or made a final

10  decision where you made recommendations to demote.

11  The first, I think you mentioned, was Mr. Snapp.   Who

12  is Mr. Snapp, please?

13       A.        Mr. Snapp was the terminal manager at

14  Mobile, Alabama.

15       Q.        Okay.   And did you recommend his

16  demotion?

17       A.        I recommended -- based upon the facts

18  that I had submitted to Mr. Pendergrass,

19  Mr. Pendergrass made a decision on the facts as to

20  what the decision would be rendered against

21  Mr. Snapp.

22       Q.        Okay.   When approximately was there an

23  incident involving Mr. Snapp that led to his

24  demotion?

25       A.        The initial incident apparently occurred



BROWN & GALLO
                              LLC

Telephone  (404) 495-0777   (404) 876-8979
Toll Free   (877) 495-0777   (800) 637-0293
          Fax (404) 495-0766

101 Marietta Street, Suite 2700
Atlanta, GA 30303

1740 Peachtree Street, NW
Atlanta, GA 30309
www.galloreporting.com

61

1   in December or January of 2006.  I was made aware of

2   it in about March of 2006.

3       Q.      March of 2006 --

4       A.      (Nods head affirmatively.)

5       Q.      -- the decision made?

6       A.      Well, that's when I was made aware of it.

7       Q.      And the incident occurred when, sir, I'm

8   sorry, I was shuffling paper?

9       A.      If I remember, the incident, if I can

10  recall, it was the latter part of December, early

11  January of 2006, latter part of December 2005.

12      Q.      What was the incident, sir?

13      A.      The incident was where we had a crew in

14  Mobile, Alabama who was taking in an early quit and

15  had made prior arrangements with the relieving crew

16  to use their pin numbers, enter an FRA screen, which

17  is a time screen, and sign their time off.

18      Q.      Do you know who was on the crew?

19      A.      Huh?

20      Q.      Do you know who was on the crew?

21      A.      I recall the conductor, the yard foreman,

22  Charlie and I can't think of Charlie's last name.  I

23  just know him as Charlie.

24      Q.      All right.  And the conductor, what was

25  his name?



BROWN & GALLO
                LLC

Telephone  (404) 495-0777   (404) 876-8979
Toll Free  (877) 495-0777   (800) 637-0293
        Fax (404) 495-0766

101 Marietta Street, Suite 2700
        Atlanta, GA 30303

1740 Peachtree Street, NW
        Atlanta, GA 30309

www.galloreporting.com

62

1     A.      That's the yard foreman.  They're

2   synonymous.  Yard foreman, conductors are synonymous.

3     Q.      Oh, I see.  Okay.  Well, who was that

4   please?

5     A.      Charlie, and I can't remember Charlie's

6   last name.  I can't recall it.

7     Q.      In that time frame, was Charlie under 40

8   or over 40?

9     A.      Charlie was approximately 60 -- about 59,

10  60 years old.

11    Q.      All right.  And who else was in that

12  crew?

13    A.      There was -- there was three others, but

14  I can't recall their names.  I can't recall their

15  names without bringing up the paperwork.  I wouldn't

16  recall.

17    Q.      Do you recall what positions they had?

18    A.      Yeah, a locomotive engineer.  You had two

19  field brakemen.

20    Q.      The way that CSX is set up, was the

21  locomotive engineer and the two field brakemen union

22  people?

23    A.      Yes, sir.

24    Q.      Okay.  Was the conductor union or not?

25    A.      Yes, sir, he was union.



BROWN & GALLO
                    LLC

Telephone  (404) 495-0777   (404) 876-8979
Toll Free   (877) 495-0777   (800) 637-0293
Fax (404) 495-0766

101 Marietta Street, Suite 2700
Atlanta, GA 30303

1740 Peachtree Street, NW
Atlanta, GA 30309

www.galloreporting.com

63

1    Q.    Union or a contract employee, right?

2    A.    Correct.

3    Q.    And regarding that incident, was the only

4  person in management Mr. Snapp?

5    A.    No, sir.

6    Q.    All right.  Who else in management was in

7  this matter, involving this matter?

8    A.    There was terminal trainmasters.

9    Q.    Who was that?

10   A.    Mike Eyler.

11   Q.    Spell Eyler.

12   A.    E-y-l-e-r.

13   Q.    And he was terminal trainmaster?

14   A.    That's correct.

15   Q.    And was he at that time over 40 or under

16  40?

17   A.    I would assume Mike is probably -- again,

18  I'm assuming, I would say he's probably about 40.

19   Q.    And who else was involved?

20   A.    Ray Billingsley.

21   Q.    What was his position?

22   A.    Terminal trainmaster.

23   Q.    Under 40 or over 40 at that time?

24   A.    Again, I'd be assuming that he was under

25  40, but that would be an assumption.



BROWN & GALLO
                                                LLC

Telephone  (404) 495-0777   (404) 876-8979
Toll Free   (877) 495-0777   (800) 637-0293
      Fax (404) 495-0766

101 Marietta Street, Suite 2700
Atlanta, GA 30303

1740 Peachtree Street, NW
Atlanta, GA 30309

www.galloreporting.com

64

1     Q.      Okay.  Anybody else involved in the Snapp

2   incident?

3     A.      Gary Jackson was the terminal trainmaster

4   there.  I'm not sure that he was involved in it, but

5   he was at Mobile at the time and he was a terminal

6   trainmaster.

7     Q.      Under 40 or over 40?

8     A.      Gary is over 50.

9     Q.      Okay.  Anybody else involved in that

10  incident, to your knowledge, the Snapp matter of

11  where the crew --

12    A.      Not that I'm aware of.  Nobody else that

13  I'm aware of.

14    Q.      Okay.  All right.  Now, in that incident,

15  was Mr. Snapp the only person that was demoted or

16  disciplined?

17    A.      That's correct.

18    Q.      Okay.  Okay.  All right.  And what was

19  Mr. Snapp's age approximately at that time?

20    A.      Again, I'd be assuming that Alan was

21  close to 50.

22    Q.      And that was your assumption at that

23  time?

24    A.      Yes, sir.

25    Q.      All right.  I'll come back to these



BROWN & GALLO
                LLC

Telephone  (404) 495-0777   (404) 876-8979
Toll Free   (877) 495-0777   (800) 637-0293
Fax (404) 495-0766

101 Marietta Street, Suite 2700
Atlanta, GA 30303

1740 Peachtree Street, NW
Atlanta, GA 30309
www.galloreporting.com

Rodney Steven Workman                                   October 29, 2007

65

1    documents.  We're trying to put them together in a

2    logical way for you.

3            Now, you talked about -- and in this

4    Snapp matter this is one in which Mr. Pendergrass

5    decided to ultimately demote Mr. Snapp after you

6    recommended his demotion, that's correct?

7        A.     Mr. Pendergrass made the decision to

8    demote Mr. Snapp based upon the facts that was given

9    to him by myself and an investigative team.

10       Q.     Okay.  All right.  Who was on the

11   investigative team, by the way?

12       A.     He had Allison Brown, who was out of

13   human resources and Mike Monley who was general

14   manager of terminals.

15       Q.     Okay.  All right.  Well, let's go to the

16   next incident.  Just a moment.  Since we've got our

17   documents together, I'm going to stay with this

18   incident for the time being.

19           (Plaintiff's Exhibit-4 was marked for

20   identification.)

21       Q.     I have marked as Plaintiff's Exhibit 4

22   documents that were provided to us by CSX and they

23   are Bates-stamped 586 through 592.  If you would look

24   at the Bates stamp of this Composite Exhibit No. 4,

25   Bates stamp 590.  Do you see it?



BROWN & GALLO

LLC

Telephone  (404) 495-0777   (404) 876-8979
Toll Free  (877) 495-0777   (800) 637-0293
Fax (404) 495-0766

101 Marietta Street, Suite 2700
Atlanta, GA 30303

1740 Peachtree Street, NW
Atlanta, GA 30309

www.galloreporting.com

66

1      A.      Uh-huh (affirmative).

2      Q.      Is this talking about the incident you've

3   been referencing in your testimony this morning just

4   now?

5      A.      Which one are you talking about?

6      Q.      Bates stamp 590, sir, of Plaintiff's

7   Exhibit 4.

8      A.      Okay.  I see what you're saying.  Okay.

9   Yes, sir.

10     Q.      I see this is cc'd from Alan Snapp to

11   Mike Pendergrass and to you.

12     A.      That's correct.

13     Q.      First off, did you receive this document?

14     A.      Yes, sir, we did.

15     Q.      You received it yourself, right?

16     A.      Yes, sir.

17     Q.      Okay.  All right.  And is this regarding

18   the matter that you've just testified about Mr. Snapp

19   and him being demoted?

20     A.      Yes, sir, that's correct.

21     Q.      Okay.  All right.  Thank you.  Now, we'll

22   move on to Ed McClellan.  I believe you testified in

23   your earlier testimony that Ed McClellan was demoted

24   based on your recommendation in which Mr. Pendergrass

25   made the final decision to demote him; is that



BROWN & GALLO
                                        LLC

Telephone  (404) 495-0777   (404) 876-8979
Toll Free  (877) 495-0777   (800) 637-0293
      Fax (404) 495-0766

101 Marietta Street, Suite 2700
Atlanta, GA 30303

1740 Peachtree Street, NW
Atlanta, GA 30309

www.galloreporting.com

67

1    correct?

2         A.      That's correct.

3         Q.      And what was that incident about, sir?

4         A.      We had a crew, a local, that originated

5    out of Cartersville, Georgia -- I can't remember the

6    exact number of the local -- who was in the process

7    of switching a customer at Kennisaw, Georgia.  At

8    that location they had to make a static drop in order

9    to spot the car.  In the process of conducting a

10   static drop, the car got away from the crew and

11   started down a 1 percent grade towards Kennisaw and

12   Marietta, Georgia.

13             And the engineer made an attempt to catch

14   the car while it was traversing down this 1 percent

15   grade, and when he came around the corner the car had

16   already went into a bowl shape and started back at

17   him and when he coupled to the car he damaged the

18   locomotive.

19             The crew immediately notified the

20   trainmaster.  The trainmaster called the manager of

21   operating practices, who was Ed McClellan, who lived

22   in that vicinity and who apparently dropped by and

23   stopped by and interviewed the crew with the

24   trainmaster as well as assessing the situation and

25   came to the conclusion to advise the trainmaster that

BROWN & GALLO
LLC

Telephone  (404) 495-0777   (404) 876-8979
Toll Free  (877) 495-0777   (800) 637-0293
Fax (404) 495-0766

101 Marietta Street, Suite 2700
Atlanta, GA 30303

1740 Peachtree Street, NW
Atlanta, GA 30309

www.galloreporting.com

68

1    it wasn't -- how can I say it, it wasn't -- there

2    wasn't a need to report it because it was -- did not

3    consist of a derailment.

4        Q.      What are the rules on derailment

5    reporting?

6        A.      Derailment reporting does include an

7    incident, and this was an incident, where there is

8    monetary damage to equipment or facilities, i.e.,

9    track.  In this instance there was damage to the

10   locomotive.

11       Q.      Okay.  But it wasn't a derailment, was

12   it, sir?

13       A.      That's correct.

14       Q.      It did not go off the tracks, correct?

15       A.      That's correct.

16       Q.      The car that went down the 1 percent

17   grade did not leave the tracks?

18       A.      That's correct.  The car was not damaged.

19       Q.      So it wasn't --

20       A.      The locomotive was.

21       Q.      -- derailment, we have established, and

22   therefore it was not under any mandatory derailment

23   reporting rules from CSX or FRA or anybody?

24       A.      It was under --

25              MR. BARKER:  Object to the form.



BROWN & GALLO
LLC

Telephone  (404) 495-0777   (404) 876-8979
Toll Free  (877) 495-0777   (800) 637-0293
Fax (404) 495-0766

101 Marietta Street, Suite 2700
Atlanta, GA 30303

1740 Peachtree Street, NW
Atlanta, GA 30309

www.galloreporting.com

69

1       A.      It was under mandatory reporting as a
2   result of damage to the locomotive.
3       Q.      What rule is that, sir?
4       A.      It's -- I'd have to go back and check the
5   rules for you, but it's a requirement that if you
6   have damage to a locomotive or equipment or
7   facilities as a result of a said incident, it has to
8   be reported in the proper way.
9       Q.      Okay.  At the time of that incident, when
10  did that occur, sir?
11      A.      January of 2006.
12      Q.      At the time of that January 2006
13  incident, how old was Ed McClellan?  Was he over 40
14  or under 40?
15      A.      Ed was approximately -- and again, I'm
16  assuming, he was approximately about 59 years of age.
17      Q.      All right.  Is there a threshold amount
18  of damage to equipment that CSX requires in
19  reporting?
20      A.      No.
21      Q.      So if I go up to a piece of equipment and
22  I'm an employee and I do a minor scratch on it, I
23  have to report that?
24      A.      Yes, sir, that's correct.  If you had a
25  sideswipe or if you -- if you have a sideswipe.  If



BROWN & GALLO
                        LLC

Telephone (404) 495-0777   (404) 876-8979
Toll Free (877) 495-0777   (800) 637-0293
        Fax (404) 495-0766

101 Marietta Street, Suite 2700
        Atlanta, GA 30303

1740 Peachtree Street, NW
        Atlanta, GA 30309

www.galloreporting.com

70

1    you do any damage to facilities no matter if it's ten

2    bucks, five bucks, you've got to report it.

3        Q.    At the time of Ed McClellan's demotion,

4    how many years had he worked at CSX?

5        A.    Approximately, I would think, about --

6    again, I'm assuming approximately about 40 years.

7        Q.    About 40 years?

8        A.    Yes, sir.

9        Q.    And at the time of his demotion, what was

10   his position, sir?

11       A.    He was manager of operating practices.

12       Q.    At the time of that incident of January

13   of 2006, where did it occur, sir?

14       A.    Kennisaw, Georgia.

15       Q.    And you were over the Kennisaw, Georgia

16   facility as the manager of the Atlanta district?

17       A.    I overseen the operation for the Atlanta

18   division which encompassed Kennisaw, Georgia.

19       Q.    Correct.  Okay.  And therefore you would

20   have been a supervisor of Ed McClellan at that time?

21       A.    Ed McClellan directly reported to me.

22       Q.    And you're agreeing with me?

23       A.    Yes, sir.

24       Q.    Okay.  And at the time of that incident,

25   what was the monetary value of the damage to the


BROWN & GALLO
LLC

Telephone (404) 495-0777   (404) 876-8979
Toll Free  (877) 495-0777   (800) 637-0293
Fax (404) 495-0766

101 Marietta Street, Suite 2700
Atlanta, GA 30303

1740 Peachtree Street, NW
Atlanta, GA 30309
www.galloreporting.com

71

1  locomotive?

2      A.    I can't recall a total amount, but I

3  would say it was probably over 10,000.

4      Q.    What was damaged?

5      A.    The snowplow and the pilot, which is

6  basically the snowplow.  The pilot of that -- the

7  locomotive was damaged significantly and the front

8  end was buckled.

9      Q.    At the time of his demotion, do you know

10 Mr. McClellan's disciplinary history?

11     A.    No, sir.

12     Q.    At the time of his demotion when you

13 recommended that he be demoted and you made this

14 recommendation to Mr. Pendergrass, I assume that you

15 reviewed his personnel file before you made that

16 recommendation, did you not?

17     A.    No, sir, I didn't, but again, as I've

18 indicated before, it was based upon the facts of the

19 case.

20     Q.    Okay.  But I'm not asking about the facts

21 of the case.

22     A.    I already indicated, no, sir, I did not

23 review his past history.

24     Q.    Okay.  At the time of the demotion, was

25 there an investigation?



BROWN & GALLO
LLC

Telephone  (404) 495-0777   (404) 876-8979
Toll Free  (877) 495-0777   (800) 637-0293
Fax (404) 495-0766

101 Marietta Street, Suite 2700
Atlanta, GA 30303

1740 Peachtree Street, NW
Atlanta, GA 30309

www.galloreporting.com

72

1        A.        Yes, sir.

2        Q.        Okay.  Did anyone in the investigation

3    review his prior disciplinary history in his

4    personnel file?

5        A.        I'm sure that -- again, I'm not sure.  I

6    can't say.  I'd be speculating.  I don't want to

7    speculate, but I'm sure human resources was engaged

8    as well.

9        Q.        At the time of his demotion, did you ever

10   have anyone report to you in this investigation as to

11   the history of his disciplinary background of the 40

12   something years that he had worked with CSX or with

13   the railroad?

14       A.        No, sir.

15       Q.        Okay.  So you made this recommendation to

16   demote without knowledge of his prior employment

17   history?

18       A.        I made a recommendation that discipline

19   be assessed as a result of the facts of this case.

20       Q.        And did not consider whatsoever his prior

21   employment history?

22       A.        That's correct.

23       Q.        Okay.  Was anyone else disciplined

24   regarding this matter of January 2006 --

25       A.        Yes, sir.



BROWN & GALLO
                                        LLC

Telephone  (404) 495-0777   (404) 876-8979
Toll Free   (877) 495-0777   (800) 637-0293
          Fax (404) 495-0766

101 Marietta Street, Suite 2700
        Atlanta, GA 30303

1740 Peachtree Street, NW
      Atlanta, GA 30309
www.galloreporting.com

73

1    Q.      -- involving -- who else?

2    A.      The crew.

3    Q.      And who was that?

4    A.      The engineer, was Gravely, and the

5 conductor, I can't remember his name, but I remember

6 the engineer.

7    Q.      G-r-a-v --

8    A.      -- e-l-y.

9    Q.      Is that a union position?  I keep on

10 asking you these questions.

11    A.      Yes, sir.

12    Q.      And who else was disciplined?

13    A.      The conductor.

14    Q.      Another union position?

15    A.      Yes, sir.

16    Q.      And his name?

17    A.      I can't remember his name.  That's

18 something you'd have to go back and get the records.

19    Q.      Another union position?

20    A.      Yes, sir.

21    Q.      Okay.  And whenever I say his name, I

22 hope that you understand it could be a female crew

23 member as well?

24    A.      Yes, sir, that's correct, but it wasn't

25 in this case.



BROWN & GALLO
LLC

Telephone  (404) 495-0777    (404) 876-8979
Toll Free   (877) 495-0777    (800) 637-0293
Fax (404) 495-0766

101 Marietta Street, Suite 2700
Atlanta, GA 30303

1740 Peachtree Street, NW
Atlanta, GA 30309
www.galloreporting.com

74

1          Q.      Okay.  Is there anything else you know

2     about the Ed McClellan demotion incident that

3     happened in January of 2006 that you haven't told the

4     court?

5                  MR. BARKER:  Object to the form.

6          Q.      Anything else you can recall about it?

7                  MR. BARKER:  Object to the form.

8          A.      Not that I can recall.

9          Q.      Okay.  Now, you talked about Mr. Snapp

10    and Mr. McClellan, those two demotions.  You've

11    mentioned other demotions as well, and I'd like to

12    try to get into those.  Angie Averitte, that was a

13    demotion?

14         A.      No, that was a lateral move.

15         Q.      Okay.  Well, let's talk about that.  When

16    did that occur, sir?

17         A.      That occurred about March or -- I'd say

18    about March, April of 2000.  It would be about March

19    2006.

20         Q.      Okay.  And what was her position before

21    she was moved?

22         A.      She was terminal manager at Montgomery,

23    Alabama.

24         Q.      And where was she moved to?

25         A.      Atlanta, Georgia.



BROWN & GALLO
LLC

Telephone  (404) 495-0777   (404) 876-8979
Toll Free    (877) 495-0777   (800) 637-0293
Fax (404) 495-0766

101 Marietta Street, Suite 2700
Atlanta, GA 30303

1740 Peachtree Street, NW
Atlanta, GA 30309

www.galloreporting.com

75

1      Q.      And what was that position?

2      A.      Manager of operating practices.

3      Q.      Was that a position that reported to you?

4      A.      Yes, sir, as far as the manager of

5   operating practices.

6      Q.      And the terminal manager was a

7   position --

8      A.      She reported to the assistant division

9   manager.

10     Q.      And then the assistant division manager

11  would report to you, so ultimately --

12     A.      That's correct.

13     Q.      -- she would have reported to you in the

14  hierarchy of command?

15     A.      Yeah, and the hierarchy is the terminal

16  manager reported to the ADMs.  The ADMs reported

17  directly to the division manager.

18     Q.      Okay.  Why was Ms. Averitte, in March of

19  2006, moved from the terminal management position in

20  Montgomery, Alabama to the position of manager of

21  operational practices in Atlanta?

22     A.      She was moved as a result of having a

23  close relationship with someone that worked directly

24  for her.

25     Q.      That was not considered a disciplinary



BROWN & GALLO
                              LLC

Telephone  (404) 495-0777   (404) 876-8979
Toll Free  (877) 495-0777   (800) 637-0293
         Fax (404) 495-0766

101 Marietta Street, Suite 2700
              Atlanta, GA 30303

1740 Peachtree Street, NW
              Atlanta, GA 30309
www.galloreporting.com

76

1    action, was it, sir?

2        A.        No, sir.  And it was in reference to

3    company policy.

4        Q.        Okay.  And that was the extent of the

5    reason why she was moved?

6        A.        Yes, sir.

7        Q.        Okay.  Did she lose any pay in that move?

8        A.        No, sir.

9        Q.        Okay.  All right.  And Mr. Pendergrass

10   agreed with that recommendation of yours, correct?

11       A.        That's correct.

12       Q.        All right.  We have an incident of, I

13   believe, John or William Faulkner --

14       A.        Yes, sir.

15       Q.        -- in Birmingham.  What was that

16   incident?

17       A.        Same as Ms. Averitte.  Mr. Faulkner was

18   the terminal trainmaster in Birmingham, Alabama and

19   he had reporting to him a yardmaster, which was his

20   son as well as a locomotive engineer, so we placed

21   John out on a position as a line of road trainmaster

22   where neither would report to him.  In regards,

23   again, to company policy.

24              MR. ATCHISON:  Okay.  All right.  This is

25       a good time for me to break with my notes, so



BROWN & GALLO
LLC

Telephone  (404) 495-0777   (404) 876-8979
Toll Free  (877) 495-0777   (800) 637-0293
Fax (404) 495-0766

101 Marietta Street, Suite 2700
Atlanta, GA 30303

1740 Peachtree Street, NW
Atlanta, GA 30309
www.galloreporting.com

77

1          let's break and have lunch.  And we'll get back

2          on the record.

3                    (Break taken.)

4     BY MR. ATCHISON:

5          Q.       All right, sir.  We're back on the

6     record.  I'd like to show you what has previously

7     been marked as Composite Exhibit Plaintiff's 5.  It

8     has Bates stamps D-563 through D-584.

9                    (Plaintiff's Composite Exhibit-5 was marked

10    for identification.)

11         Q.       Okay.  Sir, have you had an opportunity

12    to review --

13         A.       Yes, sir.

14         Q.       -- the Composite Exhibit Plaintiff's 5?

15    On the top of the exhibit, Bates stamp 563, is a

16    document.  Do you know who generated this document,

17    563, Bates stamp 563?

18         A.       I can't remember who did this one, no.

19         Q.       Okay.  Would you, having reviewed

20    Plaintiff's Exhibit 5 that's a Composite Exhibit, say

21    or state these exhibits are regarding Mr. McClellan

22    and/or the January 2006 train accident in -- scenario

23    that you've testified about immediately before lunch?

24         A.       Yeah, this is the overall investigative

25    facts in regards to that incident.



BROWN & GALLO
                                    LLC

Telephone  (404) 495-0777    (404) 876-8979
Toll Free   (877) 495-0777    (800) 637-0293
Fax (404) 495-0766

101 Marietta Street, Suite 2700
Atlanta, GA 30303

1740 Peachtree Street, NW
Atlanta, GA 30309

www.galloreporting.com

78

1        Q.      Okay.  All right.  Thank you.  I'm not
2    sure if I asked you this, but how -- at the time of
3    the John William Faulkner transfer where he was moved
4    to Birmingham because of the supervision of his son
5    to another locale, how old was he at that time?  Was
6    he over 40?
7        A.      Yes, sir.
8        Q.      Okay.  And you already testified
9    previously that in the remote control operation
10   incident that happened on May the 27th, T.J. Dean was
11   involved in that incident, correct?
12       A.      That's correct.
13       Q.      -- involving -- also involving
14   Mr. Hollon?  And Mr. T.J. Dean at that time was over
15   40, was he not?
16       A.      That's correct.
17       Q.      And you knew that at the time?
18       A.      I assume that he was over 40.
19       Q.      Okay.  All right.  Now, at the start of
20   your deposition, you mentioned the Snapp disciplinary
21   action, Snapp was over 40, the Ed McClellan
22   disciplinary action and you've testified just
23   recently that he was over 40, right?
24       A.      That's correct.
25       Q.      Okay.  The Angie Averitte lateral



BROWN & GALLO
                    LLC

Telephone  (404) 495-0777   (404) 876-8979
Toll Free   (877) 495-0777   (800) 637-0293
              Fax (404) 495-0766

101 Marietta Street, Suite 2700
              Atlanta, GA 30303

1740 Peachtree Street, NW
              Atlanta, GA 30309

www.galloreporting.com

79

1    transfer and she was over 40.  The John Faulkner

2    incident and he was over 40 and the incident

3    Mr. Hollon was involved with at -- we call it the RCO

4    incident, involving both he and Mr. T.J. Dean and

5    both of which you knew were over 40 at that time?

6         A.    I assume that they were all over 40, yes,

7    sir.

8         Q.    Okay.  All right.  Were there other

9    disciplinary instances that you may have left off

10   that list when you initially talked about demoting

11   people and/or --

12        A.    There may have been, but I can't recall

13   them.

14        Q.    Or instances where demotion was

15   considered?

16        A.    There may have been, but I can't recall

17   them.

18        Q.    Okay.

19            (Plaintiff's Exhibit-6 was marked for

20   identification.)

21        Q.    To refresh your recollection, I'd like to

22   show you what has been previously marked as

23   Plaintiff's Exhibit 6 and it's also Bates-stamped

24   000593 or I'll just call it 593.

25        A.    Okay.



BROWN & GALLO
                              LLC

Telephone  (404) 495-0777   (404) 876-8979
Toll Free   (877) 495-0777   (800) 637-0293
Fax (404) 495-0766

101 Marietta Street, Suite 2700
Atlanta, GA 30303

1740 Peachtree Street, NW
Atlanta, GA 30309

www.galloreporting.com

80

1    Q.    Okay.  What is this document, Plaintiff's

2  Exhibit 6?  It's a statement that says, quote, To

3  whom it may concern.  And it looks like it's cc'd to

4  you, among others, and Mr. Pendergrass.  What is this

5  document, please, sir?

6    A.    It was an anonymous letter that was sent

7  to Mr. Ward and Mr. Ingram.

8    Q.    And you received a copy of it?

9    A.    That's correct.

10    Q.    And Mr. Ward was the CEO of CSX

11  Transportation at the time?

12    A.    That's correct.

13    Q.    And this document is about the Alan Snapp

14  incident, is it not?

15    A.    That's correct.

16    Q.    And it also, I guess you could say,

17  points a finger at a person named Ray Billingsley.

18  Who is Ray Billingsley?

19    A.    Ray Billingsley was the terminal

20  trainmaster at Mobile, Alabama.

21    Q.    All right.  Did he report to Mr. Snapp?

22    A.    Yes, sir.

23    Q.    At the time that you recommended the

24  demotion of Mr. Snapp, had you received a copy of

25  this document?



BROWN & GALLO
                                                    LLC

Telephone  (404) 495-0777   (404) 876-8979
Toll Free  (877) 495-0777   (800) 637-0293
Fax (404) 495-0766

101 Marietta Street, Suite 2700
Atlanta, GA 30303

1740 Peachtree Street, NW
Atlanta, GA 30309

www.galloreporting.com

81

1        A.      This document was submitted to us prior

2    to the demotion, yes, sir.

3        Q.      Okay.  And Mr. Ray Billingsley at the

4    time that you received this document, he was under

5    40, wasn't he?

6        A.      I would assume that he was or close to

7    40.  I'm not sure.

8        Q.      And you would assume that as of 2006 when

9    this incident happened with Mr. Snapp?

10       A.      I would assume that he was close to 40.

11   I'm not sure.

12       Q.      Okay.  Did Mr. Ray Billingsley get

13   demoted?

14       A.      No, sir.

15       Q.      Did you recommend that he get demoted?

16       A.      No, sir.

17       Q.      Okay.  Did you investigate his

18   participation in this matter that Mr. Snapp got

19   demoted in?

20       A.      Yes, sir.

21       Q.      And what was your findings about Ray

22   Billingsley's involvement?

23       A.      Ray Billingsley was not involved in

24   regards to the said incident that led to Mr. Snapp's

25   demotion.

BROWN & GALLO
LLC

Telephone  (404) 495-0777   (404) 876-8979
Toll Free  (877) 495-0777   (800) 637-0293
Fax (404) 495-0766

101 Marietta Street, Suite 2700
Atlanta, GA 30303

1740 Peachtree Street, NW
Atlanta, GA 30309

www.galloreporting.com

82

1       Q.      All right.  It states in that document,

2    quote, Ray Billingsley is showing that he tested that

3    crew at 1458.  Now, how is this possible?  How can

4    you observe a crew that is not there, end of quote.

5       A.      The said incident or the said allegation

6    in this anonymous letter is separate and away from

7    the issue at hand with Mr. Snapp.

8       Q.      Okay.

9       A.      We did investigate Mr. Billingsley in

10   regards to this allegation in this particular

11   anonymous letter.

12      Q.      And what did you find?

13      A.      We found that there was no substance to

14   it.

15      Q.      Was it not true that Ray Billingsley

16   reported either orally or in writing that he tested

17   the crew at 1458?

18      A.      When we investigated the said incident,

19   Mr. Billingsley, when he entered into his operational

20   test in the main frame, he inadvertently put the

21   wrong date in the main frame, so when we did our

22   follow-up investigation to determine what had

23   happened here, because obviously we had an

24   allegation, we came to the conclusion that he had not

25   falsified documentation.  That he had inadvertently



LLC

Telephone  (404) 495-0777    (404) 876-8979
Toll Free   (877) 495-0777    (800) 637-0293
            Fax (404) 495-0766

101 Marietta Street, Suite 2700
Atlanta, GA 30303

1740 Peachtree Street, NW
Atlanta, GA 30309

www.galloreporting.com

83

1    put a wrong date in the test.

2        Q.    Okay.  The reference to 1458, is that a

3    reference to a date or a time, sir?

4        A.    1458 is a reference to time.

5        Q.    Okay.  That would be a military time

6    reference?

7        A.    Correct.

8        Q.    And that's not a reference to a date, is

9    it?

10        A.    Yes, sir, that's a reference to a date

11    because it references what's ahead.

12        Q.    Are you telling the court that the 1458

13    was a time entry that he made for another date?

14        A.    The same date.  If you read this it says,

15    a crew the Y10217 on March 17, 2006 put off at 1130.

16    Ray Billingsley is showing that he test that crew at

17    1458.  That crew.  On that date.

18        Q.    Okay.  All right.  But it is clear that

19    you did not make a recommendation of his -- any

20    disciplinary action against --

21        A.    There was no grounds to do it.

22        Q.    Okay.  And you're agreeing with me that

23    you did not recommend that he be disciplined in this

24    matter?

25        A.    That's correct, because there was no



BROWN & GALLO
                              LLC

Telephone   (404) 495-0777   (404) 876-8979
Toll Free    (877) 495-0777   (800) 637-0293
Fax (404) 495-0766

101 Marietta Street, Suite 2700
Atlanta, GA 30303

1740 Peachtree Street, NW
Atlanta, GA 30309

www.galloreporting.com

84

1    grounds to do it.

2         Q.    Okay.  Thank you.  All right, sir, do you

3    recall an incident involving Rod Dunlap, a

4    trainmaster in Montgomery, that was caught sleeping

5    in his vehicle with his shoes off?

6         A.    Yes, sir, I recall it.

7         Q.    Was he disciplined?

8         A.    No, sir.

9         Q.    What was his age, sir?

10        A.    I assume Rod is around 40.

11        Q.    Around 40.  Do you know if he's under --

12   as of the date of the incident under or over 40?

13        A.    I would say he might be under.  Close --

14   he's going to be close to 40.  Again, I'm assuming.

15   I'm not sure.

16        Q.    When did that incident happen?

17        A.    I can't remember the exact date and time

18   on that incident, but I do know that Angie Averitte,

19   the terminal manager, had contacted me about the said

20   situation.  And I asked Angie how did she want to

21   handle it since this individual reports to her.  It

22   was not a falsification of documents or anything of

23   that sort.  Angie said that she wanted to handle this

24   personally with him one-on-one, which she did.

25        Q.    Okay.  All right.  Do you recall whether



BROWN & GALLO
                    LLC

Telephone  (404) 495-0777   (404) 876-8979
Toll Free   (877) 495-0777   (800) 637-0293
          Fax (404) 495-0766

101 Marietta Street, Suite 2700
        Atlanta, GA 30303

1740 Peachtree Street, NW
      Atlanta, GA 30309

www.galloreporting.com

85

1    Angie Averitte suggested any demotion or discipline

2    other than what you've referenced?

3        A.    She did not recommend any discipline or

4    demotion.  She did indicate that she was going to

5    have a personal discussion with him and enter it into

6    his record.

7        Q.    Do you recall an incident involving John

8    Carnes, assistant superintendent, Birmingham,

9    Alabama, where he was accused of assaulting a female

10   yardmaster?

11       A.    Yes, sir.

12       Q.    When was that, please?

13       A.    I want to say March or April of 2006 if I

14   remember.

15       Q.    Do you recall whether or not he was

16   arrested for that matter?

17       A.    Yes, sir, he was.

18       Q.    And was he under 40 or over 40 at the

19   time of the incident?

20       A.    John was around 40.

21       Q.    So you don't know whether he was under or

22   over?

23       A.    I would assume that he was around 40

24   years of age.  He may have been a little less than

25   40.



BROWN & GALLO
LLC

Telephone (404) 495-0777   (404) 876-8979
Toll Free  (877) 495-0777   (800) 637-0293
Fax (404) 495-0766

101 Marietta Street, Suite 2700
Atlanta, GA 30303

1740 Peachtree Street, NW
Atlanta, GA 30309

www.galloreporting.com

86

1      Q.       Sir, in all of these questions I've asked

2  you about the age of the employees, you had that

3  available to you.  You were available to find out

4  that through CSX's records if you chose?  It was

5  readily available?

6      A.       Yeah, it was readily available but it was

7  not -- you know, it was no need to know.

8      Q.       Okay.  Regarding the John Carnes

9  incident, what disciplinary action, if any, was

10 taken?

11     A.       There was no need to take disciplinary

12 action against John Carnes.  The facts did not

13 support discipline.

14     Q.       So you found that he didn't assault the

15 female yardmaster?

16     A.       That's correct.

17     Q.       Do you know what happened regarding his

18 criminal case?

19     A.       Yes, sir, it was throwed out.

20     Q.       Okay.  Do you know of an incident that

21 happened in New Orleans in which there was an

22 altercation between a trainmaster and a yardmaster?

23     A.       There was never an altercation between a

24 trainmaster and a yardmaster.

25     Q.       It never happened?



LLC

Telephone (404) 495-0777   (404) 876-8979
Toll Free  (877) 495-0777   (800) 637-0293
Fax (404) 495-0766

101 Marietta Street, Suite 2700
Atlanta, GA 30303

1740 Peachtree Street, NW
Atlanta, GA 30309

www.galloreporting.com

87

1     A.     No, sir.

2     Q.     Do you know if there was any allegations

3  regarding an altercation between a trainmaster and a

4  yardmaster?

5     A.     No, sir.

6     Q.     You don't know what I'm talking about?

7     A.     No, sir, not as far as a trainmaster,

8  yardmaster.

9     Q.     Okay.  Well, do you know any allegation

10 of an altercation or fighting between anybody in

11 management in New Orleans during the time period that

12 you were district manager over the Atlanta division?

13    A.     There was no altercation, fighting

14 between any trainmasters or noncontract employees

15 while I was division manager of the Atlanta division

16 at New Orleans.

17    Q.     During the time that you worked as

18 division manager of the Atlanta division, I think you

19 said it was 2005 or the first of 2007, like around

20 that time period?

21    A.     That's correct.

22    Q.     How would you have described Mr. Hollon's

23 work ethic, loyalty and devotion to CSX?

24         MR. BARKER:  Object to the form.

25    Q.     If you want me to break that down into



BROWN & GALLO
LLC

Telephone  (404) 495-0777   (404) 876-8979
Toll Free  (877) 495-0777   (800) 637-0293
Fax (404) 495-0766

101 Marietta Street, Suite 2700
Atlanta, GA 30303

1740 Peachtree Street, NW
Atlanta, GA 30309

www.galloreporting.com

88

1    separate questions I'll be happy to.

2         A.    Would you, please.

3         Q.    Work ethic, how would you describe Mr.

4    Hollon's work ethic?

5         A.    I didn't have a problem with it.

6         Q.    No problem.  In other words no

7    violations?  Okay.  Locality and devotion or just say

8    loyalty and devotion?

9               MR. BARKER:   Object to the form.

10        Q.    Loyalty and devotion to CSX, how would

11   you describe that?

12        A.    I didn't have an issue with it.

13        Q.    No problem, correct?

14        A.    As far as my concern there was no issue.

15        Q.    Okay.  Did Mr. Hollon ever get a Spot

16   Award for an out-of-park initiative?

17        A.    Yes, sir.

18        Q.    And what was that, please?

19        A.    I think it was for $1000 and it was

20   submitted by the performance improvement group here

21   in Jacksonville.

22        Q.    And when did he receive it, sir?

23        A.    I don't know when he received it.  I just

24   know that Mr. Murphy, John Murphy had indicated that

25   he was going to submit him a Spot Award.



BROWN & GALLO
LLC

Telephone  (404) 495-0777   (404) 876-8979
Toll Free  (877) 495-0777   (800) 637-0293
Fax (404) 495-0766

101 Marietta Street, Suite 2700
Atlanta, GA 30303

1740 Peachtree Street, NW
Atlanta, GA 30309

www.galloreporting.com

89

1      Q.      Was it after or before his demotion of
2  June 19th, 2006?
3      A.      It was before.
4      Q.      Do you know how much before it was?
5      A.      Maybe a month or two.
6      Q.      We started out this deposition with
7  showing you the lawsuit and it's got a red tab on it.
8  I think it's 23 --
9      A.      Yes, sir.
10     Q.      -- Defendant's Exhibit 23.  Attached to
11 that package is another red tab and it's, I believe,
12 Defendant's 17 and there's an EEOC charge.  See if
13 you can flip to there.
14     A.      Right here?
15     Q.      Yeah.  Yeah.  Do you recall on June 19,
16 2006, the meeting that occurred between you,
17 Mr. Frost Mr. Hollon and Mr. Dean whether or not
18 Mr. Hollon presented to you an EEOC charge whether
19 draft or otherwise?
20     A.      Yes, sir, he did submit this charge.  At
21 that time I handed it over to Mr. Frost who was human
22 resources, to handle.
23     Q.      Let's talk about that meeting.  Now,
24 again, what was the first thing said in that meeting?
25 Was it said by you, the opening of the meeting?


BROWN & GALLO
LLC
Telephone  (404) 495-0777    (404) 876-8979
Toll Free  (877) 495-0777    (800) 637-0293
Fax (404) 495-0766

101 Marietta Street, Suite 2700
Atlanta, GA 30303

1740 Peachtree Street, NW
Atlanta, GA 30309

www.galloreporting.com

90

```
 1        A.      I would think so.

 2        Q.      What did you say, sir?

 3        A.      That we were here to -- I mean, I can't

 4   exactly remember verbatim.

 5        Q.      Your best recollection.

 6        A.      Probably I would have opened it up by

 7   saying that we were here to discuss the issue that

 8   had transpired in reference to the incident.

 9        Q.      The RCO incident --

10        A.      Yes, sir.

11        Q.      -- of May the 27th, 2006?

12        A.      That's correct.

13        Q.      All right.  And at what point during the

14   meeting did Mr. Hollon present to you an EEOC charge

15   like or similar to Defendant's Exhibit 17?

16        A.      I think it's when I was -- I think I had

17   initially addressed T.J. Dean and after I had gotten

18   done with T.J. -- again, I'm trying to recall this,

19   but I would say that after we had gotten done

20   addressing T.J. Dean and we turned to Ron -- Jack

21   Frost and I did -- and indicated what was going to

22   come down.  And at that time Ron handed the packet to

23   me and said that he was -- he had -- he was going to

24   issue an EEO charge against CSX.  And I handed it off

25   to Jack.
```

BROWN & GALLO
LLC

Telephone  (404) 495-0777   (404) 876-8979
Toll Free   (877) 495-0777   (800) 637-0293
          Fax (404) 495-0766

101 Marietta Street, Suite 2700
Atlanta, GA 30303

1740 Peachtree Street, NW
Atlanta, GA 30309
www.galloreporting.com

91

1      Q.      And what did you say to him or what did

2   Jack say to him?  You're talking about Jack Frost, of

3   course?

4      A.      I can't recall what Jack said to him,

5   but, you know, obviously he has a right to -- you

6   know, to address any issues he feels that he needs to

7   address and we took it.  And Jack says, I'll make

8   sure that human resources and Susan Hamilton gets it.

9      Q.      And did it upset you that he was

10  presenting you at that meeting an EEOC charge or a

11  proposed EEOC charge?

12     A.      No.

13     Q.      Okay.  What was Mr. Tipton's reply or

14  statements in that meeting of June the 19th, 2006?

15     A.      I can't recall.

16     Q.      You don't recall the statements?

17     A.      No.

18     Q.      To refresh you, did you make any

19  statement that you're ruining two good officers?

20     A.      That I'm ruining two good officers?

21     Q.      Uh-huh (affirmative).

22     A.      No, I don't recall that.

23     Q.      Okay.  Do you recall ever making the

24  statement either to him or Mr. Tipton that you better

25  be careful, be careful of what you say?

BROWN & GALLO
LLC

Telephone  (404) 495-0777   (404) 876-8979
Toll Free  (877) 495-0777   (800) 637-0293
Fax (404) 495-0766

101 Marietta Street, Suite 2700
Atlanta, GA 30303

1740 Peachtree Street, NW
Atlanta, GA 30309

www.galloreporting.com

92

1          MR. BARKER:  Who is he supposed to have
2     made the statement to?
3          Q.     To Mr. Hollon or Mr. Dean in that meeting
4     of June 19th, 2006.
5          A.     No, sir.
6          Q.     Okay.  You don't recall making a
7     statement, Be careful or you better be careful?
8          A.     No, sir.
9          Q.     Okay.  Do you recall ever making such a
10    statement in June of -- early June, June 7th a
11    statement to that effect to either of these men that
12    they better be careful or one of them better be
13    careful?
14         A.     No, sir.
15         Q.     Okay.  Was there a meeting of June the
16    7th?
17         A.     A meeting June 7th?
18         Q.     Yes.
19         A.     Not that I'm aware of.
20         Q.     Okay.  On June the 7th my client
21    refreshed me that he was pulled out of service on
22    that date.  Was that him being pulled out of service
23    from his position of terminal trainmaster?
24         A.     Yes, sir.
25         Q.     Okay.  And would that date be close in



BROWN & GALLO
                    LLC

Telephone  (404) 495-0777   (404) 876-8979
Toll Free   (877) 495-0777   (800) 637-0293
         Fax (404) 495-0766

101 Marietta Street, Suite 2700
Atlanta, GA 30303

1740 Peachtree Street, NW
Atlanta, GA 30309

www.galloreporting.com

93

```
 1   time to the date that you learned about the

 2   allegations of the RCO and the May 27th signing?

 3        A.     It may have been in close proximity.

 4        Q.     Okay.  All right.  And on that date, did

 5   you take any action against Mr. Tipton as well?

 6        A.     Mr. Tipton?

 7        Q.     Did you pull him out of service as well?

 8        A.     No, sir.

 9               MR. BARKER:  Jason Tipton?

10        Q.     Not Mr. Tipton.  I should say Mr. Dean.

11        A.     Yes, sir, Mr. Dean.

12        Q.     Okay.

13        A.     Mr. Dean was handled basically in advance

14   of Mr. Hollon --

15        Q.     Okay.

16        A.     -- because Mr. Hollon was on vacation.

17        Q.     Okay.  Did Mr. Tipton, Jason Tipton, ever

18   express to you that you were ruining two good

19   officers?

20        A.     No, sir.

21        Q.     Okay.  And did you ever make any

22   statement to him that he needed to be careful when

23   making such statements?

24        A.     No, sir.

25        Q.     Okay.  As of the date that you pulled Mr.
```



BROWN & GALLO
LLC

Telephone  (404) 495-0777   (404) 876-8979
Toll Free  (877) 495-0777   (800) 637-0293
Fax (404) 495-0766

101 Marietta Street, Suite 2700
Atlanta, GA 30303

1740 Peachtree Street, NW
Atlanta, GA 30309

www.galloreporting.com

94

1    Hollon out of service, that's approximately June the

2    7th, 2006, regarding the RCO incident, had you had

3    the occasion to talk to Mr. Hollon about his

4    understanding of the facts of that incident?

5         A.      Mr. Hollon, as I had indicated earlier,

6    had contacted me by telephone and was obviously

7    concerned about the entire matter and was questioning

8    what had taken place.  And I had indicated to him

9    that we were in the process of determining the

10   material facts in the said incident.

11        Q.      What is the TOPS program or TOPS

12   positions?  What is that, sir?

13        A.      TOPS positions?

14        Q.      Uh-huh (affirmative).  T-O-P-S?

15        A.      I know what T-O-P-S is in the main frame

16   and it's not a position.  It's a -- it tells you

17   about -- you know, it's a main frame screen that

18   tells you about jobs.

19        Q.      Is TOPS an acronym for Temporary

20   Officers' Positions?

21        A.      It may be.  I'm not sure.

22        Q.      Okay.  Well, we'll just use the phrase

23   Temporary Officers' Position.  Do you know after

24   Mr. Hollon's demotion whether or not he had been

25   placed in Temporary Officers' Positions after he had



BROWN & GALLO
LLC

Telephone  (404) 495-0777    (404) 876-8979
Toll Free   (877) 495-0777    (800) 637-0293
Fax (404) 495-0766

101 Marietta Street, Suite 2700
Atlanta, GA 30303

1740 Peachtree Street, NW
Atlanta, GA 30309

www.galloreporting.com

95

1    been demoted from the position of terminal

2    trainmaster?

3        A.    No, sir.

4        Q.    Who would have made that decision to put

5    him in Temporary Officers' Positions?

6        A.    I couldn't answer that, but it did not go

7    through me.

8        Q.    Okay.  Are you required to okay the

9    placement of people in Temporary Officers' Positions?

10       A.    Again, I'm not familiar with what a

11   Temporary Officer Position is because I'm not aware

12   of one existing.

13       Q.    Well, let me ask you this, if somebody's

14   sick, somebody's on vacation, somebody's out of town,

15   as a manager, CSX, I assume, would want somebody in a

16   temporary position filling that position, am I

17   correct, if possible?

18       A.    No, not necessarily.

19       Q.    Okay.  Well, has CSX in the past

20   temporarily filled those positions?  Just like a

21   substitute teacher, is there somebody that's been

22   filling those positions in the past when an officer

23   is out?

24       A.    No, not always.

25       Q.    Not always, but sometimes, nonetheless,



BROWN & GALLO
LLC

Telephone  (404) 495-0777    (404) 876-8979
Toll Free   (877) 495-0777    (800) 637-0293
Fax (404) 495-0766

101 Marietta Street, Suite 2700
Atlanta, GA 30303

1740 Peachtree Street, NW
Atlanta, GA 30309

www.galloreporting.com

96

1    right?

2         A.      There may be occasions in some locations

3    that may happen.

4         Q.      Okay.  And thus the term Temporary

5    Officers' Positions?

6         A.      Right.  And like I said before, I'm not

7    familiar with that --

8         Q.      Okay.

9         A.      -- an acronym.

10        Q.      All right.  Do you know the age, as of

11   2006, of Alan Walton, under 40 or over 40?

12        A.      Alan Walton, I would assume, is over 40.

13        Q.      Rodney Sanders?

14        A.      Rodney Saunders.

15        Q.      Uh-huh (affirmative).

16        A.      Rodney Saunders is over 40.

17        Q.      Mike Teal?

18        A.      Mike Teal would probably be over 40.

19        Q.      Moe Boyd?

20        A.      Moe Boyd would be over 40.

21        Q.      I think we ascertained Ed McClellan was

22   over 40, correct?

23        A.      Correct.

24        Q.      And Alan Snapp is over 40?

25        A.      Correct.



BROWN & GALLO
                              LLC

Telephone  (404) 495-0777   (404) 876-8979
Toll Free  (877) 495-0777   (800) 637-0293
        Fax (404) 495-0766

101 Marietta Street, Suite 2700
          Atlanta, GA 30303

1740 Peachtree Street, NW
      Atlanta, GA 30309

www.galloreporting.com

97

1          Q.      And, of course, we ascertained Ron Hollon

2   was over 40 and T.J. Dean is over 40, correct?

3          A.      Correct.

4          Q.      All right.  Since Mr. Hollon had been

5   terminated as manager in 2006 from the position of

6   terminal trainmaster, have there been promotion of

7   the five junior managers, namely Jeremiah Grant?

8          A.      Jeremiah Grant was promoted to a terminal

9   trainmaster in Montgomery while I was there because

10  he was a management trainee and there was a vacancy

11  being created.

12         Q.      Was he under 40 or over 40?

13         A.      Yes, sir, under.

14         Q.      Dan Bateman?

15         A.      Dan Bateman, again, was another

16  management trainee who was placed at Montgomery.

17         Q.      I'm going back to Jeremiah Grant.  I'm

18  sorry I didn't ask you this.  What was he promoted

19  to?

20         A.      Terminal trainmaster, Montgomery,

21  Alabama.

22         Q.      All right.  Dan Bateman, was he under 40?

23         A.      Yes, sir.

24         Q.      What was he promoted to?

25         A.      Terminal trainmaster, Montgomery, Alabama

BROWN & GALLO
LLC

Telephone  (404) 495-0777    (404) 876-8979
Toll Free   (877) 495-0777    (800) 637-0293
Fax (404) 495-0766

101 Marietta Street, Suite 2700
Atlanta, GA 30303

1740 Peachtree Street, NW
Atlanta, GA 30309

www.galloreporting.com

98

```
 1   out of the management trainee position.
 2        Q.      Darren Anderson, was he under 40?
 3        A.      Yes, sir, and he was promoted to terminal
 4   trainmaster at Montgomery, Alabama from a management
 5   trainee position.
 6        Q.      Chandler Plott, was he promoted?
 7        A.      Yes, sir, to a terminal trainmaster's
 8   position at Montgomery, Alabama out of the management
 9   trainee position.
10        Q.      Arthur Jackson?
11        A.      Arthur Jackson was promoted to terminal
12   trainmaster as a result of coming out of the
13   management trainee program.
14        Q.      Was he under 40?
15        A.      Yes, sir.
16        Q.      So all these people I've mentioned were
17   under 40 and promoted, correct?
18        A.      Yes, sir, from a management trainee
19   position.
20        Q.      Did any of them have college degrees?
21        A.      I think all -- I think every one of them
22   had college degrees if my recollection is right, but
23   I can't recall all of them.
24        Q.      Okay.  And how many years of service did
25   they all have?
```



BROWN & GALLO
LLC

Telephone  (404) 495-0777    (404) 876-8979
Toll Free   (877) 495-0777    (800) 637-0293
Fax (404) 495-0766

101 Marietta Street, Suite 2700
Atlanta, GA 30303

1740 Peachtree Street, NW
Atlanta, GA 30309
www.galloreporting.com

99

1          A.       Well, in most cases for all of them but

2     Chandler Plott, they all had about approximately a

3     little over a year to two-year service and all of it

4     was management trainee program.  And they had also

5     been through a developmental process through CSX as a

6     part of the management trainee program to prepare

7     them to be terminal trainmasters.

8          Q.       Is that like grooming them for management

9     positions?

10              MR. BARKER:  Object to the form.

11         A.       Yes, sir, that's correct.  Chandler Plott

12    was an internal management trainee because of his

13    prior railroad position that he had worked as a

14    yardmaster and a brakeman in New Orleans, Louisiana.

15         Q.       On most of your job postings for

16    manager's positions, don't you require a college

17    education or the equivalent in experience related

18    to --

19         A.       That's a question you're going to have to

20    ask human resources.

21         Q.       Okay.  But the job postings you've seen,

22    most of them require that?

23              MR. BARKER:  Object to the form.

24         A.       Again, that's a question you're going to

25    have to ask human resources.



BROWN & GALLO
                                    LLC

101 Marietta Street, Suite 2700
Atlanta, GA 30303

1740 Peachtree Street, NW
Atlanta, GA 30309

Telephone  (404) 495-0777   (404) 876-8979
Toll Free  (877) 495-0777   (800) 637-0293
Fax (404) 495-0766

www.galloreporting.com

100

1      Q.      We've got exhibits that say that so I

2  think we'll just show exhibits anyway.  I just

3  wondered if you remembered that.  But you're part of

4  the interview process and the hiring process, the

5  promotion process, are you not?

6      A.      I'm part of the promotion process but not

7  necessarily the interview process.

8              MR. ATCHISON:  Okay.  Let us take a short

9          break and talk for a few minutes.  I may can

10         speed this thing along.

11             (Break taken.)

12  BY MR. ATCHISON:

13     Q.      We're back on the record.  Mr. Workman, I

14  understand from my client that he applied for

15  promotion to positions that were at the Montgomery

16  terminal, the terminal that he was working at on an

17  ongoing basis.  Was there any CSX rule or regulation

18  that permitted -- excuse me -- prohibited promotion

19  of a person working at his or her terminal to a

20  higher position?

21     A.      Was there a policy?

22     Q.      Yes, was there a CSX rule, regulation or

23  a policy?

24     A.      I think there was an understanding that

25  in order for an individual to get promoted within his



BROWN & GALLO
LLC

Telephone  (404) 495-0777    (404) 876-8979
Toll Free  (877) 495-0777    (800) 637-0293
Fax (404) 495-0766

101 Marietta Street, Suite 2700
Atlanta, GA 30303

1740 Peachtree Street, NW
Atlanta, GA 30309

www.galloreporting.com

101

1    own home was -- you know, was not really going to be

2    looked upon favorably, that it was more important to

3    really -- if a person was interested and as a manager

4    of this company that they're better off in terms of

5    managing people would be not at their home but away.

6         Q.    And wasn't there also an understanding

7    that a manager should not file EEO charges against

8    the company and expect promotions?

9              MR. BARKER:   Object to the form.

10        A.    I don't know of anything like that.  I've

11   never heard of that.

12        Q.    Okay.  All right.  If there was such an

13   understanding that promoting within a terminal was

14   not favored, do you know a promotion of David Perry

15   being promoted within the Montgomery terminal from a

16   lower position to a higher position?

17        A.    David Perry was a locomotive engineer who

18   operated on the Dothan subdivision between Montgomery

19   and Dothan.  He operated on a separate division.  He

20   operated on the Jacksonville division.  At the time

21   of the applications for respective candidates for

22   that position, David Perry was promoted as a result,

23   number one, he was not on the Atlanta division, and

24   number two, he had the qualifications to become road

25   foreman.

BROWN & GALLO
LLC

Telephone  (404) 495-0777    (404) 876-8979
Toll Free  (877) 495-0777    (800) 637-0293
Fax (404) 495-0766

101 Marietta Street, Suite 2700
Atlanta, GA 30303

1740 Peachtree Street, NW
Atlanta, GA 30309

www.galloreporting.com

102

1        Q.        All right.  Well, let me ask you a

2    question.  Do you recall that Darren Anderson was

3    promoted within his terminal?  I believe that may

4    have been the Birmingham, Alabama -- from Birmingham

5    to Montgomery.

6        A.        That one I can't recall within.

7        Q.        Okay.  And to refresh you, isn't it true,

8    in fact, that he was not in the training program?

9    You mentioned several of these younger people that

10   were promoted and you mentioned the training program

11   from, I think, all of them, included Mr. Anderson?

12       A.        Yeah, I can't recall Darren.  I mean, you

13   know, I was thinking that he came out of the

14   management trainee program, but I guess apparently

15   I'm not sure of that.

16       Q.        And wouldn't you agree that approximately

17   25 years of service to CSX and its prior railroads

18   that it bought out and became part of or became part

19   of CSX, that experience of Mr. Hollon certainly was

20   equivalent to a college education particularly when

21   it was involving many college courses that he had

22   taken?

23            MR. BARKER:  Object to the form.

24       A.        I don't know how to answer that because I

25   don't know how they see my service.


LLC

Telephone  (404) 495-0777    (404) 876-8979
Toll Free   (877) 495-0777    (800) 637-0293
        Fax (404) 495-0766

101 Marietta Street, Suite 2700
Atlanta, GA 30303

1740 Peachtree Street, NW
Atlanta, GA 30309

www.galloreporting.com

103

1       Q.      Do you have a college degree?

2       A.      Yes, sir.

3       Q.      Okay.  All right.  Were you involved in

4   the recommendations and promotions that Mr. Hollon

5   had applied for?

6       A.      Was I involved?

7       Q.      Yes.

8       A.      No, sir.

9       Q.      Pardon?

10      A.      No, sir.

11      Q.      Not at all?

12      A.      (Shakes head negatively.)

13      Q.      In recommending that he be promoted or

14  not, did you have any input?

15      A.      The only input that I had was at one time

16  when he was being -- we was holding the interviews

17  for the Montgomery terminal that he at least be

18  considered for the interview.  But that happens.  I

19  mean, we always try to give the local individual at

20  least an opportunity to be heard and it gives him the

21  chance to be interviewed and strengthen their

22  interview skills.

23      Q.      Do you know whether or not Mr. Hollon got

24  to interview at all of the positions that he was

25  seeking promotion for after his demotion of June



BROWN & GALLO
LLC

Telephone  (404) 495-0777    (404) 876-8979
Toll Free  (877) 495-0777    (800) 637-0293
Fax (404) 495-0766

101 Marietta Street, Suite 2700
Atlanta, GA 30303

1740 Peachtree Street, NW
Atlanta, GA 30309

www.galloreporting.com

104

1    19th, 2006?

2         A.        No.

3         Q.        Do you know how it's decided that a party

4    is to get an interview for a promotion or not at CSX?

5         A.        I can't -- you know, I can only speak for

6    what I have control of.  As far as something generic

7    in terms of your question, you know, it's difficult

8    for me to answer how other people look at them in

9    terms of what they want as prospective candidates for

10   positions.

11                  MR. ATCHISON:  No further questions.

12                  MR. BARKER:  That's it?

13                  MR. ATCHISON:  That's it.

14

15                  (Deposition concluded at 1:16 p.m.)

16

17

18

19

20

21

22

23

24

25



BROWN & GALLO
LLC

Telephone  (404) 495-0777    (404) 876-8979
Toll Free   (877) 495-0777    (800) 637-0293
Fax (404) 495-0766

101 Marietta Street, Suite 2700
Atlanta, GA 30303

1740 Peachtree Street, NW
Atlanta, GA 30309

www.galloreporting.com

105

CERTIFICATE OF OATH

1

2

3    STATE OF FLORIDA)

4                    )

5    COUNTY OF DUVAL )

6

7

8              I, the undersigned authority, certify

9

10   that RODNEY STEVEN WORKMAN personally appeared before me

11

12   and was duly sworn.

13

14

15

16           WITNESS my hand and official seal this 11th

17

18   day of November 2007.

19

20

21

22

23

24   /s/ Richetta R. Brown

25                Richetta R. Brown

BROWN & GALLO
LLC

Telephone  (404) 495-0777    (404) 876-8979
Toll Free   (877) 495-0777    (800) 637-0293
        Fax (404) 495-0766

101 Marietta Street, Suite 2700
        Atlanta, GA 30303

1740 Peachtree Street, NW
        Atlanta, GA 30309

www.galloreporting.com

106

REPORTER'S DEPOSITION CERTIFICATE

STATE OF FLORIDA)
               )
COUNTY OF DUVAL )


        I, Richetta R. Brown, Court Reporter,
certify that I was authorized to and did
stenographically report the deposition of RODNEY STEVEN
WORKMAN; that a review of the transcript was
requested; and that the transcript is a true and
complete record of my stenographic notes.

        I further certify that I am not a relative,
employee, attorney, or counsel of any of the parties,
nor am I a relative or employee of any of the
parties' attorney or counsel connected with the
action, nor am I financially interested in the
action.



        DATED this 11th day of November 2007.



        /s/ Richetta R. Brown
        _____
        Richetta R. Brown

BROWN & GALLO
                          LLC

Telephone  (404) 495-0777    (404) 876-8979
Toll Free  (877) 495-0777    (800) 637-0293
        Fax (404) 495-0766

101 Marietta Street, Suite 2700
        Atlanta, GA 30303

1740 Peachtree Street, NW
        Atlanta, GA 30309

www.galloreporting.com

107

1                          CAPTION

2              The Deposition of RODNEY STEVEN WORKMAN,

3    taken in the matter, on the date, and at the time and

4    place set out on the title page hereof.

5              It was requested that the deposition be taken

6    by the reporter and that same be reduced to

7    typewritten form.

8              It was agreed by and between counsel and the

9    parties that the Deponent will read and sign the

10   transcript of said deposition.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



BROWN & GALLO
LLC

Telephone  (404) 495-0777   (404) 876-8979
Toll Free   (877) 495-0777   (800) 637-0293
Fax (404) 495-0766

101 Marietta Street, Suite 2700
Atlanta, GA 30303

1740 Peachtree Street, NW
Atlanta, GA 30309

www.galloreporting.com



**YAHOO! MAIL**   Welcome, jweekley1611
[Sign Out, My Account]          Mail Home - Mail Tutorials - Help



Mail ▾ | Addresses ▾ | Calendar ▾ | Notepad ▾          Mail For Mobile - Mail Upgrades - Options

[Check Mail]  [Compose]          [          ]  [Search Mail]  [Search the Web]

0% APR card
for good credit

Previous | Next | Back to Messages

[Delete] [Reply ▾] [Forward ▾] [Spam ▾] [Move... ▾]

This message is not flagged. [ Flag Message - Mark as Unread ]          Printable View

| | |
|---|---|
| **From:** | "DALE BARNETT" <DBARNETT@ELMORE.RR.COM> 🔲 View Contact Details  🔲 Add Mobile Alert |
| **To:** | "Jimmy Weekley" <jweekley1611@yahoo.com> |
| **Subject:** | FW: Re: RCO FRA Certification card falsification |
| **Date:** | Fri, 1 Dec 2006 12:03:43 -0600 |

**Folders**          [Add - Edit]
**Inbox (2)**
Draft
Sent
Bulk          [Empty]
Trash          [Empty]

**Search Shortcuts**
My Photos
My Attachments

What's your
credit score $0

Find old High
School friends

Mortgage rates
as low as 4.625%

Degrees in as
fast as 1 year

—— Original Message ——
**From:** patrick.plumb@dot.gov
**To:** dbarnett@elmore.rr.com
**Cc:** elizabeth.hudd@dot.gov
**Sent:** Wednesday, November 22, 2006 11:32 AM
**Subject:** FW: Re: RCO FRA Certification card falsification



Re: 2006-CSX-006120

Dear Mr. Barnett:

This will respond to your complaint citing an incident occurring on May 27th involving CSX employee Jeremy Weeks, Trainmaster Ron Hollon, and Road Foreman of Engines T. J. Dean in the Montgomery yard. You alleged that CSX required a Remote Control Operator (RCO) to work in Montgomery , AL without having a proper check ride within the last two (2) years. You further alleged that a non-qualified officer signed the RCO certification card.

After review of the circumstances and events on that date, FRA has determined that CSX was not in violation of federal regulations governing Remote Control Operations. FRA has allowed CSX a 60-day grace period for an RCO that has not had a check ride for the previous year which allows an RCO to operate as such for 60 days prior to the completion of a check ride. If applied, the employee could have performed his duties on JobY190 without a check ride until July 26, 2006. Therefore, no further action is warranted at this time and this office considers this matter closed.

I understand that the investigating inspector advised you of our findings and that you were satisfied with the results.

We appreciate your continued effort to identify and resolve issues that affect rail safety.

Sincerely,


**Patrick Plumb**
**Deputy Regional Administrator**
**Federal Railroad Administration**
**Region 3**

---

No virus found in this incoming message.
Checked by AVG Free Edition.
Version: 7.1.409 / Virus Database: 268.14.13/546 - Release Date: 11/22/2006

[Delete]  [Reply ▼]  [Forward ▼]  [Spam]  [Move... ▼]

Previous | Next | Back to Messages          Save Message Text | Full Headers

[Check Mail]  [Compose]          [                    ]  [Search Mail]  [Search the Web]

Copyright © 1994-2006 Yahoo Inc. All rights reserved. Terms of Service - Copyright/IP Policy - Guidelines - Ad Feedback
NOTICE: We collect personal information on this site.
To learn more about how we use your information, see our Privacy Policy

**Hollon, Ron Sr**

| | |
|---|---|
| **From:** | Averitte, Angie |
| **Sent:** | Saturday, May 27, 2006 11:06 AM |
| **To:** | Hollon, Ron Sr |
| **Subject:** | RE: MONTGOMERY AND ATLANTA POSITIONS |

**call me on the cell when you get a break...**



-----Original Message-----
**From:**     Hollon, Ron Sr
**Sent:**     Saturday, May 27, 2006 9:16 AM
**To:**       Workman, Rod; Frost, Jack Jr.; Averitte, Angie
**Subject:**  MONTGOMERY AND ATLANTA POSITIONS

Mr. Workman:

I just need some understanding why I was not considered for
the Montgomery or the Atlanta positions?  How can I improve
my chances of growing with this company?

Thanks
Ron

*Email sent to Mr Workman*
*no reply*

1

**Hollon, Ron Sr**

| | |
|---|---|
| From: | Hollon, Ron Sr |
| Sent: | Saturday, May 27, 2006 8:19 AM |
| To: | Frulla, Bob Jr.; Frost, Jack Jr.; Averitte, Angie |
| Cc: | Hollon, Ron Sr |
| Subject: | PENSACOLA POSITION |

Mr. Frulla

While checking on my status, for the position in Pensacola, in the computer.
It showed that I was in the interview stage but I was never interviewed.
I just need a little help in understanding this if you can help me.

Thanks

R. A. Hollon
Terminal Trainmaster
Montgomery, AL



Email sent about Pensacola pier.
I believe this in the same day of
the remote control

PS-10
# 166337

# EMPLOYEE RECORD



| NAME (LAST) | (FIRST) | (MIDDLE) | DATE OF BIRTH | M ☒ F ☐ | MARITAL STATUS | NAME OF SPOUSE |
|---|---|---|---|---|---|---|
| Snapp | Donald | Alan | 6-22-54 | | Single | |

SOCIAL SECURITY NO. 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    IDENT. NO. 166337    PHYSICAL RESTRICTIONS None

CURRENT ADDRESS PO Box 3286  Greenwood SC 29648    Home Telephone (803) 223-0947

## EDUCATION

| NAME OF SCHOOL | CITY AND STATE | LEVEL | MAJOR COURSE | FROM | TO | DEGREE | HONORARY SOCIETY |
|---|---|---|---|---|---|---|---|
| East High | Bluff City, Tn | GRADE SCH. HIGH SCH. COLLEGE COLLEGE OTHER | Math / Drafting | 1969 | 1972 | | |

## MILITARY SERVICE

| FROM | TO | SERVICE | BRANCH | HIGHEST RANK | TYPE DISCHARGE | RESERVE STATUS | DRAFT STATUS |
|---|---|---|---|---|---|---|---|
| | | | | | | ACTIVE _____ NONE _____ INACTIVE _____ NAT. GD. _____ | |

## TRAINING OR COURSES TAKEN

| DESCRIPTION | YEAR | DESCRIPTION | YEAR |
|---|---|---|---|
| Supv Development Program | 1981 | | |
| Managing for Productivity | 1985 | | |

## MEMBERSHIP IN PROFESSIONAL OR CIVIC ORGANIZATIONS

| NAME | OFFICE HELD | NAME | OFFICE HELD |
|---|---|---|---|
| | | | |
| | | | |
| | | | |

## MISCELLANEOUS

CONFIDENTIAL

D-000586

(Use Typewriter)

2/28/85
(Date)

Name __D. A. SNAPP__ Address __PO BOX 3286   GREENWOOD SC   29648__
Identification No. __166337__
Place of Birth __SEATTLE, WASH__ Date of Birth __6/22/54__
Marital Status __DIVORCED__ If married, spouse's name _____
Date Married _____
Children (give names and dates of birth) __NONE__

Education: High School Graduate? __YES__ If yes, give name, location and year
graduated __SULLIVAN EAST HIGH   BLUFF CITY, TN.   1972__
Years of College work:      1      2      3      4      5
College graduate? __NO__ If yes, give name, location, year graduated and
type of degree received _____

Other education and/or specialized training (include education studies during service
with the Company and indicate courses pursued under the Company Education Program)
_____
_____

Military Service (give branch of service, highest active duty rank and dates of duty)
_____
_____

List Civic and Community activities: _____
_____

Employment History (other than with the Company)
Date of Employment                Name of Company                Position Held
_____
_____
_____
_____

Date first entered service of the Company __JULY 16, 1973__
If not continuous, show also beginning date of present continuous active service _____

Length of service in each principal employment classification with the Company:

| Department & Title | Location | Date |
|---|---|---|
| TRANSPORTATION    CLERK | TAMPA, FLA. | 7/16/73 |
| "          "       YARDMASTER | "       " | 1976 |
| "          "       GEN YARDMASTER | "       " | 1979 |
| "          "       TRAINMASTER | ATLANTA DIVISION | 1983 ( 7/1/83) |

CONFIDENTIAL

D-000587



CONFIDENTIAL

D-000588

- *illegible*  Wright
- Gary Bethel

CONFIDENTIAL

D-000589

**Brown, Alison**

| | |
|---|---|
| **From:** | Pendergrass, Mike |
| **Sent:** | Wednesday, April 12, 2006 3:52 PM |
| **To:** | Brown, Alison |
| **Subject:** | FW: Mobile FRA violation |

**From:** Snapp, Alan
**Sent:** Wednesday, March 22, 2006 5:14 PM
**To:** Pendergrass, Mike; Workman, Rod
**Subject:** Mobile FRA violation

Mike Pendergrass
Rod Workman

On February 24th at approximately 1700, Trainmaster Ray Billingsley called me at home to let me know that FRA Inspector York had taken exception to a crew, Y102, that had left info in the yard office , including ID# and pin # for the 2nd shift crew to electronically log off duty.  He stated that she was going to write the incident up and it was not the first one that she had found.  This was the first knowledge that any of us had as to the exceptions taken.

I instructed Ray to immediately begin meeting all yard crews and discussing this incident and to be absolutly sure that everyone understood that the Foreman on all assignments were required by CSX Rules and FRA regulations to enter time ticket info and protect their pin numbers.  I had the other trainmasters all weekend discussing this with crews. On Monday February 27th, I had the Local Chairman in and discussed this with him and he began meeting with crews and discussing the requirements pertaining to electronic imput of info.

On Monday the 27th I called FRA Inspector York and discussed this with her.  She stated that she had observed this on other occassions during the month of February with this particular job.  I told her that I would be handling with the crew formally through the IDPAP and asked how this would be handled by the FRA.  She stated that she would have to discussed
it with Atlanta and was not sure if the Forman was going to be held personally accountable or if the CSX would be fined.  We discuss my responsiblity and  the fact that I had 30 days to respond to her write up.  This was my first FRA violation to handle in all of my years as a manager.

I immediately called John Drake's office to discuss it with him, as I was unsure of the rules and regs associated with this and to get advise on how to handle.  On Wednesday, John called.......  he was out of the office sick, and we discussed it over the telephone.  He said that he had info in the office that he would look at the next day and determine what applied. I faxed the FRA document from York to him.   The following day, he e-mailed me with the info pertaining to the rules and regs.  I then completed an assesment on Foreman Giles and sent in for handling.  Charge letter was issued.  We had no documentation to identify which of the 2nd shift crew members actually entered the info.  As I understand by using the 1st shift's ID# and pin, all transmissions were associated with Giles.  This was why no one else was charged.

The Local Chairman asked for a postponement and also asked if we would accept a waiver.  The first discipline discussed was 30 days actual.  I discussed this with Amy Furmon.  Prior to the scheduled investigation I found out from the Local Chairman and Y102's crew that when Jimmy Black was Term Manager, he allowed this practice so crews were not showing
off early.  After finding this out I discussed with Amy and David about the past practice had been and recommended that we
give him 5 days actual since a prior Manager had allowed the practice felt that an investigation would not support dismissal.

A waiver was allowed for 5 days actual.  The practice has been stopped and we now check this often utilizing the crew creens
to insure that it stays stopped.

The FRA's first notice to us was February 24th.  We responded immediately to stop any futher violations.  She had violations

1

CONFIDENTIAL

D-000590

for several days in February.....including the first week, but did not notify us until the 24th.

CONFIDENTIAL

2

D-000591

To Whom It May Concern:

In reference to the FRA cover up issue that was uncovered by the FRA in February 2006 at Mobile, Alabama in Sibert yard. Would like to start out by saying Alan Snapp knew ① and condoned the practice of jobs leaving early and letting the next job coming on tie up the time ticket. He instructed more than one yard job to this so numbers would look good ② and jobs would not be cut off. For years jobs have been going home after 4 and 5 hours onduty. And crews were instructed to doctor the time ticket. They are still getting done in that time but Snapp has instructions out now that we have to sit here until 7hrs30min has passed before we put off. This was mainly happening with the Y102. Charlie Giles, which is the employee that the FRA wrote up for 7 different violation dates and is regular on the y102 and is Alan Snapp's golden boy. Does no wrong in Alan's eyes. In fact the 5 days of discipline that was handed down for punishment was sad. 2 of the 5 days were Mr. Giles off day. Then Mr. Snapp let him cash in 3 vacation days to cover the other 3 days. So basically he was not punished at all. The charge letter stated he was being charged with things like: conduct unbecoming and dishonesty and willful neglect of your duties. How is it he only got 5 days which ended up being nothing??? And it is weird that since all this has happen Mr. Snapp has put out instructions that yard jobs have to stay at least 7hrs 30min to make it look good. Even if the jobs get done early, the jobs have to sit there until 7hrs 30 min has passed. Alan Snapp and Ray Billingsley always work first shift. These two are the ones responsible for what has gone on here. Alan

Professional ③ Snapp is unprofessional, shows favoritism, and his conduct is unbecoming, dishonest and flat out lies to make himself look good. Also, safety money, you might want to ask him about this too. Where does all the safety money go? We at sibert have been asking this

...ry ④ for a long time. The terminal never does anything to promote safety, not even cookouts. And it's pretty bad when you have Mr. Ward come down and Snapp tells the crews what to say and not to say. Also told crews to remember after Ward is gone that I am still your

NTIMIDATION ⑤ boss you have to answer to me. Big power trip. If you send a team in or somebody to investigate all this, I am certain you will find out things you would not believe. Please send in a team to interview and investigate every employee in Sibert yard including Roadway and Mechanical. Especially management. You will find out that Alan Snapp has been lying to you about this FRA incident, which is bigger than you know and other things that are going on which violates CSX code of ethics. You are only hearing his side to the whole thing involving the FRA. Please act on this. Please interview the employees at sibert yard. And to Debroah York with the FRA, please come back and talk to us.


Respectfully,
CSX Employees


Cc: Michael Ward
    Tony Ingram
    Federal Railway Administration
    Debroah York, FRA

CONFIDENTIAL

D-000592



## William E McClellan, Jr, ID #180257, Manager Safety & Operations Practices located at Atlanta, Ga

### Background
- Completed 37 years of service Feb 1, 2006
- Clerical Union Seniority - Atlanta, Ga

### Situation

- Mr McClellan instructed Trainmaster Greg Kent not to submit a report concerning a serious rule violation and damage to a locomotive on Thursday Feb 2nd ,Friday Feb 3rd and Sunday Feb 5th
- Crew did not do a hand brake test when making a static drop at customer location - 3 cars rolled free and would not stop causing crew to give chase
- There was damage to the locomotive involved in this incident in the amount of $5,000
- When confronted about this – Mr McClellan said – I used poor judgment and made a bad decision
- Trainmaster, Greg Kent,Road Foreman Joe Tatum and two crew members involved in this incident arrived at 6AM Monday morning Feb 6th to report what transpired Feb 2nd to Division Manager Rod Workman

### Recommendation

Dismissal from management position

CONFIDENTIAL

A70602 HF @ Jasper Lumber

FEB. 02, 2006

CONFIDENTIAL

02/02/06

~19:30 Event took place

a) 20:01 hr Crew notified Trainmaster Kent

b) ~ 20:15 Notified Mr. McClellan and received instructions

c) ~ 20:30 Notified RF Tatum

d) ~ 20:40 Instructed crew to safely return engine to Cartersville and report to Trainmasters office the next day for 13:00 meeting with Mr. McClellan

CONFIDENTIAL

D-000565

02/03/06

~ 07:00 Trainmaster and car inspector inspected locomotive. Found pilot damaged to a point that it was almost touching rail due to bent frame.

07:30 Called Mr. McClellan and voiced concerns over the issues.

~ 09:30 Mr. McClellan arrived and viewed damage

~ 11:00 inspector trimmed pilot to appropriate height above rail for safe movement of engine.

13:00 Mr. McClellan, myself and crew reviewed incident and rule infractions.

Spoke with RFE Tatum about my concerns over how the incident was being handled

CONFIDENTIAL

D-000566

02/04/06

~10:00 I spoke again with RFE Tatum about my concerns and I also spoke again with the crew.

~15:00 I visited Mr. McClellan at his home and expressed my discomfort about this issue.

02/05/06

~12:00 I called Mr. McClellan and told him I felt that contact needed to be made with Mr. Workman about the issue. I also stated that I did not feel that I could compromise the integrity of myself or that of my fellow employees.

~17:00 I visited with Mr. Tatum and told him I felt that we needed to go to the Division Manager at 06:00 the next morning and inform him of the incident.

Later that evening I contacted the crew and they agreed that this was the right thing to do. They agreed to meet at the GOB at 06:00 the next day.

CONFIDF

D

04:53:48    09-11-2007     5 /21

02/06/06

~05:30 I called Mr. McClellan and informed him of our intentions and he agreed that it was the correct thing to do. He said that he had given us bad advice and made a mistake.

~06:15 Mr. Tatum, myself and the crew entered the office of the Division Manager and explained the events of the incident.

CONFID

D-00

## Description Of The Incident:

A706 was initially job briefed at their on duty location in Cartersville by Trainmaster Kent. A706 departed Cartersville at 18:03 with two cars. While en route A706 picked up impact car set out at Acworth. A706 would return this car to Cartersville for repairs. Crew stopped at customer location Jasper lumber on the #1 main line at Kennesaw and conducted a job briefing about doing a Static drop to get the cars on the South side of their engine. In doing so they would have the cars properly lined up for their return trip North.

The A706 stopped short of the South facing point at Jasper. The engine CSXT. 5828 was slacked away from train. A706 Conductor walked to rear of three car train and secured the North car, A706 then lined the switch for movement into the industry and pulled engine CSXT 5828 into the industry and coupled to the empty cars to be pulled. A706 conductor then returned to cars lining switch for movement main to main on the way back to the cars. A706 conductor then proceeded to bleed the three cars of air on the way back to the North car where the hand brake was applied. With the air bled from all three car the Conductor mounted the North end of the North car in order to release the hand brake to do a Static drop of the cars using the hand brake to stop the movement of the cars after passing the customer switch.

CONFIDENTIAL

As the cars started to roll over the switch A706 conductor re-applied the hand brake and found that it would not stop the cars. A706 conductor called to the engineer that he needed his help to stop the cut from rolling away. The engineer then ran to the switch lined it for his movement and ran back to the engine and pulled North over the switch. The engineer the lined his route south, returned to the engine and gave chase to the now runaway cars. The Conductor called out his location and the engineer closed the distance to couple to the cars. The engineers view was obstructed by a South bound train on the # 2 main. When the engineer caught sight of the cars he instructed the Conductor to get clear of the cars. The coupling was made and movement stopped about 3/10's of a mile from the end of double track. No damage was done to the cars, but the engine sustained approx. $5,000 dollars to the front end of the locomotive due to excessive coupling speed.

CONFIDENTIAL



CONFIDENTIAL

D-000571

404 350 5327          CSX TRAINING                                          14:55:15    09-11-2007          9 /21



CONFIDENTIAL

D-000572



CONFIDENTIAL

D-000573

Conductor : T.G.Howell ( ID # 572066 )

Engineer: C.D.Gravley ( ID # 199611 )

Date: A70602 Local Switcher Cartersville, Ga.

Reporting The Following Human Factor Train Accident:

Date: Feb. 02, 2006

Time 19:30 Hrs.

Engineer Gravley :

Hire Date : 07/08/96

Previous Human Incidents:

Derailments: 0

Train Accidents:          0

Red Signal Violation: May 1999

Age: 32

DOB: 3/27/73

Conductor: Howell:

Hire Date: 07/27/03

Previous Human Incidents:

Derailments: 0

Train Accidents: 0

Red Signal Violation: 0

Age: 31

DOB:2/7/74

CONFIDENTIAL

D-000574

**Experience:**

Engineer Gravley: Has worked on the W&A Sub and Atlanta Terminal since his hire date: promoted to Engineer Feb. 1998.

Conductor Howell: Has worked as a Conductor on the W&A Sub and the Atlanta Terminal since his hire date 7/27/03.

**Supervisors:**

Road Forman of Engines: Joe Tatum

Trainmaster: Greg Kent

**Safety Record:** The W&A Subdivision Personal Injuries:

1 reportable injury in 2004

2 reportable injuries in 2005

1 reportable injury in 2006

CONFIDENTIAL

D-000575

Damage Cost:

Locomotive : $5000

Car : 0

Track: 0

O-Test on employees :

Engineer Gravley: 2004— 16 test 0 failures

2005— 16 test 0 failures

2006— 0 test

Conductor Howell: 2004—7 test  0 failures

2005— 32 test 1 failure

O-testing by local officers in past year:

Trainmaster Kent : 609 test with 51 failures ( 8.0%)

RFE Tatum: 857 test with 38 failures (4.0%)

Corrective Action Plan:

1. Employees out of service pending investigation

2. Assessments sent in for appropriate rule violations.

3. Set action plan for Repair of North end of Vulcan siding so local can run around cars without holding main track

4. Re evaluate Static drops on the subdivision.

5. Met with ADE Fraizer was advised the cost to put north end of Vulcan siding and South end Chickamauga siding in service will cost ~ $90 K. This would prevent the need for static drops.

CONFIDENTIAL





Evidence of previous damage from earlier collisions

CONFIDENTIAL

D-000577



Can see
brake chain
bound over
top of axle

This was the North out
car that was used to
brake cut in the static
drop UTLX 79130

CONFIDENTIAL

D-000578



## Mauldin, Kristi

**From:** Mauldin, Kristi on behalf of Workman, Rod
**Sent:** Tuesday, February 07, 2006 11:12 AM
**To:** Mauldin, Kristi
**Subject:** FW: Human Factor Train Accident Report A70602

Conductor : T.G.Howell  ( ID # 572066 )
Engineer: C.D.Gravley ( ID # 199611 )

Date: A70602 Local Switcher Cartersville, Ga.

Reporting The Following Human Factor Train Accident:

Date: Feb. 02, 2006
Time 19:30 Hrs.

Engineer Gravley :

Hire Date : 07/08/96
Previous Human Incidents:
Derailments: 0
Train Accidents:        0
Red Signal Violation: May 1999
Age: 32
DOB: 3/27/73

Conductor Howell:

Hire Date: 07/27/03
Previous Human Incidents:
Derailments: 0
   Train Accidents: 0
Red Signal Violation: 0
Age: 31
DOB:2/7/74

**Experience:**
Engineer Gravley: Has worked on the W&A Sub and Atlanta Terminal since his
hire date: promoted to Engineer Feb. 1998.

Conductor Howell: Has worked as a Conductor on the W&A Sub and the Atlanta
Terminal since his hire date 7/27/03.

**Supervisors:**
Road Forman of Engines: Joe Tatum
Trainmaster: GregKent

**Safety Record:** The W&A Subdivision Personal Injuries:
1 reportable injury in 2004
2 reportable injuries in 2005
1 reportable injury in 2006

**Description Of The Incident:** A706 was initially job briefed at their on duty location
in Cartersville by Trainmaster Kent. A706 departed Cartersville at 18:03 with two cars. While
en route A706 picked up impact car set out at Acworth. A706 would return this car to
Cartersville for repairs. Crew stopped at customer location Jasper lumber and conducted a job
briefing about doing a Static drop to get the cars on the South side of their engine. In doing so
they would have the cars properly lined up for their return trip North.
        The A706 stopped short of the South facing point at Jasper. The engine CSXT 5828 was
slacked away from train. A706 Conductor walked to rear of three car train and secured the North
car. A706 then lined the switch for movement into the industry and pulled engine CSXT 5828
into the industry and coupled to the empty cars to be pulled. A706 conductor then returned
to cars lining switch for movement main to main on the way back to the cars. A706 conductor
then proceeded to bleed the three cars of air on the way back to the North car where the
hand brake was applied. With the air bled from all three car the Conductor mounted the
North end of the North car in order to release the hand brake to do a Static drop of the cars
using the hand brake to stop the movement of the cars after passing the customer switch.
        As the cars started to roll over the switch A706 conductor re-applied the hand
brake and found that while it would not stop the cars. A706 conductor called to the engineer

1

CONFIDENTIAL

D-000579

that he needed his help to stop the cut from rolling away. The engineer then ran to the switch lined it for his movement and ran back to the engine and pulled North over the switch. The engineer the lined his route south, returned to the engine and gave chase to the now runaway cars. The Conductor called out his location and the engineer closed the distance to couple to the cars. The engineers view was obstructed by a South bound train on the # 2 main. When the engineer caught sight of the cars he instructed the Conductor to get clear of the cars. The coupling was made and movement stopped about 3/10's of a mile from the end of double track. No damage was done to the cars, but the engine sustained approx: $5,000 dollars to the front end of the locomotive due to excessive coupling speed.

**Damage Cost:**
   **Locomotive : $5000**
   **Car : 0**
   **Track: 0**

**O-Test on employees :**
**Engineer Gravley:** 2004-- 16 test 0 failures
              2005-- 16 test 0 failures
              2006--  0 test

**Conductor Howell: 2004--7 test   0 failures**
              **2005-- 32 test 1 failure**

**O-testing by local officers in past year:**
**Trainmaster Kent : 609 test with 51 failures ( 8.0%)**
 **RFE Tatum: 857 test with 38 failures ( 4.0%)**

**Corrective Action Plan:**
1. Employees out of service pending investigation
2. Assessments sent in for appropriate rule violations
3. Set action plan for Repair of North end of Vulcan
   siding so local can run around cars without holding main track
4. Re evaluate Static drops on the subdivision.

CONFIDENTIAL

D-000580

CONFIDENTIAL

D-000581

# DERAILMENT/ACCIDENT REPORT

FORM REX (Effective Feb. 2005)

| INCIDENT NUMBER 01 | INCIDENT DATE & TIME 02 | TYPE OF INCIDENT 03 | WEATHER 04 | VISIBILITY 05 | TEMPERATURE 06 |
|---|---|---|---|---|---|
| | M M D D Y Y Y Y  0 2 0 2 2 4 0 6   Hr Clock  2 0 4 0 | 1. Injury/Fatality 2. Train Accident 3. Including Road Crossing 4. Road Crossing  2 | 1. Clear 2. Cloudy 3. Rain 5. Snow  2 | 1. Dawn 2. Daylight 3. Dusk 4. Dark  2 | 1. Above Zero 2. Below Zero  1  Temp  +78 |

| JOINT OPERATION 07 | NUMBER OF PEOPLE EVACUATED 08 | BILLABLE | IN USA? 09 | STATE 10 | COUNTY 11 | 12 |
|---|---|---|---|---|---|---|
| 1. CSX ONLY 2. AMTRAK 3. FOREIGN RAILROAD 4. INDUSTRY  1 | 0 | 1. Yes 2. No  2  If billable, to Whom | Y = Yes N = No  Y | GA | COBB | |

| YARD TERMINAL 13 | NEAREST RAILROAD STATION (from city of occurrence) 14 | CITY AND ZIP CODE 15 | DIVISION CODE 16 | SUBDIVISION CODE 17 | LOCATION MILEPOST 18 |
|---|---|---|---|---|---|
| 00T237 | DAY | City  KENNESAW   Zip Code | AT | WA | 0WA226 3 |

| SHOP/SERVICE CENTER 19 | RAIL CODE 20 | TRACK NUMBER OR NAME 21 | OTHER RAILROAD OR INDUSTRY INVOLVED 22 |
|---|---|---|---|
| 1. Local Shop 2. Local Service Center 3. Not Shop or Service Center  3 | | Number    Name  MAINLINE | NO |

| OTHER RAILROAD OR INDUSTRY RESPONSIBLE FOR TRACK MAINTENANCE 23 | CAUSE CODES 24 | TYPE OF ACCIDENT 25 |
|---|---|---|
| NO | Primary  H02E   Contributing  E0AC | 01. Derailment  07. Hwy Grade Crossing  02. Head-on Collision  08. Roll. Grade Crossing  03. Rear-end Collision  09. Obstruction  04. Side Collision  10. Raking Collision  05. Raking Collision  11. Fire / explosion  06. Broken Track Collision  12. Other Specify  13. Other (Specify)   Other (Specify)  EXCESSIVE COUPLING SPEED  13 |

| TYPE OF EQUIPMENT 26 | TYPE OF REPORT 27 | METHOD OF OPERATION 28 |
|---|---|---|
| 01. Freight Train  05. Out of Class  02. Passenger Train  06. Yard/Switching  03. Commuter Train  07. Light Loco(s)  04. Work Train  08. Maint/Inspect Car  05. Single Car  09. Geometry Car   2 | 1. FRA Reportable 2. Non-Reportable  2 | ATCS  a. Auto Train Control  b. Auto Train Stop  c. Cab Signals  d. Traffic Control  e. Interlocking  f. Automatic Block   g. Current of Traffic  h. Timetable/Train Orders  i. Train Warrant Control  j. Direct Traffic Control  k. Main Track/Yard Limits   Codes  E |

| EQUIPMENT ATTENDED 29 | CSX ESTIMATED DAMAGES | INDUSTRY OR FOREIGN RR EST. DAMAGES 30 | TRACK TYPE 31 | IF ACCIDENT DESTRUCTED MAIN TRACK, HOW LONG? 33 |
|---|---|---|---|---|
| Yes  X   No | LOCO $ 51000   TRACK $   CAR $   SIGNALS $ | | 1. Main Track  2. Yard  3. Industry   M   H Man  P = Primary  S = Branch   If Main  O = Crossover  P = Passing  S = Siding | Hours  0 0   Min.  0 0 |

| FRA TRACK CLASS 34 | ANNUAL TRACK DENSITY 35 | FIRST LOCO/CAR IN CONSIST FOUND DERAILED OR DAMAGED 36 | TRAIN NUMBER 37 | TIME TABLE DIRECTION 38 | TRAILING TONS 39 |
|---|---|---|---|---|---|
| | | Initial  CSXT   Number  5828   Position in Train   AAR Car Type   L=Load E=Empty   Weight (Tons) | B10602   Date | N W      E S | 389 |

| REMOTE CONTROL LOCOMOTIVE? 40 | ACTUAL SPEED 41 | TIMETABLE SPEED 42 | EQUIPMENT 43 | CABOOSE 44 | TOTAL HAZMAT CARS 45 |
|---|---|---|---|---|---|
| Switch = RC Operator 1=RC Portable Transmitter 2=RC Tower Operation 3=RC Portable Transmitter more than 1 RC Transmitter  0 | 0 MPH  E = Estimated  R = Recorded | 35 MPH  P = Permanent  T = Temporary | | Loaded  CONSISTED  3 0   Empties  DERAILED  3 0 | 1. None  2. Used  3. Not Derailed   Carrying   Derailed   Damaged   Leaking |

| PRINCIPLE/CAUSING EQUIPMENT 46 |
|---|

| Initial | Number | Position in Train | AAR Car Type | L=Load E=Empty | Weight (Tons) | END OF CAR (A or B), OR LOCOMOTIVE LEADING (F or R) | SPECIAL TRACK FEATURES |
|---|---|---|---|---|---|---|---|
| UTLX | 79130 | | 770S | L | 128 | FIRST WHEEL TO DERAIL   L=Load R=Right   Wheel Height | 1. None  6. Curve  2. Tunnel or Crossover  7. Insulated Joint  3. Crossing Diamond  8. Bridge Approach  4. Roll-Highway Grade Crossing  9. Other - Explain in Remarks  5. Tangent  0 |
| | | | | | | WHEEL ACTION:  1. Climb  3. Drop In  2. Lift  4. Unknown | DISTANCE FROM POINT OF DERAILMENT TO REST (FEET) |

| LOCOMOTIVES 47 | | | | | | | | H W X R Y | | | | | H W X R Y | | | | | H W X R Y |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| INITIAL | NUMBER | | | | | INITIAL | NUMBER | | INITIAL | NUMBER | | | | | | | | | |
| 1. CSXT | 5828 | H | W | K | | 4. | | | 7. | | | | CODES  H = Head End  M = Mid-Train  R = Rear End   W = Working  P = Offline   Y = Derailed  N = Not Derailed  X = Damaged, Not Derailed | | | | | | |

**REMARKS (DESCRIBE THE ACCIDENT) - PLEASE PRINT** 48

HAND BRAKE ON UTLX 79130 FAILED to stop
3 cars. As cars ran away on grade, engineer made the decision to
help fellow employee on moving cut. Engineer ran down cars and
coupled at an excessive speed damaging front end of engine

CONTINUE ON REVERSE SIDE
(OVER)

CONFIDENTIAL

D-000582

CSXT 5828. CAR # UTLX 79130 WAS found to have
handbrake linkage pin binding on leading axle
of BEND Not Allowing handbrake to fully apply.
Engineer felt he had to take emergency actions
to save life and property. Conductor Failed
to properly test hand brakes.

CONFIDENTIAL

D-000583

**TRAIN CREW INFORMATION** 4B

| | LAST NAME | FI | MI | ID NUMBER | Hours on Duty Hrs. Min. | # Consecutive Days Worked | Hours off prior to tour of duty | Tox Test 1=Yes 2=No | Drug Test 3=FRA 2nd agreement | Urine Sample 1=Yes 2=No | Blood Sample 1=Yes 2=No |
|---|---|---|---|---|---|---|---|---|---|---|---|
| ENGINEER | GRAVLEY | ED | | 199611 | 7 30 | 2 | 13 | 2 | | 2 | 2 |
| CONDUCTOR | HOWELL | TB | | 577119 | 7 30 | 6 | 13 | 2 | | 2 | 2 |
| TRAINMAN | | | | | | | | | | | |
| OTHER (e.g. trainee) | | | | | | | | | | | |
| OTHER (e.g. trainee) | | | | | | | | | | | |

## HUMAN FACTOR SECTION
* IF EITHER CAUSE CODE IN FIELD 24 IS A HUMAN FACTOR CODE, COMPLETE THE FOLLOWING

The railroad has **determined** (check only one): 50

[X] a. One or more railroad employees was a primary or contributing cause of the accident.

[ ] b. One or more railroad employees was not a primary or contributing cause of the accident.

[ ] c. It is uncertain whether one or more railroad employees was a primary or contributing cause of the accident.

If item "b" or "c" was checked, go to the last field on the form (field 54).
If item "a" was checked, complete field 51.

The railroad has **identified** (check only one): 51

[ ] 1. All the railroad employees who were a primary or contributing cause of the accident.

[ ] 2. Some, but not all of the railroad employees who were a primary or contributing cause of the accident.

[ ] 3. None of the railroad employees who were a primary or contributing cause of the accident.

If item "3" was checked, go to the last field on the form (field 54).
If item "1" or "2" was checked, complete fields 52, 53, 54.

IF ITEM "1" or "2" WAS CHOSEN IN FIELD 51, COMPLETE THE FOLLOWING FOR EACH EMPLOYEE IDENTIFIED AS A PRIMARY OR CONTRIBUTING CAUSE OF THE ACCIDENT: (ATTACH ADDITIONAL PAGES IF NEEDED) 52

| Last Name | FI | MI | ID Number | Job Title | Employing RR Code | Cause Codes Primary | Contributing | Did this employee die as a result of the accident? YES | NO |
|---|---|---|---|---|---|---|---|---|---|
| GRAVLEY | ED | | 199611 | Engineer | CSXT | H301 | H604 | | X |
| HOWELL | TB | | 577119 | Conductor | CSXT | H025 | E01C | | X |

DESCRIBE WHY THE EMPLOYEE WAS A PRIMARY OR CONTRIBUTING CAUSE OF THE ACCIDENT - PLEASE PRINT 53

REPORT PREPARER INFORMATION - PLEASE PRINT 54

| Last Name | FI | MI | ID Number | Job Title | Area Code | Phone Number | Report Date and Signature |
|---|---|---|---|---|---|---|---|
| KENT | WE | | 179612 | Trainmaster | 770 | 2076920 | W. Gary Kent 2/6/06 |

## INSTRUCTIONS FOR PREPARATION OF DERAILMENT/ACCIDENT REPORT, FORM REO

01. Accident number is generated by RAIS.
02. Enter date and time of the accident occurrence.
03. Enter code(s) to indicate the type of accident.
04. Enter code to indicate weather conditions at the time of occurrence.
05. Enter code to indicate visibility at the time of occurrence.
06. Enter temperature and code to indicate above or below zero.
07. Enter code to indicate a.p.m./p.m. time is indicated.
08. Enter total number of people occupied, if more, enter zeros.
09. Enter code to indicate whether billable; if yes, to whom billable.
10. Enter code to indicate whether accident occurred in USA.
11. Enter the state where the accident occurred.
12. Enter the county where the accident occurred.
13. If accident occurred in a terminal, enter the terminal code from Terminal Yard Management System (TYMS).
14. Enter nearest station as found in the timetable.
15. Enter the city and ZIP code where the accident occurred.
16. Enter alphabetical Division Code (refer to Timetable).
17. Enter alphabetical Subdivision Code (refer to Timetable).
18. Enter milepost location to nearest tenth of a mile. If accident was on industry track, enter nearest railroad milepost.
19. If accident occurred at Mechanical location, enter appropriate code.
20. Enter RAIL Code for the accident location.
21. Enter track name or number. If accident occurred in a terminal, use the track number code from the TYMS.
22. If other railroad or industry involved, enter railroad or industry name.
23. Enter railroad or industry responsible for track maintenance.
24. Enter cause codes from CSX Cause Finding Manual.
25. Enter code to indicate the type of accident being reported. If more than one accident is involved, RE5 required for each (Consist" also pertains to a single piece of equipment). If coupled RF, Form HS-3 RINS is also required.
26. Enter code to indicate type of equipment.
27. Enter code to indicate FRA reportable.
28. Enter code(s) to indicate method(s) of operation.
29. Enter code to indicate if on-track equipment was attended.
30. Enter code for type of track. If track is Siding, add total code to indicate.
31. Enter estimated damage to CSX equipment and infrastructure.
32. Enter estimated damage to other railroad or industry.
33. Enter code for type of track. If track is Siding, add total code is required.
34. Enter amount of time main track was obstructed, if not obstructed enter zeros.
35. Enter FRA track class (see FRA Guide Chapter 7, pages 6-7).
36. Enter annual track density (X: Gross, Mainway table).
37. Enter information for equipment. This should be the first loco or car in the consist found derailed or damaged once the consist has come to rest.
37. Enter trainyard job number.
38. Place "X" mark in appropriate square to indicate direction of movement.
39. Enter braking time in consist.
40. Enter code for type of operational manual or RCO.
    NOTE: CSXT does not utilize RC Tower Operators.
41. Enter actual speed at time of accident and code for whether the speed was estimated or recorded.
42. Enter authorized maximum speed at time of accident and code for whether the speed that was permanent or temporary.
43. Enter number of locos that applied in consist and how many derailed if cars derailed enter zero.
44. Enter information for caboose, if no caboose enter "none".
45. Enter the number of cars in consist transporting hazardous materials and if any derailed, damaged, and/or in siding if none enter zeros.
    NOTE: If hazardous occurs, MUST provide car number and hazmat contents, STCC Number and how much leaked for each car, UEDs records read.
46. Enter information for rail-sign-carrying equipment involved in accident.
47. Enter information for all locomotives in consist.
48. Enter train crew and fuel test information.
49. Enter train crew and fuel test information.
50. If cause code is Human factor Code, complete this field.
51. If other cause code is Human factor Code, complete this field.
52. If either cause code is Human factor Code, complete this field.
53. If other cause code is Human factor Code, complete this field.
54. Enter report preparer information, date and sign as required.

CONFIDENTIAL

D-000584

  

small



To Whom It May Concern:

In reference to the 1st letter that was written about the FRA violation dealing with the
time tickets at Mobile, Alabama. Alan Snapp has made the statement that this issue is
dead. And he has stated that he did not get caught and laughed about it. If you want
proof that he knew what the crews were doing, just come ask. Every crew and every shift
was doing it under his instructions. There is a lot of incorrect data reporting going on.
For example, Ray Billingsley and efficiency testing. A crew, the Y10217 on March 17,
2006 put off at 1130. Ray Billingsley is showing that he tested that crew at 1458. Now
how is this possible? How can you observe a crew that is not there? This is not fair to
us!!!! If we are going to be put under a microscope, then he should be too. This is just the
tip of the ice berg. Alan Snapp has doctored the books long enough. He is the one that
has stolen from this company. Please investigate and interview everyone. He is still
having us sit around after the work is done, sometimes 3 and 4 hours. We are not
allowed to put off until after 7hr 30min. He has stated that the early quits will come back
after this blows over. Please, the employees at sibert need a better leader than Alan
Snapp!!!!!!!!!

Respectfully

CSX Employees

Cc: Michael Ward
    Tony Ingram
    Federal Railway Administration
    Debroah York
    T. M. Pendergrass
    R. S. Workman

CONFIDENTIAL

D-000593

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

Ronald A. Hollon, Sr.,                 )
                                       )
        Plaintiff,                     )
                                       )
v.                                     )        Civil Action No. 2:06-CV-1099-WKW
                                       )
CSX Transportation, Inc.,              )
                                       )
        Defendant.                     )

## DECLARATION OF MIKE PENDERGRASS

I, Mike Pendergrass, do hereby swear and affirm as follows:

1.      I am over 21 years of age and fully competent to make this Declaration. I make this Declaration of my own personal knowledge and for any uses allowed by law.

2.      I am Vice President of CSX Transportation, Inc.'s ("CSXT") Southern Region. CSXT is a railroad transportation company operating in the Eastern United States and Canada. Like other commercial railroads in the United States, CSXT is subject to regulations promulgated by the Federal Railroad Administration ("FRA").

3.      In early June 2006, I was informed by Rod Workman, at that time the Division Manager of CSXT's Atlanta Division, about an incident involving falsification of an FRA-regulated document by two management employees in Montgomery, Alabama – road foreman of engines T.J. Dean and terminal trainmaster Ron Hollon. At my request, an internal investigation regarding the incident was launched by Rodney Saunders, at that time the Senior Road Foreman of Engines for the Atlanta Division. Mr. Saunders prepared an investigative memo that included written statements submitted by Mr. Hollon and Mr. Dean. Based on my review of Mr. Saunders' investigation, I determined that, on May 19,

2006, Mr. Dean requested that Mr. Hollon sign his (Dean's) name to an FRA-regulated remote control operator's ("RCO's") certification card. By doing so, Mr. Hollon falsely certified that Dean had given an operational monitoring test to an RCO, as required by applicable FRA regulations, even though at the time that Mr. Hollon signed the card no such observation had taken place. Because of their admitted unethical behavior, I determined that Hollon and Dean should be demoted from their positions as CSXT company officers, due to their conspiracy to falsify an FRA document.

4.    In March 2006, CSXT posted a vacancy for a Terminal Manager position in Montgomery, Alabama. The Montgomery terminal is part of the Atlanta Division, which is within CSXT's Southern Region. The Terminal Manager is the company officer responsible for all aspects of the terminal's operations. In 2006, candidates for positions within the Atlanta Division were screened and selected for interview by Assistant Division Manager David Hamby. Mr. Hamby's recommendations were then reviewed by Mr. Workman. Workman, in turn, made a recommendation to me. I am ultimately responsible for all management hiring decisions within the Southern Region.

5.    Jason Tipton was considered the best candidate by Mr. Hamby and was recommended to me by Mr. Workman. I approved the selection of Mr. Tipton for the position because of Mr. Tipton's superior qualifications, including his educational background, the diversity of his experience in other positions at CSXT and at other geographic locations, and the particular skills that I believed he could bring to the position in question. Specifically, Mr. Tipton had previously been a Terminal Manager in Mobile, Alabama and was an Assistant Terminal Superintendent in Atlanta at the time that he applied for the Terminal Manager position in Montgomery. Mr. Tipton also has a

bachelor's degree in business and management, as well as an MBA. The Montgomery Terminal Manager position was a lateral move for Mr. Tipton but would have been a promotion for Mr. Hollon. A copy of Mr. Tipton's 2006 resume from CSXT's files is attached to this declaration as Exhibit A.

6.      In April 2006, CSXT also posted a vacancy for an Assistant Terminal Superintendent position in Atlanta, Georgia. The process of filling this position was similar to that followed for the Montgomery Terminal Manager position. David Hamby and Rod Dunlap, Terminal Superintendent in Atlanta, interviewed various candidates and made a recommendation to Rod Workman. Mr. Workman in turn made a recommendation to me. In this case, Mr. Hamby, Mr. Dunlap, and Mr. Workman both recommended Danny Spencer for this position. However, I selected Terry Walton for the Atlanta Assistant Terminal Superintendent position because of his superior qualifications, including his educational background, the diversity of his experience in other positions at CSXT and at other geographic locations, and the particular skills that I believed he could bring to the position in question. Specifically, Mr. Walton was formerly an officer in the United States Marine Corps and is a veteran of Operation Desert Storm. He previously held positions at CSXT as the managing director of mechanical operations and the director of process improvements for the Jacksonville Division. He also has a bachelor's degree in engineering from the U.S. Naval Academy and an MBA. Although I was not aware of Mr. Walton's age at the time that I selected him for the position and I did not consider any applicant's age when making a decision, I understand that CSXT's records list his date of birth as August 5, 1961. A copy of Mr. Walton's resume from CSXT's files is attached to this declaration as Exhibit B.

7.     Mr. Hollon's prior experience in union jobs was not a factor that I would have considered for any of these positions. In my opinion, an applicant's prior experience in union jobs is relevant only for initial promotions to a management position, not for subsequent promotions. For subsequent promotions to management positions, only an individual's prior managerial experience is considered.

8.     Until Mr. Hollon gave his charge of discrimination to Rod Workman and Jack Frost on the day they informed him of his demotion, I was not aware of any complaints of age discrimination that Mr. Hollon had against CSXT. I am not aware of any conversations that he may have had with other CSXT employees regarding the company's hiring or promotion practices.

9.     While demotion from a management position is not a per se disqualification from future promotions, I consider it a substantial negative factor for some time after the demotion. That is particularly true in a situation, such as the demotions of Mr. Hollon and Mr. Dean, where the demotion was based on unethical behavior. I am not aware of any positions to which Mr. Hollon has applied since his demotion. Although I approve or disapprove candidates for promotion in the Southern Region, I do not get involved in assessing every person who applies. If Mr. Hollon has applied for any positions within the Southern Region since his demotion, I have not reviewed his candidacy for any of those jobs.

Pursuant to 28 U.S.C. § 1746, I swear under penalty of perjury that the foregoing is true and correct.

Executed this _28_ day of November, 2007.

_Mike Pendergrass_

**JASON TIPTON**
**2853 LOST LAKES WAY**
**POWDER SPRINGS, GEORGIA 30127**
**770-943-9004 HOME**
**678-622-8988 CELL**
**Jason_Tipton@csx.com**

## SUMMARY OF QUALIFICATIONS:

A proven transportation leader with experience developed though multiple positions with CSX ranging from the coalfields of West Virginia to a major processing terminal in Atlanta, Georgia. A visionary with the ability to improve operations while working within corporate policies, budget constraints and union contracts. Able to establish rapport and credibility with diverse groups ranging from union members to board members to multi-million dollar customers.

## EDUCATION AND TRAINING:

M.B.A., University of South Alabama - Mobile, Alabama GPA 3.31
B.S., Business & Management, University of South Alabama - Mobile, Alabama GPA 3.33
HAZMAT Sentinel Training, CSX, Pueblo, Colorado 2005
Key Factor Analysis Training, CSX, Mobile, Alabama 2003
Advanced Terminal Management Program, CSX, Jacksonville, Florida 2002
Train Accident Prevention & Analysis Training, CSX, Atlanta, Georgia - 2000

## PROFESSIONAL SUMMARY:

CSX Transportation
Assistant Terminal Superintendent, Atlanta, Georgia (2004 current)
Leadership of a Safety Committee and process that reduced FRA reportable injuries in Atlanta by 75% for 2005
Responsible for efficient and effective service to 32 customers in the Atlanta Terminal
Leadership and management of Atlanta Terminal that has continually ranked in the top 5 terminals in the Out of the Park terminal competition
Managed and coordinated operations thru the 2004 One Plan change.
Management, motivation, scheduling and evaluation of 5 officers and 20 contract supervisors
Involvement in education of new hire conductor trainees in coordination and supervision of a full time conductor mentor

Terminal Manager, Mobile, Alabama ¿ (2001 ¿ 2004)
Developed and implemented an aggressive safety action plan utilizing increased involvement and buy-in of all contract employees
Developed a yard matrix process for the Mobile terminal to insure switching efficiency and cost effectiveness
Education of employees in operational and safety rules though the Safety Leadership Process and operational testing
Coordination with class 1 railroads for safe and efficient handling of traffic though interchange

EXHIBIT
A

D-000350
CONFIDENTIAL

Development of subordinates into future management leaders with CSX

Trainmaster, Flomaton, Alabama (2000 2001)
Developed an aggressive operational process that maximized customer service and minimized cost for the M&M and PD subdivisions
Responsible for efficient management of the July 4, 2001 Engineering (Jamboree) on the M&M and PD subdivisions including the prep work and positioning of 3 miles of rail and over 100,000 cross ties.

Trainmaster, Columbus, Ohio  (1999  2000)
Developed an operational process to insure improved customer service and reduced cost while maintaining a safe operation on the Columbus subdivision
Managed the training of 76 new hire conductor trainees during a 6 month hiring blitz on the Columbus Subdivision
Launched the transportation planning and operation for the Conrail (DAY 1) merger for the Columbus terminal and subdivision

Assistant Trainmaster, Richmond, Virginia  (1997- 1999)
Provided save and efficient handling of all traffic on the Riavanna, Piedmont and Peninsula subdivisions including Fulton Yard
In-depth coordination with 3 separates divisions, (the C&O business unit, Baltimore Service Lane and Florence Service Lane) in making tactical decisions in order to maximize customer service, corporate safety and minimize costs

Yardmaster, Huntington, West Virginia  (1996-1997)
Directed safe, efficient and timely disposition of traffic in the South Charleston, Peach Creek, Hinton, Elk Run and Quinimont yards

## PROFESSIONAL SKILLS:

Complete understanding of CSX rail network, line capacity and inventory management
Expertise in handling multi-million dollar customers and customer issues
Experience in educating, training and if needed, implementation of the process improvement policy for managers
Expertise in Performance Managements four phases to conduct a comprehensive review and critique of direct reports
Experience in managing the training process of new hire conductor trainees
Extensive derailment experience including FRA reportable, mainline, yard and industry
Complete understanding and usage of the IDPAP and SLP processes
Complete involvement and understanding of current Atlanta Division Safety Overlap Process
Comprehensive ability in handling personal injuries
Working knowledge of labor / union contacts and agreements including L&N, SCL, AJT, C&O Proper, B&O and RF&P agreements
Computer skills / literate in Window and PC systems and comprehensive knowledge of CSX Mainframe applications, CSX Gateway, NOW workstation and transportation workstations

D-000351
CONFIDENTIAL

TERRANCE B. WALTON
520 N. Bridgestone Ave.
Jacksonville Fl. 32259
(904) 287-9975 terry_walton@csx.com


DESCRIPTION:    · Proven leader with a history of success at various positions and
levels of management.

· XPERIENCE:
6/03 ¿ Present: DIRECTOR PROCESS IMPROVEMENT, Jacksonville, FL
·    . Successfully aided various terminals to improve their on time originations, RCRT,
dwell and ODTOD.
       Provided STP/YOP training for terminal management teams on the Florence
division.
·      Managed improvement projects that reduced lease locomotive OOS and
implemented CSXT locomotive Bad Actor program.

2/01 ¿ 6/03:    MANAGING DIRECTOR MECHANICAL OPERATIONS, CSX
Transportation, Jacksonville, FL
·      Managed three supervisors in the daily handling of mechanical locomotive and
. car issues throughout the CSX network.
·      Coordinated effort between the mechanical shop network and locomotive
operations.

9/97 ¿ 2/01:       PLANT MANAGER, CSX Transportation, Waycross, GA.
·      Provide leadership/organization for 21 supervisors/450 contract employees.
·      Implemented improved Maintenance Process at Waycross shops.
·      Responsible for the safe, cost effective maintenance of 1,049
       · Locomotives (60% GE, 40% EMD) assigned to Waycross.

    5/96 ¿ 9/97:       MANAGER OF PRODUCTION, CSX Transportation,
Waycross, GA.
·      Provided leadership for the safe, quality, cost effective maintenance and repair of
CSXT locomotive fleet as shift supervisor in Locomotive Shop.

    7/84 ¿ 5/96:       CAPTAIN U. S. MARINE CORPS,
·      Executive Officer Recruiting Station-Planned and developed Recruiting structure
for 80 recruiting personnel. .
·      Division Office in Charge-Provided for the leadership of three officers and 131
enlisted personnel.
·      Supervised engineer projects that included the construction of roads, bridges,
temporary airfields, and maintained heavy const. equipment, electrical distribution
systems.
·      Led unit as part of Operations Desert Shield/Desert Storm
·      Supervised 15 Drill Instructors in the training of 1000 recruits annually.



EXHIBIT
B

D-000448
CONFIDENTIAL

EDUCATION:          MBA (Master of Business Administration) Webster
University 2003
BS General Engineering, United States Naval Academy, May 1984
Certified Six Sigma Black Belt November 2004

AWARDS:          Best Locomotive Q Shop 2000, Most Improved Locomotive Q
Shop 1998
Eastern Collegiate Boxing Champion, All American Boxer 1984

REFERENCES:          Available upon request.

D-000449
CONFIDENTIAL

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA**
**NORTHERN DIVISION**

| | | |
|---|---|---|
| Ronald A. Hollon, Sr., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 2:06-CV-1099-WKW |
| | ) | |
| CSX Transportation, Inc., | ) | |
| | ) | |
| Defendant. | ) | |

<u>**DECLARATION OF ROD WORKMAN**</u>

I, Rod Workman, do hereby swear and affirm as follows:

1.      I am over 21 years of age and fully competent to make this Declaration. I make this Declaration of my own personal knowledge and for any uses allowed by law.

2.      I am currently the General Manager of Operating Rules and Practices at CSX Transportation, Inc. ("CSXT"). Prior to holding my current position, I was the Division Manager of CSXT's Atlanta Division from approximately March 2005 to January 2007.

3.      In March 2006, CSXT posted a vacancy for a Terminal Manager position in Montgomery, Alabama. The Montgomery terminal is part of the Atlanta Division, which is within CSXT's Southern Region. The Terminal Manager is the company officer responsible for all aspects of the terminal's operations. Candidates for this position were screened and selected for interview by Assistant Division Manager David Hamby. After interviewing the candidates, Mr. Hamby made a recommendation to me. I then reviewed Mr. Hamby's recommendations and made my own recommendation to Mike Pendergrass, Vice President of the Southern Region. Mr. Hamby indicated to me that he considered

Jason Tipton the best candidate for the Montgomery Terminal Manager position and I concurred. Ultimately, Mr. Pendergrass selected Mr. Tipton for the position in question.

6.      In April 2006, CSXT also posted a vacancy for an Assistant Terminal Superintendent position in Atlanta, Georgia. The Atlanta Assistant Terminal Superintendent position is also a position within the Atlanta Division, and the process of filling this position was similar to the one used for filling the Montgomery Terminal Manager position. Mr. Hamby and Bill Dunlap, Terminal Superintendent in Atlanta, selected candidates for interview and made recommendations to me. I reviewed their recommendations. Mr. Hamby and Mr. Dunlap recommended Danny Spencer. I agreed with this recommendation and in turn recommended Mr. Spencer to Mr. Pendergrass. However, Mr. Pendergrass selected Terry Walton, another applicant, for the Assistant Terminal Superintendent position in Atlanta.

7.      I understand that, in the spring of 2006, CSXT also posted a vacancy for an Assistant Manager of Customer Operations position in Jacksonville, Florida. That position is within CSXT's customer operations group, which is separate from both the Atlanta Division and the Southern Region. I have never had any responsibility over the customer operations group and I had no role in selecting candidates for that position.

8.      Until Mr. Hollon handed me his draft EEOC charge when I met with him on June 19, 2007 to inform him of his demotion, I was not aware of any complaints of age discrimination that Mr. Hollon had against CSXT. On one occasion, Mr. Hollon sent me an e-mail inquiring about how he could improve his chances of growing with the company. I did not construe this e-mail as a complaint by Mr. Hollon. Other than this e-mail, I do not recall any communications between Mr. Hollon and me about CSXT's hiring or

promotion practices, nor am I aware of any conversations that he may have had with other CSXT employees regarding the company's hiring or promotion practices.

11.     Mr. Hollon was demoted in June 2006 and I am not aware of any positions to which Mr. Hollon has applied since that time.

Pursuant to 28 U.S.C. § 1746, I swear under penalty of perjury that the foregoing is true and correct.

Executed this 27 day of November, 2007.

Rod Workman

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| Ronald A. Hollon, Sr., | ) |
| Plaintiff, | ) ) |
| | ) **Civil Action No. 2:06-CV-1099-WKW** |
| v. | ) ) |
| CSX Transportation, Inc., | ) ) |
| Defendant. | ) |

### DECLARATION OF FRANK LEYHEW

I, Frank Leyhew, do hereby swear and affirm as follows:

1.  I am over 21 years of age and fully competent to make this Declaration. I make this Declaration of my own personal knowledge and for any uses allowed by law.

2.  I am currently an employee of CSX Transportation, Inc. ("CSXT"). In 2006, I held the position of Manager Professional Recruiting for CSXT. In that role, I was involved in the process of recruiting and hiring individuals for various management positions.

3.  According to company records, in April 2006, Ron Hollon applied for a Trainmaster position in Pensacola, Florida. As part of the application process, my colleagues and I screened applications to determine which applicants should be interviewed for various management positions. When we determined that an applicant would be invited to interview for a position, an administrative employee would be assigned the task of contacting the applicant to schedule an interview. The administrative employee would then notify me of the applicant's availability.

4.      Although Mr. Hollon was selected for an interview, according to company records, I was notified that he did not respond to the interview request before the deadline. A copy of that record is attached as Exhibit A. Because he did not respond, he was not interviewed and, therefore, was not considered for the Pensacola Trainmaster position. If Mr. Hollon did not receive the interview invitation, I was not aware of that fact.

Pursuant to 28 U.S.C. § 1746, I swear under penalty of perjury that the foregoing is true and correct.

Executed this 30th day of November, 2007.

Frank Leyhew

## Leyhew, Frank

| | |
|---|---|
| **Subject:** | Trainmaster Interviews (req #016101) |
| **Location:** | Phone |
| **Start:** | Tue 5/2/2006 9:00 AM |
| **End:** | Tue 5/2/2006 1:00 PM |
| **Recurrence:** | (none) |
| **Meeting Status:** | Accepted |
| **Required Attendees:** | Gefon, Dina; Frulla, Bob Jr.; Miller, Jeff; Leyhew, Frank |

| | | |
|---|---|---|
| 9:00am | Bill Setser | 904-214-9534 |
| 9:45am | Ken Williams | 205-620-0978 |
| 10:30am | Jerry Holzworth | RNX291-4142 |
| 11:15am | OPEN-waiting for Ron Hollon (will update) | |
| 12:00pm | OPEN-waiting for Stephen Miskimens (will update) | |

Bob Frulla - Division Manager Jacksonville Division
Rnx - 426-6766

Jeff Miller - Superintendent Line of Road
Jacksonville Division

EXHIBIT A

D-000427
CONFIDENTIAL

1

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| Ronald A. Hollon, Sr., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 2:06-CV-1099-WKW |
| | ) | |
| CSX Transportation, Inc., | ) | |
| | ) | |
| Defendant. | ) | |

## DECLARATION OF REBECCA CALLAHAN

I, Rebecca Callahan, do hereby swear and affirm as follows:

1.    I am over 21 years of age and fully competent to make this Declaration. I make this Declaration of my own personal knowledge and for any uses allowed by law.

2.    I am the Director Executive Recruiting in CSX Transportation, Inc.'s management staffing department. In that role, I have responsibility for supervising and managing employees who post management job openings on the company's intranet.

3.    CSXT uses a PeopleSoft program called "E-Recruit" to manage the process of filling management job openings. When a management job opening is posted at CSXT, the E-Recruit system assigns a requisition number for the job opening. For positions with multiple openings, the company clones a requisition as only one person can be hired per requisition. When the requisition is cloned, it takes on all the properties of the original requisition. Since requisitions are usually programmed to be posted for 7 days, a human resources employee must manually adjust the cloned requisition in the "E-Recruit" program so that the requisition does not continue to be posted. Until the cloned requisition is adjusted, it is posted on the company's intranet and available to be viewed by

employees. When requisitions are cloned because there are multiple openings, the cloned requisitions do not necessarily reflect unfilled positions and the company does not intend for applicants to apply for those cloned requisitions.

4.    I have reviewed the company's file regarding an Assistant Manager of Customer Operations position in Jacksonville, Florida that was assigned a requisition number of 015462. Because two openings were available in that position, the company hired two individuals for that position – Aldred Odom and Timothy Grayson – from the pool of applicants who applied for the posting assigned requisition number 015462. After the hiring decisions had already been made, requisition no. 015462 was cloned and was assigned a requisition number of 015882. Ron Hollon appears to have applied for this position on March 10, 2006 during the short period of time that the cloned requisition was being adjusted in the "E-Recruit" program. The position was never intended to be posted on March 10, 2006, as the position had already been filled.

5.    CSXT's records regarding the Assistant Manager of Customer Operations position include the resumes of Mr. Odom and Mr. Grayson. In their respective resumes, both Mr. Odom and Mr. Grayson indicated that they were proficient with various computer systems related to the assistant manager of customer operations position. Copies of Mr. Odom's and Mr. Grayson's resumes from CSXT's files are attached to this declaration as Exhibits A and B.

Pursuant to 28 U.S.C. § 1746, I swear under penalty of perjury that the foregoing is true and correct.

Executed this 30 day of November, 2007.

Rebecca Callahan

1169 Emily's Walk Lane W. Jacksonville, Fl 32221
(904) 693-4842H (904) 226-4714 C
Al_Odom@CSX.com

Alfred T. Odom

Objective

To be an important part of the changes taking place at CSX, playing a larger role in the
evolution of this company. Confident in my skills to help CSX grow, I feel that I can add
to CSX¿s diversified portfolio of effective leaders.

Education

Bachelor of Science in Business Administration University of Phoenix    Jacksonville, FL
65 of 110 Credit hours completed.  GPA 3.87

Summary of qualifications
·An effective communicator, motivator, and mentor.  Proactively trained over 4,000
conductors to use the OBWO device during implementation initiative.
·15 years of experience working extensive hours, intensive travel and working on call.
Travel the entire CSX system for 22 months to implement the Onboard System.
·15 years of experience in air and ground transportation.  Departments include but not
limited to Administrative, Customer Service, Management, Training, Career Counselor,
Transportatioan and Mechanical Operations, Accounting, and Quality Assurance.
·Strong analytical, organization and planning ability.
·Disciplined Manager with Leadership skills.  As Administrative Office Manager of US
Navy- managed, evaluated and disciplined staff of 23 plus personnel.
·Extremely physically fit.  Required as conductor to walk three to five miles daily on
uneven railroad ballast.
·9 years of familiarity on Jacksonville Division railways as a Conductor, Engineer,
Remote Control Operator.
·Thorough understanding in FRA, CSX operating rules, and UTU and BLE contract.
·Highly proficient prioritizing and organizational skills.  Lauded by senior management
for proactively developing and managing personnel schedule that resulted in improved
personnel moral and proved cost effective to annual budget.
·Consistently selected by senior management to lead in more challenging supervisory
positions.
·Highly proficient with computers.  Working knowledge of CSX mainframe- STEPS,
AEI Studio, Cops, Car and Train, Yard System, OBWO, IIDS, TCIS, etc..
·Active Toast Masters Member.

Work experience



EXHIBIT
A

D-000292
CONFIDENTIAL

02/03 ¿ Present        CSX Transportation, OBRS Field Implementation Team
        Conductor Trainer
·Investigate, research and evaluate onboard computers and equipment for swift attention
from proper technology department or replacement if necessary.  Reduced replacement-
shipping cost by 35 percent in 2005.
·Advise technology department during testing and design phase of OBWO POD course
and device on enhancements that will reach 10,000 untrained conductors.
·One of three conductors that man the OBWO Help Desk to handle CSX employee
questions about car movements and procedural steps in using the OBWO device and
Dashboard application.
·Collateral duties include- Managing personnel schedule for onboard desk, research and
follow-up technical discrepancy tickets with TCIS, track onboard shipments, etc.
·Evaluate and investigate conductor noncompliance while advising and assisting terminal
managers in reaching their compliance goals.
·Leadership and presentation skills used during field implementation classroom training
sessions.  Increased conductor logon compliance with OBWO jobs from 67 percent in
2004 to 95.0 percent in 2005.
Handle work order profile issue.


06/02 ¿ 02/03  CSX Transportation, FRA Certified Remote Control Operator
·One of the first three Locomotive Engineers in Jacksonville to be Licensed and Certified
by FRA to operate CSX RCO engines.
·Performs Daily Inspections on CSX Locomotives.
·Safely operates remote control engines in daily yard operations with zero incidents.08/97
¿ 02/03CSX Transportation, FRA Certified Locomotive Engineer
·Safely Expedites CSX Intermodal, Coal, Mix Freight and Hazardous Unit Trains to
destinations over the Jacksonville Terminal with zero incidents.
·Performs Daily Inspections on CSX Locomotives.
·Trains new hire Engineers to safely operate Trains over the Jacksonville Terminal in
Road and Yard Operation.

08/97 ¿ 02/03        CSX Transportation, Yard Conductor and Foreman
·Safely, accurately and effectively handles cars in yard classification operations.
·Maintains customer focus while working hand-in-hand with CSX customers to resolve
issues in industrial switching operations.
·Trains new hire conductors, brakemen and switchmen.

08/90 ¿ 08/97        United States Navy, Supervisor Mechanical OPS·  Office
manager for Intermediate Maintenance Department.
·Handled $15 Million Shipping and Receiving Fiscal Budget for power plants
department.
·Coordinates and prioritizes issuing of Intermediate Level Maintenance for Aircraft,
Aeronautical and Personal Protective Equipment (PPE) at NAS Jacksonville.
·Manages Mechanical Accounting, Logs and Records.
·Proactively works to resolve customer issues.

D-000293
CONFIDENTIAL

9916 Wiltshire Manor
Riverview, FL 33569
Phone (813) 546-0175
Chad_Grayson@csx.com

T. Chad Grayson

Objective

\sst Mgr Customer Operations (Job Posting Number 015462)
Education     1998 - 1999   Darton College           Albany, GA 1994 ¿ 1998
Cairo High School                        Cairo, GA·                          High
School Diploma

Summary of qualifications

·Highly customer focused with extensive internal and external customer service
experience. Highly proficient with computers.  Working knowledge of STEPS, AEI
Studio, Yard System, OBWO.
·Demonstrated Commitment to Safety with a perfect safety record for past 4 years.
·Dedicated to Teamwork.  Collaborated efforts helped increase conductor log on
compliance with OBWO jobs to 90.7 percent 2005 from 83.5 percent in 2004 and 72
percent in 2003.
· Created buy-in and overcame resistance to technology and change during field
implementation of the On Board Work Order reporting system in group, individual, and
OJT training sessions.
·Supported CSX company initiatives to improve the accuracy, completeness, and
timeliness of data reporting coming in from the field.
·Exemplary problem solving skills as Subject Matter Expert on the On Board Work Order
Help Desk.
·Effective written and oral communication skills.
· Superb analytical and problem solving skills.
·Thorough understanding in FRA, CSX operating rules, and UTU contract.

Work experience

Mar 04 ¿ Present      CSX Transportation, OBRS Help Desk
·Evaluated On Board computers and equipment for swift attention from the proper
communications department or replacement if necessary, reducing replacement shipping
cost by 35 percent in 2005.
·Increased work order instruction reporting percentages from 67 percent in 2004 to 89.0
percent in 2005.
·One of three conductors that man the OBWO Help Desk to handle CSX employee
procedural training on the OBWO device, field questions about car movement events,
and instructed officials on the use of the OBWO Siebel Dashboard to review
measurements.

EXHIBIT
B

D-000058
CONFIDENTIAL

·Handle conductor non-compliance issues while advising and assisting terminal managers to reach their compliance goals.
·Researches and handles onboard computer issues in support of the warehouse.
.Apr 03 ¿ Mar 04      CSX Transportation, OBRS Field Implementation Team
Conductor Trainer
·Proactively trained over 4,000 conductors to use the OBWO device during implementation initiative.
·Advises technology department during test phase of device enhancements to improve functionality and design of OBWO device.
Handle conductor non-compliance issues while advising and assisting terminal managers to reach their compliance goals.
·Investigates and handles onboard computer issues.

May 02 ¿ Apr 03      CSX Transportation, Road Conductor
·Safely, accurately and effectively moved trains from one destination to another with a perfect safety and accident record.
·Maintains customer focus while working hand-in-hand with CSX customers to resolve issues in industrial switching operations.
·Trains new hire conductors, brakemen and switchmen.

June 98 ¿ Apr 02      Knight Equipment, Parts Department  ·

Converted Half a Million Dollars of parts from paper to computerized inventory control system.
·Maintain and control parts inventory.
·Handle shipping and receiving for heavy equipment.
·Insure completion of shop work orders
·Minor hydraulic equipment repair.

Other Training

·CSX Operating Rules Certified.
·FRA Certified
·Hazmat Safety Training

References

Rodney Barber- Supt Field OPS Coordination (work 279-5363)
Otis Foltz- Manager Field Implementation (work 279-4218)
Neal Sharpton- Manager Customer Support (work 279-7345)
Brent Humber- Trainmaster (cell 622-6790)
Danny Hammond- Manager Customer OPS (cell 904-813-5308)

D-000059
CONFIDENTIAL